**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------------x

MUSAIB ISMAILOVYCH ISMAILOV and AKHMED
HADZHYIOVYCH BILALOV,

               Plaintiffs,

       -v-

MYKHAILO SAFARBEKOVYCH HUTSERIEV,
STANISLAV KOSTIANTYNOVYCH KUZNETSOV,
and PUBLIC JOINT STOCK COMPANY
"SBERBANK OF RUSSIA,"

               Defendants.

-----------------------------------------------------------------------x

Civ. No. 1:24-cv-03287-AT

**PLAINTIFFS' FIRST AMENDED COMPLAINT FOR THE
RECOGNITION AND ENFORCEMENT OF A FOREIGN JUDGMENT**

Plaintiffs Musaib Ismailovych Ismailov and Akhmed Hadzhyiovych Bilalov (together, "**Plaintiffs**"), by their attorneys, Seiden Law LLP, as and for their first amended complaint against defendants Mykhailo Safarbekovych Hutseriev, Stanislav Kostiantynovych Kuznetsov, and Public Joint Stock Company "Sberbank of Russia" (collectively, "**Defendants**"), allege as follows:

**NATURE OF THE ACTION**

1. This is an action to recognize and enforce a money judgment that was adjudicated and rendered by the Ukrainian judicial system against Defendants in the amount of USD $200,000,000.00.

2. Plaintiffs contracted with Defendants for the sale of ownership shares in Open Joint Stock Company "Krasnaya Polyana" ("**OJSC Krasnaya Polyana**" or the "**Company**"). Plaintiffs fully performed their obligations under the Sales Agreement (defined herein) by transferring their

1

ownership interests in the Company to Defendants.  However, Defendants failed to pay amounts owed to Plaintiffs under the Sales Agreement for these shares.  Defendants did not make a single payment to Plaintiffs and impermissibly converted Plaintiffs' shares in the Company.

3.   On March 2, 2023 and arising out of this misconduct by Defendants, Plaintiffs sued Defendants for breach of contract in Ukraine.  On May 25, 2023, a Ukrainian court issued a default judgment against Defendants and in favor of Plaintiffs ("**Default Judgment**").

4.   Under Ukrainian law and in accordance with the Default Judgment, Defendants are jointly and severally liable for the entire amount owed to Plaintiffs – USD $200,000,000.00 (two-hundred million dollars).  The Default Judgment is final and not subject to appeal.

5.   Defendants have not satisfied any portion of the Default Judgment.  Plaintiffs seek this Court's recognition and enforcement of the Default Judgment to stop this injustice.

## THE PARTIES

**A.   Plaintiffs**

6.   Plaintiff Musaib Ismailovych Ismailov ("**Ismailov**") is an individual over the age of 18, a Ukrainian citizen and resident, and, at all material times herein, a businessman who was a shareholder and owner of the Company.

7.   Plaintiff Akhmed Hadzhyiovych Bilalov ("**Bilalov**") is an individual over the age of 18, a Russian citizen and politician, a lawful a resident of New York State, and, at all material times herein, a businessman who was a shareholder and owner of the Company.

8.   Plaintiff Bilalov is currently a resident of New York, New York, residing at 200 East 61st Street, Apartment, 3D, New York City, NY 10006. Bilalov has recently been approved for a pathway to obtain his green card by the United States Department of Homeland Security, United States Citizenship and Immigration Services.

**B.      The Individual Defendants**

9.      Defendant Mykhailo Safarbekovych Hutseriev a/k/a Mikail Safarbekovich Gutseriev, a/k/a Mikhail Safarbekovich Gutseriev ("**Hutseriev**") is over the age of 18, a citizen of Russia, and a businessman.  Upon information and belief, Hutseriev owns assets located in New York, including but not limited to real property, personal and business bank accounts, and shares in corporate entities.

10.      Defendant Stanislav Kostiantynovych Kuznetsov ("**Kuznetsov**") is over the age of 18, a citizen of Russia, and a businessman.  Upon information and belief, Defendant Kuznetsov owns assets located in New York, including but not limited to real property, personal and business bank accounts, and shares in corporate entities.

**C.      The Russian State-Owned Bank: Defendant Sberbank**

11.      Defendant Public Joint Stock Company "Sberbank of Russia" ("**Sberbank**") is a public joint stock company that is registered to do business in Russia and has its principal place of business in Moscow, Russia.  Sberbank is the largest financial institution in Russia and is majority-owned by the Russian government. Sberbank holds the largest market share of savings deposits in Russia, is the Russian economy's primary creditor, and is deemed by the Russian government to be a critical financial institution.

12.      Non-Party Sberbank CIB USA, Inc. ("**Sberbank USA**"), is a U.S.-based subsidiary through which Defendant Sberbank conducts business and maintains a Manhattan, New York office.  At all relevant times, Defendant Sberbank deliberately and repeatedly routed U.S. dollar-denominated transactions through correspondent bank accounts at Sberbank USA in Manhattan.

13.      At all relevant times, Sberbank advertised itself as an international "Group" covering 20 countries with more than 11 million customers outside of Russia and identified

Sberbank USA as "the Group's corporate and investment banking business," listing its New York office as a means of contacting the Sberbank Group.

14.     At all relevant times and since 2011, Sberbank was trading Level II American Depository Receipts on the New York Stock Exchange.

15.     At all relevant times, Sberbank offered alternative depositary receipts which trade on U.S. over-the-counter markets.  In an April 2018 interview with the Financial Times, Herman Gref ("**Gref**"), the Chairman of Sberbank's executive board, boasted that at least 25 percent of Sberbank's shareholders are located in the United States and claimed that its American ownership was so substantial that "[w]e don't need lobbyists.  Our American shareholders do that for us." On information and belief, and other than the Russian government, which owns 51 percent of Sberbank, Americans were the single largest group of Sberbank shareholders.

16.     At all relevant times, Sberbank has spent hundreds of thousands of dollars on lobbying the U.S. government for the stated purpose of "assessing possible ways to address sanctions relief."

17.     At all relevant times, Sberbank and Sberbank USA provided banking and money transfer-services that allow individuals to send and/or receive money via wire transfers, including wire transfers sent from or through the United States, either to specified accounts at Sberbank or Sberbank USA or to cards issued by Sberbank or Sberbank USA.  These cards issued by Sberbank and Sberbank USA, known as "payment cards" or "bank cards," allow for the transfer of funds from one card to another or from funds in a bank account to a card.  Sberbank and Sberbank USA's banking services therefore allow individuals to provide funds, typically through an online process, to another individual's card issued by Sberbank and Sberbank USA.

18.    Sberbank and Sberbank USA profit by charging fees for certain banking services, as well charging a percentage fee for international money transfers. Sberbank and Sberbank USA also earn revenue from international transactions sent in one currency and received in a different currency.

19.    At all relevant times, Sberbank maintained correspondent bank accounts in this district in order to deliberately and repeatedly effectuate the transfer of funds in U.S. dollars. For example, Sberbank has maintained correspondent bank accounts with New York City-branches of JPMorgan Chase Bank, Citibank N.A., Bank of America, the Bank of New York Mellon, and Deutsche Bank Trust Company Americas ("**Deutsche Bank**"). To that effect and at all relevant times, Sberbank's website stated that its "Main correspondent bank for client payments in US dollars" was Deutsche Bank Trust Company Americas in "New York, NY" and that its "Principal correspondent bank for client payments and treasury operations in US dollars" was the Bank of New York Mellon in "New York, NY."

20.    At all relevant times, Sberbank announced that Deutsche Bank presented the "2012 USD STP Excellence Award"[1] to Sberbank "for excellence in formatting payments routed through Sberbank's Nostro correspondent accounts with Deutsche Bank Trust Company Americas (USA)," which is located at 60 Wall Street, New York, New York.

21.    According to the Office of Foreign Assets Control of the U.S. Treasury Department ("**OFAC**"), at all relevant times, Sberbank was one of the most active Russian-based financial institutions transacting business in U.S. dollars. According to OFAC, during all relevant times, Russian-financial institutions conducted about USD $46 billion in foreign exchange transactions, 80 percent of which were in U.S. dollars.

---

[1] A transaction efficiency award based on the speed, accuracy, and volume of transaction conducted in USD. https://www.oreanda-news.com/en/promyshlennost/article723878/

22.     At all relevant times and on each of their respective websites partnerships, Sberbank and Sberbank USA advertised discounts and promotions with several U.S. credit and consumer companies.

23.     As of August 2023 and notwithstanding the numerous sanctions imposed on Russian-based banking institutions arising out of Russia's invasion of Ukraine and the ensuing war between those two countries, U.S.-based companies were still invested in and owned shares of Defendant Sberbank.  Specifically, Goldman Sachs III SICAV Fund held shares in Defendant Sberbank, which were frozen by a Russian court.

24.     As recently as March 25, 2024, OFAC identified numerous financial technology companies that aided Sberbank in issuing, exchanging, and transferring digital financial assets in order to target Americans to evade OFAC's prior sanctions.

25.     Sberbank USA is a corporation incorporated under the laws of Delaware and is licensed to do business in New York. Its principal place of business is located at 152 West 57th Street, 44th Floor, New York, NY 10019, United States.

26.     According to Bloomberg, Sberbank USA operates as an investment banking firm, providing integrated financial solutions and investment advisory services to its clients worldwide, including but not limited to corporations, financial institutions, sovereign states, and federal and sub-federal government bodies and organizations.

27.     Sberbank USA is majority-owned subsidiary of SB CIB Holdings, LLC, which is a direct subsidiary of Defendant Sberbank.  At all relevant times, Sberbank USA was a direct subsidiary Defendant Sberbank.

28.     In August 2017, Sberbank USA executed an amendment to its existing non-cancelable lease for its office space that extended the lease expiration date through April 30, 2028.

29.	At all relevant times, Sberbank USA possessed at least $21 million in assets in the U.S.

**JURISDICTION AND VENUE**

**A.	The Court Has Jurisdiction Over Sberbank Pursuant To FSIA**

30.	With respect to Defendant Sberbank, this Court has exclusive subject matter and personal jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1330, the Foreign Sovereign Immunities Act ("**FSIA**") 28 U.S.C. §§ 1602, *et seq*., and 28 U.S.C. § 1610(b).

31.	Under FSIA, foreign states, and their agencies or instrumentalities, are afforded immunity from the jurisdiction of United States district courts unless an exception to FSIA immunity applies. 28 U.S.C. § 1604. As set alleged herein, such an exception applies to Sberbank, giving the Court jurisdiction over Sberbank.

32.	Under 28 U.S.C. §§ 1330(a) and (b), United States district courts have original subject matter jurisdiction and personal jurisdiction over any nonjury civil action against a foreign state (as defined in 28 U.S.C. § 1603(a)).

33.	Under FSIA, specifically 28 U.S.C. § 1603(a), the term "foreign state" includes an agency or instrumentality of a foreign state.

34.	Under FSIA, the term "agency or instrumentality of a foreign state" means a "separate legal person, corporate or otherwise, and which is an organ of a foreign state or political subdivision thereof, or *a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof*…." 28 U.S.C. § 1603(b) (emphasis added).

35.	Sberbank is an agency or instrumentality of Russia because Sberbank is a state-owned bank. Indeed, the Russian government owns a majority interest in Sberbank.

36.	To that effect, OFAC has made this conclusion. Indeed, OFAC has determined that

Sberbank holds the largest market share of savings deposits in the country, is the main creditor of the Russian economy, and is deemed by the Russian government to be a systemically-important financial institution. As a result of the Russian's government's use of Sberbank as an agent or instrumentality of the Russian government, OFAC sanctioned Sberbank in connection with Russian's 2022 invasion of Ukraine.

37.    In November 2023, the think tank and publisher the Council on Foreign Relations reported that the Russian government used Sberbank as a political proxy. Specifically, the Council on Foreign Relations found that Russian government directed Sberbank "to make investments across the [Balkan] region that [the Russian government] calculates will boost its political sway."

38.    More recently, Reuters reported that, because the Russian government owns a majority interest in Sberbank, Sberbank's dividends are expected to "make a sizeable contribution to Russia's budget revenues, ultimately enabling the government to continue heavy spending" on Russia's ongoing war with Ukraine.[2]

39.    As to the Court's jurisdiction over Sberbank, the Court has both subject matter and personal jurisdiction over Sberbank as an agency or instrumentality of Russia pursuant to the expropriation exception of FSIA.  28 U.S.C. § 1605(a)(3) ("**Expropriation Exception**").

40.    Under the Expropriation Exception, United States courts have exclusive subject matter and personal jurisdiction over agencies or instrumentalities of a foreign state when an agency or instrumentality of a foreign state takes property in violation of international law and that

---

[2] A similar article entitled "Russia's Sberbank reports $4.32 billion profit, dividends to boost Kremlin war chest" was published on April 26, 2024 by *The Kyiv Independent*.  https://kyivindependent.com/reuters-russias-sberbank-announces-4-32bn-profit-dividends-to-boost-kremlin-war-chest/.

agency or instrumentality is engaged in commercial activity in the United States.  28 U.S.C. § 1605(a)(3).

41.    For a taking of property to be in violation of international law, it must be the taking of a property interest without payment, and it must be a state taking the property of a national of another state. *See Fed. Republic of Germany v Philipp*, 592 U.S. 169, 179-80 (2021) (*quoting Republic of Austria v. Altmann*, 541 U.S. 677, 713 (2004) (Breyer, J., concurring) ("Based on this historical and legal background, courts arrived at a consensus that the expropriation exception's reference to 'violation of international law' does not cover expropriations of property belonging to a country's own nationals")); *see also Beierwaltes v L'Office Federale De La Culture De La Confederation Suisse*, 999 F3d 808 (2d Cir 2021) (*citing Smith Rocke Ltd. v Republica Bolivariana de Venezuela*, 2014 WL 288705, at *7 (S.D.N.Y. Jan. 27, 2014); *Nemariam v Fed. Democratic Republic of Ethiopia*, 491 F3d 470, 480 (D.C. Cir. 2007) ("The term 'taken in violation of international law' would include the nationalization or expropriation of property without payment of the prompt [,] adequate and effective compensation required by international law"); *Aboutaam v L'Office Federale De La Culture De La Confederation Suisse*, 2019 WL 4640083, at *3 (S.D.N.Y. Sept. 24, 2019); *Arch Trading Corp. v Republic of Ecuador*, 2015 WL 3443906, at *3 (S.D.N.Y.  May 28, 2015), affd, 839 F3d 193 (2d Cir 2016) ("Plaintiffs' property was physically located in Ecuador and was expropriated by the AGD, an Ecuadorian entity").

42.    Here, Sberbank satisfies the Expropriation Exception. 28 U.S.C. § 1605(a)(3). Specifically:

       a.  Sberbank is as an agency and/or instrumentality of Russia because, *inter alia* and as alleged above*,* the Russian government owns a majority interest in Sberbank, the Russian government uses Sberbank to perpetuate its political goals, and the money that Sberbank generates is used by the Russian government to pay for and further the government's administration and operations;

9

b.  Sberbank took property from Ismailov, a Ukrainian citizen; and,

c.  Sberbank, via Sberbank USA, is engaged in commercial activity in the United States.

43.     Accordingly, Sberbank, as an agency and/or instrumentality of Russia, is "not immune from the jurisdiction of the courts of the United States," including this Court.  28 U.S.C. § 1605(a)(3).  For these reasons, the Court has subject matter jurisdiction as to Count I (Plaintiff Ismailov's claim against Sberbank for recognition and enforcement of the Ukrainian Judgment) and personal jurisdiction over Sberbank.

**B.     The Court Has Supplemental Jurisdiction Over This Case**

44.     This Court has subject matter jurisdiction over Count II (Plaintiffs' claim for foreign judgment recognition and enforcement against Defendants Hutseriev and Kuznetsov) and Count III (Plaintiffs' claim for restitution asserted against all Defendants) pursuant to 28 U.S.C. § 1367.  Counts II and III constitute part of the same case or controversy that derives from the same nucleus of operative facts that give rise to Count I, which in turn is based on the Court's federal question jurisdiction pursuant to 28 U.S.C. § 1331, as set forth above.

45.     Pursuant to 28 U.S.C. § 1367(a), "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." Exercising supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367 "requires a common nucleus of operative facts…" between the federal question claim and the state law claim(s). *Lyndonville Sav. Bank & Tr. Co. v Lussier*, 211 F.3d 697, 704 (2d Cir. 2000).

10

46.    For a court to exercise supplemental jurisdiction pursuant to the "common nucleus of operative facts" test, the federal and state law claims must arise "out of approximately the same set of events…." *Treglia v. Town of Manlius,* 313 F.3d 713, 723 (2d Cir.2002). *See also BLT Rest. Grp. LLC v. Tourondel*, 855 F. Supp. 2d 4, 10 (S.D.N.Y. 2012) (finding that courts in this circuit have determined that a common nucleus of operative facts exists when "the facts pertinent to the federal and state claims substantially overlap or if presentation of the federal claim necessarily would bring the facts underlying the state claim before the court").

47.    Here, a common nucleus of operative facts exists between Count I (the foreign judgment recognition and enforcement claim asserted against Defendant Sberbank, pursuant to FSIA) and Counts II and III, respectively, the foreign judgment recognition and enforcement claims asserted against Defendants Hutseriev and Kuznetsov, and the claim for restitution asserted against all Defendants.  All claims asserted herein arise from identical facts, including the same underlying contracts, the same misconduct, and the same foreign judgment which Plaintiffs seek to enforce. *See Treglia*, 313 F.3d at 723 (finding that supplemental jurisdiction existed when the plaintiff's federal and state disability claims arose out of the same facts: the plaintiff's onset of epileptic seizures and the employer's response and mistreatment of plaintiff); *Red Apple Media, Inc. v Batchelor*, 636 F Supp 3d 468 (S.D.N.Y. 2022) (when only one of the plaintiff's claims arose under federal copyright law and the remaining claims did not invoke federal question or diversity jurisdiction, the court invoked supplemental jurisdiction because all of the plaintiff's claims related to the ownership rights over a news podcast and the state law claims of conversion, unjust enrichment and breach of contract were borne out of "the same common core of facts" that the federal copyright claim originated).

11

48.     Further, and as is the case here, federal courts routinely exercise supplemental jurisdiction over state law claims when a foreign state is exempt from sovereign immunity under FSIA. *See World Holdings, LLC v Fed. Republic of Germany*, 701 F. 3d 641, 651 (11th Cir. 2012) (because court had jurisdiction over a foreign state defendant pursuant to FSIA's commercial activity exception, the court properly exercised supplemental jurisdiction over identical claims against non-foreign state defendants because those claims "involve[d] the same facts, occurrences, witnesses, and evidence" as claim to which court had federal question jurisdiction under FSIA exception); *U.S. Fid. & Guar. Co. v Braspetro Oil*, 379 F. Supp 2d 487, 489-90 (S.D.N.Y. 2005) (applying same rationale); *Hansen v. Danish Tourist Bd.*, 147 F. Supp. 2d 142, 151–57 (E.D.N.Y. 2001) (because the court had jurisdiction regarding the claims arising under federal law pursuant to FSIA, the court had supplemental jurisdiction over the state law claims which arose from the same factual allegations as the federal claims); *Harraz v. EgyptAir Airlines Co.*, 2019 WL 6700946, at *9 (S.D.N.Y. Dec. 9, 2019) (the court had supplemental jurisdiction over state law claim where plaintiff's claim against a foreign state's agency or instrumentality gave rise to the court's jurisdiction under FSIA).

49.     As to Count I, this Court has subject matter jurisdiction pursuant 28 U.S.C. § 1331 because pursuant to 28 U.S.C. § 1330(a) this Court has original and exclusive subject matter jurisdiction for any nonjury civil action against a foreign state, including its agencies or instrumentalities, to which the foreign state is not entitled to immunity. Defendant Sberbank is an agency or instrumentality of Russia and is not entitled to immunity under the Expropriation Exception to FSIA. Therefore, this Court has original and exclusive federal question jurisdiction over the claims asserted against Defendant Sberbank.

50.    Because all claims herein involve the same facts, misconduct, documents, foreign judgment, and evidence, the Court has supplemental jurisdiction over all state law claims (not alleged under FSIA) pursuant to 28 U.S.C. § 1367, and as such the court has subject matter jurisdiction over Counts II and III herein, respectively the claim for foreign judgment recognition and enforcement asserted against Defendants Hutseriev and Kuznetsov and the claim for restitution asserted against every Defendant.

**C.    The Court Does Not Need To Have Personal Jurisdiction Over Defendants For The Enforcement of A Foreign Country Money Judgment.**

47.    No personal jurisdiction over defendants is required for the domestication of a foreign country money judgment pursuant to CPLR Article 53.  *See* CPLR § 5305; *Lenchysyn v. Pelko Electric, Inc.*, 281 A.D.2d 42, 47 (4th Dept. 2001); *see also Abu Dhabi Com. Bank PJSC v. Saad Trading, Contracting & Fin. Servs. Co.*, 117 A.D.3d 609, 611 (1st Dept. 2014) (applying *Lenchysyn*; the First Department found that so long as the jurisdiction that issued the judgement had personal jurisdiction over the judgment debtor, or that the foreign judgments entitlement to recognition under CPLR Article 53 is not put into question, a foreign judgment cannot be refused recognition on the basis that a New York court lacks personal jurisdiction); *AlbaniaBEG Ambient Sh.p.k. v. Enel S.p.A.*, 160 A.D.3d 93, 108 (1st Dept. 2018) (same); David D. Seigel, 2001 Practice Commentary to CPLR § 5305, C5305.

48.    Accordingly, the Court does not need to determine whether it has personal jurisdiction over Defendants here.

**D.    Alternatively, The Court Has Personal Jurisdiction Over Defendants**

49.    In the event the Court requires a finding of personal jurisdiction (which it should not), this Court has personal jurisdiction over Sberbank pursuant to 28 U.S.C. § 1330(b). 28 U.S.C. § 1330(b) provides that a United States District Court shall have personal jurisdiction over a

foreign State, including an agency or instrumentality of a foreign State (such as Sberbank) that is not immune from suit, provided that service of process is effectuated in accordance with 28 U.S.C. § 1608.

50.    Plaintiffs anticipate serving process on Sberbank pursuant to 28 U.S.C. § 1608(b), which is in accordance with this Court's June 6, 2024 Order granting Plaintiffs' motion for alternative service on Defendants (ECF 17), and this Court therefore has personal jurisdiction over Sberbank.

51.    Because Plaintiffs have satisfied the requirements of FSIA, the Court has and can exercise personal jurisdiction over Sberbank – which is an agent or instrumentality of Russia – without conducting any due process analysis applicable to "persons." *Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*, 582 F.3d 393, 400 (2d Cir. 2009) ("[F]oreign states are not 'persons' entitled to rights under the Due Process Clause…."); *TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296, 302 (D.C. Cir. 2005) (an instrumentality of a sovereign State "is not a 'person' for purposes of the due process clause and cannot invoke the minimum contacts test to avoid the personal jurisdiction of the district court").

52.    Further, meeting the requirements of FSIA by itself satisfies the constitutional due process requirement necessary to exercise personal jurisdiction over a party, and thus, the Court has personal jurisdiction over Sberbank. *See Shapiro v. Republic of Bolivia*, 930 F.2d 1013, 1020 (2d Cir. 1991) (satisfying FSIA's nexus requirement is more than sufficient to satisfy the requirements of the Due Process Clause).

53.    Finally, the Court's exercise of personal jurisdiction over all Defendants is proper, pursuant to paragraph 5 of the Sales Agreement, *infra*, all parties agreed to resolve any dispute in accordance with "the laws of the State of New York…." **Exhibit A**, *infra*, p. 3, ¶5.    Thus,

14

Defendants contemplated having disputes arising under the Sales Agreement, such as this action, be adjudicated by this Court.

54.    In the event that Defendants seek dismissal on jurisdictional grounds and there is a purported issue as to whether the Court has personal jurisdiction over Defendants, Plaintiffs will move for an order from the Court permitting Plaintiffs to seek jurisdictional discovery so that Plaintiffs may properly test Defendants' contacts with the forum.

**E.    This Court Has *In Rem* Jurisdiction Over Defendants' Property In This District**

55.    Even when a court does not have personal jurisdiction over a defendant, a court can find that it has "in rem" or "quasi in rem" (collectively "In Rem") jurisdiction to preside over the action.[3]   In Rem jurisdiction establishes that the property is proceeded against "as though it were conscious instead of inanimate and insentient."  *Waterloo Distilling Corp. v. United States*, 282 U.S. 577, 581 (1931); *see also Shaffer v. Heitner*, 433 U.S. 186, 199 (1977) ("If jurisdiction is based on the court's power over property within its territory, the action is called in rem or quasi in rem. The effect of a judgment in such a case is limited to the property that supports jurisdiction and does not impose a personal liability on the property owner, since he is not before the court."); *Shipping Corp. of India v. Jaldhi Overseas Pte Ltd.*, 585 F.3d 58, 69 (2d Cir. 2009) (citing authorities) ("*In rem* jurisdiction is based on the well-established theory that the thing is itself treated as the offender and made the defendant by name or description.").

56.    Upon information and belief, this Court has In Rem jurisdiction over Defendants' assets located in New York, including bank accounts, real property, shares in companies, or other tangible or intangible property.  *See Shaffer*, 433 U.S. at 210 n.36 (1977) ("Once it has been determined by a court of competent jurisdiction that the defendant is a debtor of the plaintiff, there

---

[3] *See Shaffer v. Heitner*, 433 U.S. 186, 199, n.17 (1977) (the Supreme Court, for convenience, used "the term in rem in place of 'in rem and quasi in rem.'").

would seem to be no unfairness in allowing an action to realize on that debt in a State where the defendant has property, whether or not that State would have jurisdiction to determine the existence of the debt as an original matter; *Hausler v. JPMorgan Chase Bank, N.A.*, 740 F. Supp. 2d 525, 539 (S.D.N.Y. 2010) (in a judgment recognition and enforcement action, the court found in part that it had in rem jurisdiction over the judgement debtors bank accounts located within this District); *CME Media Enters. B.V. v. Zelezny*, 2001 WL 1035138, at \*3-4 (S.D.N.Y. Sept. 10, 2001) (applying the same reasoning for an international arbitration award issued against the judgement debtor).

## F.    Venue Is Proper In This District

57.    With respect to Sberbank, pursuant to 28 U.S.C. § 1391(f)(1) and (3), venue is proper in this District because there is substantial property located within this District, substantial property is located within this District that is the subject of the action, and Sberbank by and through Sberbank USA is licensed to do business in this District.

58.    Despite there being no requirement for personal jurisdiction for the domestication and enforcement of a foreign country money judgment pursuant to CPLR § 5305, with respect to Hutseriev and Kuznetsov, venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3) because there is substantial property located within this District conferring in rem jurisdiction over Defendants Hutseriev and Kuznetsov assets in this District.

59.    Venue is also proper in this District because pursuant to paragraph 5 of the Sales Agreement, *infra*, all parties agreed to resolve any dispute in accordance with "the laws of the State of New York…." **Exhibit A**, *infra*, p. 3, ¶5. Thus, Defendants contemplated having disputes arising under the Sales Agreement, such as this action, be adjudicated by Courts in this District.

60.    Venue is proper in this District because Plaintiff Bilalov resides within this District.

**FACTUAL BACKGROUND**

**General Background**

61.     On September 5, 2001, OJSC Krasnaya Polyana, the Company, was founded with the purpose to develop and support an investment project for the creation and development of the competitive domestic ski and health resort named the "Mountain Carousel," which was intended to target the international sport and tourist markets.

62.     OJSC Krasnaya Polyana was partly owned by Plaintiffs, Plaintiff Bilalov's brother Magomed Bilalov ("**Magomed**"), and others.

63.     During all relevant times herein, and due to the fact that Plaintiff Bilalov was involved with the Russian government, Bilalov could not directly own an interest in the Company. Therefore, Plaintiff Bilalov's ownership interest in the Company was held in trust by Magomed.

64.     In 2006, plaintiff Bilalov and his brother Magomed, through the Company, purchased the ski resort Gornaya Carousel ("**Ski Resort**") in the Sochi region of Russia.  The Company aimed to develop the area surrounding the Ski Resort, which included constructing a new expressway to the region, a ski lift, and the development of other real estate ventures.

65.     In 2007, the International Olympic Committee announced that Sochi, Russia would be the host of the 2014 Winter Olympic games.  Thereafter, the Russian government announced a subsidized project to develop the site of the upcoming 2014 Olympics, which included (among other things) the construction of a ski jump complex that contained 15,000 seats at the Ski Resort. The project also included the construction of a media village and a series of hotels that held 2,658 rooms.

66.     As a result of these announcements, investors' interest in the Company grew from prior to 2007.

17

67.     In 2008, under the direction of the Russian government and by the initiative of Sberbank and its Vice-Chairman Defendant Kuznetsov, Sberbank Capital (an entity that was 100 percent owned by Sberbank) became an investor in the Company.

68.     In furtherance of the development of the Ski Resort for the 2014 Olympics, the Russian government instructed Sberbank and Sberbank Capital to issue a credit line of up to 40 billion rubles (approximately USD $1,600,000,000.00) for the construction of the Ski Resort site.

69.     Sberbank and Sberbank Capital did not issue the line of credit, and the Company was forced to obtain high-interest loans to continue the construction of the Ski Resort site.

70.     At the same time, Defendant Kuznetsov became the Chairman of the Board of the Company.

71.     By the end of 2008, and despite Sberbank and Sberbank Capital's guarantee of a 40-billion ruble line of credit, the Company received only 2.7 billion rubles (approximately USD $108,000,000.00).   While less than promised, this investment nonetheless allowed Sberbank Capital to gain control of 25.01 percent of the Company's shares.

72.     In 2008, the Russian government committed to building a new expressway from the existing A148 expressway to the Ski Resort.  The road, however, was never completed by the Russian government.

73.     As a result, the Company incurred additional, unexpected costs to complete the expressway, which in turn forced the Company to seek additional financial support from Sberbank.

74.     From 2008 to 2012, construction of the 2014 Olympic site was performed by Trans Engineering, a construction company controlled by Magomed, at a rate of $1,800.00 USD per square meter.  In 2012, Magomed received an award from President Vladimir Putin for the successful construction of the Olympic facilities.

75.     But in the middle of 2012 and as a result of pressure from Gref, Sberbank's Chairman, Magomed's company was replaced by a Turkish construction company, Sembol. Sembol invoiced the same work at a rate of more than USD $3,000 per square meter, significantly higher than Magomed's company's rate, and did not guarantee a deadline for completion of the project.

76.     After Sembol was contracted, the construction budget was increased by USD $1 billion. Delays in the construction were also incurred.

77.     Subsequently, Sberbank required all owners of the Company to each make additional investments of USD $50 million to ensure that the value of the Company would remain above USD $800 million.

78.     Magomed disputed the change imposed by Sberbank. As a result of Magomed's disagreement, in 2012, Sberbank removed Magomed from his managerial role with the Company.

79.     With Magomed gone from the Company, Sberbank took control of the construction for the 2014 Olympics.  Bilalov and Magomed were no longer involved in the Company's day-to-day or long-term operations.

80.     The actions of Sberbank, Kuznetsov, and other third parties, caused Bilalov's shares in the Company to be materially diluted from 60 percent in 2010 to 41.29 percent in 2012.

81.     On or about February 2, 2013, a meeting was held between Sberbank and Magomed during which an agreement was reached between to divide the Company's assets. Specifically, after the completion of the 2014 Olympics, one-third of the Company's assets would be transferred to Plaintiff Bilalov and Magomed, and the other two-thirds would be transferred to Sberbank. To memorialize this agreement, the minutes from the February 2, 2013 meeting were signed by Gref and Vice Prime Minister Dmitriy Kozak ("**Kozak**").

82.     However, neither Gref nor Kozak performed their obligation under the agreement. Indeed, shortly thereafter in February 2013, Gref held a second meeting with Kozak and Plaintiff Bilalov, during which Gref demanded the transfer of all of Bilalov and Magomed's shares in the Company to Gref and/or Sberbank. In this second meeting, Gref stated that if the shares in the Company were not transferred, Plaintiff Bilalov and his family would face serious consequences, including threatening them with significant bodily harm or death.

83.     As a result of these threats, Bilalov feared for his health and safety.  And these fears were legitimate and substantiated; in 2013, Bilalov was poisoned with mercury while he was in Germany. Upon information and belief, it was Sberbank or the Russian government that orchestrated and was responsible for Bilalov's poisoning.

84.     After the second meeting in February 2013, Sberbank prepared a fraudulent report concerning the development of the Ski Resort. Specifically, this report purportedly demonstrated that Magomed solely managed the construction site, was responsible for the delays in the construction of the 2014 Olympic site, and was responsible for the increased construction costs. This fraudulent report intended to defraud Plaintiff Bilalov's assets in the Company and resulted in a criminal investigation into Plaintiff Bilalov. Sberbank presented this report to Russian President Vladimir Putin.

85.     As of March 2013, Plaintiff Bilalov and Magomed owned 41.429 percent of the Company.  Pursuant to a March 2013 valuation prepared by Ernst & Young upon request of Sberbank, the value of this ownership amount in the Company was USD $328 million.

**The Sales Agreement**

86.     On April 17, 2009, Zeeland Development Corp. ("**Zeeland**"), a British Virgin Islands corporation, was founded by Dragan Perovych ("**Perovych**").  Also on April 17, 2009,

Toomas Truuwert ("**Truuwert**") and Perovych were appointed as directors of Zeeland.

87.    Between 2009 to March 2012, Zeeland purchased 817 shares of the Company.

88.    On March 9, 2013, Plaintiffs Ismailov and Bilalov, together with Magomed, entered a partnership agreement whereby Ismailov acquired the powers of Trustee of Zeeland and the assets owned by Zeeland, which included ownership of 817 shares of the Company.    In consideration of Plaintiff Ismailov's receipt of Zeeland, Magomed would receive 15 percent of the value from the future sale of the shares of the Company owned by Zeeland.

89.    On March 15, 2013, Perovych transferred ownership of Zeeland to Defendant Ismailov, including Zeeland's ownership interest in 817 shares of the Company.

90.    Also on March 15, 2013, Plaintiff Ismailov, on behalf of Zeeland, executed a sales agreement with Defendants Hutseriev and Sberbank (by and through Defendant Kuznetsov) for the sale of Zeeland's ownership interest in 817 shares of the Company for USD$200 million (the "**Sales Agreement**," annexed hereto as **Exhibit A**).    Payment by Defendants Hutseriev and Sberbank was to be made to Plaintiffs Ismailov and Bilalov within thirty days – April 15, 2013. **Ex. A**, p. 2, ¶ 2.

91.    After execution of the Sales Agreement and the transfer of the 817 shares of the Company to Hutseriev, Defendants Hutseriev and Sberbank never paid Zeeland or Plaintiffs. Accordingly, Defendants Hutseriev and Sberbank (by and through Defendant Kuznetsov) by way of the Sales Agreement obtained ownership of 817 shares of the Company without payment to Plaintiffs.

92.    Thereafter, Plaintiff Bilalov and his family, in fear for their lives, fled Russia and moved to New York.  Frightened of what Sberbank and the Russian government might do to him if he returned to Russa, Bilalov has not returned to Russia. He continues to reside in New York.

21

**The Ukrainian Case and Judgment**

93.     On March 2, 2023, Plaintiffs commenced a breach of contract action against Defendants before the Skvyra District Court of Kyiv Region ("**Ukrainian Court**"), bearing the case number 376/560/23 ("**Ukrainian Case**").  A copy of the March 2, 2023 resolution from the Ukrainian Court confirming the commencement of the Ukrainian is annexed hereto as **Exhibit B** (as translated by web-browser Chrome and downloaded from web address: https://reyestr.court.gov.ua/Review/109441891).

94.     Ukrainian lawyers Maksym Vasylovych Kucheruk and Valerii Leonidovych Sokolovskyi of Maxym Kucheruk's Law Firm (collectively, the "**Ukrainian Lawyers**") represented Plaintiffs in the Ukrainian Case, as confirmed by an affidavit from the Ukrainian Lawyers, annexed hereto as **Exhibit C**.

95.     On May 25, 2023, the Ukrainian Court entered a default judgment against Defendants in favor of Plaintiffs.  Specifically, the Ukrainian Court found that Defendants are jointly and severally liable to Plaintiffs for USD $200 million – USD $30 million to Plaintiff Ismailov and USD $170 million to Plaintiff Bilalov ("**Ukrainian Judgment**"; annexed hereto as **Exhibit D** at p.29). *See also* **Ex**. **C** at ¶23.

96.     Under New York law, foreign judgments are enforceable where the judgment is final, conclusive, and enforceable in the jurisdiction that issued it.  Further, the judgment is not required to be non-appealable for recognition to be granted.  "There are ten exceptions to that presumption of enforceability … [one of which] requires that a court not enforce a judgment if 'the 240 judgment was rendered under a system which does not provide impartial tribunals or procedures compatible with the requirements of due process of law." *Chevron Corp. v Naranjo*, 667 F3d 232, 239-40 (2d Cir. 2012) (*citing* CPLR §§ 5302-5304; internal quotations omitted).

Further, pursuant to CPLR § 5305(a)(3), a foreign country's judgment may not be denied recognition on the basis of personal jurisdiction where a "defendant prior to the commencement of the proceeding had agreed to submit to the jurisdiction of the foreign court with respect to the subject matter involved…." CPLR § 5305(a)(3).

97.    All requirements for this Court to enforce the Ukrainian judgement have been satisfied. As set forth below, the Ukrainian Court had jurisdiction over the Ukrainian Case and Defendants. Likewise, Plaintiffs brought the Ukrainian Case within the statute of limitations, the Defendants were properly served with notice of the Ukrainian Case, and the Ukrainian judicial system is fair, impartial and promotes due process.

***The Ukrainian Court Had Jurisdiction Over The Ukrainian Case and Defendants***

98.    Pursuant to the Ukrainian Lawyers' affidavit, the laws of Ukraine set forth the following:

   a. In accordance with Paragraph 1 of Article 3 of the Civil Procedure Code of Ukraine, all civil proceedings must be carried out in accordance with the Constitution of Ukraine, the Civil Procedure Code of Ukraine, the Law of Ukraine "On Private International Law," and all other laws of Ukraine. **Ex. C** at ¶5;

   b. According to subparts 2 and 4 of subparagraph 2 of Paragraph 1 of Article 1 of the Law of Ukraine "On Private International Law," a matter is considered to be "cross-border" in nature when: (i) at least one participant is a Ukrainian citizen that is residing outside of Ukraine, a foreigner, a stateless person or a foreign legal entity, and they are involved in a dispute in the Ukraine, or (ii) a fact or event exists that creates, changes, or terminates a legal relationship that has taken place (or is contemporaneously taking place) outside of Ukraine. **Ex. C** at ¶6; and

   c. In accordance with the provisions of subparagraphs 1 and 5 of Paragraph 1 of Article 76 of the Law of Ukraine "On Private International Law," Ukrainian courts have jurisdiction to hear any cross-border disputes when: (i) the parties have agreed in writing to the jurisdiction of Ukrainian courts; and/or (ii) in the case involving economic damages, the plaintiff is an individual who resides in Ukraine. **Ex. C** at ¶7.

99.     The Ukrainian Court had jurisdiction over the Ukrainian Case for the following reasons:

    a.  Pursuant to paragraph 5 of the Sales Agreement, any dispute arising out of and/or related to fulfillment of the Sales Agreement has the right to be resolved before any court of the Commonwealth of Independent States ("**CIS**").  At the time the Sales Agreement was executed, Ukraine was a founding and active member of the CIS.  **Ex. C** at ¶9;

    b.  Accordingly, the Parties consented in writing to the jurisdiction of the Ukrainian courts at the time of the execution of the Sales Agreement. **Ex. C** at ¶10; and

    c.  The Ukrainian Court also had jurisdiction over the Ukrainian Case because, at all relevant times Plaintiff Ismailov is/was a Ukrainian citizen and resided in the Ukraine.  **Ex. C** at ¶11.

***The Ukrainian Case Was Brought Within The Statute of Limitations***

100.    The Ukrainian Case was also brought within the recognized statute of limitations pursuant to the laws of Ukraine.

101.    Specifically, pursuant to Articles 257, 259, and 261 of the Civil Procedure Code of Ukraine, parties may commence an action for economic damages within three years from the alleged conduct.  **Ex. C** at ¶17. Additionally, parties are permitted to extend the applicable statute of limitations so long as it is agreed to in writing. *Id.*

102.    According to paragraph 5 of the Sales Agreement dated March 15, 2013, the signatories agreed to resolve any dispute arising out of or in connection with Sales Agreement within 10-years from the date the Sales Agreement was executed. **Ex. A** at p. 2, ¶ 5.  Thus, the Sales Agreement properly extended the applicable statute of limitations to and including March 15, 2023. **Ex. C** at ¶18.

103.    Because Plaintiffs brought the Ukrainian case on March 2, 2023, the Ukrainian Case was commenced within the applicable statute of limitations. **Ex. C** at ¶19.

*Defendants Were Properly Served In The Ukrainian Case*

104.    Defendants were properly served in Ukrainian Case in accordance with the laws of Ukraine.

105.    Specifically, pursuant to Article 128 of the Civil Procedure Code of Ukraine, Ukrainian courts will issue a summons of a case that notifies the parties that their presence is obligatory and, if there is a hearing, the time and place of the hearing, and, if relevant, the current procedural posture of the matter.  The summons issued by a Ukrainian court is sent: (i) by mail to the defendant to an action at the defendant's last known location or last known location of the defendant's representative; (ii) by email to the defendant or defendant's representative; or (iii) in the case of a foreign citizen if subparts (i) or (ii) are unavailable, to the embassy of the foreign citizen.  When a defendant's registered residence or place business is unknown or unavailable, the court posts a notice of summons of the participant in  case on the official website of the judiciary of Ukraine (https://sk.ko.court.gov.ua/sud1022/) at least 10-days prior to the court hearing, which is considered proper notice or service. **Ex. C** at ¶14.

106.    In the Ukrainian Case, and as ordered by the Ukrainian Court, on March 23, 2023, Defendants were each provided with timely notice of the time and place of the Ukrainian Case and hearing in the Ukrainian Case scheduled for May 11, 2023 at 2:30 p.m..  The Ukrainian Court sent an e-mail from the official email address "inbox@sk.ko.court.gov.ua" with the statement of claim and summons to appear in court to the last known e-mail addresses of Defendants, which were obtained from the public domain. **Ex. C** at ¶15; **Exhibit B**; annexed hereto as **Exhibit E** are certified translated copies of the Ukrainian Court's email notification sent to Defendants.

107.    In the Ukrainian Case, Defendants were each provided with timely notice of the time and place of the Ukrainian Case and a preliminary hearing in the Ukrainian Case scheduled

25

for May 24, 2023 at 11:45a.m. The Ukrainian Court sent an e-mail from the official email address "inbox@sk.ko.court.gov.ua" with the statement of claim and summons to appear in court to the last known e-mail addresses of Defendants, which were obtained from the public domain. **Ex. C** at ¶15; a copy of an April 21, 2023 resolution from the Ukrainian Court confirming the preliminary hearing is annexed hereto as **Exhibit F** (as translated by web-browser Chrome and downloaded from web address: https://reyestr.court.gov.ua/Review/110369418).

108.    Due to the Russian invasion of Ukraine and pursuant to Presidential Decree No. 32/2017 issued by then President of Ukraine, Petro Oleksiyovych Poroshenko, correspondence of public Ukrainian authorities with Russian domains was then and remains prohibited.  Accordingly and pursuant to Article 130 of the Civil Procedure Code of Ukraine, the Ukrainian Court also notified Defendants of the Ukrainian case by publication on the official website of the judiciary of Ukraine (https://sk.ko.court.gov.ua/sud1022/) at least 10-days prior to a hearing in the Ukrainian Case. **Ex. C** at ¶15.

109.    On May 11, 2023, the Ukrainian Court at the aforementioned preliminary hearing held, in part, that Defendants" did not appear at the hearing despite being "properly informed" of the hearing, the time, date and place.  Similarly, the Ukrainian Court found that Defendants did not submit a response or defense to the Ukrainian Court and did not provide any reason or justification for their non-appearance.  A copy of the May 11, 2023 resolution from the Ukrainian Court is annexed hereto as **Exhibit G** (as translated by web-browser Chrome and downloaded from web address: https://reyestr.court.gov.ua/Review/110868296).

*The Ukrainian Judgment Against Defendants Is Final And Non-Appealable*

110.    Despite Defendants having been properly notified of the Ukrainian Case and all hearings and proceedings therein, Defendants failed to appear before the Ukrainian Court. **Ex. C**

at ¶¶20-21; **Ex. G**.

111.    Defendants also failed to send a lawyer to appear on their behalf and provide Plaintiffs or the Ukrainian Court with a reason for the failure to appear. **Ex. C** at ¶21; **Ex. G**.

112.    On May 25, 2023, one day after the Ukrainian Court ordered a trial on the merits, the Ukrainian Court entered the default against Defendants and in favor of Plaintiffs.  **Ex. C** at ¶23; **Ex. G**.

113.    The Ukrainian Judgment was amended on May 26, 2023, but only with respect to the costs associated with the judgment; the judgment was not otherwise altered, such that Defendants are jointly and severally liable to Plaintiffs for USD $200 million – $30 million to Plaintiff Ismailov and $170 million to Plaintiff Bilalov.  **Ex. C** at ¶23.

114.     Pursuant to paragraph 3 of Article 284 of the Civil Procedure Code of Ukraine, Defendants had thirty days from the entry of the Ukrainian Judgment to appear to contest the default judgment.  **Ex. C** at ¶24. After thirty days, the default judgment would become final and not subject to appeal. *Id*.

115.    Defendants failed to appear within thirty days from entry of the Ukrainian Judgment; Defendants never appeared. Accordingly, the Ukrainian Judgment is final and not subject to appeal.  **Ex. C** at ¶25.

***The Ukrainian Judicial System Is Fair And Impartial And Requires And Promotes Due Process***

116.    The courts of Ukraine continue to operate in a materially identical manner as they did prior to the February 2022 Russian invasion of Ukraine.  **Ex. C** at ¶26.

117.    Under Paragraph 1 of Article 4 and Paragraph 1 of Article 5 of the Civil Procedure Code of Ukraine, every person or legal entity has the right to apply to the Ukrainian courts for the

protection of their rights, freedoms, and legitimate interests. This has remained unchanged despite the Russian invasion. **Ex. C** at ¶27.

118.    Under Paragraphs 3 and 4 of Article 12 of the Civil Procedure Code of Ukraine, each party to a case is required to establish the facts and circumstances to support their claims. Likewise, under Paragraph 1 of Articles 81 and 89 of the Civil Procedure Code of Ukraine, each party is required to establish the facts and circumstances to support their objections.  In accordance with the laws of Ukraine including the laws governing the admissibility and reliability of evidence, the Ukrainian courts will assess the merits of each claim, objection, and defense based on an unbiased evaluation of the facts and circumstances presented to the courts.  These standards and obligations have remained unchanged despite the Russian invasion.  **Ex. C** at ¶28.

119.    The only discernable changes in the Ukrainian judicial system and courts are as follows:

    a.  Due to the Russian invasion of Ukraine, Ukraine has stopped mail service by and between Ukraine and Russia, which may impact the available methods of service and notification; however, Ukrainian courts still require service by publication and email notification where possible;

    b.  Due to the Russian invasion of Ukraine, Ukrainian courts have permitted parties and their lawyers or representatives to appear virtually in lieu of in-person attendance if appearing virtually is more practicable to the parties; and,

    c.  Due to the Russian invasion of Ukraine, when certain regions of the country have been subject to increased fighting or bombing, the Ukrainian courts have changed the venue in which a case is heard to facilitate judicial safety.

**Ex. C** at ¶29.

120.    Ukrainian courts continue to operate in a fair and impartial manner and continue to require and promote due process to all legal parties in cases before the courts.  **Ex. C** at ¶30.

## CLAIMS FOR RELIEF

### COUNT I
**Recognition And Enforcement Of The Ukrainian Judgment Pursuant to FSIA
(By Plaintiff Ismailov against Defendant Sberbank)**

121.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

122.    As to Count I, this Court has federal question jurisdiction over this claim under 28 U.S.C. § 1331 because, pursuant to 28 U.S.C. § 1330(a), this Court has original and exclusive jurisdiction for any nonjury civil action against a foreign state, including its agencies or instrumentalities, to which the foreign state is not entitled to immunity.

123.    Defendant Sberbank is an agency or instrumentality of Russia and is not entitled to immunity under the Expropriation Exception to FSIA.  Therefore, this Court has original and exclusive federal question jurisdiction over this claim asserted against Defendant Sberbank.

124.    Under principles of international comity, U.S. courts will recognize and enforce private rights acquired under valid foreign judgments, provided that such judgments are jurisdictionally well-founded and not contrary to U.S. public policy.

125.    Under the Uniform Foreign Country Money-Judgments Recognition Act, Article 53 of the N.Y. Civil Practice Law and Rules, a foreign country money judgment that is final and conclusive may be enforced in New York.

126.    Ukraine is a "foreign country" as defined in CPLR 5301(a) and as used in Article 53 of the CPLR.

127.    The Ukrainian Judgment is a "foreign country judgment" as defined in CPLR 5301(b), and as used in Article 53 of the N.Y. Civil Practice Law and Rules.

128.    All the grounds for recognition of the Ukrainian Judgment under Article 53 of the N.Y. Civil Practice Law and Rules have been satisfied.

129.    The Ukrainian Court is a court of competent jurisdiction.

130.    Ukrainian Court possessed subject matter and personal jurisdiction over the dispute and parties before it in the Ukrainian Case.

131.    The Ukrainian Judgment does not conflict with any other final and conclusive judgment.

132.    The Ukrainian Judgment has become final, conclusive, and enforceable in the Ukraine.

133.    The Ukrainian Judgment is not subject to appeal in the Ukraine or in any other court of competent jurisdiction.

134.    The Ukrainian judicial system is recognized as providing impartial tribunals whose procedures are compatible with due process by abiding by fundamental standards of procedural fairness.

135.    The laws and public policy of New York and the rights of its residents will not be violated by the recognition and enforcement of the Ukrainian Judgment.

136.    Under Ukrainian law, it is presumed that judgments of foreign courts receive reciprocal enforcement.

137.    The Ukrainian Judgment should be recognized and enforced in favor of Plaintiff Ismailov in the following amounts:

    a.    Principal amount of USD $30,000,000.00 in favor of Plaintiff Ismailov;

    b.    Court fees and costs of UAH 8,946.69 to be paid in U.S. dollars pursuant to the exchange rate existing as of September 25, 2023, which equals to USD $242.45;

    c.    Interest accrued since the date of the Ukrainian Judgment, including but not limited

to interest accrued until the entry of a judgment by this Court and pre and/or post-judgement interest; and

d.  Attorneys' fees, costs, and post-judgment interest associated with this action.

## COUNT II
### Recognition And Enforcement Of The Ukrainian Judgment
### (By Plaintiffs Against Defendants Hutseriev and Kuznetsov)

138.  Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

139.  This Court has federal question jurisdiction over this claim under 28 U.S.C. § 1331, as this case is brought under the Expropriation Exception to FSIA (28 U.S.C. § 1330, 28 U.S.C. §§ 1602, *et seq.*, and 28 U.S.C. § 1610(b)), and supplemental jurisdiction under 28 U.S.C. § 1367.

140.  Under principles of international comity, U.S. courts will recognize and enforce private rights acquired under valid foreign judgments, provided that such judgments are jurisdictionally well-founded and not contrary to U.S. public policy.

141.  Under the Uniform Foreign Country Money-Judgments Recognition Act, Article 53 of the N.Y. Civil Practice Law and Rules, a foreign country money judgment that is final and conclusive may be enforced in New York.

142.  Ukraine is a "foreign country" as defined in CPLR 5301(a) and as used in Article 53 of the CPLR.

143.  The Ukrainian Judgment is a "foreign country judgment" as defined in CPLR 5301(b), and as used in Article 53 of the N.Y. Civil Practice Law and Rules.

144.  All the grounds for recognition of the Ukrainian Judgment under Article 53 of the N.Y. Civil Practice Law and Rules have been satisfied.

145.  The Ukrainian Court is a court of competent jurisdiction.

146.    Ukrainian Court possessed subject matter and personal jurisdiction over the dispute and parties before it in the Ukrainian Case.

147.    The Ukrainian Judgment does not conflict with any other final and conclusive judgment.

148.    The Ukrainian Judgment has become final, conclusive, and enforceable in the Ukraine.

149.    The Ukrainian Judgment is not subject to appeal in the Ukraine or in any other court of competent jurisdiction.

150.    The Ukrainian judicial system is recognized as providing impartial tribunals whose procedures are compatible with due process by abiding by fundamental standards of procedural fairness.

151.    The laws and public policy of New York and the rights of its residents will not be violated by the recognition and enforcement of the Ukrainian Judgment.

152.    Under Ukrainian law, it is presumed that judgments of foreign courts receive reciprocal enforcement.

153.    The Ukrainian Judgment should be recognized and enforced in favor of Plaintiffs Ismailov and Bilalov in the following amounts:

a.    Principal amount of USD $200,000,000.00 in favor of Plaintiffs;

b.    Court fees and costs of UAH 8,946.69 to be paid in U.S. dollars pursuant to the exchange rate existing as of September 25, 2023, which equals to USD $242.45;

c.    Interest accrued since the date of the Ukrainian Judgment, including but not limited to interest accrued until the entry of a judgment by this Court and pre and/or post-judgement interest; and

d.    Attorneys' fees, costs, and post-judgment interest associated with this action.

## COUNT III
### Restitution
### (Against All Defendants)

154.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

155.    This Court has federal question jurisdiction under 28 U.S.C. § 1331, as this case is brought under the Expropriation Exception to FSIA (28 U.S.C. § 1330, 28 U.S.C. §§ 1602, *et seq.*, and 28 U.S.C. § 1610(b)), and supplemental jurisdiction under 28 U.S.C. § 1367.

156.    To the extent the Court does not apply the exchange rate applicable to the Ukrainian Judgment from at least the dates of breach, Defendants will benefit at Plaintiffs' expense since Defendants will enjoy the benefit of the currency exchange rates and Plaintiff will not be made whole.

157.    Equity and good conscience require restitution not to permit Defendants to retain the benefit obtained through the fluctuations in the currency exchange rate.

158.    Accordingly, to the extent that it is necessary to make Plaintiffs whole, restitutionary damages should be awarded in an amount to be determined.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants:

(a)    Recognizing and enforcing the Ukrainian Judgment by awarding Plaintiffs the following amounts:

  i.    Total principal amount of USD $200,000,000.00 in favor of Plaintiffs;

  ii.    Court fees and costs of UAH 8,946.69 to be paid in US dollars pursuant to the exchange rate existing as of September 25, 2023, which equals approximately USD $242.45.

(b)    Directing the Clerk to enter judgment against Defendants in favor of Plaintiffs;

33

(c) Awarding, to the extent it is necessary to make Plaintiff whole, restitutionary damages in an amount to be determined;

(d) Awarding post-judgment and/or pre-judgment interest since the date of the Ukrainian Judgment until the entry of a judgment by this Court;

(e) Awarding post-judgment interest from the date of entry of judgment by this Court until the judgment is fully paid;

(f) Awarding Plaintiffs' attorneys' fees and costs associated with the present action; and,

(g) Awarding such other and further relief as deemed appropriate.

Dated: June 10, 2024
    New York, New York

**SEIDEN LAW LLP**

*/s/ Jake Nachmani*
Jake Nachmani
MarcAnthony Bonanno
322 Eighth Avenue, Suite 1200
New York, NY 10001
jnachmani@seidenlaw.com
mbonanno@seidenlaw.com
(646) 766-1723

*Attorneys for Plaintiffs*