**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MUSAIB ISMAILOVYCH ISMAILOV, and AKHMED HADZHYIOVYCH BILALOV, <br><br> Plaintiffs, <br><br> v. <br><br> MYKHAILO SAFARBEKOVYCH HUTSERIEV, STANISLAV KOSTIANTYNOVYCH KUZNETSOV, and PUBLIC JOINT STOCK COMPANY "SBERBANK OF RUSSIA," <br><br> Defendants. | Case No. 1:24-cv-03287 (AT) |

**MEMORANDUM OF LAW IN SUPPORT OF OMNIBUS MOTIONS TO DISMISS BY DEFENDANT MYKHAILO SAFARBEKOVYCH HUTSERIEV**

Jay S. Auslander
Natalie Shkolnik
David Partida
Michael Van Riper
Wilk Auslander LLP
825 Eighth Avenue, Suite 2900
New York, New York 10019
Tel: (212) 981-2338

*Attorneys for Defendant Mykhailo*
*Safarbekovych Hutseriev*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

PROCEDURAL AND FACTUAL BACKGROUND ............................................................... 3

    A.   The Transfer of Krasnaya Polyana, As Told in Bilalov I ............................................ 3

    B.   *Bilalov I* Ends in Bilalov's Defeat .............................................................................. 6

    C.   The Transfer of Krasnaya Polyana, As Told This Time Around ................................. 7

        1.   Change of Story: Now It Is Zeeland, not Magomed or Bilalov, Who Owned the Key Shares of Krasnaya Polyana the Whole Time ............................................ 7

        2.   Change of Theory: This Time, Supposedly, Hutseriev is Liable for Breach of the Newly Alleged March 2013 Sales Agreement ............................................ 8

        3.   Change of Plan: Sue in Ukraine and then Return to New York ..................................... 9

    D.   Plaintiffs Allege No Personal Jurisdictional Contacts Between Hutseriev and the Southern District .................................................................................................... 12

ARGUMENT ........................................................................................................................... 13

    I.   STANDARDS ON MOTION TO DISMISS .................................................... 14

        A.   Standard Under Rule 12(b)(1) ........................................................................... 14

        B.   Standard Under Rule 12(b)(2), 12(b)(3), and 12(b)(5) – Personal Jurisdiction, Venue, and Service .......................................................................................... 15

        C.   Standard Under Rule 12(b)(6) ........................................................................... 16

    II.   NO SUBJECT MATTER JURISDICTION EXISTS ........................................ 17

    III.   NO PERSONAL OR *QUASI IN REM* JURISDICTION EXISTS ................... 19

    IV.   PLAINTIFFS HAVE IMPROPERLY SITED VENUE ..................................... 24

    V.   PLAINTIFFS' CHOSEN MANNER OF SERVICE VIOLATES THE HAGUE SERVICE CONVENTION .................................................................................. 25

    VI.   THE UNIFORM ACT REQUIRES THE COURT TO DENY RECOGNITION OF THE UKRAINIAN JUDGMENT AND MANDATES DISMISSAL ................ 26

CONCLUSION ........................................................................................................................ 31

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Abu Dhabi Com. Bank PJSC v. Saad Trading, Contracting & Fin. Servs. Co.*,
117 A.D.3d 609 (1st Dept. 2014) ............................................................................................ 20

*Ackermann v. Levine*,
788 F.2d 830 .............................................................................................................................. 25

*AlbaniaBEG Ambient Sh.p.k. v. Enel S.p.A.*,
160 A.D.3d 93 (1st Dept. 2018) .............................................................................................. 20

*AMTO, LLC v. Bedford Asset Management, LLC*,
2015 WL 3457452 (S.D.N.Y. June 1, 2015) ........................................................................... 24

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .................................................................................................................. 16

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .................................................................................................................. 16

*Bilalov v. Gref*,
No. 20-cv-9153 (AT), 2022 WL 4225968 (S.D.N.Y. Sept. 13, 2022) .................................... 10

*Cabiri v. Gov't of Republic of Ghana*,
165 F.3d 193 (2d Cir. 1999) ..................................................................................................... 17

*Cortec Indus., Inc. v. Sum Holding L.P.*,
949 F.2d 42 (2d Cir. 1991) ....................................................................................................... 16

*Daou v. BLC Bank, S.A.L.*,
42 F.4th 120 (2d Cir. 2022) ...................................................................................................... 19

*DeMaria v. Nutritional Beverages, LLC*,
No. 23-cv-7314, 2024 WL 4145743 (E.D.N.Y. Sept. 11, 2024) ............................................. 19

*George v. Pro. Disposables Int'l, Inc.*,
221 F. Supp. 3d 428 (S.D.N.Y. 2016) ...................................................................................... 15

*Gulf Ins. Co. v. Glasbrenner*,
417 F.3d 353 (2d Cir. 2005) ............................................................................................... 15, 24

*Itar-Tass Russian News Agency v. Russian Kurier, Inc.*,
140 F.3d 442 (2d Cir. 1998) ..................................................................................................... 18

*John Galliano, S.A. v. Stallion, Inc.*,
15 N.Y.3d 75 (2010) ................................................................................................................. 26

*Kadmon Corp., LLC v. Ltd. Liab. Co. Oncon*,
No. 22-CV-5271 (LJL), 2023 WL 2346340 (S.D.N.Y. Mar. 3, 2023) .................................... 24

*Lenchysyn v. Pelko Electric, Inc.*,
281 A.D.2d 42 (4th Dept. 2001) ............................................................................................... 20

*Levitin v. PaineWebber, Inc.*,
  159 F.3d 698 (2d Cir. 1998) ................................................................................................. 16

*Liu v. Guan*,
  225 A.D.3d 749 (2d Dept. 2024) .......................................................................................... 28

*McCoy v. Goord*,
  255 F. Supp. 2d 233 (S.D.N.Y. 2003) .................................................................................. 16

*Orient Overseas Container Line v. Kids Int'l Corp.*, No.,
  96-cv-4699 (DLC), 1998 WL 531840 (S.D.N.Y. Aug. 24, 1998)......................................... 22

*Rocky Aspen Mgmt. 204 LLC v. Hanford Holdings LLC*,
  358 F. Supp. 3d 279 (S.D.N.Y. 2019) .................................................................................. 17

*S.C. Chimexim S.A. v. Velco Enterprises Ltd.*,
  36 F. Supp. 2d 206 (S.D.N.Y. 1999) .................................................................................... 17

*Shaffer v. Heitner*,
  433 U.S. 186 ......................................................................................................................... 22

*Sung ex rel. Lazard Ltd. v. Wasserstein*,
  415 F. Supp. 2d 393 (S.D.N.Y. 2006) .................................................................................. 17

*Tagger v. Strauss Grp. Ltd.*,
  951 F.3d 124 (2d Cir. 2020)................................................................................................. 17

*Trustees of United Health & Welfare Fund v. Copper Servs., LLC*,
  No. 22-cv-8965 (VSB), 2024 WL 3553138 (S.D.N.Y. July 26, 2024) ................................... 17

*United States v. Gonzalez-Lopez*,
  548 U.S. 140 (2006)............................................................................................................. 27

*Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*,
  751 F.2d 117 (2d Cir. 1984) ................................................................................................ 15

*Water Splash, Inc. v. Menon*,
  581 U.S. 271 (2017).............................................................................................................. 24

*Wimmer Canada, Inc. v. Abele Tractor & Equip. Co.*,
  299 A.D.2d 47 (1st Dept. 2002)............................................................................................ 28

**Statutes**

28 U.S.C. § 1330............................................................................................................ 12, 14, 18

28 U.S.C. § 1331.................................................................................................................... 17

28 U.S.C. § 1332.................................................................................................................... 17

28 U.S.C. § 1367.................................................................................................................... 18

28 U.S.C. § 1391(b) .............................................................................................................. 23

28 U.S.C. § 1391(f).............................................................................................................. 23

28 U.S.C. § 1604.................................................................................................................... 18

28 U.S.C. § 1604(a)(3)................................................................................................ 18

28 U.S.C. § 1605........................................................................................................ 19

**Rules**

CPLR 302.................................................................................................................... 19

CPLR 5304.................................................................................................... 16, 21, 25

Fed. R. Civ P. 4(n)..................................................................................................... 22

Federal Rule of Civil Procedure 12(b)(1), 12(b)(2), 12(b)(3), 12(b)(5), and 12(b)(6)............. 1, 28

Rule 12(b) .................................................................................................................... 2

Rule 4(f)...................................................................................................................... 24

**Other Authorities**

*Fundamental Fairness: Finding A Civil Right To Counsel In International Human Rights Law*,
    57 University of Richmond Law Review 685 (2023)................................................. 27

Defendant Mykhailo Safarbekovych Hutseriev respectfully submits the following memorandum of law in support of his motion to dismiss the First Amended Complaint of Plaintiffs Akhmed Hadzhyiovych Bilalov and Musaib Ismailovych Ismailov with prejudice and without leave to amend, pursuant to Federal Rule of Civil Procedure 12(b)(1), 12(b)(2), 12(b)(3), 12(b)(5), and 12(b)(6).

### PRELIMINARY STATEMENT

In this action, Plaintiffs Akhmed Hadzhyiovych Bilalov and Musaib Ismailovych Ismailov ask the Court to recognize a default judgment entered without notice against Defendant Hutseriev by the Skvrya District Court of Kyiv, Ukraine. Hutseriev is liable, say Plaintiffs, for breach of a contract to sell a controlling stake in OJSC Krasnaya Polyana ("Krasnaya Polyana," or the "Company"), a Russian joint stock company that owns a ski resort in southern Russia. According to Plaintiffs, this breach was the final step in the orchestrated expropriation of Krasnaya Polyana by co-defendant Sberbank of Russia PJSC ("Sberbank") and Stanislav Kostiantynovych Kuznetsov (collectively, with Sberbank, the "Sberbank Defendants").

Plaintiffs' Ukrainian lawsuit was not the first time Plaintiffs tried to cast the blame on Hutseriev, however. Rather, Bilalov first pointed the finger at Hutseriev in a lawsuit he filed with this Court back in 2020, entitled *Bilalov v. Gref, et al.*, No. 20-cv-9153 ("*Bilalov I*"). According to the allegations in *Bilalov I*, Sberbank and its CEO, Herman Gref, coerced Bilalov to transfer Krasnaya Polyana through a combination of threats and unfounded civil and criminal proceedings. Throughout, says Bilalov, Hutseriev pressured Bilalov to accede to Sberbank and Gref's insistence that Bilalov sell the property, but then reneged on his own promise to share "half of profits which [Hutseriev] received" in that unspecified deal. (*See Bilalov I* Compl. ¶¶ 112). (A copy of the Complaint in *Bilalov I* is attached the accompanying Declaration of Michael Van Riper as Exhibit 1.)

Indeed, Bilalov railed against Hutseriev at great length in *Bilalov I* for his supposed role in this pressure campaign, yet he never named Hutseriev as a defendant in the lawsuit, nor did he raise any claim against Hutseriev for breach of contract. Rather – despite amending his complaint three times throughout *Bilalov I* to add new claims, theories, and defendants – Bilalov decided to pursue Hutseriev directly only after this Court dismissed *Bilalov I* on September 13, 2022. Only then, on the cusp of defeat, did Bilalov hatch his backup plan: pursue Sberbank abroad in Ukraine, add Hutseriev as a defendant, secure a furtive default judgment without notice, and then ask this Court to recognize *that* judgment, with no further assessment of the validity of Bilalov's underlying claims.

How so? First, by alleging breach of a previously unknown share purchase agreement that Hutseriev purportedly signed in 2013 on behalf of his companies, the BIN Group of Companies (the "BIN Group"), with Zeeland Development Corporation ("Zeeland"), a British Virgin Islands corporation under the alleged control of plaintiff Ismailov. This single-page agreement, which Bilalov never mentioned even once in any previous iteration of the *Bilalov I* complaint despite amending it three times, is in reality a post-hoc forgery conjured up by Bilalov only as that lawsuit sank beneath the waves (though Hutseriev will nevertheless presume it is genuine for purposes of this motion to dismiss, as Rule 12(b) requires). Under that fraudulent agreement, the BIN Group agreed to purchase 817 shares of Krasnaya Polyana at a price of $200,000,000 from Zeeland Development Corporation (allegedly under the control of plaintiff Ismailov). Wielding that forged agreement, Bilalov and Ismailov commenced suit in the district court in Kyiv and in short order obtained a default judgment against Hutseriev in his *personal* capacity, even though the (phony) agreement purports to bind only BIN Group.

Now, Plaintiffs ask the Court to rubberstamp the Ukrainian default judgment and thereby put its own imprimatur on a dispute that it previously rejected in *Bilalov I* – a *res* that the Court has already made *judicata*. Unfortunately for Plaintiffs, however, their contrived theory of federal court subject matter and personal jurisdiction falls short, and the Court must dismiss.

Even if the Court could proceed, however, Plaintiffs have improperly lain venue and their chosen method for service of process – although endorsed by the Court on an *ex parte* motion – does not satisfy Rule 4(f)(3)'s requirement that court-ordered service not be "prohibited by international agreement."

And even if Plaintiffs could clear all of these hurdles (though in reality they can clear none of them), the governing statute – New York's Uniform Foreign Country Money Judgments Recognition Act (the "Uniform Act"), CPLR 5301-5308 – outright prohibits recognition of the judgment, because Ukrainian courts do not provide due process to Russian defendants under current conditions of martial law; because Plaintiffs failed to provide Hutseriev with notice of the Ukrainian action conforming to New York law; and because, even under Ukrainian domestic law, the Ukrainian court did not have subject matter jurisdiction over Plaintiffs' claims.

## PROCEDURAL AND FACTUAL BACKGROUND

Although he has now moved Hutseriev from the periphery of *Bilalov I* to the center of this new iteration of that same old story, and although he has brought Ismailov along as a new plaintiff, Bilalov's current action is at its root exactly the same controversy that this Court decided in *Bilalov I*: Bilalov persists in his claim that Hutseriev and the Sberbank Defendants coerced and/or cheated him out of his interests in Krasnaya Polyana, and demands compensation for it.

### A.    The Transfer of Krasnaya Polyana, As Told in *Bilalov I*

Plaintiff and his brother Magomed Bilalov founded Krasnaya Polyana in approximately September 2001. (First Am. Compl. ¶¶ 61-62, ECF No. 18). According to Bilalov's complaint in

3

*Bilalov I*, the brothers intended to develop a ski resort through the Company in southern Russia, but because Bilalov served in the Russian government, he could not directly own an interest in the Company. (*Bilalov I* Compl. ¶¶ 55-57). Magomed therefore held Bilalov's ownership interest in the Company in trust for him. (*Id*. ¶ 52.) By 2006, Bilalov and Magomed – through the Company – had purchased that ski resort: Gornaya Carousel in the Sochi region of Russia. (*Id*. ¶ 56).  Their plans for the surrounding area included the construction of a new expressway to the region, a ski lift, and the development of nearby real estate ventures. (*Id*. ¶ 57).

In 2007, the International Olympic Committee announced that Russia would be hosting the 2014 Winter Olympic games in Sochi. (*Id*.). When the Russian government then announced plans to construct a ski jump exhibition at the Krasnaya Polyana site, interest in the Company grew, and a Sberbank affiliate – Sberbank Capital – joined its investors. (*Id*. ¶ 59).

According to Plaintiffs, Sberbank became obligated to issue a credit line of up to 40 billion rubles (approximately $1,600,000,000.00) for development of the site. (*Id*. ¶ 64). Plaintiffs say that Sberbank provided only 2.7 billion rubles (approximately $108,000,000) in funding and thereby forced the Company to take out higher interest loans to continue construction. (*Id*. ¶ 61, 64). Complicating matters further, the Russian government did not complete the anticipated construction of a new expressway linking the resort to the wider regional road network. (*Id*. ¶¶ 66-67). This forced Plaintiffs, so they say, to seek further financial support from Sberbank. (*Id*. ¶ 65).

Throughout this period – approximately 2008 through 2012 – Magomed Bilalov had been managing new construction on the Krasnaya Polyana site through his company, Transcomstroy. (*Id*. ¶ 69-72). In 2012, however – just two years out from the Games – Sberbank and Gref demanded that Transcomstroy be terminated from the project as a condition of continued funding

and arranged for its replacement by a Turkish company, Sembol. (*Id*. ¶ 74-77). Sberbank also required that Magomed relinquish his role as manager of Krasnaya Polyana and further required a fresh injection of capital into the Company by its owners. (*Id*. ¶¶ 77-79). That new round of capital contributions left Bilalov and Magomed with control of 41.29 percent of the Company at the close of 2012, down from a controlling stake of 60 percent in 2010. (*Id*. ¶ 70, 79).

By outward appearances, then, a pair of oligarchs had gotten in over their heads on a construction project that would soon command the view of the entire globe and were justifiably relieved of control as a condition of continued funding for that project. According to Bilalov, however, all of these developments – despite those outward appearances – resulted from the deliberate machinations of Sberbank and Gref, designed to force him and Magomed out of the Company without adequate compensation. (*Id*. ¶ 74-75).

The next and final phase – at least according to *Bilalov I* – began to unfold on February 2, 2013, when Sberbank and Magomed reached an agreement to divide Krasnaya Polyana. (*Id*. ¶ 82). According to the minutes of a meeting held on that date and signed by Gref, one-third of the Company's assets would be transferred to Bilalov and Magomed, and the other two-thirds would be transferred to Sberbank. (*Id*.) The deal would be consummated after the 2014 Olympics concluded. (*Id*.) Bilalov alleged that he and Gref then had a second meeting later that same month at which Gref threatened Bilalov and pressured him to immediately transfer his and Magomed's shares in the Company. (*Id*. ¶¶ 83-84). To ensure compliance, says Bilalov, Gref and Sberbank also prepared a "false" report to the Russian government attributing the construction delays and cost overruns at the ski resort to Bilalov and Magomed's mismanagement. (*Id*.)

As alleged in *Bilalov I*, Hutseriev then entered the picture, "offer[ing] his assistance" to Gref in securing Bilalov and Magomed's consent to transfer 601 shares of the Company (not 817,

as Bilalov now alleges in this most recent iteration of this convoluted story). (*Id*. ¶¶ 98, 105-06). Bilalov claimed that Hutseriev then applied additional pressure to Magomed at a meeting in March 2013, simultaneously acting as a sort of good cop to Sberbank's proverbial bad cop by both pressuring Magomed on Gref's alleged behalf and providing assurances that the increasing scrutiny applied to their mismanagement of Krasnaya Polyana would dissipate if they agreed to transfer their 601 (not 817) shares. (*Id*. ¶¶ 103-04).

### B.    *Bilalov I* Ends in Bilalov's Defeat

Recall that Bilalov commenced his first lawsuit in the Southern District – *without* Ismailov – on November 2, 2020, a full three years before bringing his underlying suit in Ukraine. (*See Bilalov I*, ECF No. 1). He brought that action against Sberbank, Gref, and Sberbank USA CIB, Inc. ("Sberbank CIB"), the latter of which is no longer a defendant, but remains tangential here as a putative hook for personal jurisdiction over the Sberbank Defendants, despite having ceased to exist in December 2023. (*Compare Bilalov I* Compl. ¶ 22 *with* Sberbank Defendants' Mem. Law Supp. Mot. Dismiss 17-18, ECF No. 52).

Bilalov fared poorly in his first Southern District lawsuit: On September 13, 2022, the Court granted a motion to dismiss *Bilalov I* on three principal grounds: (i) that the Court lacked subject matter jurisdiction over all claims, except Bilalov's state law claim for abuse of process, because Sberbank was immune under the Foreign Sovereign Immunities Act ("FSIA"), (ii) that Bilalov failed to state a claim under the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), the federal Alien Tort Statute ("ATS"), and for abuse of process; and (iii) that the statute of limitations barred all of Bilalov's claims, except his ATS claim and claim for abuse of process. (*Bilalov I*, Order Granting Mot. Dismiss 1, ECF No. 98).

That decision did grant Bilalov very narrow permission to seek leave to amend the complaint to salvage the abuse of process claim (*id*. 25), but nevertheless clearly put Bilalov on

the path to final defeat. Indeed, after a short-lived appeal, and having lost a subsequent motion for leave to amend, this Court entered final judgment against Bilalov on July 5, 2023. (*Bilalov I*, Order Adopting Report and Recommendation, ECF No. 121).

### C.    The Transfer of Krasnaya Polyana, As Told This Time Around

*Bilalov I*, in short, was laced throughout with salacious allegations that Sberbank, Gref, and Hutseriev engaged in a pressure campaign to force Bilalov and Magomed to relinquish their interests in the Company.  None of those allegations have ever been tested because – as the Court subsequently concluded in *Bilalov I* – none of it is actionable in a United States court.

Unbeknownst to the Sberbank Defendants, Hutseriev, or the Court, on March 2, 2023 – while *Bilalov I* remained pending – Bilalov commenced his underlying suit in Ukraine on March 2, 2023. (First Am. Compl. ¶ 3). And once he handily pocketed his default judgment in that action – now against Sberbank,. Kuznetsov, and Hutseriev, rather than Sberbank, Gref, and Sberbank CIB – he returned to the Southern District telling a distinctly different story in pursuit of the same result: a money judgment compensating him for what he still thinks he deserves for Krasnaya Polyana. (*Id*. ¶¶ 90-91).Who

#### 1.    *Change of Story: Now It Is Zeeland, not Magomed or Bilalov, Who Owned the Key Shares of Krasnaya Polyana the Whole Time*

In their new lawsuit, Plaintiffs seek payment for 817 shares of Krasnaya Polyana – a marked, but unexplained increase from their previous suit over 601 shares. (*Compare id*. ¶¶ 87-88 *with Bilalov I* Compl. 98). This time around, moreover, they reveal that actually neither Bilalov nor Ismailov ever owned those shares: Zeeland did. (First Am. Compl. ¶ 87).

According to Paragraph 86 of the First Amended Complaint in this action, a non-party named Dragan Perovych founded Zeeland on April 17, 2009, and served as its original director alongside one Toomas Truuwert. Between 2009 and March 2012, Zeeland gradually acquired the

7

817 shares of the Company for which Plaintiffs now seek compensation, first in Ukraine and now here in New York. (*Id.* ¶87.) On March 9, 2013, Ismailov, Bilalov, and Magomed, entered a partnership agreement under which Ismailov became a trustee for Zeeland and all assets under its control, including those 817 shares of Krasnaya Polyana. (*Id.* ¶ 88). In consideration of that agreement, Magomed would (somehow) receive 15 percent of the value from the future sale of Zeeland's 817 shares. (*Id.*).

None of it makes much sense, not even on multiple read-throughs. For Plaintiffs, however, that does not matter. What matters is that – through this circuitous series of transactions, and despite apparently never owning Zeeland's shares of Krasnaya Polyana themselves – Bilalov and Ismailov supposedly acquired control of Zeeland and then caused Zeeland to enter the putative Sales Agreement. (First Am. Compl. Ex. A).

### 2. Change of Theory: This Time, Supposedly, Hutseriev is Liable for Breach of the Newly Alleged March 2013 Sales Agreement

In their own dismissal papers, the Sberbank Defendants have explained at length why the Sales Agreement is a palpable fake, a late-breaking invention crafted by Bilalov to continue his misbegotten pursuit of Krasnaya Polyana. (Sberbank Defendants' Mem. Law Supp. Mot. Dismiss 11-12). Hutseriev joins in that conclusion wholeheartedly, but – like the Sberbank Defendants – will assume for the sake of argument (as he must on a Rule 12(b) motion) that the Sales Agreement is genuine. Plaintiffs' case still fails.

Under the newly contrived Sales Agreement, Zeeland agreed to sell its 817 shares of Krasnaya Polyana to BIN Group for $200,000,000. (First Am. Compl. ¶88). That payment, say Plaintiffs, was supposed to have gone to Bilalov and Ismailov within thirty days, although neither Bilalov nor Ismailov actually owned a single piece of Zeeland until March 15, 2013, the date of

the Sales Agreement itself. (*Id*. ¶ 90). BIN Group, however, never paid the purchase price, and so – according to Plaintiffs – Hutseriev is liable under the Sales Agreement. (*Id*.)

Paragraph 5 of the Sales Agreement further provides that: "In the event of any disputes arising out of this agreement and/or related to the fact of performance of obligations under this agreement, the *parties* reserve the right to resolve such disputes in accordance with the national laws of the CIS countries and/or the laws of the State of New York." (First Am. Compl. Ex. A). This is on its face a choice of law provision, and a sloppy one at that, vesting all three parties to the agreement with discretion to elect the governing law in the event of any dispute, with no provision for resolving disagreements among them as to their choice of law. Paragraph 5 does *not*, however, require any of the parties to submit to the *jurisdiction* of any particular court.

And even if it did, Hutseriev *personally* agreed to *nothing*, even assuming the Sales Agreement is genuine: On its face, the Sales Agreement binds *BIN Group*, on whose behalf Hutseriev signed as its "representative." (*Id*.) The Sales Agreement, moreover, identifies only three actual "part[ies]" to the agreement: Zeeland (identified as "Seller"), BIN Group (identified as "Buyer") and Sberbank (identified as "Lender") – not Hutseriev, not Kuznetsov, not Bilalov, and not Ismailov. (*Id*.) Even Plaintiffs do not pretend otherwise, alleging nowhere that Hutseriev is personally bound to the Sales Agreement, even though the Ukrainian default judgment holds him responsible for its alleged breach. Whether such secondary liability is defensible as a matter of Ukrainian law is presently beside the point: under *New York* law, Hutseriev is plainly unbound by the Sales Agreement because he is not a party to it, and – as will be seen – that has fatal consequences for Plaintiffs' already threadbare theory of personal jurisdiction.

### 3.    *Change of Plan: Sue in Ukraine and then Return to New York*

Extracting a coherent narrative from *Bilalov I* and this lawsuit is extremely difficult, but one thing is certain: Bilalov simply cannot keep his story straight, even though he is now on his

*fourth* attempt at telling it. What was once – in *Bilalov I* – an agreement with Sberbank in February 2013 to divide Krasnaya Polyana between Sberbank, Bilalov, and Magomed *after* completion of the 2014 Olympics has now morphed – in this lawsuit – into a March 2013 Sales Agreement for the *immediate* sale of Zeeland's stake in Krasnaya Polyana to BIN Group. Whereas Bilalov *previously* accused Hutseriev of bringing additional pressure to bear in order to seal an accord with Gref and Sberbank, he *now* accuses Hutseriev of directly entering into the newly discovered March 2013 Sales Agreement on BIN Group's behalf. Whereas Bilalov *once* lamented that he was forced to transfer 601 shares of Krasnaya Polyana, despite also never giving instructions to complete that transfer (*Bilalov I* Compl. ¶ 99), *now* he says Zeeland voluntarily transferred 817 shares at his and Magomed's direction, but that Zeeland was never paid. (First Am. Compl. ¶ 91).

None of it coheres. It is therefore unsurprising that – in his latest iteration – Bilalov never alleges a coherent theory of why Hutseriev, rather than BIN Group, should be directly liable for the alleged breach of the supposed Sales Agreement, nor why Hutseriev, or the Sberbank Defendants, or BIN Group – or indeed *anyone* else – should be liable to Bilalov and Ismailov, rather than to Zeeland, who was the seller under the Sales Agreement in Bilalov's latest fanciful telling.

To unscramble this omelet, Bilalov knew that he could not directly return to this Court, which had already rejected *Bilalov I* both on the merits and under the Foreign Sovereign Immunities Act ("FSIA"). Instead, he needed to circumvent any further close review by pursuing relief in a new forum, accompanied by a new Plaintiff – Ismailov, a Ukrainian national. He found that forum in Ukraine, a jurisdiction currently under martial law, in which a Russian national cannot get a fair hearing and in which Plaintiffs employed a manner of service *least* calculated to apprise defendants of the lawsuit. (*See infra* Section V). One could almost admire Bilalov's

creativity, were it not marred by such shameless cynicism: an effort to leverage the current misery in Eastern Europe to his own personal advantage, by obtaining a fraudulent default judgment and thereby avoiding the scrutiny of an American legal system that previously upended him.

Ismailov originally commenced that action in Ukraine on or about March 2, 2023, and Bilalov later joined the case as a third party. (First Am. Compl. ¶ 3). They asserted personal jurisdiction based on Paragraph 5, the aforementioned choice of law clause in the Sales Agreement that ultimately chooses no jurisdiction's law, does not select any forum, and in any event does not and never has bound Hutseriev, even on its face. (*Id*. ¶ 53 and Ex. A). And they served notice of the action in a manner so grossly deficient that insufficient service alone forecloses recognition of the Ukrainian default judgment.

Specifically, Plaintiffs allege that on March 23, 2023, the Ukrainian court provided notice of the time and place of an initial May 11, 2023 hearing via email. (*Id*. ¶ 105 and Ex. C). According to an attorney affidavit attached to the First Amended Complaint, Plaintiffs obtained Hutseriev's and Kuznetsov's email addresses from the public domain: m.s.guceriev@gmail.com and kuznecov.s.k.1962@gmail.com. (*Id*., Ex. E at 5-6). The Ukrainian court allegedly sent the statement of claim and summons to those two email addresses exactly once and apparently never again. (*Id*.) Plaintiffs further allege that the Ukrainian court notified Hutseriev of the lawsuit by publishing the summons on the Court's official website, though how and why Hutseriev would have been monitoring that website is left unstated. (*Id*. ¶ 105).

With no appearance by any defendant, on May 25, 2023 the Ukrainian court entered a default judgment against the Sberbank Defendants and Hutseriev in the amount of $200 million, awarding $30 million to Ismailov and $170 million to Bilalov. (*Id*. ¶ 95). Having laundered their inconsistent and incoherent claims into a default judgment, Plaintiffs then returned to the Southern

11

District to collect, counting on the provisions of the Uniform Act to insulate those inconsistent and incoherent claims from further review. (*Id*. ¶¶ 96-97).

>   **D.      Plaintiffs Allege No Suit-Related Personal Jurisdictional Contacts Between Hutseriev and the Southern District**

Bilalov never named Hutseriev as a defendant in *Bilalov I*, and no wonder, because he is not subject to personal jurisdiction in the Southern District for any claim arising out of the transfer of Krasnaya Polyana, including Plaintiffs' present claim to recognize their Ukrainian judgment. Search high and low throughout all three complaints in *Bilalov I*, the original complaint in this action, and the First Amended Complaint, and you will find no allegation of any suit-related contact between Hutseriev and the State of New York. Yes, Plaintiffs offer several putative contacts between *Sberbank* and New York (though not one of them is actually related to this suit), but they offer no contacts between *Hutseriev* and this forum.

To make up for that otherwise fatal shortfall, Plaintiffs offer three alternatives. First, in a risible misrepresentation of their own supporting case law, they say that personal jurisdiction is not required over a judgment debtor in an action seeking to recognize a foreign money judgment. (First Am. Compl. ¶ 47). Second, they claim that Paragraph 5 of the Sales Agreement – the choice-of-law clause that vacillates among over a dozen different legal regimes in Europe, Central Asia, and New York, in an agreement that does not personally bind Hutseriev – somehow operates as a forum selection clause personally binding on Hutseriev, and exclusively in New York. Third, Plaintiffs make a strange attempt to allege *quasi in rem* jurisdiction, even though they have neither attached any property of Hutseriev in the Southern District, nor even identified any such property. None of these alternatives pass muster, as explained more fully below.

12

## <u>ARGUMENT</u>

The Court should grant Hutseriev's motion to dismiss for five reasons, each an independent defense under Rule 12(b):

<u>First</u>, no subject matter jurisdiction exists over Plaintiffs' claims against Hutseriev. Although Plaintiffs wisely dropped their assertion of diversity jurisdiction over such claims when amending their original complaint, they still assert supplemental jurisdiction anchored to their claims against Sberbank and its Vice Chairman, Stanislav Kuznetsov (collectively, with Sberbank, the "Sberbank Defendants"). That theory fails, however, because no original subject matter jurisdiction exists over Plaintiffs' claims against the Sberbank Defendants either. Rather, Plaintiffs' sole theory of such original jurisdiction – jurisdiction over "foreign states" under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1330 – fails because Sberbank, though undoubtedly a "foreign state," remains immune under the FSIA. And in the absence of such *original* jurisdiction, there can be no valid basis for *supplemental* jurisdiction over Hutseriev.

<u>Second</u>, no personal jurisdiction exists over Hutseriev, a Russian citizen who is therefore not subject to general jurisdiction in the Southern District. Nor is he subject to specific personal jurisdiction, because Plaintiffs' suit seeks to enforce a judgment entered by a Ukrainian court on a claim for breach of a contract entered into between a British Virgin Islands company (Zeeland) and a Russian non-party (BIN Group), for the sale of Zeeland's shares of a Russian joint stock company (Krasnaya Polyana), whose principal asset was a villa in southern Russia. This lawsuit has no connection to the United States, let alone a substantial connection sufficient to satisfy due process on a theory of specific jurisdiction.

<u>Third</u>, and for similar reasons, venue cannot be properly sited in the Southern District because no defendant resides in the Southern District and because no part of the underlying events or omissions giving rise to the claim occurred in the Southern District.

13

Fourth, although Plaintiffs successfully moved *ex parte* for an order authorizing service of process in this action via email to Huseriev's U.S.-based attorneys, that order was improvidently granted because – contrary to Plaintiffs' representations in that *ex parte* application – the 1965 Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters (the "Hague Service Convention") does not authorize service of process by email on Russian nationals.

Fifth, and finally, the governing statute in this action – New York's version of the Uniform Act – forecloses recognition of Plaintiffs' judgment as a matter of law, even accepting the truth of their allegations and of the exhibits attached to the First Amended Complaint. Consequently, Plaintiffs' action is properly subject to a facial challenge on the grounds that a complete defense appears on the face of the First Amended Complaint.

## I.    STANDARDS ON MOTION TO DISMISS

Although the precise legal standard varies among its sub-components, a motion to dismiss under Rule 12(b) is at bottom an opportunity for a defendant to explain to the Court why – even if every single thing a plaintiff alleges is true – the Court must still dismiss the lawsuit. That is what Hutseriev will do here: assume the truth of Plaintiffs' allegations and demonstrate why the case still fails from the very outset.

Rule 12(b) sets forth seven defenses, five of which are relevant here: (i) lack of subject matter jurisdiction under Rule 12(b)(1); (ii) lack of personal jurisdiction under Rule 12(b)(2); (iii) improper venue under Rule 12(b)(3); (iv) insufficient service of process under Rule 12(b)(5); and (v) failure to state a claim upon which relief can be granted.

### A.    Standard Under Rule 12(b)(1)

Every motion to dismiss starts from the central assumption that the factual allegations of the complaint are true. *See, e.g., Levy v. NYC Health + Hosps.*, 660 F. Supp. 3d 220, 228 (S.D.N.Y.

2023). The *legal* conclusions asserted in a complaint, however, are not assumed true: quite the contrary, as the fundamental purpose of a Rule 12(b) motion is to challenge those very conclusions. *See id.*

Nowhere is that skepticism more warranted than on a motion to dismiss for lack of subject matter jurisdiction. *See, e.g., Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). As courts of limited jurisdiction, the federal courts may not hear a claim unless there is a constitutional and statutory basis for doing so. *See id.* Accordingly – even though the allegations are assumed true – a district court must always undertake its own assessment of whether those allegations make out a basis for subject matter jurisdiction, including taking extrinsic evidence where necessary. *Id.*

The need for that independent assessment is at perhaps its most acute under the FSIA, which – as a matter of international comity – vests subject matter jurisdiction over claims against a defendant "foreign state" *only* when the complaining plaintiffs can establish that the foreign state is not immune. 28 U.S.C. § 1330. As such, a foreign state has latitude to bring *both* a facial challenge to Plaintiffs' allegations of subject matter jurisdiction *and* challenge the underlying real-world factual basis for such jurisdiction. (*See* Sberbank Defendants' Mem. Law Supp. Mot. Dismiss 18). That is what the Sberbank Defendants have done here – successfully. And for the reasons set forth more fully below, the absence of subject matter jurisdiction over Sberbank eliminates any conceivable basis for subject matter jurisdiction over Hutseriev.

### B. Standard Under Rule 12(b)(2), 12(b)(3), and 12(b)(5) – Personal Jurisdiction, Venue, and Service

Rule 12(b) also permits challenges on the basis of lack of personal jurisdiction, improper venue, and improper service. Again, the courts will assume the truth of the factual allegations in the complaint, but Plaintiffs may not summarily declare the existence of personal jurisdiction as a matter of law; rather, the allegations must at minimum show "a prima facie case" that personal

15

jurisdiction exists. *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 120 (2d Cir. 1984). Defendant, moreover, may challenge personal jurisdiction by resort to extrinsic evidence, but that will not be necessary here, where Plaintiffs offer nothing to support the Court's exercise of personal jurisdiction over Hutseriev.

The same standard governs motions to dismiss under both Rule 12(b)(3) for improper venue, and Rule 12(b)(5) for insufficient service of process. *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 355 (2d Cir. 2005) ("[W]e will apply the same standard of review in Rule 12(b)(3) dismissals for improper venue as we do in Rule 12(b)(2) dismissals for lack of personal jurisdiction . . . ."); *George v. Pro. Disposables Int'l, Inc.*, 221 F. Supp. 3d 428, 442 (S.D.N.Y. 2016) ("[A]lthough a Rule 12(b)(5) motion is distinct from a Rule 12(b)(2) motion, which challenges the actual existence of personal jurisdiction, both go to the Court's ability to exercise judicial power over the defendant . . . (quotations marks and citations omitted)).

### C.    Standard Under Rule 12(b)(6)

The most exacting standard under Rule 12(b) is a motion to dismiss under Rule 12(b)(6) for failure to state a claim. In reviewing such a motion, the Court both assumes the truth of the allegations and draws all reasonable inferences in the plaintiff's favor, ultimately asking whether whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a [legal] claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Even here, however, the Court must not accept legal conclusions at face value. Moreover, the Court's examination is not limited to the four corners of the complaint itself, but may also reach exhibits to the complaint, documents incorporated by reference or otherwise integral to the complaint, and extraneous material that is subject to judicial notice. "[A] complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents

16

incorporated in it by reference." *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991). "[W]e may [also] consider documents 'integral to the complaint' on a motion to dismiss – 'particularly where plaintiff has been put on notice' thereof." *Levitin v. PaineWebber, Inc.*, 159 F.3d 698, 703 (2d Cir. 1998).

Crucially, a defendant may also bring a facial challenge to a complaint on the basis that it presents a complete defense on its face. *McCoy v. Goord*, 255 F. Supp. 2d 233, 250 (S.D.N.Y. 2003). Here, as set forth more fully below, all three grounds for non-recognition of a foreign country money judgment under CLR 5304(a) are apparent from the face of the complaint when read alongside Plaintiffs' own exhibits. These CPLR 5304 defenses, moreover, may be properly invoked on a motion to dismiss because "[t]hese bases of non-recognition preclude courts from recognizing the foreign judgment *as a matter of law*." *S.C. Chimexim S.A. v. Velco Enterprises Ltd.*, 36 F. Supp. 2d 206, 212 (S.D.N.Y. 1999) (emphasis added).

## II.    NO SUBJECT MATTER JURISDICTION EXISTS

No federal claim may proceed in the absence of jurisdiction over the subject matter. *See Cabiri v. Gov't of Republic of Ghana*, 165 F.3d 193, 196 (2d Cir. 1999). Such jurisdiction, moreover, must be established "on a claim-by-claim basis." *Trustees of United Health & Welfare Fund v. Copper Servs., LLC*, No. 22-cv-8965 (VSB), 2024 WL 3553138, at *2 (S.D.N.Y. July 26, 2024) (citing *Rocky Aspen Mgmt. 204 LLC v. Hanford Holdings LLC*, 358 F. Supp. 3d 279, 282 (S.D.N.Y. 2019)). When determining the existence of original subject matter jurisdiction, the courts typically resort to two time-tested alternatives: federal question jurisdiction under 28 U.S.C. § 1331 and diversity jurisdiction under 28 U.S.C. § 1332.

Neither of these familiar jurisdictional workhorses carry Plaintiffs forward here. Although Plaintiffs initially claimed original subject matter jurisdiction on the basis of diversity, they wisely abandoned that theory in the First Amended Complaint, evidently taking heed that complete

17

diversity of parties does not exist in a suit commenced solely among aliens, even when one of those aliens (Bilalov) is a permanent legal resident. *See Tagger v. Strauss Grp. Ltd.*, 951 F.3d 124, 127-28 (2d Cir. 2020) ("[W]e hold that section 1332(a)(2) does not give the district court jurisdiction over a suit by a permanent resident alien against a non-resident alien . . . ."). Every party to this action is a non-citizen, and therefore no federal diversity jurisdiction obtains over any of Plaintiffs' claims.

Likewise, because Plaintiffs bring claims solely under state law – the Uniform Act, plus a common law claim for restitution – and because neither of these state law claim turns on an underlying construction of federal law, no federal question jurisdiction exists. *See, e.g., Sung ex rel. Lazard Ltd. v. Wasserstein*, 415 F. Supp. 2d 393, 396 (S.D.N.Y. 2006).

Instead, to support their claims against Hutseriev, Plaintiffs rely on *supplemental* jurisdiction under 28 U.S.C. § 1367, which allows a district court to take supplemental jurisdiction over a non-federal claim amongst non-diverse parties when the court has original jurisdiction over some other claim – often referred to as an "anchor claim" – with which it shares a common nucleus of operative fact. *See generally Goney v. SuttonPark Cap. LLC,* No. 22-1830, 2023 WL 8235019, at *4 (2d Cir. Nov. 28, 2023); *Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 140 F.3d 442, 447 (2d Cir. 1998).

Lacking federal question or diversity as an anchor, Plaintiffs rely here on a third candidate: jurisdiction over foreign states under the FSIA. Specifically, Plaintiffs argue that the Court holds original jurisdiction over their claims against Sberbank, which is a foreign state within the meaning of 28 U.S.C. § 1330. (First Am. Compl. ¶¶ 30-31). Plaintiffs' claims against Sberbank, however, are a potential basis for original federal subject matter jurisdiction if – but *only* if – Sberbank is *not* immune under 28 U.S.C. §§ 1604-1605.

18

But Sberbank *is* immune. Indisputably so, and *for the very same reasons* that this Court dismissed *Bilalov I*: a private enterprise – even one owned by the state – is not in and of itself capable of executing a taking within the meaning of 28 U.S.C. § 1605(a)(3). *Bilalov v. Gref*, No. 20-cv-9153 (AT), 2022 WL 4225968, at *6 (S.D.N.Y. Sept. 13, 2022). As the Sberbank Defendants explain at greater length in their own moving papers, only an actual sovereignty – presumably, in this instance, the Russian Federation – is capable of executing a governmental "taking" of property. (Sberbank Defendants' Mem. Law Supp. Mot. Dismiss 26-29). Sberbank is not the Russian Federation and cannot be sued under the expropriation exception to the FSIA, and therefore *Hutseriev* cannot be sued on the basis of supplemental jurisdiction anchored to a claim against Sberbank.

Hutseriev joins in the Sberbank Defendants' argument that they cannot be subject to original federal court jurisdiction under the expropriation exception. And because supplemental jurisdiction is Plaintiffs' *sole* basis for subject matter jurisdiction over their claims against Hutseriev, that conclusion ends the case. As the First Amended Complaint implicitly concedes, there *cannot be* supplemental jurisdiction over such claims in the absence of a jurisdictional anchor claim against Sberbank, and yet there is no jurisdiction anchor claim because Sberbank remains immune under 28 U.S.C. § 1605. Consequently, the Court lacks subject matter jurisdiction over Plaintiffs' claims against Hutseriev, and must dismiss.

## III.    NO PERSONAL OR *QUASI IN REM* JURISDICTION EXISTS

Hutseriev is a Russian national and therefore not subject to general jurisdiction in the Southern District, nor anywhere in the United States. *See, e.g., DeMaria v. Nutritional Beverages, LLC*, No. 23-cv-7314, 2024 WL 4145743, at *7 (E.D.N.Y. Sept. 11, 2024). That leaves only one hypothetical basis for personal jurisdiction: specific jurisdiction under New York's long-arm statute, CPLR 302. That statute confers specific jurisdiction only when the lawsuit itself arises out

of or has a substantial connection with: (i) the defendant's "transact[ion] [of any business within the state" or a contract to "supply goods or services in the state"; (ii) a "tortious act within the state" committed by defendant; (iii) a "tortious act *without* the state" that causes injury to a person within the state; or (iv) the defendant's ownership of property within the state.

None of those four prongs obtains here. *See generally Daou v. BLC Bank, S.A.L.*, 42 F.4th 120, 128 (2d Cir. 2022). Plaintiffs bring suit to enforce a judgment issued in Ukraine and arising from a dispute with no connection the United States. A tandem of Russian and Ukrainian nationals (Bilalov and Ismailov) sue a trio of Russian defendants (Sberbank, Kuznetsov, and Hutseriev) for beach of a contract executed in Russia (the Sales Agreement) for the sale of shares in a British Virgin Islands corporation (Zeeland) to a Russian company (BIN Group). There is no connection between the judgment or the underlying dispute and the Southern District, and consequently no connection sufficient to establish specific jurisdiction – or even hint at it.

Plaintiffs proffer a series of workarounds, but none hits the mark.

First, Plaintiffs claim that – under state law – they need not establish personal jurisdiction over a judgment debtor in an action to recognize a foreign money judgment. In support, the First Amended Complaint invokes *Lenchysyn v. Pelko Electric, Inc.*, 281 A.D.2d 42, 47 (4th Dept. 2001), *Abu Dhabi Com. Bank PJSC v. Saad Trading, Contracting & Fin. Servs. Co.*, 117 A.D.3d 609, 611 (1st Dept. 2014), and *AlbaniaBEG Ambient Sh.p.k. v. Enel S.p.A.*, 160 A.D.3d 93, 108 (1st Dept. 2018). Plaintiffs grossly misconstrue that line of authority.

In *Lenchsyn*, the Fourth Department (whose rulings control as precedent in western New York, not Manhattan) held that personal jurisdiction need not be established when a judgment creditor "merely asks the court to perform its ministerial function of recognizing the foreign country money judgment." *Id*. at 49. Similarly, the First Department in *Abu Dhabi Commercial*

20

*Bank* reasoned that, ordinarily, "[i]n [a] proceeding under article 53, the judgment creditor does not seek any new relief against the judgment debtor, but instead merely asks the court to perform its ministerial function of recognizing the foreign country money judgment and converting it into a New York judgment."

If that were the final word, Plaintiffs might have some justification for setting aside the requirement of personal jurisdiction. But *Lenchsyn* and *Abu Dhabi Commercial Bank* are not the final word: nor could they be, given that personal jurisdiction is not merely a matter of state statutory law, but also a requirement of constitutional due process. Unsurprisingly, then, in *AlbaniaBEG*, the First Department clarified that the rulings in *Lenchsyn* and *Abu Dhabi Commercial Bank* are limited to their facts, and specifically limited to those situations in which recognition of a judgment is truly "ministerial" and entirely without controversy. 160 A.D.3d at 107-08.

But in contrast, where the judgment creditor's entitlement to recognition of the judgment is called into question, the judgment debtor must establish a basis for personal jurisdiction within the limits of the due process clause, as the First Department emphatically and unambiguously explained in *AlbaniaBEG*:

> The *Abu Dhabi* holding applies only "under the[ ] circumstances" that were presented by that case, namely, where the defendant—unlike defendants in the case before us – does not contend that substantive grounds exist to deny recognition to the foreign judgment under article 53.

> ***

> *Abu Dhabi*, by its own terms, is not controlling where – as is the case here – the foreign judgment's entitlement to recognition under article 53 is placed in question. In that situation, there is something to defend, and the court's function ceases to be merely ministerial. In such a case – and the matter before us is such a case – the court will be required to determine contested questions of fact, of law, or of both, and . . . To require a defendant to litigate such substantive issues in a forum where it maintains no property, and where it has no contacts that would otherwise subject

it to personal jurisdiction, would "offend [the] traditional notions of fair play and substantial justice."

*Id*. at 108.

In so ruling, the First Department unequivocally dispensed with Plaintiffs' argument that they need not establish personal jurisdiction over Hutseriev. It is hardly a shock that both Hutseriev and the Sberbank Defendants – all of whom are supposedly subject to a default judgment entered without notice in a jurisdiction, Ukraine, that does not presently afford them due process – emphatically and justifiably challenge recognition under CPLR 5304. Accordingly, Plaintiffs must sufficiently allege a basis for personal jurisdiction. They have not.

Second, in seeming recognition that their misinterpretation of the case law does not survive cursory examination, Plaintiffs allege several putative jurisdictional contacts between New York state and the Sberbank Defendants – but *only* the Sberbank Defendants. (*See* First Am. Compl. ¶¶ 12-29). To be sure, not one of Plaintiffs' disparate economic contacts between Sberbank and New York suffice to establish specific personal jurisdiction over Sberbank or Kuznetsov *in this lawsuit* (not least because most of those contacts are attributable to the now-deceased Sberbank CIB). With respect to Hutseriev, however, Plaintiffs allege *no suit-related contacts whatsoever*. Plaintiffs do attempt to invoke Paragraph 5 of the Sales Agreement (which they mischaracterize as a forum selection clause), yet that clause does not even bind Hutseriev, whatever its meaning. As such, there is no basis to on which to establish the personal jurisdiction demanded by *AlbaniaBEG* in this vigorously – and justifiably – contested recognition action. This is no mere ministerial dispute, and yet there is no basis for specific jurisdiction.

Third, and finally, Plaintiffs wrongheadedly attempt to invoke *quasi in rem* jurisdiction, citing a famous footnote from the Supreme Court's decision in *Shaffer v. Heitner*, 433 U.S. 186, 199 n. 36 (1977). *Shaffer* is indeed an epochal decision, imposed upon first-year law students ever

since – but it stands for little more than the proposition that *quasi in rem* jurisdiction is indeed a constitutionally permissible substitute for general and specific jurisdiction (a controversial question at the time). It says nothing about whether such jurisdiction is appropriate in any particular case. To make *that* determination, the Court must turn to the Federal Rules and on that score Plaintiffs stumble at the starting gate.

Under Rule 4(n), *quasi in rem* jurisdiction does *not* simply attach whenever – as here – a plaintiff vaguely alleges the presence of unspecified property that might possibly be sited within the district, P.S., details to follow. On the contrary, Rule 4(n) permits the exercise of *quasi in rem* jurisdiction only "[o]n a showing that personal jurisdiction over a defendant cannot be obtained in the district where the action is brought by reasonable efforts to serve a summons under this rule," and then only after the plaintiff "seiz[es] the assets under the circumstances and in the manner provided by state law in that district." Fed. R. Civ P. 4(n); *See also Orient Overseas Container Line v. Kids Int'l Corp.*, No. 96-cv-4699 (DLC), 1998 WL 531840, at *4 (S.D.N.Y. Aug. 24, 1998) ("There are two issues in considering an attachment for purposes of attaining *quasi in rem* jurisdiction: (1) whether the movant has satisfied the conditions for an order of attachment under the relevant procedural rules; and (2) whether the court's exercise of jurisdiction over the defendant, assuming the order of attachment issues, comports with constitutional standards of due process.")

Hutseriev can – and does! – readily agree that there is no basis whatsoever for personal jurisdiction over him in the Southern District. Unfortunately for Plaintiffs, however, that is only the first step towards perfecting *quasi in rem* jurisdiction. Plaintiffs must then attach property within the district in accordance with state law, yet they have made no effort at all to do so. Rather, Plaintiffs meekly allege that "[u]pon information and belief, this Court has In Rem jurisdiction

23

over Defendants' assets located in New York, including bank accounts, real property, shares in companies, or other tangible or intangible property." (First Am. Compl. ¶ 56). Which bank accounts? What real property? What shares? When did Plaintiffs attach any such property? Did they do so in accordance with state law? Did they provide notice to Hutseriev?

P.S., say Plaintiffs – details to follow. That is not enough.

In the end, citing *Shaffer*, Plaintiffs allege only that *quasi in rem* jurisdiction is – in theory – constitutionally permissible. But they have not established such jurisdiction in practice and they certainly cannot substitute *quasi in rem* jurisdiction over Hutseriev's unidentified and unattached property for *specific* jurisdiction over Hutseriev's person.

This case cannot proceed in New York.

## IV.    PLAINTIFFS HAVE IMPROPERLY SITED VENUE

For essentially the same reason, the Southern District is not a proper venue for this lawsuit.

As the Sberbank Defendants explain at length in their motion to dismiss, there is no basis to lay venue against Sberbank under 28 U.S.C. § 1391(f), which governs venue under the FSIA. For that reason alone, the Court should dismiss for lack of proper venue. Yet even under the ordinary venue statute, 28 U.S.C. § 1391(b), venue cannot lie in the Southern District.

"[T]he civil venue statute permits venue in multiple judicial districts as long as 'a substantial part' of the underlying events took place in those districts." *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 356 (2d Cir. 2005). And "substantial" contact means something even *more* pronounced than the contacts required to establish specific jurisdiction: "[F]or venue to be proper, significant events or omissions material to the plaintiff's claim must have occurred in the district in question, even if other material events occurred elsewhere. It would be error, for instance, to treat the venue statute's 'substantial part' test as mirroring the minimum contacts test employed in personal jurisdiction inquiries." *Id*. In this case, where Plaintiffs quite literally allege

*no contacts* between Hutseriev and New York related to their suit, neither personal jurisdiction nor venue may be sustained.

## V. PLAINTIFFS' CHOSEN MANNER OF SERVICE VIOLATES THE HAGUE SERVICE CONVENTION

Although Plaintiffs obtained an *ex parte* order from this Court authorizing service on Hutseriev by email under Rule 4(f), their application overlooked a crucial restraint on the Court's discretion: that alternative service without the United States not be "prohibited by international agreement." Here, the Hague Service Convention bars service by email, because the Russian Federation has objected to such service in civil actions. *See generally Kadmon Corp., LLC v. Ltd. Liab. Co. Oncon*, No. 22-cv-5271 (LJL), 2023 WL 2346340, at *2 (S.D.N.Y. Mar. 3, 2023).

Concededly, several district courts have sustained service by email despite Russia's objection. *See, e.g., AMTO, LLC v. Bedford Asset Management, LLC*, 2015 WL 3457452, at *4 (S.D.N.Y. June 1, 2015). Yet none of those cases can be reconciled with the Supreme Court's decision in *Water Splash, Inc. v. Menon*, 581 U.S. 271, 278 (2017). In *Water Splash*, the Court held unequivocally that the Hague Service Convention establish an *exclusive* list of permissible methods of service, which – unsurprisingly for a treaty concluded in the 1960s – does not include service by email. Nevertheless, Article 10 of the Hague Service Convention does permit service by *regular* mail and some courts have therefore inferred that service by *electronic* mail is also permissible under the Convention.

That may or may not be a fair reading of Article 10. With respect to service in Russia, however, the issue is academic, because Russia long ago objected to Article 10 service *in its entirety*. *See Kadmon Corp.*, 2023 WL 2346340, at *4. As such, the only remotely plausible basis for service by email under the Hague Convention – Article 10 – simply does not apply in Russia. And because, as *Water Splash* teaches, the Hague Service Convention establishes an *exclusive* list

25

of permissible methods of service, the Convention necessarily precludes mail and email service within the Russian Federation. *Id*.

## VI.    THE UNIFORM ACT REQUIRES THE COURT TO DENY RECOGNITION OF THE UKRAINIAN JUDGMENT AND MANDATES DISMISSAL

CPLR 5304 sets forth three mandatory grounds for non-recognition of a foreign money judgment:

> A court of this state may not recognize a foreign country judgment if: 1. the judgment was rendered under a judicial system that does not provide impartial tribunals or procedures compatible with the requirements of due process of law; 2. the foreign court did not have personal jurisdiction over the defendant; or 3. the foreign court did not have jurisdiction over the subject matter.

Accordingly, "a plaintiff seeking enforcement of a foreign country judgment granting or denying recovery of a sum of money must establish prima facie: (1) a final judgment, conclusive and enforceable where rendered; (2) subject matter jurisdiction; (3) jurisdiction over the parties or the res; and (4) regular proceedings conducted under a system that provides impartial tribunals and procedures compatible with due process." *Ackermann v. Levine*, 788 F.2d 830, 842 n. 12 (2d Cir.1986). Here, Plaintiffs arguably allege the first of these four elements, but the remaining three prongs foreclose recognition of their Ukrainian judgment.

First, Plaintiffs incorrectly assert that the Ukrainian court had subject matter jurisdiction over their claims against Hutseriev under Article 76 of the Ukrainian Law on Private International Law. (*See* First Am. Compl. ¶ 98(c)). (A translated copy of the *Law on Private International Law* is attached to the Van Riper Declaration as Exhibit 2).That provision vests jurisdiction: (i) "if the parties stipulated in their agreement that the case with a foreign element be subject to the courts of Ukraine," as stated in Article 76(1); or (ii) "if in the case of compensation for damage the plaintiff (natural person) has a place of residence in Ukraine or a legal person (defendant) has a place of residence in Ukraine," as stated in Article 76(5).

Because only Zeeland and BIN Group – not Ismailov, Bilalov, or Hutseriev – are allegedly party to the Sales Agreement, neither provision of Article 76 can confer subject matter jurisdiction. Even under the dubious assumption that Paragraph 5 of the Sales Agreement is a forum selection clause, it does not bind Hutseriev directly, hence Article 76(1) cannot apply.

As to Article 76(5), it is true – at least allegedly – that Ismailov "has a place of residence in Ukraine," yet Article 76(5) remains inapplicable, because the actual parties to the contract all reside outside Ukraine. In an April 1, 1994 ruling entitled *On Issues of Practice Regarding Compensation for Damages*, the Supreme Court of Arbitration of Ukraine cautioned its subordinate courts to carefully distinguish between contact and tort claims: "When resolving disputes about the recovery of damages, the economic court must first of all find out the legal grounds for assigning the specified property liability." (A translated copy of that decision is attached to the Van Riper Declaration as Exhibit 3). That contractual/tort distinction has many vital consequences, as the court explained, some familiar to American jurists, some less so. The most important of them for present purposes, however is quite familiar indeed: compensation for *contractual* damages may generally be sought only by and from the *parties* to that contract: "damage caused by non-fulfillment of contractual obligations must be compensated by the counterparty under the contract." *Id*.

Consequently, Article 76(5) can supply no basis for subject matter jurisdiction in this breach of contract lawsuit, because it can only apply  when either the plaintiff or the defendant – the parties or counterparties, in a breach of contract action – "ha[ve] a place of residence" in Ukraine. Here none of the actual parties to the Sales Agreement have residence in Ukraine. Zeeland is an alleged party, but it resides outside Ukraine, in the British Virgin Islands. BIN Group is an

27

alleged party to the Sales Agreement, but it too resides outside Ukraine. Sberbank is Russian. The only person with alleged Ukrainian residency even connected to the Sales Agreement was Ismailov, but because he is not a party to it, he cannot directly sue under it. Ismailov's residency therefore was not a basis for subject matter jurisdiction in the underlying breach of contract suit against him.[1]

Second, as the Sberbank Defendants lay out at length in their motion to dismiss, the Ukrainian court lacked personal jurisdiction over any defendant in the Ukrainian action because Plaintiffs employed a manner of service that does not comport with the requirement under New York law (and indeed American law more broadly), that the defendant receive "meaningful notice of the foreign proceeding "*John Galliano, S.A. v. Stallion, Inc.*, 15 N.Y.3d 75, 80 81 (2010). Personal jurisdiction, after all, requires both sufficient jurisdictional contacts and proper service of process. By opting to "serve" defendants by sending them a single email with notice of a hearing that had already concluded, Plaintiffs deprived Hutseriev and the Sberbank Defendants of meaningful notice: and *of course* they did, because Bilalov's entire plan hinged on circumventing the result in *Bilalov I* by obtaining a default judgment and then seeking recognition of that judgment in the Southern District.

Third, and perhaps most importantly, the Ukrainian court could not afford due process to Hutseriev, even if he had notice of the proceedings, because Ukrainian sanctions broadly prohibit Ukrainian citizens from providing services to Russian nationals under the Resolution of the Cabinet Ministers of Ukraine, No. 187 (March 3, 2022), which prohibits performance by Ukrainian nationals of a broad suite of obligations in favor of the Russian Federation, its citizens, companies

---

[1] Would it have been viable in tort? Maybe. But Plaintiffs' underlying claim is self-avowedly one for breach of contract (*see* First Am. Compl. ¶ 3), and thus belonged directly only to Zeeland, and against only BIN Group.

registered in the Russian Federation, and companies registered in Ukraine for whom which the ultimate beneficial owner or the owner of a share of 10% or more is the Russian Federation, a citizen of the Russian Federation or a Russian company. (Cabinet Resolution No. 198 is attached to the Van Riper Declaration as Exhibit 4.) In some respects, this prohibition is similar to sanctions restrictions under American law, under which U.S. Persons may not provide services of any kind to Russian nationals identified on OFAC's Specially Designated Nationals list. *See* 31 CFR § 589.201. Unlike American law, however, Ukrainian law applies this prohibition to all Russian citizens (including, presumably, Hutseriev), and – more importantly – includes no apparent exception for legal services. *Compare with* 31 CFR § 589.506.

The effect of this prohibition is to deprive Russian nationals of legal representation, a deprivation of due process that by itself forecloses recognition of Plaintiffs' Ukrainian judgment. The right to representation by counsel is fundamental to due process, even in civil cases, and even though – to be sure – the choice of any one specific attorney may and does yield to other considerations, such as the need to maintain the integrity of the legal system. *See United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006). The basic right to have *a lawyer*, however, is long-established in the United States, and is increasingly recognized under international law as well, ever since Article 7 of the Universal Declaration of Human Rights took the first steps towards enshrining the right to due process as a component of international law. *See generally* Hollman, Meredith, *Fundamental Fairness: Finding A Civil Right To Counsel In International Human Rights Law*, 57 University of Richmond Law Review 685 (2023). More importantly, the federal courts have long required such access as a condition of recognizing foreign country money judgments under the Uniform Act:

> The evidence in this case indicated that [relations of the former Iranian Shah] . . . could not personally appear before [Iranian] courts, [and] could not obtain proper legal representation in Iran . . . . Those are not mere niceties of American jurisprudence. They are ingredients of 'civilized jurisprudence.' They are ingredients of basic due process.

*Bank Melli Iran v. Pahlavi*, 58 F.3d 1406, 1413 (9th Cir. 1995) (quoting *Hilton v. Guyot*, 159 U.S. 113, 205 (1895)).

The mere fact that a Russian national presently has no guarantee of counsel in a proceeding in Ukraine is enough to foreclose recognition of a Ukrainian court judgment issued while these present conditions of martial law remain in effect. The Court need not hold more broadly that the Ukrainian court system is infirm, or that the Ukrainian Court's judgment in this matter was legally or factually unfounded, or that those conditions of martial law are unjustified or inappropriate. The Court need only recognize present reality: sanctions regulations would have prohibited Hutseriev from retaining counsel even if he had notice of Plaintiffs' Ukrainian lawsuit. That alone requires the Court to reject Plaintiffs' cynical attempt to leverage those conditions to obtain a judgment that they could have never obtained otherwise.

Plaintiffs, not Hutseriev, carry the burden of establishing that the Ukrainian court afforded due process. *See Liu v. Guan*, 225 A.D.3d 749, 751 (2d Dept. 2024); *Wimmer Canada, Inc. v. Abele Tractor & Equip. Co.*, 299 A.D.2d 47, 49 (1st Dept. 2002). Here, they cannot possibly sustain that burden, because Hutseriev could not have retained competent Ukrainian counsel even if he had notice of the proceedings. The Ukrainian judgment thus issued from a court that did not have subject matter jurisdiction, against defendants that had no meaningful notice of the proceedings, and in a procedural environment that does not afford representation – and therefore cannot afford due process – to Russian nationals. Consequently, the Court must not recognize the judgment, and must instead dismiss Plaintiffs' lawsuit with prejudice.

30

## CONCLUSION

For the reasons set forth above, this Court should grant the Hutseriev's motion to dismiss under Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), 12(b)(3), 12(b)(5), and 12(b)(6).

Dated: October 18, 2024
      New York, New York

Respectfully submitted,


*/s/ Jay S. Auslander*
Jay S. Auslander
Natalie Shkolnik
David Partida
Michael Van Riper
Wilk Auslander LLP
825 Eighth Avenue, Suite 2900
New York, New York 10019
Tel: (212) 981-2338

*Attorneys for Defendant Mykhailo Safarbekovych Hutseriev*

31