# EXHIBIT 7


An official website of the United States government    Here's how you know

**U.S. DEPARTMENT OF THE TREASURY**                          READ THE LATEST TREASURY NEWS

## Office of Foreign Assets Control

A PART OF TREASURY'S
OFFICE OF TERRORISM AND
FINANCIAL INTELLIGENCE

**HOME    FREQUENTLY ASKED QUESTIONS    FAQ TOPIC PAGE**

Specially Designated
Nationals List (SDN
List)

Consolidated
Sanctions List (Non-
SDN Lists)

Additional Sanctions
Lists

Search OFAC's
Sanctions Lists

Sanctions Programs
and Country
Information

Recent Actions

OFAC License
Application Page

Additional OFAC
Resources

Frequently Asked
Questions

Civil Penalties and
Enforcement
Information

OFAC Reporting
System

Selected General
Licenses Issued by
OFAC

# Russian Harmful Foreign Activities Sanctions

Search FAQs

Search FAQs

PRINT THIS TOPIC

## RUSSIAN HARMFUL FOREIGN ACTIVITIES SANCTIONS

### 886. What does Executive Order (E.O.) 14024, "Blocking Property with Respect to Specified Harmful Foreign Activities of the Government of the Russian Federation" do?

E.O. 14024    establishes a new national emergency under which sanctions may be imposed against individuals and entities furthering specified harmful foreign activities of the Russian Federation.  This national emergency is separate from the national emergency relating to the crisis in Ukraine, declared in E.O. 13660    and further addressed in E.O.s 13661   , 13662   , 13685   , and 13849   .  E.O. 14024 addresses national security threats posed by specified harmful foreign activities of the Russian Federation, including:  its efforts to undermine the conduct of free and fair democratic elections and democratic institutions in the United States and its allies and partners; engaging in and facilitating malicious cyber-enabled activities against the United States and its allies and partners; fostering and using transnational corruption to influence foreign governments; pursuing extraterritorial activities targeting dissidents or journalists; undermining security in countries and regions important to United States national security; and

Contact OFAC

violating well-established principles of international law, including respect for the territorial integrity of states.

Like any other blocking Executive order, E.O. 14024 permits the United States to impose blocking and short-of-blocking sanctions.  The Office of Foreign Assets Control (OFAC) issued several directives under E.O. 14024 specifying certain prohibitions relating to persons determined to be subject to the applicable directive.  OFAC recommends reviewing the sanctions lists maintained by OFAC, including the Specially Designated Nationals and Blocked Persons List (SDN List), the List of Foreign Financial Institutions Subject to Correspondent Account or Payable-Through Account Sanctions (CAPTA List), and the Non-SDN Menu-Based Sanctions List (NS-MBS List), to determine which sanctions are applicable.

On December 22, 2023, the President issued E.O. 14114 , "Taking Additional Steps With Respect to the Russian Federation's Harmful Activities," which amended E.O. 14024 to further address the Russian Federation's continued use of its military-industrial base to aid its effort to undermine security in countries and regions important to United States national security.  See FAQ 1147 for information on how E.O. 14114 amended E.O. 14024.

**Date Updated: February 23, 2024**

Released on April 15, 2021

### 887. Are persons identified pursuant to Executive Order (E.O.) 13662 as subject to Directive 3 for operating in the defense and related materiel sector of the Russian Federation economy blocked pursuant to E.O. 14024?

Persons identified pursuant to E.O. 13662 as subject to Directive 3 for operating in the defense and related materiel sector of the Russian Federation economy are not subject to prohibitions under E.O. 14024 unless those persons are also sanctioned pursuant to E.O. 14024.  For more information regarding Directive 3, please review applicable OFAC public guidance, such as FAQ 411.

E.O. 14024 provides for blocking sanctions on persons operating in the technology sector or the defense and related materiel sector of the Russian Federation economy, or any other sectors determined by the Secretary of the Treasury, in consultation with the Secretary of State.  The identification of a sector pursuant to E.O. 14024 provides notice that persons operating in the identified sector are exposed to sanctions risk; however, such identification does not automatically block all persons operating in the sector.  Only persons designated pursuant to E.O. 14024 for operating in the defense and related materiel sector of the Russian

economy (or any other sector identified under the E.O.) are subject to blocking sanctions and will appear on the SDN List.

E.O. 14024, as amended by E.O. 14114, also authorizes the imposition of sanctions on foreign financial institutions that have conducted or facilitated certain transactions involving Russia's military-industrial base.  See FAQs 1147, 1148, 1149, 1150 and 1151 for information.

**Date Updated: February 23, 2024**

Released on April 15, 2021

### 888. What does Directive 1A under Executive Order (E.O.) 14024, "Prohibitions Related to Certain Sovereign Debt of the Russian Federation" (Russia-related Sovereign Debt Directive) do?

Pursuant to the Russia-related Sovereign Debt Directive, the following activities by a U.S. financial institution are prohibited:

1. As of June 14, 2021, participation in the primary market for ruble or non-ruble denominated bonds issued after June 14, 2021 by the Central Bank of the Russian Federation, the National Wealth Fund of the Russian Federation, or the Ministry of Finance of the Russian Federation;

2. As of June 14, 2021, lending ruble or non-ruble denominated funds to the Central Bank of the Russian Federation, the National Wealth Fund of the Russian Federation, or the Ministry of Finance of the Russian Federation; and

3. As of March 1, 2022, participation in the secondary market for ruble or non-ruble denominated bonds issued after March 1, 2022 by the Central Bank of the Russian Federation, the National Wealth Fund of the Russian Federation, or the Ministry of Finance of the Russian Federation.

Further, except to the extent otherwise provided by law or unless authorized by OFAC or exempt, the following are also prohibited pursuant to the Russia-related Sovereign Debt Directive:  (1) any transaction that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions of the Russia-related Sovereign Debt Directive; and (2) any conspiracy formed to violate any of the prohibitions of the Russia-related Sovereign Debt Directive.

Independent of the Russia-related Sovereign Debt Directive, OFAC has imposed prohibitions on certain Russia-related entities subject to the Russia-related Sovereign Debt Directive, pursuant to Russia-related directives under Executive Order (E.O.) 13883 and E.O. 14024.

**Date Updated: March 02, 2022**

Released on April 15, 2021

**889. Does Directive 1A under Executive Order (E.O.) 14024, "Prohibitions Related to Certain Sovereign Debt of the Russian Federation" (Russia-related Sovereign Debt Directive) prohibit participation in the secondary market for bonds issued by the Central Bank of the Russian Federation, the National Wealth Fund of the Russian Federation, or the Ministry of Finance of the Russian Federation?**

Yes (see FAQ 888 and FAQ 965).

**Date Updated: February 22, 2022**

Released on April 15, 2021

**890. Prior to June 14, 2021, are U.S. financial institutions prohibited from participating in the primary market for ruble or non-ruble denominated bonds issued by, or lending ruble or non-ruble denominated funds to, the Central Bank of the Russian Federation, the National Wealth Fund of the Russian Federation, or the Ministry of Finance of the Russian Federation?**

Even prior to June 14, 2021, "U.S. banks" were prohibited from participating in the primary market for non-ruble denominated bonds issued by the Russian sovereign (including the Central Bank of the Russian Federation, the National Wealth Fund of the Russian Federation, and the Ministry of Finance of the Russian Federation), and from lending non-ruble denominated funds to the Russian sovereign pursuant to the Russia-related Directive under Executive Order 13883    ("CBW Act Directive"    "), which was issued on August 2, 2019 and went into effect on August 26, 2019.  However, the CBW Act Directive does not prohibit "U.S. banks" (as defined in the CBW Act Directive) from participating in the primary market for ruble denominated bonds issued by the Russian sovereign, or the lending of ruble denominated funds to the Russian sovereign.

Pursuant to Directive 1A    under (E.O.) 14024    , "Prohibitions Related to Certain Sovereign Debt of the Russian Federation" (Russia-related Sovereign Debt Directive    ), after June 14, 2021, U.S. financial institutions (as defined in the Russia-related Sovereign Debt Directive) are prohibited from participating in the primary market for ruble or non-ruble denominated bonds issued by, or the lending of ruble or non-ruble denominated funds to, the Central Bank of the Russian Federation, the National Wealth Fund of the Russian Federation, or the Ministry of Finance of the Russian Federation, unless otherwise authorized by OFAC or exempt.  Pursuant to the Russia-related Sovereign Debt Directive, as of March 1, 2022, U.S. financial institutions are also prohibited from participating in

the secondary market for ruble or non-ruble denominated bonds issued after March 1, 2022 by these entities.

Note that the prohibitions found in the CBW Act Directive remain in effect and are separate from the prohibitions of the Russia-related Sovereign Debt Directive, or other directives under E.O. 14024. For more information on the CBW Act Directive, please see FAQs 673 - 678.

**Date Updated: March 02, 2022**

Released on April 15, 2021

### 891. Does the 50 Percent Rule apply to Directive 1A under Executive Order (E.O.) 14024, "Prohibitions Related to Certain Sovereign Debt of the Russian Federation" (Russia-related Sovereign Debt Directive)?

No. The prohibitions of the Russia-related Sovereign Debt Directive apply only to bonds issued by, or loans made to, the Central Bank of the Russian Federation, the National Wealth Fund of the Russian Federation, or the Ministry of Finance of the Russian Federation. The prohibitions of the Russia-related Sovereign Debt Directive do not apply to the property or interests in property of those three entities.

**Date Updated: February 22, 2022**

Released on April 15, 2021

### 894. What does Russia-related General License (GL) 1A authorize?

Russia-related GL 1A authorizes U.S. persons to engage in certain transactions and activities otherwise prohibited by Executive Order (E.O.) of August 20, 2021, "Blocking Property with Respect to Certain Russian Energy Export Pipelines," or the Protecting Europe's Energy Security Act of 2019, 22 U.S.C. 9526 note, as amended (PEESA). A prior version of Russia-related GL 1A was issued on May 21, 2021 (GL 1). On August 20, 2021, GL 1 was amended and reissued as Russia-related GL 1A to ensure that the scope of activities authorized with respect to the Federal State Budgetary Institution Marine Rescue Service (MRS) includes E.O. of August 20, 2021. Russia-related GL 1A replaces and supersedes GL 1 effective August 20, 2021. Specifically, GL 1A authorizes U.S. persons to engage in transactions and activities involving MRS, or any entity in which MRS owns, directly or indirectly, a 50 percent or greater interest, that are not related to the construction of the Nord Stream 2 pipeline project, the TurkStream pipeline project, or any project that is a successor to either such project. GL 1A does not, however, authorize any transactions or activities with any vessels identified on the

Office of Foreign Assets Control's List of Specially Designated Nationals and Blocked Persons (SDN List) as blocked property of MRS, including vessels identified as blocked property of any entity in which MRS owns, directly or indirectly, a 50 percent or greater interest.

Released on August 20, 2021

### 921. What is the purpose of Executive Order (E.O.) of August 20, 2021, "Blocking Property with Respect to Certain Russian Energy Export Pipelines"?

The Protecting Europe's Energy Security Act of 2019, 22 U.S.C. 9526 note, as amended (PEESA), requires the imposition of sanctions with respect to the provision of vessels engaged in specified activities for the construction of certain Russian energy export pipelines, including the Nord Stream 2 pipeline project, the TurkStream pipeline project, or any project that is a successor to either such project.  E.O. of August 20, 2021    , issued under the International Emergency Economic Powers Act (IEEPA), authorizes the Secretary of the Treasury and the Secretary of State to further implement those sanctions and directs agencies of the United States government to take all appropriate measures within their authority to ensure the full implementation of those sanctions.

Among other things, E.O. of August 20, 2021    enables Treasury to promulgate regulations and provides for blocking of PEESA-designated persons without the exception relating to the importation of goods in Section 7503(e) of PEESA.  All property and interests in property of persons designated pursuant to E.O. of August 20, 2021 that are or come within the United States or the possession or control of U.S. persons are blocked, and U.S. persons are generally prohibited from engaging in transactions with them.  Additionally, entities owned 50 percent or more, individually or in the aggregate, directly or indirectly, by one or more blocked persons are also blocked.

Released on August 20, 2021

### 965. How does Directive 1A under Executive Order (E.O.) 14024, "Prohibitions Related to Certain Sovereign Debt of the Russian Federation" (Russia-related Sovereign Debt Directive) change prohibitions relating to U.S. financial institution dealings in Russian sovereign debt pursuant to Directive 1 under E.O. 14024 of April 15, 2021?

Directive 1 under E.O. 14024    of April 15, 2021 imposed prohibitions on participation in the primary market for ruble or non-ruble denominated bonds issued by, or the lending of ruble or non-ruble denominated funds to, the Central Bank of the Russian Federation, the National Wealth Fund of the Russian

Federation, or the Ministry of Finance of the Russian Federation.  The Russia-related Sovereign Debt Directive   replaces and supersedes Directive 1 under E.O. 14024 of April 15, 2021.  It expands upon the existing prohibitions to also prohibit, as of March 1, 2022 , participation in the secondary market for ruble or non-ruble denominated bonds issued by these entities after March 1, 2022.  Please see FAQ 888 for additional details on the effective dates of these prohibitions.

The Russia-related Sovereign Debt Directive also includes technical revisions to the definition of "U.S. financial institution" to expand the definition.

Independent of the Russia-related Sovereign Debt Directive, OFAC has imposed prohibitions on certain Russia-related entities subject to the Russia-related Sovereign Debt Directive, pursuant to Russia-related directives under E.O. 13883 and E.O. 14024.

**Date Updated: March 02, 2022**

Released on February 22, 2022

### 966. What actions did Treasury take in February 2022 related to Russia's financial services sector pursuant to Executive Order (E.O.) 14024?

Treasury took expansive sanctions actions related to Russia's financial services sector in February 2022 as detailed below.

- **Financial services sector determination**.  On February 22, 2022, the Secretary of the Treasury, in consultation with the Secretary of State, issued a determination   pursuant to E.O. 14024   that authorizes sanctions against persons determined to operate or to have operated in the financial services sector of the Russian Federation economy (see FAQ 964).
- **Correspondent or payable-through account and payment processing prohibitions**.  On February 24, 2022, the Office of Foreign Assets Control (OFAC) issued Directive 2 under E.O. 14024, "Prohibitions Related to Correspondent or Payable-Through Accounts and Processing of Transactions Involving Certain Foreign Financial Institutions" (Russia-related CAPTA Directive)   , which prohibits U.S. financial institutions from:  (i) the opening or maintaining of a correspondent account or payable-through account for or on behalf of foreign financial institutions determined to be subject to the prohibitions of the Russia-related CAPTA Directive; and (ii) the processing of transactions involving foreign financial institutions determined to be subject to the prohibitions of the Russia-related CAPTA Directive.  Annex 1 to the Russia-related CAPTA Directive identifies Public Joint Stock Company Sberbank of Russia and other foreign financial institutions owned 50 percent

or more by this bank as subject to these prohibitions, which become effective on March 26, 2022 (see FAQs 964, 967, 968, 969, 970, 971, 972 and 973).

- **Blocking certain Russian financial institutions**.  OFAC designated specified Russian financial institutions pursuant to E.O. 14024, including the State Corporation Bank for Development and Foreign Economic Affairs Vnesheconombank (VEB), VTB Bank Public Joint Stock Company, Public Joint Stock Company Bank Financial Corporation Otkritie, Promsvyazbank Public Joint Stock Company, Sovcombank Open Joint Stock Company, Joint Stock Commercial Bank Novikombank, and several of these financial institutions' subsidiaries.  As a result, all property and interests in property of these entities in the possession or control of U.S. persons, including U.S. financial institutions, or within U.S. jurisdiction, are blocked and must be reported to OFAC.  In addition, all property and interests in property of any entity that is owned, directly or indirectly, individually or in the aggregate, 50 percent or more by one or more blocked persons are also blocked.  Accordingly, U.S. persons, including U.S. financial institutions, are prohibited from transacting with these entities unless exempt or authorized by OFAC (see FAQs 974, 975, 976, 977, 978, 979, 980, 981, and 982).

- **Expanding sovereign debt prohibitions to include the secondary market**.  On February 22, 2022, OFAC issued Directive 1A under E.O. 14024, "Prohibitions Related to Certain Sovereign Debt of the Russian Federation" (Russia-related Sovereign Debt Directive), replacing and superseding Directive 1 under E.O. 14024 of April 15, 2021, to extend existing sovereign debt prohibitions to cover participation in the secondary market for ruble or non-ruble denominated bonds issued after March 1, 2022 by the Central Bank of the Russian Federation, the National Wealth Fund of the Russian Federation, or the Ministry of Finance of the Russian Federation (see FAQs 888, 889, 890, 891, 965, and 983).

- **New debt and equity restrictions involving certain Russia-related entities**.  On February 24, 2022, OFAC imposed additional debt and equity restrictions involving Russia-related entities by issuing Directive 3 under E.O. 14024, "Prohibitions Related to New Debt and Equity of Certain Russia-related Entities" (Russia-related Entities Directive), to prohibit certain dealings by U.S. persons, or within the United States, in new debt of longer than 14 days maturity or new equity of Russia-related entities determined to be subject to the prohibitions of the Russia-related Entities Directive.  OFAC determined on February 24, 2022 that the entities listed in Annex 1 to the Russia-related Entities Directive, which include certain major Russian state-owned enterprises and large privately owned financial institutions, are subject to the prohibitions of this directive for new debt or equity issued on or after March 26, 2022 (see 983, 984, 985, 986, 987, 988 and 989).

- **General Licenses (GLs)**.  OFAC issued several Russia-related GLs authorizing certain transactions otherwise prohibited by E.O. 14024 (see FAQs 974, 975, 976, 977, 978, 979, 981, 982, and 990).
- **New restrictions on sovereign transactions**.  On February 28, 2022, OFAC issued Directive 4 under E.O. 14024, "Prohibitions Related to Transactions Involving the Central Bank of the Russian Federation, the National Wealth Fund of the Russian Federation, and the Ministry of Finance of the Russian Federation" (Russia-related Sovereign Transactions Directive) to prohibit U.S. persons from engaging in any transaction involving the Central Bank of the Russian Federation, the National Wealth Fund of the Russian Federation, or the Ministry of Finance of the Russian Federation, including any transfer of assets to such entities or any foreign exchange transaction for or on behalf of such entities (see FAQs 998 – 1003).

**Date Updated: March 02, 2022**

Released on February 24, 2022

### 967. What does Directive 2 under Executive Order (E.O.) 14024, "Prohibitions Related to Correspondent or Payable-Through Accounts and Processing of Transactions Involving Certain Foreign Financial Institutions" (Russia-related CAPTA Directive) prohibit?

The Russia-related CAPTA Directive     prohibits U.S. financial institutions from:  (i) the opening or maintaining of a correspondent account or payable-through account for or on behalf of foreign financial institutions determined to be subject to the prohibitions of the Russia-related CAPTA Directive; and (ii) the processing of transactions involving foreign financial institutions determined to be subject to the prohibitions of the Russia-related CAPTA Directive.  Please see the Russia-related CAPTA Directive for the definition of the terms "U.S. financial institution" and "foreign financial institution" for purposes of this directive.  Please see FAQ 969 regarding the applicability of OFAC's 50 Percent Rule with respect to this directive.

Annex 1 to the Russia-related CAPTA Directive lists the foreign financial institutions determined to be subject to the prohibitions as of March 26, 2022.  Foreign financial institutions determined to be subject to the prohibitions of the Russia-related CAPTA Directive, including the foreign financial institutions listed in Annex 1, can be found on the Office of Foreign Assets Control's (OFAC) List of Foreign Financial Institutions Subject to Correspondent Account or Payable-Through Account Sanctions (CAPTA List).  Relevant entries on the CAPTA List will denote when a foreign financial institution became subject to the prohibitions of the Russia-related CAPTA Directive, as well as when the prohibitions of the Russia-

related CAPTA Directive come into effect with respect to that foreign financial institution.

The below table identifies the dates the prohibitions of the Russia-related CAPTA Directive take effect for (i) foreign financial institutions listed in Annex 1 to the Russia-related CAPTA Directive, and (ii) foreign financial institutions otherwise determined to be subject to its prohibitions and added to the CAPTA List.

| Foreign Financial Institution Type | Relevant Sanctions Effective Date |
|---|---|
| Foreign financial institutions listed in Annex 1 to the Russia-related CAPTA Directive | 12:01 a.m. eastern daylight time on March 26, 2022 |
| Foreign financial institution otherwise determined to be subject to the prohibitions of the Russia-related CAPTA Directive | 12:01 a.m. eastern time on the date that is 30 days after the date of such determination |

U.S. financial institutions must close any correspondent or payable-through account maintained for or on behalf of foreign financial institutions determined to be subject to the prohibitions of the Russia-related CAPTA Directive, or their property or interests in property, by the relevant effective date. Separately, as of the relevant effective date, U.S. financial institutions may not process transactions involving foreign financial institutions determined to be subject to the prohibitions of the Russia-related CAPTA Directive, or their property or interests in property, and must reject such transactions unless exempt or authorized by OFAC.

Accordingly, after the relevant effective date, U.S. financial institutions must reject any transaction involving a foreign financial institution determined to be subject to the prohibitions of the Russia-related CAPTA Directive or involving that foreign financial institution's property or interests in property. This includes rejecting transactions related to any securities (including depositary receipts) issued by a foreign financial institution determined to be subject to the prohibitions of the Russia-related CAPTA Directive, including secondary market trading. For certain authorized securities-related transactions, see GL 9C and FAQ 981. By virtue of the prohibition on the processing of transactions for or on behalf of foreign financial institutions determined to be subject to the prohibitions of the Russia-related CAPTA Directive, U.S. financial institutions are also prohibited from engaging in transactions with a covered foreign financial institution in connection with the foreign financial institution's role as a local custodian for depositary receipt issuances.

The Russia-related CAPTA Directive does not impose blocking sanctions and, thus, does not require U.S. financial institutions (or other U.S. persons) to block the assets of foreign financial institutions determined to be subject to the prohibitions of this directive. However, U.S. persons should be aware that foreign financial institutions subject to the prohibitions of the Russia-related CAPTA Directive may also be subject to additional prohibitions under other sanctions authorities, such as additional directives under E.O. 14024 or E.O. 13662.

OFAC issued several Russia-related general licenses (GLs) authorizing certain transactions involving the foreign financial institutions subject to the prohibitions of the Russia-related CAPTA Directive, including:

- GL 6B : authorizing transactions related to (1) the production, manufacturing, sale, or transport of agricultural commodities, agricultural equipment, medicine, medical devices, replacement parts and components for medical devices, or software updates for medical devices; (2) the prevention, diagnosis, or treatment of COVID-19 (including research or clinical studies relating to COVID-19); or (3) ongoing clinical trials and other medical research activities;
- GL 7A : authorizing overflight payments, emergency landings, and air ambulance services;
- GL 8C : authorizing transactions related to energy; and
- GL 27 : authorizing transactions in support of nongovernmental organizations' activities

On March 1, 2022, OFAC issued the Russian Harmful Foreign Activities Sanctions Regulations, 31 CFR part 587 (RuHSR), which incorporate GL 5 in section 587.510 of the RuHSR.

For additional information, please see FAQs 976, 977, 978, 979, 981, 982 and 990.

**Date Updated: July 14, 2022**

Released on February 24, 2022

**968. What foreign financial institutions are listed in Annex 1 to Directive 2 under Executive Order (E.O.) 14024, "Prohibitions Related to Correspondent or Payable-Through Accounts and Processing of Transactions Involving Certain Foreign Financial Institutions" (Russia-related CAPTA Directive)?**

Annex 1 to the Russia-related CAPTA Directive identifies Public Joint Stock Company Sberbank of Russia as well as many of its foreign financial institution subsidiaries. The foreign financial institutions listed in Annex 1 have been

determined to be subject to the prohibitions of the Russia-related CAPTA Directive for operating or having operated in the financial services sector of the Russian Federation economy, or for being foreign financial institutions that are 50 percent or more owned, directly or indirectly, individually or in the aggregate, by one or more foreign financial institutions subject to the prohibitions of the Russia-related CAPTA Directive.  Please see FAQ 969 regarding the applicability of OFAC's 50 Percent Rule to these entities.

Released on February 24, 2022

### 969. Does OFAC's 50 Percent Rule apply to foreign financial institutions listed in Annex 1 to Directive 2 under Executive Order (E.O.) 14024, "Prohibitions Related to Correspondent or Payable-Through Accounts and Processing of Transactions Involving Certain Foreign Financial Institutions" (Russia-related CAPTA Directive)?

Yes.  The prohibitions of the Russia-related CAPTA Directive apply to any foreign financial institution listed in Annex 1 to the Russia-related CAPTA Directive or otherwise determined to be subject to the prohibitions of the Russia-related CAPTA Directive, "or their property or interests in property," which includes foreign financial institutions 50 percent or more owned, directly or indirectly, individually or in the aggregate, by one or more foreign financial institutions determined to be subject to the prohibitions of the Russia-related CAPTA Directive.  As stated in the Russia-related CAPTA Directive, the prohibitions of this directive apply only with respect to a U.S. financial institution's opening or maintaining of a correspondent account or payable-through account for or on behalf of, or processing of a transaction involving, a "foreign financial institution," as defined in the Russia-related CAPTA Directive.  Thus, for purposes of the Russia-related CAPTA Directive, the prohibitions of this directive do not apply to non-"foreign financial institutions," even if those non-"foreign financial institutions" are 50 percent or more owned, directly or indirectly, individually or in the aggregate, by one or more "foreign financial institutions" determined to be subject to this directive.

Released on February 24, 2022

### 970. Are foreign financial institutions (FFIs) located outside of Russia potentially subject to the prohibitions of Directive 2 under Executive Order (E.O.) 14024, "Prohibitions Related to Correspondent or Payable-Through Accounts and Processing of Transactions Involving Certain Foreign Financial Institutions" (Russia-related CAPTA Directive)?

Yes.  The prohibitions of the Russia-related CAPTA Directive apply to a U.S. financial institution's opening or maintaining of a correspondent account or payable-through account for or on behalf of, or processing of a transaction

involving, any FFI, wherever located outside of the United States, determined to be subject to the prohibitions of the Russia-related CAPTA Directive, or their property or interests in property—which includes FFIs 50 percent or more owned, directly or indirectly, individually or in the aggregate, by one or more FFIs determined to be subject to the prohibitions of the Russia-related CAPTA Directive.  This includes, for example, banking subsidiaries that are 50 percent or more owned by Public Joint Stock Company Sberbank of Russia and located outside of the United States.

Released on February 24, 2022

### 971. Are the prohibitions of Directive 2 under Executive Order (E.O.) 14024, "Prohibitions Related to Correspondent or Payable-Through Accounts and Processing of Transactions Involving Certain Foreign Financial Institutions" (Russia-related CAPTA Directive) limited to transactions denominated in U.S. dollars?

No.  The prohibitions of the Russia-related CAPTA Directive  apply with respect to any currency.  For example, a foreign branch of a U.S. financial institution may not open or maintain a correspondent account for or on behalf of, or process a transaction involving, a foreign financial institution determined to be subject to the prohibitions of the Russia-related CAPTA Directive, even if that account is denominated in a currency other than U.S. dollars, such as euros.

Released on February 24, 2022

### 972. Do non-U.S. financial institutions have to comply with the prohibitions of Directive 2 under Executive Order (E.O.) 14024, "Prohibitions Related to Correspondent or Payable-Through Accounts and Processing of Transactions Involving Certain Foreign Financial Institutions" (Russia-related CAPTA Directive)?

Under the Russia-related CAPTA Directive , U.S. financial institutions are prohibited from the opening or maintaining of a correspondent account or payable-through account for or on behalf of, or from processing of a transaction involving, a foreign financial institution determined to be subject to the prohibitions of the Russia-related CAPTA Directive.  The term "U.S. financial institution," as defined in the directive, includes foreign branches of U.S. financial institutions, but not their foreign subsidiaries.  Note, however, that the Russia-related CAPTA Directive prohibits any transaction that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions of this directive, as well as any conspiracy formed to violate any of the prohibitions of this directive.  OFAC will not view as "evading or avoiding" efforts by non-U.S. persons to comply with U.S. sanctions by replacing sanctioned

suppliers or service providers (including financial institutions) with non-sanctioned persons.

Released on February 24, 2022

### 973. I am a U.S. individual or company that maintains an account at a foreign financial institution sanctioned pursuant to Directive 2 under Executive Order (E.O.) 14024.  What are my obligations?

With respect to foreign financial institutions subject to the prohibitions of Directive 2 under E.O. 14024, "Prohibitions Related to Correspondent or Payable-Through Accounts and Processing of Transactions Involving Certain Foreign Financial Institutions" (Russia-related CAPTA Directive), including Public Joint Stock Company Sberbank of Russia, obligations under this directive apply to U.S. financial institutions only.  U.S. individuals and companies that are not "U.S. financial institutions," as defined in the Russia-related CAPTA Directive, are not prohibited from processing transactions involving foreign financial institutions solely subject to the Russia-related CAPTA Directive.

With respect to the Russian financial institutions blocked on February 22 and 24, 2022 pursuant to E.O. 14024, General Licenses (GLs) 3 and 11 authorized U.S. persons to engage in transactions ordinarily incident and necessary to terminate their relationship with specified blocked Russian financial institutions, including withdrawing funds and securities, cancelling letters of credit, and amending or cancelling performance guarantees.  For additional information, please see FAQ 975.  Upon the respective expiration of GLs 3 and 11, U.S. persons were prohibited from transacting with the blocked Russian financial institutions, unless exempt or authorized by OFAC.

**Date Updated: December 22, 2023**

Released on February 24, 2022

### 974. What Russian financial institutions were blocked in February 2022 pursuant to Executive Order (E.O.) 14024, and what activities are prohibited as a result?

On February 22, 2022, the Office of Foreign Assets Control (OFAC) designated specified Russian financial institutions pursuant to E.O. 14024, including the State Corporation Bank for Development and Foreign Economic Affairs Vnesheconombank (VEB), Promsvyazbank Public Joint Stock Company, and many of their subsidiaries.  OFAC designated additional Russian financial institutions on February 24, 2022, including VTB Bank Public Joint Stock Company, Public Joint Stock Company Bank Financial Corporation Otkritie (Otkritie), Sovcombank Open

Joint Stock Company (Sovcombank), Joint Stock Commercial Bank Novikombank, and many of these financial institutions' subsidiaries. As a result, all property and interests in property of these entities in the possession or control of U.S. persons, including U.S. financial institutions, or within U.S. jurisdiction, are blocked and must be reported to OFAC. In addition, all property and interests in property of any entity that is owned, directly or indirectly, individually or in the aggregate, 50 percent or more by one or more blocked persons are also blocked. Accordingly, U.S. persons, including U.S. financial institutions, are prohibited from transacting with these entities unless exempt or authorized by OFAC.

OFAC issued several Russia-related general licenses (GLs) authorizing transactions involving specified blocked Russian financial institutions, including:
- GL 2    : authorizing certain transactions involving VEB related to servicing obligations of certain Russian sovereign debt;
- GL 3    : authorizing the wind down of certain transactions involving VEB until 12:01 a.m. eastern daylight time, March 24, 2022;
- GL 11    : authorizing the wind down of certain transactions involving VTB Bank Public Joint Stock Company, Otkritie, and Sovcombank until 12:01 a.m. eastern daylight time, March 26, 2022; and
- GL 12    : authorizing the rejection (rather than blocking) of certain transactions involving VTB Bank Public Joint Stock Company, Otkritie, and Sovcombank until 12:01 a.m. eastern daylight time, March 26, 2022.

Note that these GLs do not authorize certain activities with all blocked Russian financial institutions; nor does each GL authorize certain activities with the same group of blocked Russian financial institutions. For example, the GLs listed above do not authorize any transactions involving Promsvyazbank Public Joint Stock Company or Joint Stock Commercial Bank Novikombank, and GLs 2 and 3 relate only to VEB.

Other GLs that may be applicable to one or more of the Russian financial institutions blocked in February 2022 include:

- GL 5    : authorizing transactions related to the official business of certain international organizations and other entities;
- GL 6    : authorizing certain transactions related to the exportation or reexportation of agricultural commodities, medicine, medical devices, replacement parts and components, or software updates, or the prevention, diagnosis, or treatment of COVID-19;
- GL 7    : authorizing overflight payments, emergency landings, and air ambulance services;

- GL 8A    : authorizing transactions related to energy;
- GL 9A    : authorizing transactions related to dealings in certain debt and equity

until 12:01 a.m. eastern daylight time, May 25, 2022; and

- GL 10A   : authorizing certain transactions related to derivative contracts until 12:01 a.m. eastern daylight time, May 25, 2022.

Please consult each GL for further information regarding its scope.

On March 1, 2022, OFAC issued the Russian Harmful Foreign Activities Sanctions Regulations, 31 CFR part 587 (RuHSR), which incorporate GL 5 in section 587.510 of the RuHSR.

Additionally, consistent with section 9 of E.O. 14024, transactions for the conduct of the official business of the Federal Government or the United Nations (including its specialized agencies, programs, funds, and related organizations) by employees, grantees, and contractors thereof are exempt from the sanctions prohibitions of E.O. 14024.

**Date Updated: March 02, 2022**

Released on February 24, 2022

### 975. Is there a wind-down period for transactions involving the Russian financial institutions blocked in February 2022 pursuant to Executive Order (E.O.) 14024? What transactions are authorized during the wind-down period?

For certain Russian financial institutions blocked in February 2022 pursuant to E.O. 14024 , a short-term wind-down period is authorized.  General License (GL) 3 authorizes a wind-down period of 30 days for transactions involving State Corporation Bank for Development and Foreign Economic Affairs Vnesheconombank (VEB), and GL 11    authorizes a wind-down period of 30 days for transactions involving VTB Bank Public Joint Stock Company, Public Joint Stock Company Bank Financial Corporation Otkritie, or Sovcombank Open Joint Stock Company.  These authorizations also apply to any entity in which these financial institutions own, directly or indirectly, individually or in the aggregate, a 50 percent or greater interest.

GLs 3 and 11 authorize U.S. persons to engage in transactions ordinarily incident and necessary to exit operations, contracts, or other agreements that were in effect prior to the date of blocking involving the specified blocked Russian financial institutions, provided that such transactions do not involve a debit to a blocked account on the books of a U.S. financial institution (see FAQ 990).  For example, a U.S. financial institution may take steps necessary to collect on outstanding loans made to a blocked person, including exercising rights to any collateral related thereto, as authorized wind-down activity, provided that the transaction does not involve a debit to a blocked account on the books of a U.S.

financial institution (unless separately authorized).  A U.S. financial institution may also take steps necessary to pay outstanding loans, provided that, if such payment is for the benefit of a blocked person, it must be transferred into a blocked account.  Similarly, a U.S. financial institution may take steps necessary to close a correspondent account maintained for a blocked person; however, funds in the correspondent account may not be returned to the blocked person, and must remain blocked, absent separate authorization from OFAC.

GLs 3 and 11 authorize only new or continued business activities that are ordinarily incident and necessary to wind-down activities.  Wind-down activities do not include the continued processing of funds transfers, securities trades, or other transactions involving a blocked person that were part of ongoing business activities prior to the imposition of sanctions, unless separately authorized (see, e.g., GLs 8, 9, and 10).  Moreover, GLs 3 and 11 do not apply to all Russian financial institutions blocked in February 2022, such as Promsvyazbank Public Joint Stock Company or Joint Stock Commercial Bank Novikombank, or transactions involving other persons blocked pursuant to E.O. 14024, other than the blocked Russian financial institutions specified in GLs 3 and 11.

In addition to GLs 3 and 11, OFAC issued GL 12   to authorize U.S. persons to reject, rather than block, prohibited transactions involving specified blocked Russian financial institutions for 30 days.  This authorizes, for example, a U.S. financial institution to reject, rather than block, an attempted unauthorized funds transfer until the expiration of GL 12.  The authorization provided in GL 3 expires at 12:01 eastern daylight time, March 24, 2022.  The authorizations provided in GLs 11 and 12 expire at 12:01 a.m. eastern daylight time, March 26, 2022.

For more information on the prohibitions that apply to Russian financial institutions blocked pursuant to E.O. 14024 in February 2022, or related authorizations, please see FAQ 974.

For guidance regarding transactions involving securities and derivatives contracts related to the blocked persons listed above, see FAQ 982.

Released on February 24, 2022

### 976. Can a U.S. financial institution process transactions related to energy where a Russian financial institution sanctioned pursuant to Executive Order (E.O.) 14024 is involved?

General License (GL) 8J   authorizes certain transactions "related to energy" (as defined in the GL; see also FAQ 977) involving the following entities (collectively, "Covered Entities"):

- State Corporation Bank for Development and Foreign Economic Affairs Vnesheconombank (VEB);
- Public Joint Stock Company Bank Financial Corporation Otkritie;
- Sovcombank Open Joint Stock Company;
- Public Joint Stock Company Sberbank of Russia;
- VTB Bank Public Joint Stock Company;
- Joint Stock Company Alfa-Bank;
- Public Joint Stock Company Rosbank;
- Bank Zenit Public Joint Stock Company;
- Bank Saint-Petersburg Public Joint Stock Company;
- National Clearing Center (NCC);
- Any entity owned 50 percent or more, directly or indirectly, individually or in the aggregate, by one of the above entities; and
- The Central Bank of the Russian Federation.

GL 8J    does not authorize any transaction prohibited by Directive 1A under E.O. 14024, "Prohibitions Related to Certain Sovereign Debt of the Russian Federation" (Russia-related Sovereign Debt Directive    ).  In addition, GL 8C does not authorize any debit to an account on the books of a U.S. financial institution of the Central Bank of the Russian Federation.  Further, GL 8J does not authorize a U.S. financial institution to maintain (or open) a correspondent account or payable-through account for or on behalf of foreign financial institutions subject to the prohibitions of Directive 2 under E.O. 14024, "Prohibitions Related to Correspondent or Payable-Through Accounts and Processing of Transactions Involving Certain Foreign Financial Institutions" (the "Russia-related CAPTA Directive"    ). Consequently, in order for a U.S. financial institution to engage in transactions authorized by GL 8C, all funds transfers related to energy involving one or more Covered Entities must be processed indirectly through a non-sanctioned, non-U.S. financial institution.  Please see FAQ 978 for examples of authorized and prohibited transactions flows under certain GLs, including GL 8J    .

For purposes of assessing whether certain transactions are authorized under GL 8J, U.S. persons may rely upon the information available to them in the ordinary course of business, including reasonable reliance on information about the underlying transaction provided by the parties thereto.

GL 8J    is valid until 12:01 eastern daylight time, November 1, 2024 unless renewed.  Persons unable to wind down prohibited transactions with the Covered Entities by November 1, 2024 are encouraged to approach the Office of Foreign Assets Control, which may consider renewing GL 8J.  Please see FAQs 977, 978, 1010, 1111, and 1012 for additional guidance related to GL 8J.

GL 8J provides authorization solely under E.O. 14024. Therefore, U.S. financial institutions that rely on the authorization provided in GL 8J to process transactions related to energy must also comply with the prohibitions of E.O. 14066, E.O. 14068, and E.O. 14071 (see FAQs 1013, 1014 and 1015).

**Updated: June 12, 2024**

Released on February 24, 2022

### 977. What are transactions "related to energy" for purposes of Russia-related General License (GL) 8C?

For the purposes of GL 8C , the term "related to energy" means the extraction, production, refinement, liquefaction, gasification, regasification, conversion, enrichment, fabrication, transport, or purchase of petroleum, including crude oil, lease condensates, unfinished oils, natural gas liquids, petroleum products, natural gas, or other products capable of producing energy, such as coal, wood, or agricultural products used to manufacture biofuels, or uranium in any form, as well as the development, production, generation, transmission, or exchange of power, through any means, including nuclear, thermal, and renewable energy sources. This definition remains unchanged from GL 8.

**Updated: June 14, 2022**

Released on February 24, 2022

### 978. For transactions authorized under Russia-related General Licenses (GL) 6A, 7A, or 8C what is an example of a permissible funds transfer involving a foreign financial institution sanctioned pursuant to Executive Order (E.O.) 14024?

GLs 6A , 7A , and 8C do not authorize a U.S. financial institution to maintain (or open) a correspondent account or payable-through account for or on behalf of entities subject to the prohibitions of Directive 2 under E.O. 14024 , "Prohibitions Related to Correspondent or Payable-Through Accounts and Processing of Transactions Involving Certain Foreign Financial Institutions" (Russia-related CAPTA Directive ). Consequently, in order for a U.S. financial institution to engage in transactions authorized under these GLs (e.g., a funds transfer related to energy), all such funds transfers must be processed indirectly through a non-sanctioned, non-U.S. financial institution.

**Examples of authorized and prohibited funds transfers under GLs 6A, 7A, and 8C include:**

### *Payment from third-country originator*

**Authorized** payment from third-country originator to beneficiary with an account at a sanctioned institution:



**Prohibited** payment from third-country originator to beneficiary with an account at a sanctioned institution:



### *Payment from U.S. originator*

**Authorized** payment from U.S. originator to beneficiary with an account at a sanctioned institution:



**Prohibited** payment from U.S. originator to beneficiary with an account at a sanctioned institution:



In each of the above examples, the underlying funds transfer must be authorized under the applicable GL.

**Updated: June 14, 2022**

Released on February 24, 2022

**979. I am a U.S. person.  Can I rely on a person sanctioned pursuant to Executive Order (E.O.) 14024 in connection with transactions for official business of an international organization, certain humanitarian-related trade, or the response to the Coronavirus Disease 2019 (COVID-19) pandemic?**

Yes, U.S. persons supporting activities undertaken for the official business of certain international organizations or entities, certain humanitarian-related trade, or the response to the COVID-19 pandemic may continue to engage in such activity

involving persons sanctioned pursuant to E.O. 14024 through a variety of OFAC authorizations or exemptions, as described below.

Consistent with section 9 of E.O. 14024, transactions for the conduct of the official business of the Federal Government or the United Nations (including its specialized agencies, programs, funds, and related organizations) by employees, grantees, and contractors thereof are exempt from the sanctions prohibitions of E.O. 14024.

Additionally, OFAC has issued General License (GL) 5, authorizing transactions for the conduct of the official business of certain international organizations and entities.

OFAC also issued GL 6, which authorizes, subject to certain conditions, transactions that are ordinarily incident and necessary to: (1) the exportation or reexportation of agricultural commodities, medicine, medical devices, replacement parts and components for medical devices, or software updates for medical devices to, from, or transiting the Russian Federation; or (2) the prevention, diagnosis, or treatment of COVID-19 (including research or clinical studies relating to COVID-19).

While certain Russian financial institutions are subject to sanctions under E.O. 14024, the financial services sector of the Russian Federation economy is not comprehensively sanctioned (see FAQ 964). Accordingly, U.S. persons may also use non-sanctioned Russian financial institutions to process these transactions.

Note that the authorizations and exemptions described above do not extend to prohibitions applied to persons sanctioned pursuant to any other sanctions authorities implemented by OFAC, such as E.O. 13662.

Released on February 24, 2022

### 980. Do non-U.S. persons risk being sanctioned for engaging in activity with persons sanctioned pursuant to Executive Order (E.O.) 14024?

OFAC evaluates a range of factors when developing sanctions targets, consistent with foreign policy and national security goals. In the context of blocking sanctions, non-U.S. persons may be exposed to sanctions risk in relation to activities with persons subject to blocking sanctions pursuant to E.O. 14024. Under E.O. 14024, non-U.S. persons may be designated if they have materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, certain activities, a person whose property and interests in property are blocked pursuant to E.O. 14024, or (in certain circumstances) a blocked government. Please see sections 1(a)(vi) and 1(b) of E.O. 14024.

Non-U.S. persons generally do not risk exposure to U.S. blocking sanctions under E.O. 14024 for engaging in transactions with persons subject to the prohibitions of the directives under E.O. 14024.  Moreover, non-U.S. persons generally do not risk exposure to U.S. blocking sanctions under E.O. 14024 for engaging in transactions with blocked persons, where those transactions would not require a specific license if engaged in by a U.S. person.  Note, however, that E.O. 14024 and the directives under E.O. 14024 prohibit any transaction that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions of those directives, as well as any conspiracy formed to violate any of the prohibitions of those directives.  OFAC will not view as "evading or avoiding" efforts by non-U.S. persons to comply with U.S. sanctions by replacing sanctioned suppliers or service providers (including financial institutions) with non-sanctioned persons.

Released on February 24, 2022

### 981. What does General License (GL) 9A authorize with respect to the debt and equity of certain Russian financial institutions sanctioned pursuant to Executive Order (E.O.) 14024?  What are the implications for U.S. and non-U.S. persons?

General License (GL) 9A     authorizes U.S. persons, until 12:01 a.m. eastern daylight time May 25, 2022, to engage in transactions prohibited by the Russian Harmful Foreign Activities Sanctions Regulations, 31 CFR part 587, that are ordinarily incident and necessary to dealings in debt or equity issued prior to February 24, 2022 of one or more of the following entities ("covered debt or equity"), provided that any divestment or transfer of, or facilitation of divestment or transfer of, covered debt or equity must be to a non-U.S. person:

- State Corporation Bank for Development and Foreign Economic Affairs Vnesheconombank (VEB);
- Public Joint Stock Company Bank Financial Corporation Otkritie;
- Sovcombank Open Joint Stock Company;
- Public Joint Stock Company Sberbank of Russia;
- VTB Bank Public Joint Stock Company;
- Any entity owned 50 percent or more, directly or indirectly, individually or in the aggregate, by one of the above entities.

This authorization includes the facilitation, clearing, and settling of transactions ordinarily incident and necessary to divest covered debt or equity to a non-U.S. person, including on behalf of U.S. persons.  Also, as part of a divestment transaction to a non-U.S. person, U.S. persons may engage in purchases of or

investment in covered debt or equity if ordinarily incident and necessary to buy to cover a short position in such holdings.

To allow the closing of trades initiated before February 24, 2022, paragraph (b) of GL 9A authorizes all transactions that are ordinarily incident and necessary to facilitating, clearing, and settling trades of covered debt or equity through 12:01 a.m. eastern daylight time May 25, 2022, provided such trades were placed prior to 4:00 p.m. eastern standard time on February 24, 2022, including debits to accounts on the books of U.S. financial institutions of certain blocked entities.

GL 9A also authorizes U.S. persons to receive interest, dividend, or maturity payments on debt or equity of the Central Bank of the Russian Federation, the National Wealth Fund of the Russian Federation, and the Ministry of Finance of the Russian Federation through 12:01 a.m. eastern daylight time on May 25, 2022. After May 25, 2022, U.S. persons would require a specific license to continue to receive such payments.

Certain transactions otherwise prohibited by the Russian Harmful Foreign Activities Sanctions Regulations, 31 CFR part 587, are not authorized by GL 9A. Please see GL 9A for additional details. Please also see GL 10A with respect to authorizations related to certain derivative contracts.

For purposes of assessing whether certain transactions are authorized under GL 9A or GL 10A, U.S. persons—including financial institutions, registered broker-dealers in securities, securities exchanges, and other market intermediaries and participants—may rely upon the information available to them in the ordinary course of business, including reasonable reliance on information about the underlying transaction provided by the parties thereto. However, U.S. persons should also exercise caution in engaging in foreign exchange transactions on the Moscow Exchange given the current heightened risk that the Central Bank of the Russia Federation could be a counterparty to such transactions (see FAQ 1002).

**Date Updated: March 02, 2022**

Released on February 24, 2022

### 982. Are U.S. funds allowed to buy or sell debt or equity of blocked Russian financial institutions? Are U.S. investors allowed to invest in a fund that holds debt or equity of a blocked Russian financial institution?

Unless otherwise authorized, U.S. persons may not buy or sell debt or equity of the Russian financial institutions blocked pursuant to Executive Order (E.O.) 14024. Accordingly, a U.S. fund may not buy, sell, or otherwise engage in transactions related to debt or equity of such blocked Russian financial institutions, and must block such holdings, unless exempt or otherwise authorized by the Office of

Foreign Assets Control (OFAC).  A U.S. fund that contains such blocked holdings generally is not itself considered a blocked entity unless such blocked holdings represent a 50 percent or more share by value of the fund.  If such blocked holdings do not represent a 50 percent or more share by value of the fund, U.S. persons may continue to invest in it, and the fund is not considered blocked.  The fund may divest itself of blocked holdings to the extent authorized by OFAC.

**Date Updated: January 17, 2023**

Released on February 24, 2022

### 983. What actions did the Office of Foreign Assets Control (OFAC) take in February 2022 with respect to new debt or equity restrictions pursuant to Executive Order (E.O.) 14024?

In February 2022, OFAC issued two directives under E.O. 14024    regarding restrictions related to new debt or equity involving certain Russian Federation or Russia-related entities:

- On February 22, 2022, OFAC issued Directive 1A under E.O. 14024, "Prohibitions Related to Certain Sovereign Debt of the Russian Federation" (Russia-related Sovereign Debt Directive    ), replacing and superseding Directive 1 under E.O. 14024 of April 15, 2021, to extend existing sovereign debt prohibitions to cover participation in the secondary market for ruble and non-ruble denominated bonds issued after March 1, 2022 by the Central Bank of the Russian Federation, the National Wealth Fund of the Russian Federation, or the Ministry of Finance of the Russian Federation (see FAQs 888 and 965).
- On February 24, 2022, OFAC issued Directive 3 under E.O. 14024, "Prohibitions Related to New Debt and Equity of Certain Russia-related Entities" (Russia-related Entities Directive    ) to prohibit all transactions in, provision of financing for, and other dealings in new debt of longer than 14 days maturity or new equity issued on or after 12:01 a.m. eastern daylight time, March 26, 2022 by the entities listed in Annex 1 to that directive, or their property or interests in property.  These same prohibitions also apply to any entity subsequently determined to be subject to the prohibitions of the Russia-related Entities Directive, or its property or interests in property, beginning on or after 12:01 a.m. eastern time on the date that is 30 days after the date of such determination (see FAQ 984).

Entities determined to be subject to the prohibitions of these directives will be listed on the Non-SDN Menu-Based Sanctions List (NS-MBS List) (in addition to any other applicable sanctions lists maintained by OFAC).  Please see FAQ 985 regarding the applicability of OFAC's 50 Percent Rule with respect to the Russia-

related Entities Directive.  Listings on the NS-MBS List will denote when an entity has been determined to be subject to prohibitions, as well as when the prohibitions come into effect with respect to each entity.

Released on February 24, 2022

### 984. What does Directive 3 under Executive Order (E.O.) 14024, "Prohibitions Related to New Debt and Equity of Certain Russia-related Entities" (Russia-related Entities Directive) prohibit?

The Russia-related Entities Directive    prohibits certain dealings by U.S. persons or within the United States in new debt of longer than 14 days maturity or new equity of Russian entities determined to be subject to the prohibitions of the directive or their property or interests in property.  The prohibitions of the Russia-related Entities Directive are effective beginning on 12:01 a.m. eastern daylight time, March 26, 2022 for entities listed in Annex 1 to the Russia-related Entities Directive, or their property or interests in property.  For entities subsequently determined to be subject to the prohibitions of the Russia-related Entities Directive, the prohibitions are effective 12:01 a.m. eastern time 30 days following such determination.

Specifically, the Russia-related Entities Directive prohibits the following activities by U.S. persons or within the United States:  all transactions in, provision of financing for, and other dealings in new debt with a maturity of greater than 14 days or new equity of entities listed in Annex 1 to the Russia-related Entities Directive or otherwise determined to be subject to the prohibitions of the Russia-related Entities Directive, or their property or interests in property, where such debt or equity is issued on or after the relevant sanctions effective date.  Please see FAQ 985 regarding the applicability of OFAC's 50 Percent Rule with respect to this directive.

| **Entity Type** | **Relevant Sanctions Effective Date** |
| --- | --- |
| Entities listed in Annex 1 to the Russia-related Entities Directive, or their property or interests in property | On or after 12:01 a.m. eastern daylight time on March 26, 2022 |
| Entities otherwise determined to be subject to | On or after 12:01 a.m. eastern time on the date that is 30 days after the date |

| the prohibitions of the Russia-related Entities Directive, or their property or interests in property | of such determination |
|---|---|

These prohibitions apply to all new debt with a maturity of greater than 14 days and new equity irrespective of currency denomination.

In addition, the Russia-related Entities Directive prohibits: (1) any transaction that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions of the Russia-related Entities Directive; and (2) any conspiracy formed to violate any of the prohibitions of the Russia-related Entities Directive.

Some entities determined to be subject to the prohibitions of the Russia-related Entities Directive may also be subject to prohibitions in other sanctions authorities, such as prohibitions of other directives issued under E.O. 14024, or directives issued under E.O. 13662. It is important to note that each directive operates independently of the others. For example, if a transaction involves a person subject to two separate directives, a U.S. person engaging in that transaction must comply with both directives.

Released on February 24, 2022

### 985. Does the 50 Percent Rule apply to Directive 3 under Executive Order (E.O.) 14024, "Prohibitions Related to New Debt and Equity of Certain Russia-related Entities" (Russia-related Entities Directive)?

Yes. The prohibitions of the Russia-related Entities Directive apply to any entity listed in Annex 1 to the Russia-related Entities Directive or otherwise determined to be subject to the prohibitions of the Russia-related Entities Directive, or their property or interests in property, which includes entities 50 percent or more owned, directly or indirectly, individually or in the aggregate, by one or more entities determined to be subject to the prohibitions of the Russia-related Entities Directive.

Released on February 24, 2022

### 986. What constitutes debt or equity for purposes of Directive 3 under Executive Order (E.O.) 14024, "Prohibitions Related to New Debt and Equity of Certain Russia-related Entities" (Russia-related Entities Directive)?

The term "debt" includes bonds, loans, extensions of credit, loan guarantees, letters of credit, drafts, bankers acceptances, discount notes or bills, or commercial paper.

The term "equity" includes stocks, share issuances, depositary receipts, or any other evidence of title or ownership.

Released on February 24, 2022

**987. If a U.S. person entered into a revolving credit facility or long-term loan agreement for an entity determined to be subject to Russia-related Directive 3 under Executive Order (E.O.) 14024, "Prohibitions Related to New Debt and Equity of Certain Russia-related Entities" (Russia-related Entities Directive) prior to the relevant sanctions effective date described in the Russia-related Entities Directive, what are the restrictions on drawdowns from that facility?  Do all drawdowns and disbursements pursuant to the parent agreement need to carry repayment terms of 14 days or less?**

If a U.S. person entered into a long-term credit facility or loan agreement prior to the relevant sanctions effective date described in the Russia-related Entities Directive, drawdowns and disbursements with repayment terms of 14 days or less are permitted.  In addition, drawdowns and disbursements whose repayment terms exceed 14 days are not prohibited if the terms of such drawdowns and disbursements (including the length of the repayment period, the interest rate applied to the drawdown, and the maximum drawdown amount) were contractually agreed to prior to the relevant sanctions effective date and are not modified on or after the relevant sanctions effective date.  U.S. persons may not deal in a drawdown or disbursement initiated on or after the relevant sanctions effective date with a repayment term that is longer than 14 days if the terms of the drawdown or disbursement were negotiated on or after the relevant sanctions effective date.  Such a newly negotiated drawdown or disbursement would constitute a prohibited extension of credit.

Released on February 24, 2022

**988. Does Russia-related Directive 3 under Executive Order (E.O.) 14024, "Prohibitions Related to New Debt and Equity of Certain Russia-related Entities" (Russia-related Entities Directive) prohibit U.S. persons from engaging in all activities with entities subject to it?**

No.  The Russia-related Entities Directive          prohibits U.S. persons from engaging in only certain activities related to new debt of longer than 14 days maturity or

new equity of the entities listed in Annex 1 to the Russia-related Entities Directive, or of entities otherwise determined to be subject to the prohibitions of the Russia-related Entities Directive, as explained in FAQ 984.  Please see FAQ 985 regarding the applicability of OFAC's 50 Percent Rule with respect to this directive.

Some entities determined to be subject to the prohibitions of the Russia-related Entities Directive may also be subject to additional prohibitions under other sanctions authorities, such as additional directives under E.O. 14024     or E.O. 13662   .  It is important to note that each directive operates independently of the others.  For example, if a transaction involves a person subject to two separate directives, a U.S. person engaging in that transaction must comply with both directives.

Released on February 24, 2022

### 989. Does Russia-related Directive 3 under Executive Order (E.O.) 14024, "Prohibitions Related to New Debt and Equity of Certain Russia-related Entities" (Russia-related Entities Directive) prohibit U.S. persons from engaging in dealings related to debt or equity issued before the relevant sanctions effective date by entities subject to it?

No, so long as the terms of such debt (including the repayment period, the interest rate, and the amount) were contractually agreed to before the relevant sanctions effective date described in the Russia-related Entities Directive  and are not modified on or after the relevant sanctions effective date (FAQ 984).  As stated in FAQ 956, loans, contracts, or other agreements that use London Interbank Offered Rate (LIBOR) as a reference rate that are modified to replace such benchmark reference rate will not be treated as new debt for OFAC sanctions purposes, so long as no other material terms of the loan, contract, or agreement are modified.

Some entities determined to be subject to the prohibitions of the Russia-related Entities Directive may also be subject to additional prohibitions under other sanctions authorities, such as additional directives under E.O. 14024     or E.O. 13662   .  It is important to note that each directive operates independently of the others.  For example, if a transaction involves a person subject to two separate directives, a U.S. person engaging in that transaction must comply with both directives.

Released on February 24, 2022

### 990. May a debit to an account of a person blocked pursuant to Executive Order (E.O.) 14024 be authorized as a transaction that is ordinarily

**incident and necessary to a licensed transaction?**

An authorization for transactions that are ordinarily incident and necessary to a transaction licensed pursuant to E.O. 14024 does not implicitly authorize a debit to a blocked account on the books of a U.S. financial institution. Debits to an account on the books of a U.S. financial institution of a blocked person are only authorized as transactions ordinarily incident and necessary to a licensed transaction if such license explicitly authorizes such debits.

For example, General Licenses (GLs) 9 and 10 explicitly state that debits to accounts on the books of a U.S. financial institution of the blocked entities listed in the GLs are authorized to the extent ordinarily incident and necessary to effect the specified transactions authorized therein. By contrast, GLs 3 and 11 do not explicitly authorize debits to accounts on the books of a U.S. financial institution of the blocked entities.

Released on February 24, 2022

**998. What are the requirements of Directive 4 under Executive Order (E.O.) 14024, "Prohibitions Related to Transactions Involving the Central Bank of the Russian Federation, the National Wealth Fund of the Russian Federation, and the Ministry of Finance of the Russian Federation," as amended (Russia-related Sovereign Transactions Directive)?**

The Russia-related Sovereign Transactions Directive prohibits U.S. persons from engaging in any transaction involving the Central Bank of the Russian Federation, the National Wealth Fund of the Russian Federation, or the Ministry of Finance of the Russian Federation (collectively, "Directive 4 entities"), including any transfer of assets to such entities or any foreign exchange transaction for or on behalf of such entities. Effective February 28, 2022, U.S. persons may not engage in any transactions involving these entities unless exempt or authorized by the Office of Foreign Assets Control (OFAC). This includes both direct and indirect transactions involving any Directive 4 entity. Prohibited transactions include trade or financial transactions and other dealings in which U.S. persons may not engage unless exempt or expressly authorized by OFAC.

The Russia-related Sovereign Transactions Directive also prohibits: (1) any transaction that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions of the Russia-related Sovereign Transactions Directive; and (2) any conspiracy formed to violate any of the prohibitions of the Russia-related Sovereign Transactions Directive.

This action effectively immobilizes any assets of the Directive 4 entities that are held in the United States or by U.S. persons, wherever located, unless exempt or

authorized by OFAC.  Effective February 28, 2022, U.S. financial institutions must reject transactions involving any Directive 4 entity, unless exempt or authorized by OFAC, and file a report within 10 business days in accordance with 31 CFR § 501.604.  OFAC issued general licenses that authorize certain limited transactions involving the Directive 4 entities (see FAQ 999).

On May 19, 2023, OFAC amended Directive 4 to require U.S. persons to submit a report to OFACreport@treasury.gov on or before June 18, 2023, and annually thereafter by June 30, regarding property in their possession or control in which any Directive 4 entity has an interest of any nature whatsoever, direct or indirect.  This reporting requirement is intended to identify assets of Directive 4 entities held by U.S. persons as of May 31, 2023, and annually thereafter, and is separate from the above-noted requirement under 31 CFR 501.604 to file reports on rejected transactions involving any Directive 4 entity.

Entities determined to be subject to the Russia-related Sovereign Transactions Directive are listed on OFAC's Non-SDN Menu-Based Sanctions (NS-MBS) List.

**Date Updated: May 19, 2023**

Released on March 2, 2022

### 999. What authorizations exist for entities subject to Directive 4 under Executive Order (E.O.) 14024, "Prohibitions Related to Transactions Involving the Central Bank of the Russian Federation, the National Wealth Fund of the Russian Federation, and the Ministry of Finance of the Russian Federation," as amended (Russia-related Sovereign Transactions Directive)?

OFAC issued Russia-related General License (GL) 8G to authorize certain energy-related transactions involving the Central Bank of the Russian Federation that would be prohibited by the Russia-related Sovereign Transactions Directive (see FAQs 976 and 977).

OFAC issued GL 13E to authorize U.S. persons to pay taxes, fees, or import duties and purchase or receive permits, licenses, registrations, or certifications, to the extent such transactions are prohibited by the Russia-related Sovereign Transactions Directive, provided such transactions are ordinarily incident and necessary to such persons' day-to-day operations in the Russian Federation.  For further information on the types of transactions authorized by GL 13E, see FAQ 1118.

OFAC also issued GL 14, authorizing certain transactions involving any Directive 4 entity where the Directive 4 entity's sole function in the transaction is to act as an operator of a clearing and settlement system.  GL 14 does not authorize any

transfer of assets to or from any Directive 4 entity, or any transaction where a Directive 4 entity is either a counterparty or beneficiary to the transaction. In addition, GL 14 does not authorize any debit to an account on the books of a U.S. financial institution of any Directive 4 entity. See FAQ 1003.

Note that GL 8G, GL 13E, and GL 14 continue to authorize against the Russia-related Sovereign Transactions Directive.

**Date Updated: May 19, 2023**

Released on March 2, 2022

### 1000. What sanctions are applicable to the Central Bank of the Russian Federation, the National Wealth Fund of the Russian Federation, or the Ministry of Finance of the Russian Federation?

The Central Bank of the Russian Federation, the National Wealth Fund of the Russian Federation, and the Ministry of Finance of the Russian Federation are subject to several restrictions under the following directives:

- Effective February 28, 2022, Directive 4 under Executive Order (E.O.) 14024, "Prohibitions Related to Transactions Involving the Central Bank of the Russian Federation, the National Wealth Fund of the Russian Federation, and the Ministry of Finance of the Russian Federation," as amended (Russia-related Sovereign Transactions Directive), prohibits U.S. persons from engaging in any transaction involving these entities, including any transfer of assets to such entities or any foreign exchange transaction for or on behalf of such entities. The Russia-related Sovereign Transactions Directive was amended on May 19, 2023 to include a reporting requirement. (see FAQ 998)

- Pursuant to Directive 1A under E.O. 14024, "Prohibitions Related to Certain Sovereign Debt of the Russian Federation" (Russia-related Sovereign Debt Directive), the following activities by a U.S. financial institution are prohibited:
  - As of June 14, 2021, participation in the primary market for ruble or non-ruble denominated bonds issued after June 14, 2021 by the Central Bank of the Russian Federation, the National Wealth Fund of the Russian Federation, or the Ministry of Finance of the Russian Federation;
  - As of June 14, 2021, lending ruble or non-ruble denominated funds to the Central Bank of the Russian Federation, the National Wealth Fund of the Russian Federation, or the Ministry of Finance of the Russian Federation; and
  - As of March 1, 2022, participation in the secondary market for ruble or non-ruble denominated bonds issued after March 1, 2022 by the Central

Bank of the Russian Federation, the National Wealth Fund of the Russian Federation, or the Ministry of Finance of the Russian Federation (see FAQ 888).

- Effective August 19, 2019, the Russia-Related Directive (the "CBW Act Directive") prohibits U.S. banks from participating in the primary market for non-ruble denominated bonds issued by the Russian sovereign and also prohibits U.S. banks from lending non-ruble denominated funds to the Russian sovereign. The CBW Act Directive defines the term "Russian sovereign" as any ministry, agency, or sovereign fund of the Russian Federation, including the Central Bank of the Russian Federation, the National Wealth Fund, and the Ministry of Finance of the Russian Federation (see FAQs 675 and 676).

The Russia-related Sovereign Transactions Directive includes prohibitions more expansive than the Russia-related Sovereign Debt Directive and the CBW Act Directive; however, it is important to note that each directive operates independently of the others and may have different effective dates. Transactions involving these entities must comply with all three directives described above.

**Date Updated: May 19, 2023**

Released on March 2, 2022

**1001. Does the 50 Percent Rule apply to Directive 4 under Executive Order (E.O.) 14024, "Prohibitions Related to Transactions Involving the Central Bank of the Russian Federation, the National Wealth Fund of the Russian Federation, and the Ministry of Finance of the Russian Federation," as amended (Russia-related Sovereign Transactions Directive)?**

No.

**Date Updated: May 19, 2023**

Released on March 2, 2022

**1002. Can U.S. persons engage in indirect transactions with persons subject to Directive 4 under Executive Order (E.O.) 14024, "Prohibitions Related to Transactions Involving the Central Bank of the Russian Federation, the National Wealth Fund of the Russian Federation, and the Ministry of Finance of the Russian Federation," as amended (Russia-related Sovereign Transactions Directive)?**

No. The Russia-related Sovereign Transactions Directive prohibits U.S. persons from engaging in any transaction involving the Central Bank of the Russian

Federation, the National Wealth Fund of the Russian Federation, or the Ministry of Finance of the Russian Federation, including any transfer of assets to such entities or any foreign exchange transaction for or on behalf of such entities. Effective February 28, 2022, U.S. persons may not engage in any transactions involving these entities unless exempt or authorized by the Office of Foreign Assets Control (OFAC), including debiting funds from restricted accounts. This includes both direct and indirect transactions. The Russia-related Sovereign Transactions Directive also prohibits: (1) any transaction that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions of the Russia-related Sovereign Transactions Directive; and (2) any conspiracy formed to violate any of the prohibitions of the Russia-related Sovereign Transactions Directive.

In light of the current economic situation in Russia, U.S. persons should be on alert for nonroutine foreign exchange transactions that may indirectly involve entities subject to the Russia-related Sovereign Transactions Directive, including transactions that are inconsistent with activity over the 12 months prior to February 28, 2022. For example, the Central Bank of the Russian Federation may seek to use import or export companies to engage in foreign exchange transactions on its behalf and obfuscate its involvement. U.S. persons should also exercise caution in engaging in foreign exchange transactions on the Moscow Exchange given the current heightened risk that the Central Bank of the Russia Federation could be a counterparty to such transactions.

**Date Updated: May 19, 2023**

Released on March 2, 2022

### 1003. Are transactions where the Central Bank of the Russian Federation, National Wealth Fund of the Russian Federation, or the Ministry of Finance of the Russian Federation serves solely as the operator of a clearing and settlement system authorized?

Yes. Please see General License 14    and FAQ 999.

Released on March 2, 2022

### 1004. Are U.S. persons required to block transactions involving entities subject to Directive 4 under Executive Order (E.O.) 14024, "Prohibitions Related to Transactions Involving the Central Bank of the Russian Federation, the National Wealth Fund of the Russian Federation, and the Ministry of Finance of the Russian Federation," as amended (Russia-related Sovereign Transactions Directive)?

No.  Although the prohibitions of the Russia-related Sovereign Transactions Directive  effectively immobilize any assets of the Central Bank of the Russian Federation, the National Wealth Fund of the Russian Federation, or the Ministry of Finance of the Russian Federation (collectively, the "Directive 4 entities") that are held in the United States or by U.S. persons, wherever located, the Russia-related Sovereign Transactions Directive does not impose blocking sanctions on the Directive 4 entities.  Rather, U.S. persons must reject transactions involving the Directive 4 entities, unless exempt or authorized by OFAC.

**Date Updated: May 19, 2023**

Released on March 2, 2022

### 1005. Does Directive 4 under Executive Order (E.O.) 14024, "Prohibitions Related to Transactions Involving the Central Bank of the Russian Federation, the National Wealth Fund of the Russian Federation, and the Ministry of Finance of the Russian Federation," as amended (Russia-related Sovereign Transactions Directive), prohibit trading in the secondary markets for Russian sovereign debt?

No, the Russia-related Sovereign Transactions Directive does not prohibit trading in the secondary markets for debt or equity of the Central Bank of the Russian Federation, the National Wealth Fund of the Russian Federation, or the Ministry of Finance of the Russian Federation (collectively, "Directive 4 entities"), provided that no Directive 4  entity is a counterparty to such a transaction.  Please note, however, that Directive 1A  under E.O. 14024 , "Prohibitions Related to Certain Sovereign Debt of the Russian Federation" (Russia-related Sovereign Debt Directive), prohibits U.S. financial institutions from participation in the secondary market for ruble or non-ruble denominated bonds issued after March 1, 2022 by the Directive 4 entities.  However, the "new investment" prohibitions of E.O.14066 , E.O. 14068 , and E.O. 14071  prohibit U.S. persons from purchasing debt and equity securities issued by an entity in the Russian Federation.  Please see FAQ 1054.

**Date Updated: May 19, 2023**

Released on March 2, 2022

### 1010. My company transports Russian oil for sale to the United States and third countries.  Can I continue to transport or sell Russian-origin oil without violating sanctions pursuant to Executive Order (E.O.) 14024?

The energy sector of the Russian Federation economy itself is not subject to comprehensive sanctions.  However, prohibitions or restrictions may apply to

certain energy-related transactions under several sanctions authorities, including prohibitions issued pursuant to E.O. 13662, E.O. 14024, E.O. 14066, E.O. 14071, and E.O. 14068.

Pursuant to E.O. 14066, the import into the United States of crude oil; petroleum; petroleum fuels, oils, and products of their distillation; liquefied natural gas; coal; and coal products of Russian Federation origin is prohibited; and U.S. persons, wherever located, are prohibited from new investment in the energy sector in the Russian Federation, among other things.

E.O. 14066 does not prohibit transactions such as the unwinding of contracts or other business-related activities by U.S. persons to comply with the import ban imposed under E.O. 14066. Likewise, E.O. 14066 does not prohibit U.S. persons from engaging in transactions to sell or re-direct shipments that were laden on or after March 8, 2022 and previously destined for the United States. The Office of Foreign Assets Control (OFAC) has also authorized until April 22, 2022 certain transactions prohibited by E.O. 14066 (see FAQs 1013 – 1020).

In addition, pursuant to E.O. 14024, OFAC has imposed expansive sanctions on persons that operate or have operated in the financial services sector of the Russian Federation economy (see FAQ 966). To limit the degree to which these financial services sector sanctions may inhibit energy-related transactions, OFAC has issued Russia-related General License (GL) 8C authorizing U.S. persons to process energy-related transactions involving the sanctioned Russian financial institutions identified in GL 8C. GL 8C expires at 12:01 a.m. eastern standard time, December 5, 2022, unless renewed (see FAQs 976, 977, 978, 1011, and 1012).

Energy-related transactions authorized in GL 8C include payments connected with a variety of upstream and downstream activities, including the extraction, production, refinement, liquefaction, gasification, regasification, conversion, enrichment, fabrication, transport, or purchase of energy for import from the Russian Federation to countries other than the United States or for export to the Russian Federation, as well as financing, loading, or unloading related to such processes (see FAQ 977). However, transactions related to new investment in the energy sector in the Russian Federation are not authorized pursuant to GL 8C.

**Updated: June 14, 2022**

Released on March 4, 2022

**1011. My U.S. bank refused to process a requested payment related to energy despite the authorization in Russia-related General License (GL) 8C under Executive Order (E.O.) 14024. What can I do?**

The Office of Foreign Assets Control (OFAC) encourages persons to connect with their financial institution regarding the status of any payment.  In addition, persons with questions about engaging in or processing transactions related to GL 8C   can contact the OFAC Compliance Hotline.

**Updated: June 14, 2022**

Released on March 4, 2022

### 1012. Do I have to wind down energy-related transactions by the expiration date of Russia-related General License (GL) 8C?

GL 8C   authorizes energy-related transactions through 12:01 a.m. eastern standard time, December 5, 2022, unless renewed.  In the event that GL 8C is not renewed, OFAC intends to issue a general license authorizing the orderly wind down of activities covered by GL 8C.

**Updated: June 14, 2022**

Released on March 4, 2022

### 1013. What does Executive Order (E.O.) of March 8, 2022, "Prohibiting Certain Imports and New Investments With Respect to Continued Russian Federation Efforts to Undermine the Sovereignty and Territorial Integrity of Ukraine," do?

E.O. of March 8, 2022   prohibits the following activities:

- the importation into the United States of crude oil; petroleum; petroleum fuels, oils, and products of their distillation; liquefied natural gas; coal; and coal products of Russian Federation origin;
- new investment in the energy sector in the Russian Federation by a United States person, wherever located; and
- any approval, financing, facilitation, or guarantee by a United States person, wherever located, of a transaction by a foreign person where the transaction by that foreign person would be prohibited by E.O. of March 8, 2022, if performed by a United States person or within the United States.

Released on March 8, 2022

### 1014. Are all energy imports from Russia now prohibited by Executive Order (E.O.) of March 8, 2022, "Prohibiting Certain Imports and New Investments With Respect to Continued Russian Federation Efforts to Undermine the Sovereignty and Territorial Integrity of Ukraine"?

No, only imports of crude oil; petroleum; petroleum fuels, oils, and products of their distillation; liquefied natural gas; coal; and coal products of Russian Federation origin into the United States are prohibited by E.O. of March 8, 2022, "Prohibiting Certain Imports and New Investments With Respect to Continued Russian Federation Efforts to Undermine the Sovereignty and Territorial Integrity of Ukraine ."  Imports of other forms of energy of Russian Federation origin are not prohibited by E.O. of March 8, 2022.  In addition, E.O. of March 8, 2022 does not prohibit imports of non-Russian Federation origin, even if such items transit through or depart from the Russian Federation.  However, targeted prohibitions or restrictions may apply to certain energy-related dealings with specified Russian persons under other sanctions authorities, such as E.O. 13662    or E.O. 14024    .

Released on March 8, 2022

### 1015. Is there a period for U.S. persons to continue imports prohibited by Executive Order (E.O.) of March 8, 2022, "Prohibiting Certain Imports and New Investments With Respect to Continued Russian Federation Efforts to Undermine the Sovereignty and Territorial Integrity of Ukraine"?

Through 12:01 eastern daylight time, April 22, 2022, Russia-related General License (GL) 16    authorizes all transactions prohibited by E.O. of March 8, 2022    that are ordinarily incident and necessary to the importation of crude oil; petroleum; petroleum fuels, oils, and products of their distillation; liquefied natural gas; coal; and coal products of Russian Federation origin pursuant to written contracts or written agreements entered prior to March 8, 2022.  GL 16 does not authorize entry into new contracts.

Additionally, E.O. of March 8, 2022 does not prohibit transactions such as the unwinding of contracts or other business-related activities by U.S. persons to comply with the import ban imposed under E.O. of March 8, 2022.  Likewise, E.O. of March 8, 2022 does not prohibit U.S. persons from engaging in transactions to sell or re-direct shipments that were laden on or after March 8, 2022 and previously destined for the United States.

Note that all other prohibitions specified in E.O. of March 8, 2022 are effective immediately.

Released on March 8, 2022

### 1016. I have a shipment of a product or products listed in Executive Order (E.O.) of March 8, 2022, "Prohibiting Certain Imports and New Investments With Respect to Continued Russian Federation Efforts to Undermine the Sovereignty and Territorial Integrity of Ukraine," en route to the United States that was contracted prior to March 8, 2022.  Can I

**find a new buyer for this shipment, re-direct the shipment to a country other than the United States, or import the product and comply with the import ban?**

Yes.  E.O. of March 8, 2022    prohibits the importation into the United States of crude oil; petroleum; petroleum fuels, oils, and products of their distillation; liquefied natural gas; coal; and coal products of Russian Federation origin.  It does not prohibit U.S. persons from engaging in transactions to sell or re-direct shipments that were previously destined for the United States.  In addition, the Office of Foreign of Assets Control (OFAC) has issued General License (GL) 16    to authorize the limited import of these items pursuant to pre-existing written contracts or written agreements through April 22, 2022 (see FAQ 1015).  Such shipments into the United States can still be imported in compliance with E.O. of March 8, 2022.  OFAC may issue specific licenses on a case-by-case basis to authorize shipments occurring after April 22, 2022 or other activity outside the scope of GL 16.

Released on March 8, 2022

### 1017. Does Russia-related General License (GL) 8C remain valid following the issuance of Executive Order (E.O.) 14066, "Prohibiting Certain Imports and New Investments With Respect to Continued Russian Federation Efforts to Undermine the Sovereignty and Territorial Integrity of Ukraine"?

Yes.  GL 8C    , which authorizes certain transactions "related to energy" involving specified Russian financial institutions, remains in effect until 12:01 eastern standard time, December 5, 2022, unless renewed.  However, GL 8C does not authorize any transactions prohibited by E.O. 14066    (see FAQs 976-978 and 1,010-1,012).

**Updated: June 14, 2022**

Released on March 8, 2022

### 1018. Are non-U.S. persons exposed to sanctions if they continue to import to non-U.S. jurisdictions certain products of Russian Federation origin that are banned from the United States pursuant to Executive Order (E.O.) of March 8, 2022, "Prohibiting Certain Imports and New Investments With Respect to Continued Russian Federation Efforts to Undermine the Sovereignty and Territorial Integrity of Ukraine"?

E.O. of March 8, 2022    prohibits the importation into the United States of crude oil; petroleum; petroleum fuels, oils, and products of their distillation; liquefied natural gas; coal; and coal products of Russian Federation origin.  To the extent the

import of such products of Russian Federation origin outside of the United States does not involve a sanctioned person or an otherwise prohibited transaction, non-U.S. persons are not exposed to sanctions under E.O. of March 8, 2022.  However, targeted prohibitions or restrictions may apply to certain energy-related dealings with specified Russian persons under other sanctions authorities, such as E.O. 13662   or E.O. 14024.

Released on March 8, 2022

### 1019. For the purposes of Executive Order (E.O.) 14066, 14068, as amended by E.O. 14114, and the determination "Prohibitions on Certain Services for the Acquisition of Aluminum, Copper, or Nickel of Russian Federation Origin" pursuant to Executive Order (E.O.) 14071 what is meant by the term "Russian Federation origin"?

For the purposes of E.O. 14066   , "Prohibiting Certain Imports and New Investments With Respect to Continued Russian Federation Efforts To Undermine the Sovereignty and Territorial Integrity of Ukraine", E.O. 14068, as amended by E.O. 14114, "Taking Additional Steps With Respect to the Russian Federation's Harmful Activities," and **the determination "Prohibitions on Certain Services for the Acquisition of Aluminum, Copper, or Nickel of Russian Federation Origin" pursuant to** E.O. 14071, the Office of Foreign Assets Control (OFAC) anticipates publishing regulations defining the term "Russian Federation origin" to include goods produced, manufactured, extracted, or processed in the Russian Federation, excluding any Russian Federation origin good that has been incorporated or substantially transformed into a foreign-made product.

For information on prohibitions related to new investment pursuant to Russia-related E.O. 14066   , E.O. 14068   , and E.O. 14071   , please see FAQs 1049-1055. For information on the amendment to E.O. 14068, see FAQ 1154.

**Updated: April 12, 2024**

Released on March 8, 2022

### 1020. Does Executive Order (E.O.) 14066 prohibit dealing in Kazakh-origin crude oil of the Caspian Pipeline Consortium ("CPC")?

No.  The importation prohibition of E.O. 14066   applies to the import of certain products of Russian Federation origin to the United States and excludes imports that are not of Russian Federation origin, even if such items transit through or depart from the Russian Federation.  The CPC transports crude oil through the CPC pipeline that is predominantly of Kazakh origin and that is marketed and loaded with a certificate of origin verifying that the crude is of Kazakh origin.  Any crude oil

that is primarily of Russian Federation origin is marketed and loaded separately and certified as Russian origin. For purposes of assessing whether crude oil marketed by the CPC is of Russian origin, U.S. persons may reasonably rely upon a certificate of origin, but should exercise caution if they have a reason to believe such certificate has been falsified.

**Date Updated: 03/18/2022**

Released on March 8, 2022

### 1021. Do the prohibitions of Executive Order (E.O.) 14024 and other Russia-related sanctions extend to virtual currency?

Yes. The Office of Foreign Assets Control (OFAC) has imposed expansive sanctions actions against certain Russian entities and individuals pursuant to E.O. 14024, in addition to other authorities. All U.S. persons are required to comply with OFAC regulations, regardless of whether a transaction is denominated in traditional fiat currency or virtual currency (see FAQ 560).

Sanctioned Russian persons are known to employ a wide variety of measures in their efforts to evade U.S. and international sanctions. As such, U.S. persons, wherever located, including firms that process virtual currency transactions, must be vigilant against attempts to circumvent OFAC regulations and must take risk-based steps to ensure they do not engage in prohibited transactions. For additional information regarding sanctions compliance best practices for the virtual currency industry, please see OFAC's Sanctions Compliance Guidance for the Virtual Currency Industry.

U.S. persons, including virtual currency exchanges, virtual wallet hosts, and other service providers, such as those that provide nested services for foreign exchanges, are generally prohibited from engaging in or facilitating prohibited transactions, including virtual currency transactions in which blocked persons have an interest. U.S. persons are further prohibited from engaging in or facilitating any transaction by a non-U.S. person that would be prohibited if performed by a U.S. person or within the United States, including virtual currency transactions involving the Central Bank of the Russian Federation, National Wealth Fund of the Russian Federation, or the Ministry of Finance of the Russian Federation. Among other activities, U.S. financial institutions are also generally prohibited from processing transactions, including virtual currency transactions, involving foreign financial institutions that are determined to be subject to the prohibitions of Directive 2 under Executive Order 14024, "Prohibitions Related to Correspondent or Payable-Through Accounts and Processing of Transactions Involving Certain Foreign Financial Institutions" (Russia-related CAPTA

Directive ).  For additional information regarding the Russia-related CAPTA Directive, please see FAQ 967.

Non-U.S. persons are also subject to certain OFAC prohibitions.  Such persons, for example, are prohibited from causing or conspiring to cause U.S. persons to violate U.S. sanctions, as well as engaging in conduct that evades or avoids a violation of OFAC sanctions.  Violations of OFAC regulations may result in criminal or civil penalties.

E.O. 14024 further authorizes sanctions against persons determined to be responsible for or complicit in, or to have directly or indirectly engaged or attempted to engage in, deceptive or structured transactions or dealings to circumvent U.S. sanctions, including through the use of digital currencies or assets, or the use of physical assets.  E.O. 14024 also authorizes sanctions against persons determined to operate or to have operated in the financial services or technology sectors of the Russian Federation economy, as well as persons that have materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, blocked persons.

OFAC is closely monitoring any efforts to circumvent or violate Russia-related sanctions, including through the use of virtual currency, and is committed to using its broad enforcement authorities to act against violations and to promote compliance.

For additional information regarding the application of sanctions to virtual currency, please see FAQs 559, 560, 561, 562, 563, 594, 646, 647, and 971, as well as OFAC's Sanctions Compliance Guidance for the Virtual Currency Industry.

For additional Treasury guidance on Russia and sanctions evasion, please see FinCEN's Alert on Increased Vigilance for Potential Russian Sanctions Evasion Attempts.

Released on March 11, 2022

### 1022. What does Executive Order (E.O.) 14068, "Prohibiting Certain Imports, Exports, and New Investment With Respect to Continued Russian Federation Aggression," do?

E.O. 14068  prohibits the following activities:

- the importation into the United States of the following products of Russian Federation origin:  fish, seafood, and preparations thereof; alcoholic beverages; non-industrial diamonds; and any other products of Russian

Federation origin as may be determined by the Secretary of the Treasury, in consultation with the Secretary of State and the Secretary of Commerce;

- the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of luxury goods, and any other items as may be determined by the Secretary of Commerce, in consultation with the Secretary of State and the Secretary of the Treasury, to any person located in the Russian Federation;
- new investment in any sector of the Russian Federation economy as may be determined by the Secretary of the Treasury, in consultation with the Secretary of State, by a United States person, wherever located;
- the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of U.S. dollar-denominated banknotes to the Government of the Russian Federation or any person located in the Russian Federation; and
- any approval, financing, facilitation, or guarantee by a United States person, wherever located, of a transaction by a foreign person where the transaction by that foreign person would be prohibited by sections 1(a)(i)-(iv) of E.O. 14068 if performed by a United States person or within the United States.

On December 22, 2023, E.O. 14068 was amended to provide for additional prohibitions on the importation and entry into the United States of certain categories of products.  See FAQ 1154 for additional information on how E.O. 14114 amends E.O. 14068.

**Date Updated: February 23, 2024**

Released on March 11, 2022

**1024. I have a shipment of a certain product(s) listed in Executive Order (E.O.) 14068 en route to the United States that were contracted prior to March 11, 2022.  Can I find a new buyer for this shipment, re-direct the shipment to a country other than the United States, or import the product(s) and comply with the import ban?**

Yes.  E.O. 14068    prohibits the importation into the United States of fish, seafood, and preparations thereof; alcoholic beverages; and non-industrial diamonds of Russian Federation origin.  It does not prohibit U.S. persons from engaging in transactions to sell or re-direct shipments outside the United States that were previously destined for the United States.

In addition, the Office of Foreign of Assets Control (OFAC) has issued Russia-related General License (GL) 17A to authorize the import, for a limited time, of certain items pursuant to pre-existing written contracts or written agreements (see FAQ 1023).  GL 17A provides such authorization for importing alcoholic beverages

or non-industrial diamonds of Russian Federation origin until March 25, 2022 and authorization for importing fish, seafood, and preparations thereof of Russian Federation origin until June 23, 2022. OFAC may issue specific licenses on a case-by-case basis to authorize shipments occurring after the expiry of GL 17A or for other activity outside the scope of this GL.

**(Updated March 24, 2022)**

Released on March 11, 2022

**1025. Executive Order (E.O.) 14068, "Prohibiting Certain Imports, Exports, and New Investment With Respect to Continued Russian Federation Aggression" prohibits the importation into the United States of fish, seafood, and preparations thereof of Russian Federation origin. How does this affect Russia-related General License (GL) 6C?**

Russia-related GL 6C    ("Transactions Related to Agricultural Commodities, Medicine, Medical Devices, Replacement Parts and Components, or Software Updates, the Coronavirus Disease 2019 (COVID-19) Pandemic, or Clinical Trials") remains valid and authorizes, among other things, certain transactions prohibited by the Russian Harmful Foreign Activities Sanctions Regulations, 31 CFR part 587, ordinarily incident and necessary to (1) the production, manufacturing, sale, transport, or provision of agricultural commodities, including products such as fish, seafood, or preparations thereof — to the extent they fall within the definition of agricultural commodities provided in GL 6C — to, from, or transiting the Russian Federation (see FAQ 979).

However, GL 6C does not authorize any transactions prohibited by E.O. 14068, including transactions prohibited by the determination of December 22, 2023 (Seafood Determination    ). In particular, E.O. 14068 prohibits the importation into the United States of, among other things, Russian Federation origin fish, seafood, and preparations thereof. The Seafood Determination further prohibits the importation of salmon, cod, pollock, or crab produced wholly or in part in the Russian Federation, or harvested in waters under the jurisdiction of the Russian Federation or by Russia-flagged vessels, notwithstanding whether such salmon, cod, pollock, or crab has been incorporated or substantially transformed into another product outside of the Russian Federation. As such, U.S. persons cannot rely on GL 6C for transactions that are for the importation into the United States of Russian Federation origin fish, seafood, or preparations thereof, or salmon, cod, pollock, or crab covered by the Seafood Determination, unless otherwise authorized by OFAC. However, U.S. persons may continue to rely on GL 6C for transactions otherwise prohibited by E.O. 14024    involving agricultural commodities.

Date Updated: February 23, 2024

Released on March 11, 2023

**1026. Are non-U.S. persons exposed to sanctions if they continue to import to non-U.S. jurisdictions certain products of Russian Federation origin that are banned from the United States pursuant to Executive Order (E.O.) of March 11, 2022, "Prohibiting Certain Imports, Exports, and New Investment With Respect to Continued Russian Federation Aggression"?**

E.O. of March 11, 2022    prohibits the importation into the United States of fish, seafood, and preparations thereof; alcoholic beverages; and non-industrial diamonds of Russian Federation origin.  To the extent the import of such products of Russian Federation origin to jurisdictions outside of the United States does not involve a sanctioned person or an otherwise prohibited transaction, non-U.S. persons are not exposed to sanctions under E.O. of March 11, 2022.

Released on March 11, 2022

**1027. For the purposes of Executive Order (E.O.) 14068, as amended, "Prohibiting Certain Imports, Exports, and New Investment With Respect to Continued Russian Federation Aggression," and associated determinations, what is meant by the terms "Russian Federation origin," "fish, seafood, and preparations thereof," "alcoholic beverages," "unsorted diamonds," and "non-industrial diamonds"?**

For the purposes of E.O. 14068    , as amended by E.O. 14114, the Office of Foreign Assets Control anticipates publishing regulations defining these terms to include the following:

- "Russian Federation origin" – see FAQ 1019.
- "fish, seafood, and preparations thereof" – articles defined at Harmonized Tariff Schedule of the United States (HTSUS) subheadings 0301.11.00 to 0301.99.03; 0302.11.00 to 0302.99.00; 0303.11.00 to 0303.99.00; 0304.31.00 to 0304.99.91; 0305.20.20 to 0305.79.00; 0306.11.00 to 0306.99.01; 0307.11.00 to 0307.99.03; 0308.11.00 to 0308.90.01; 0309.10.05 to 0309.90.90; 1603.00.10; 1603.00.90; 1604.11.20 to 1604.32.40; 1605.10.05 to 1605.69.00; 0508.00.0000; 2301.20.0010; 2310.20.0090; 1504.10.20 to 1504.20.60; and 2106.90.9998, including any subsequent revisions to the list of HTSUS classifications. See FAQ 1157 for additional definitions of certain categories of fish, seafood, and preparations thereof.
- "alcoholic beverages" – articles defined at HTSUS subheadings 2203.00.00; 2204.10.00 to 2204.30.00; 2205.10.30 to 2205.90.60; 2206.00.15 to 2206.00.90;

2207.10.30 to 2207.20.00; and 2208.20.10 to 2208.90.80, including any subsequent revisions to the list of HTSUS classifications.

- "non-industrial diamonds" – articles defined at HTSUS subheadings 7102.31.00 and 7102.39.00, including any subsequent revisions to the list of HTSUS classifications.
- "diamonds" - includes any diamonds classifiable under HTSUS subheadings 7102.10, 7102.31, and 7102.39 and under any other subheadings of the Harmonized Tariff Schedule of the United States specified in determinations.
- "unsorted diamonds" – articles defined under HTSUS subheading 7102.10.
- "diamond jewelry" – articles defined under HTSUS heading 7113, incorporating diamonds.

With respect to the export prohibitions set forth in section 1(a)(ii) of E.O. 14068, please consult the U.S. Department of Commerce, Bureau of Industry and Security, for guidance.

**Date Updated: February 23, 2024**

Released on March 11, 2022

**1028. Does the U.S. dollar-denominated banknote export ban imposed by Executive Order (E.O.) of March 11, 2022, "Prohibiting Certain Imports, Exports, and New Investment With Respect to Continued Russian Federation Aggression," prohibit sending noncommercial, personal remittances denominated in U.S. dollars to the Russia Federation (or to individuals ordinarily resident in the Russia Federation)?**

E.O. of March 11, 2022    prohibits the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of U.S. dollar-denominated banknotes to the Government of the Russian Federation or any person located in the Russian Federation.  However, Russia-related General License (GL) 18    authorizes certain transactions that are ordinarily incident and necessary to the transfer of U.S. dollar-denominated banknotes for noncommercial, personal remittances from:  (i) the United States or a U.S. person, wherever located, to an individual located in the Russian Federation; or (ii) a U.S. person who is an individual located in the Russian Federation.

GL 18 authorizes methods of payment including withdrawals of U.S. dollar-denominated banknotes via automated teller machines and the hand carrying of U.S. dollar-denominated banknotes.

Note that GL 18 does not authorize U.S. financial institutions to process transactions for the provision of U.S. dollar-denominated banknotes to foreign financial institutions for further distribution or supply to the Government of the

Russian Federation or any person located in the Russian Federation.

Released on March 11, 2022

### 1029. How do the prohibitions of Executive Order (E.O.) 14024 and other Russia-related sanctions impact gold-related transactions or persons participating in the gold market?

Gold-related transactions involving the Russian Federation may be sanctionable under E.O. 14024    or other Russia-related sanctions authorities.  For example, E.O. 14024 authorizes sanctions against:

- Persons determined to be responsible for or complicit in, or to have directly or indirectly engaged or attempted to engage in, deceptive or structured transactions or dealings to circumvent U.S. sanctions, including through the use of assets such as gold or other precious metals;
- Persons determined to operate or to have operated in the financial services sector of the Russian Federation economy, which could include those engaging in gold-related transactions involving the Russian Federation; and
- Persons that have materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, persons blocked under E.O. 14024.  This could include transactions in gold or other precious metals that involve such blocked persons.

In addition, gold-related transactions involving Russia or the Russian Federation may be prohibited under E.O. 14024 or other Russia-related sanctions authorities.  For example:

- The determination of June 28, 2022    issued pursuant to E.O. 14068, "Prohibitions Related to Imports of Gold of Russian Federation Origin," prohibits the importation into the United States of certain gold of Russian Federation origin (see FAQ 1070).
- U.S. persons, including gold dealers, distributors, wholesalers, buyers, individual traders, refineries, and financial institutions, are generally prohibited from engaging in or facilitating prohibited transactions, including gold-related transactions, in which blocked persons have an interest.
- U.S. persons are prohibited from engaging in any transaction — including gold-related transactions — involving the Central Bank of the Russian Federation, the National Wealth Fund of the Russian Federation, or the Ministry of Finance of the Russian Federation, pursuant to Directive 4 under E.O. 14024, "Prohibitions Related to Transactions Involving the Central Bank of the Russian Federation, the National Wealth Fund of the Russian

Federation, and the Ministry of Finance of the Russian Federation (Russia-related Sovereign Transactions Directive).      Please see FAQ 998.

- U.S. financial institutions are also generally prohibited from processing transactions, including gold-related transactions, involving foreign financial institutions that are determined to be subject to the prohibitions of Directive 2 under Executive Order 14024, "Prohibitions Related to Correspondent or Payable-Through Accounts and Processing of Transactions Involving Certain Foreign Financial Institutions" (Russia-related CAPTA Directive).      Please see FAQ 967 and FAQ 969.

- Non-U.S. persons are prohibited from causing or conspiring to cause U.S. persons to violate U.S. sanctions, as well as engaging in conduct that evades or avoids a violation of OFAC sanctions.

Sanctioned Russian persons are known to employ a wide variety of measures in their efforts to evade U.S. and international sanctions.  As such, U.S. persons, wherever located, including persons that process or facilitate gold-related transactions, must be vigilant against attempts to circumvent OFAC regulations and must take risk-based steps to ensure they do not engage in prohibited transactions.

Violations of OFAC regulations may result in criminal or civil penalties.  OFAC is closely monitoring any efforts to circumvent or violate Russia-related sanctions, including through the use of gold or other precious metals, and is committed to using its authorities to act against sanctions evaders, and promote compliance.

**Date Updated: June 28, 2022**

Released on March 24, 2022

**1030. What obligations do operators of credit card systems have under the Russian Harmful Foreign Activities Sanctions Regulations, 31 C.F.R. part 587 (RuHSR), and the Belarus Sanctions Regulations, 31 C.F.R. part 548 (BSR), with regard to payment cards issued by sanctioned Russian financial institutions?**

Pursuant to the RuHSR and BSR, U.S. persons, including U.S. operators of credit card systems and U.S. acquirers, are prohibited from processing transactions involving certain sanctioned foreign financial institutions, unless exempt or authorized by OFAC.  Non-U.S. operators of credit card systems whose payment cards are issued by sanctioned foreign financial institutions may also be in violation of OFAC-administered sanctions regulations if they allow those cards to be used in the United States.

OFAC encourages U.S. persons, including U.S. operators of credit card systems and U.S. acquirers, to exercise caution and due diligence in dealing with non-U.S. operators of credit card systems that are known to host payment cards issued by sanctioned foreign financial institutions and whose payment cards are accepted in the United States. Examples of due diligence measures may include requesting Bank Identification Numbers (BINs) associated with sanctioned foreign financial institutions, disabling those BINs from operation in the United States, and requesting that non-U.S. operators of credit card systems prevent the use of payment cards issued by sanctioned foreign financial institutions in the United States at the network level.

Released on April 20, 2022

### 1033. What actions were taken on May 8, 2022 related to certain accounting, trust and corporate formation, and management consulting services?

On May 8, 2022, the Director of OFAC, in consultation with the Department of State, issued a determination    pursuant to Executive Order (E.O.) 14071    , "Prohibitions Related to Certain Accounting, Trust and Corporate Formation, and Management Consulting Services," prohibiting the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of certain accounting, trust and corporate formation, and management consulting services to any person located in the Russian Federation. This determination takes effect June 07, 2022. For more information, please see FAQ 1034.

On May 08, 2022, the Director of OFAC, in consultation with the Department of State, also issued a sectoral determination    pursuant to E.O. 14024    that authorizes the imposition of economic sanctions on individuals and entities that operate or have operated in the accounting, trust and corporate formation services, or management consulting sectors of the Russian Federation economy. This determination takes effect on May 08, 2022. For further information, please see FAQ 1034.

On June 12, 2024, the Department of the Treasury issued a determination    that restricts the provision of certain IT and software-related services to Russia, including prohibiting the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, to any person located in the Russian Federation of IT support services and cloud-based services for the following categories of software: enterprise management software and design and manufacturing software (collectively, "Covered

Software"). These prohibitions took effect on September 12, 2024. See FAQs 1184 – 1188 for additional information.

**Date Updated: September 12, 2024**

Released on May 8, 2022

**1034. For the purposes of the determination of May 8, 2022 made pursuant to Executive Order (E.O.) 14071, "Prohibitions Related to Certain Accounting, Trust and Corporate Formation, and Management Consulting Services," what is meant by the terms "accounting," "trust and corporate formation," and "management consulting" services?**

For the purposes of the determination of May 8, 2022 made pursuant to E.O. 14071, OFAC anticipates publishing regulations defining these terms to include the following:

- "Accounting services" – includes services related to the measurement, processing, and evaluation of financial data about economic entities. Please note that OFAC has issued General License 35 to authorize certain transactions ordinarily incident and necessary to the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of credit rating or auditing services to any person located in the Russian Federation through 12:01 a.m. eastern daylight time, August 20, 2022. See FAQ 1035.
- "Trust and corporate formation services" – includes services related to assisting persons in forming or structuring legal persons, such as trusts and corporations; acting or arranging for other persons to act as directors, secretaries, administrative trustees, trust fiduciaries, registered agents, or nominee shareholders of legal persons; providing a registered office, business address, correspondence address, or administrative address for legal persons; and providing administrative services for trusts. Please note that all of these activities are common activities of trust and corporate service providers (TCSPs), although they may be provided by other persons.
- "Management consulting services" – includes services related to strategic business advice; organizational and systems planning, evaluation, and selection; development or evaluation of marketing programs or implementation; mergers, acquisitions, and organizational structure; staff augmentation and human resources policies and practices; and brand management.

This determination excludes from the scope of the aforementioned services: (1) any service to an entity located in the Russian Federation that is owned or controlled, directly or indirectly, by a United States person; and (2) any service in

connection with the wind down or divestiture of an entity located in the Russian Federation that is not owned or controlled, directly or indirectly, by a Russian person.

For the purposes of the prohibitions set forth in in the determination of May 8, 2022 made pursuant to E.O. 14071, OFAC anticipates publishing regulations defining the term "person located in the Russian Federation" as set forth in FAQ 1058. For the purposes of the exclusion set forth in the determination of May 8, 2022 made pursuant to E.O. 14071, OFAC anticipates publishing regulations defining the term "Russian person" to mean an individual who is a citizen or national of the Russian Federation, or an entity organized under the laws of the Russian Federation.

**Date Updated: September 15, 2022**

Released on May 8, 2022

### 1035. For the purposes of Russia-related General License 35 what is meant by the terms "credit rating services" and "auditing services?"

The term "credit rating services" means services related to assessments of a borrower's ability to meet financial commitments, including analysis of general creditworthiness or with respect to a specific debt or financial obligation.

The term "auditing services" means examination or inspection of business records by an auditor, including checking and verifying accounts, statements, or other representation of the financial position or regulatory compliance of the auditee.

General License 35 authorizes certain transactions ordinarily incident and necessary to the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of credit rating or auditing services to any person located in the Russian Federation through 12:01 a.m. eastern daylight time, August 20, 2022.

**Updated: May 11, 2022**

Released on May 8, 2022

### 1036. When do the prohibitions imposed by the determination of May 8, 2022 made pursuant to Executive Order (E.O.) 14071, "Prohibitions Related to Certain Accounting, Trust and Corporate Formation, and Management Consulting Services," take effect?

The prohibitions imposed by the determination of May 8, 2022 made pursuant to E.O. 14071 take effect at 12:01 a.m. eastern daylight time June 7, 2022.

In addition, OFAC has issued General License 34 to authorize all transactions ordinarily incident and necessary to the wind down of the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of accounting, trust and corporate formation, and management consulting services to any person located in the Russian Federation, through 12:01 a.m. eastern daylight time, July 7, 2022.

Released on May 8, 2022

### 1038. For the purposes of the determination of May 8, 2022 made pursuant to Executive Order (E.O.) 14024, what is meant by the terms "accounting," "trust and corporate formation services," and "management consulting" sectors of the Russian Federation economy?

For the purposes of the determination of May 8, 2022 made pursuant to E.O. 14024, OFAC interprets the following terms to include activities related to products and services in or involving the Russian Federation in the following:

- "Accounting sector" – includes the measurement, processing, and evaluation of financial data about economic entities.
- "Trust and corporate formation services sector" – includes assisting persons in forming or structuring legal persons, such as trusts and corporations; acting or arranging for another person to act as directors, secretaries, administrative trustees, trust fiduciaries, registered agents, or nominee shareholders of legal persons; providing a registered office, business address, correspondence address, or administrative address for legal persons; and providing administrative services for trusts.
- "Management consulting sector" – includes strategic business advice; organizational and systems planning, evaluation, and selection; development or evaluation of marketing programs or implementation; mergers, acquisitions, and organizational structure; staff augmentation and human resources policies and practices; and brand management.

The determination regarding these sectors pursuant to E.O. 14024 takes effect immediately.

**Updated: May 11, 2022**

Released on May 8, 2022

### 1039. Are transactions ordinarily incident and necessary to the exportation or reexportation of agricultural commodities to, from, or transiting the Russian Federation that involve Agropromyshlennyi

Office of Foreign Assets Control

**Kompleks Voronezhskii OOO, Anninskii Elevator OOO, and Azovskaya Zernovaya Kompaniya OOO authorized under OFAC sanctions?**

Yes. On May 8, 2022, OFAC designated Agropromyshlennyi Kompleks Voronezhskii OOO, Anninskii Elevator OOO, and Azovskaya Zernovaya Kompaniya OOO pursuant to Executive Order (E.O.) 14024 for being owned or controlled by, or for having acted or purported to act for or on behalf of, directly or indirectly, Joint Stock Company Moscow Industrial Bank (MIB), which was also designated on May 8, 2022 pursuant to E.O. 14024 for operating or having operated in the financial services sector of the Russian Federation economy. Russia-related General License (GL) 6B authorizes, among other activities, certain transactions prohibited by the Russian Harmful Foreign Activities Sanctions Regulations, 31 CFR part 587 (RuHSR), that are related to the sale, or transport of agricultural commodities, which includes transactions ordinarily incident and necessary to the exportation or reexportation of agricultural commodities to, from, or transiting the Russian Federation. For additional information, please see the text of GL 6B.

For further information on relevant authorizations, exemptions, and public guidance, please review OFAC's Fact Sheets, "Preserving Agricultural Trade, Access to Communication, and Other Support to Those Impacted by Russia's War Against Ukraine" and "Russia Sanctions and Agricultural Trade".

**Date Updated: July 14, 2022**

Released on May 8, 2022

**1040. Are transactions related to telecommunications and certain internet-based communications that involve persons designated pursuant to Executive Order 14024 authorized by Russia-related General License (GL) 25F?**

GL 25F authorizes certain transactions ordinarily incident and necessary to the receipt or transmission of telecommunications involving the Russian Federation that are prohibited by the Russian Harmful Foreign Activities Sanctions Regulations, 31 CFR part 587 (RuHSR). In addition, GL 25F authorizes certain transactions from the United States or by U.S. persons, wherever located, to the Russian Federation that are incident to the exchange of communications over the internet and that are prohibited by the RuHSR. With respect to software, hardware, and technology, GL 25F authorizes the exportation or reexportation, sale, or supply from the United States or by U.S. persons, wherever located, to the Russian Federation of software, hardware, or technology incident to the exchange of communications over the internet that is authorized for export to Russia by the Department of Commerce if it is subject to the Export Administration Regulations, 15 CFR parts 730-774 (EAR), or that would be eligible for a license exception or

otherwise authorized for export to Russia by the Department of Commerce if it were subject to the EAR. However, GL 25F explicitly excludes from the authorization any transactions that are prohibited by the RuHSR involving Joint Stock Company Channel One Russia, Television Station Russia-1, Joint Stock Company NTV Broadcasting Company, Limited Liability Company Algoritm, New Eastern Outlook, Oriental Review, Garantex Europe OU, Autonomous Non-Profit Organization Dialog, Autonomous Non-Profit Organization Dialog Regions, Federal State Unitary Enterprise International Information Agency Rossiya Segodnya, or Autonomous Non Profit Organization TV Novosti, which are designated pursuant to [Executive Order 14024](#)    .

For further information on relevant authorizations, exemptions, and public guidance, please review OFAC's Fact Sheet, ["Preserving Agricultural Trade, Access to Communication, and Other Support to Those Impacted by Russia's War Against Ukraine."](#)

**Date Updated: September 13, 2024**

Released on May 8, 2022

### 1049. For the purposes of Russia-related Executive Order (E.O.) 14066, E.O. 14068, or E.O. 14071 (collectively, "the respective E.O.s"), what is meant by the term "new investment"?

For the purposes of the respective E.O.s, the Office of Foreign Assets Control (OFAC) views "investment" as the commitment of capital or other assets for the purpose of generating returns or appreciation.  OFAC interprets "new" investment as such a commitment made on or after the effective date of the respective E.O. prohibitions.  As a general matter, new investment includes such commitments that are pursuant to an agreement entered on or after the effective dates of the respective E.O. prohibitions.  New investment also includes such commitments pursuant to the exercise of rights under an agreement entered into before the effective dates of the respective E.O. prohibitions, where such commitment is made on or after the effective dates of the respective E.O. prohibitions.  We note, however, that new investment does not include the maintenance of an investment made prior to the applicable effective dates of the respective E.O. prohibitions (see [FAQ 1050](#)).

Unless exempt or otherwise authorized by OFAC, transactions that OFAC considers to be "new investment" for the purposes of the respective E.O. prohibitions include:

- The purchase or acquisition of real estate in the Russian Federation, other than for noncommercial, personal use;

- Entry into an agreement requiring the commitment of capital or other assets for the establishment or expansion of projects or operations in the Russian Federation, including the formation of joint ventures or other corporate entities in the Russian Federation;
- Entry into an agreement providing for the participation in royalties or ongoing profits in the Russian Federation;
- The lending of funds to persons located in the Russian Federation for commercial purposes, including when such funds are intended to be used to fund a new or expanded project or operation in the Russian Federation;
- The purchase of an equity interest in an entity located in the Russian Federation (see FAQs 1054 and 1055); and
- The purchase or acquisition of rights to natural resources or exploitation thereof in the Russian Federation.

Examples of transactions that OFAC does not consider to be "new investment" for the purposes of the respective E.O. prohibitions include:

- Entry into, performance of, or financing of a contract, pursuant to ordinary commercial sales terms, to sell or purchase goods, services, or technology to or from an entity in the Russian Federation (e.g., a payment of an invoice for goods, where payment is made within the contracted time period and such payment does not involve participation in royalties or ongoing profits);
- Maintenance of an investment in the Russian Federation, where the investment was made prior to the effective date of the respective E.O. prohibitions, including maintenance of pre-existing entities, projects, or operations, including associated tangible property, in the Russian Federation (see FAQ 1050); and
- Wind down or divestment of a pre-existing investment, such as a pre-existing investment in an entity, project, or operation, including any associated tangible property, located in the Russian Federation (see FAQs 1053 and 1054).

Even if a transaction is not a prohibited form of "new investment" pursuant to the respective E.O.s, U.S. persons engaging in the transaction must comply with all other relevant sanctions prohibitions, including those pursuant to Ukraine-/Russia-Related Sanctions Regulations and Russian Harmful Foreign Activities Sanctions Regulations (see, e.g., FAQ 415).  For example, the respective E.O.s include provisions prohibiting any approval, financing, facilitation, or guarantee by a United States person, wherever located, of a transaction by a foreign person where the transaction by that foreign person would be prohibited if performed by a United States person or within the United States.  For more information, see FAQ 1053.

Released on June 6, 2022

### 1050. What types of transactions are considered to be "maintenance" activities described in FAQ 1049 and therefore outside the scope of the "new investment" prohibitions of Russia-related Executive Order (E.O.) 14066, E.O. 14068, or E.O. 14071 (collectively, "the respective E.O.s")?

For the purposes of the respective E.O. prohibitions, "new investment" generally excludes the maintenance of investments in the Russian Federation that were made prior to the effective dates of the respective E.O. prohibitions ("pre-existing projects or operations"). "Maintenance" of investments includes:

- Transactions to ensure continuity of pre-existing projects or operations located in the Russian Federation, including payments to employees, suppliers, landlords, lenders, and partners;
- The preservation and upkeep of pre-existing tangible property in the Russian Federation; and
- Activities associated with maintaining pre-existing capital investments or equity investments.

As a general matter, "maintenance" includes all transactions ordinarily incident to performing under an agreement in effect prior to the effective date of the respective E.O. prohibitions ("pre-existing agreement"), provided that such transactions are consistent with previously established practices and support pre-existing projects or operations. However, "maintenance" does not include the expansion of pre-existing projects or operations beyond those in effect prior to the effective dates of the respective E.O. prohibitions, even if pursuant to a pre-existing agreement, where such expansion occurs on or after the effective dates of the respective E.O. prohibitions. Nor does "maintenance" include commitments pursuant to the exercise of rights under a pre-existing agreement where such commitment is made on or after the effective dates of the respective E.O. prohibitions.

In connection with maintenance activity, U.S. persons also may modify or alter pre-existing agreements, or enter into new contracts or agreements, provided that any transaction under such contracts or agreements are consistent with previously established practices and support pre-existing projects or operations. For example, a pre-existing agreement may be modified, or new contract established, to substitute suppliers, conduct maintenance or repairs, or comply with new environmental or safety standards. In assessing whether activity is consistent with past practice, the Office of Foreign Assets Control (OFAC) will consider all relevant facts and circumstances, including the transaction history between contract parties prior to the effective date of the respective E.O.s.

Note that maintenance activities must not involve blocked persons or other prohibited transactions unless exempt or otherwise authorized by OFAC.

Released on June 6, 2022

### 1051. Is the export to the Russian Federation or import from the Russian Federation of goods, services, or technology considered "new investment" for the purposes of Russia-related Executive Order (E.O.) 14066, E.O. 14068, or E.O. 14071 (collectively, "the respective E.O.s")?

The prohibitions on "new investment" pursuant to the respective E.O.s do not prohibit the export or import of goods, services, or technology, or related sales or purchases, to or from the Russian Federation, provided that such transaction is made pursuant to ordinary commercial sales terms (e.g., a payment of an invoice for goods made within the contracted time period, where such payment does not involve ongoing participation in royalties or ongoing profits) (see FAQ 1049). Such transactions can be supported through traditional trade finance products, including commercial letters of credit and documentary collections. U.S. persons are not prohibited pursuant to the respective E.O.s from entering into new contracts or agreements for such transactions.

However, please note that U.S. persons are prohibited or restricted from exporting, reexporting, or importing certain goods and services involving the Russian Federation, as described by law (see, for example, section 1(a)(i) of E.O. 14068; see also FAQ 415).

Released on June 6, 2022

### 1052. Can U.S. persons continue to fund their subsidiaries and affiliates with projects or operations located in the Russian Federation prior to the effective dates of the new investment prohibitions of Executive Order (E.O.) 14066, E.O. 14068, or E.O. 14071 (collectively, "the respective E.O.s")?

Yes, provided that the use of the funds by the subsidiary or affiliate is consistent with maintenance, as described in FAQ 1050. "Maintenance" does not include the expansion of pre-existing projects or operations beyond those in effect prior to the effective dates of the respective E.O. prohibitions. Therefore, U.S. persons may not fund new or expanded projects or operations undertaken by their subsidiaries and affiliates located in the Russian Federation after the effective dates of the respective E.O. prohibitions.

Released on June 6, 2022

## 1053. Under the new investment prohibitions of Russia-related Executive Order (E.O.) 14066, E.O. 14068, or E.O. 14071 (collectively, "the respective E.O.s"), are transactions related to divestment in a project or operation in the Russian Federation permissible?

Yes.  Transactions related to the divestment or the facilitation of divestment of a pre-existing investment in a project or operation in the Russian Federation are not prohibited by the new investment prohibitions of the respective E.O.s.  Such transactions may not involve a blocked person or otherwise prohibited transactions unless exempt or authorized by the Office of Foreign Assets Control (OFAC).

The respective E.O.s prohibit any approval, financing, facilitation, or guarantee by a United States person, wherever located, of a transaction by a foreign person where the transaction by that foreign person would be prohibited if performed by a United States person or within the United States.  Such provisions do not prohibit U.S. persons from facilitating the wind down or divestment of an existing investment  in a project or operation in the Russian Federation.  For example, a U.S. financial institution is not prohibited from advising a client that seeks to divest from a project or operation in the Russian Federation (i.e., the seller in a transaction).  However, a U.S. person is prohibited from providing any approval, financing, facilitation, or guarantee to a non-U.S. person that seeks to invest in a project or operation in the Russian Federation (i.e., the buyer in such a transaction).

Such provisions also do not prohibit U.S. persons from advising on the requirements of U.S. sanctions laws consistent with OFAC's Guidance on the Provision of Certain Services Relating to the Requirements of U.S. Sanctions Laws.

For guidance related to divestment transactions in the secondary market involving debt or equity securities issued by an entity in the Russian Federation, please see FAQ 1054.

**Updated: July 22, 2022**

Released on June 6, 2022


## 1054. Do the new investment prohibitions of Executive Order (E.O.) 14066, E.O. 14068, or E.O. 14071 (collectively, "the respective E.O.s") prohibit U.S. persons from purchasing debt or equity securities issued by an entity in the Russian Federation?

Yes, the respective E.O.s prohibit U.S. persons from purchasing both new and existing debt and equity securities issued by an entity in the Russian Federation. However, the new investment prohibitions of the respective E.O.s do not prohibit U.S. persons from selling or divesting debt or equity securities issued by an entity in the Russian Federation to a non-U.S. person (see FAQ 1049), including purchases of such debt or equity securities if ordinarily incident and necessary to the divestment or transfer of the debt or equity securities to a non-U.S. person. U.S. financial institutions may clear and settle, or otherwise serve as market intermediaries in, divestment transactions on the secondary market—including transactions between non-U.S. persons.

Please note that U.S. persons are not required to divest such securities and may continue to hold such previously acquired securities. Moreover, the conversion of depositary receipts to underlying local shares of non-sanctioned Russian issuers would not be considered a prohibited "new investment" in the Russian Federation under the respective E.O.s.

Additionally, the purchase of shares in a U.S. fund would not be considered a prohibited "new investment" under the respective E.O.s, unless the fund's holdings of debt or equity securities issued by entities in the Russian Federation represent a 50 percent or more share by value of the fund. Generally, the fund may also divest itself of these prohibited holdings.

**Date Updated: January 17, 2023**

Released on June 6, 2022

**1055. Do the new investment prohibitions of Executive Order (E.O.) 14066, E.O. 14068, or E.O. 14071 (collectively, "the respective E.O.s") prohibit U.S. persons from lending funds to, or purchasing a debt or equity interest in, entities located outside of the Russian Federation?**

No, provided that (i) such funds are not specifically intended for new projects or operations in the Russian Federation and (ii) the entity located outside the Russian Federation derives less than 50 percent of its revenues from its investments in the Russian Federation.

For the purposes of assessing the foregoing, U.S. persons, including U.S. financial institutions, may reasonably rely upon the information available to them in the ordinary course of business, including publicly available information such as an entity's most recent quarterly or annual report. For the purposes of determining the percentage of revenues derived from investments in the Russian Federation, revenues derived from the commercial sale of goods or services by an entity located outside of the Russian Federation to persons in the Russian Federation

should not be included.  This approach is consistent with the guidance provided by the Office of Foreign Assets Control (OFAC) in FAQ 1049, which clarifies that OFAC does not consider the commercial sale of goods or services to persons in the Russian Federation by an entity located outside the Russian Federation to be new investment in the Russian Federation for purposes of the respective E.O. prohibitions.

Unless exempt or otherwise authorized by OFAC, examples of transactions that OFAC considers to be "new investment" for the purposes of the respective E.O. prohibitions include:

- The lending of funds to a special purpose vehicle established outside of the Russian Federation by a Russian entity for the purpose of raising funds intended to support new or expanded physical operations in the Russian Federation.
- The purchase (including on the secondary markets) of a debt or equity interest in an entity located outside of the Russian Federation that derives 50 percent or more of its revenues from its ownership of a subsidiary located in the Russian Federation (e.g., through dividends paid up by the Russian subsidiary to the non-Russian parent company).
- The purchase (including on the secondary markets) of a debt or equity interest in an entity located outside of the Russian Federation that derives 50 percent or more of its revenues from its ownership of real estate, a mine, or other physical property located in the Russian Federation.

OFAC notes, however, the new investment prohibitions of the respective E.O.s do not prohibit U.S. persons from selling or divesting debt or equity securities issued by such entities to a non-U.S. person.  Moreover, U.S. financial institutions may clear and settle, or otherwise serve as market intermediaries in, such divestment transactions on the secondary market — including transactions between non-U.S. persons.  For the purposes of assessing whether certain purchases of debt or equity of an entity are permissible, U.S. financial institutions, including securities exchanges and other market intermediaries and participants, may reasonably rely upon the information available to them in the ordinary course of business.

Examples of transactions that OFAC does not consider to be "new investment" for the purposes of the respective E.O. prohibitions include:

- The purchase (including on the secondary markets) of a debt or equity interest in an entity located outside of the Russian Federation provided that the entity derives less than 50 percent of its revenues from its ownership of a subsidiary or physical operation located in the Russian Federation.
- The purchase (including on the secondary markets) of a debt or equity interest in an entity located outside of the Russian Federation whose revenue

is exclusively derived from the commercial sale of goods or services to persons located in the Russian Federation.

- Activities that would be considered "maintenance" pursuant to FAQ 1050.

**Date Updated: January 17, 2023**

Released on June 6, 2022

### 1058. For the purposes of section 1(a)(ii) of Executive Order (E.O.) 14071, what is meant by the term "person located in the Russian Federation"?

For the purposes of section 1(a)(ii) of E.O. 14071, OFAC interprets "person located in the Russian Federation" to include persons in the Russian Federation, individuals ordinarily resident in the Russian Federation, and entities incorporated or organized under the laws of the Russian Federation or any jurisdiction within the Russian Federation.

Please note that section 1(a)(ii) of E.O. 14071 prohibits the direct or indirect exportation, reexportation, sale, or supply from the United States, or by a United States person, wherever located, of such services determined pursuant to E.O. 14071. For the purposes of E.O. 14071, OFAC interprets the "indirect" provision of such services to include when the benefit of the services is ultimately received by a "person located in the Russian Federation." Please see FAQ 1059 for more information.

Released on June 9, 2022

### 1059. Do the determinations made pursuant to Executive Order (E.O.) 14071 on May 8, 2022, "Prohibitions Related to Certain Accounting, Trust and Corporate Formation, and Management Consulting Services," on September 15, 2022, "Prohibitions Related to Certain Quantum Computing Services," and on May 19, 2023, "Prohibitions Related to Architecture and Engineering Services" ("the determinations"), prohibit U.S. persons from providing services to persons located outside of the Russian Federation that are owned or controlled by persons located in the Russian Federation?

No, provided that the provision of services is not an indirect export to a person located in the Russian Federation. For the purposes of these determinations, OFAC interprets the "indirect" provision of the prohibited services to include when the benefit of the services is ultimately received by a "person located in the Russian Federation."

In contrast, OFAC would not consider to be prohibited the provision of services to a non-Russian company that has a physical presence and operations outside of the

Russian Federation, including such a company owned or controlled by persons located in the Russian Federation, provided that the services will not be further exported or reexported to persons located in the Russian Federation.

For example, the following scenarios describe services that would be prohibited under the determination:

- A U.S. corporate service provider administers a trust established under the laws of a U.S. state, where the trust exists to hold, sell, or purchase assets on behalf of a settlor, trustor, or beneficiary who is an individual ordinarily resident in Russia.
- A U.S. corporate service provider registers a limited liability company in a third country on behalf of an individual ordinarily resident in Russia for the purpose of holding real estate assets, and this company has no other physical presence or operations in the third country.

The following scenarios illustrate services to a non-Russian subsidiary of a Russian person that would not be prohibited under the determination:

- A U.S. accounting firm provides tax advisory and preparation services to the U.S. subsidiary of a Russian company. This U.S. subsidiary has an office and employees in the United States and conducts business in the United States, and the services will not be exported or reexported to the Russian parent company.
- A U.S. management consulting firm provides strategic business advice to the subsidiary of a Russian company located in a third country. This subsidiary has an office and employees in the third country and conducts business in this third country, and the services will not be reexported to the Russian parent company.

**Date Updated: May 19, 2023**

Released on June 9, 2022

**1060. Does the determination made pursuant to Executive Order (E.O.) 14071 on May 8, 2022, "Prohibitions Related to Certain Accounting, Trust and Corporate Formation, and Management Consulting Services" ("the determination"), prohibit U.S. persons from serving as directors of companies located in the Russian Federation?**

Under the determination, U.S. persons are prohibited from exporting, reexporting, selling, or supplying, directly or indirectly, trust and corporate formation services to persons located in the Russian Federation. This prohibition on trust and corporate formation services does not, in and of itself, prohibit U.S. persons from serving on the board of directors of a company located in the Russian Federation.

However, this determination would prohibit U.S. persons from providing nominee officer or director services in which a U.S. person is contracted to serve as a nominee officer, director, shareholder, or signatory of a legal person on behalf of a person located in the Russian Federation.

Released on June 9, 2022

**1061. Do the determinations made pursuant to Executive Order (E.O.) 14071 on May 8, 2022, "Prohibitions Related to Certain Accounting, Trust and Corporate Formation, and Management Consulting Services, on September 15, 2022, "Prohibitions Related to Certain Quantum Computing Services," and on May 19, 2023, "Prohibitions Related to Architecture and Engineering Services" ("the determinations") prohibit U.S. persons from working as employees of entities located in the Russian Federation?**

Not necessarily.  Under the determinations, U.S. persons are prohibited from exporting, reexporting, selling, or supplying, directly or indirectly: management consulting; trust and corporate formation services; accounting services; quantum computing services; architecture services; and engineering services to persons located in the Russian Federation.  Thus, U.S. persons are prohibited from providing these services to companies located in the Russian Federation ("Russian companies") in their capacity as employees.  However, the determinations do not prohibit U.S. persons from providing other services not covered by these determinations as part of their employment by Russian companies.

In addition, please note that the determinations exclude from the scope of the aforementioned services:  (1) any service to an entity located in the Russian Federation that is owned or controlled, directly or indirectly, by a United States person; and (2) any service in connection with the wind down or divestiture of an entity located in the Russian Federation that is not owned or controlled, directly or indirectly, by a Russian person.

**Date Updated: May 19, 2023**

Released on September 15, 2022

**1062. Do the prohibitions imposed by the determinations made pursuant to Executive Order (E.O.) 14071 on May 8, 2022, "Prohibitions Related to Certain Accounting, Trust and Corporate Formation, and Management Consulting Services," on September 15, 2022, "Prohibitions Related to Certain Quantum Computing Services," and on May 19, 2023, "Prohibitions Related to Architecture and Engineering Services," apply to**

services provided to a parent company located in the Russian Federation by a U.S. subsidiary?

Yes. The prohibitions apply to services provided to a company located in the Russian Federation (the "Russian company") by any U.S. person, including the Russian company's U.S. subsidiary.

**Date Updated: May 19, 2023**

Released on June 9, 2022

### 1063. Do the prohibitions imposed by the determination made pursuant to Executive Order (E.O.) 14071 on May 8, 2022, "Prohibitions Related to Certain Accounting, Trust and Corporate Formation, and Management Consulting Services" ("the determination"), apply only with respect to the formation of new trusts and companies or do the prohibitions also apply with respect to existing trusts and companies?

The prohibitions imposed by the determination do not distinguish between new and existing trusts and companies. Under the determination, U.S. persons are prohibited from providing trust and corporate formation services to persons located in the Russian Federation, regardless of whether the services are performed as part of the formation of a new trust or company, or as part of the administration or maintenance of an existing trust or company. Please see FAQ 1034 for more information.

In addition, please note that the determination excludes from the scope of the aforementioned services: (1) any service to an entity located in the Russian Federation that is owned or controlled, directly or indirectly, by a United States person; and (2) any service in connection with the wind down or divestiture of an entity located in the Russian Federation that is not owned or controlled, directly or indirectly, by a Russian person.

Released on June 9, 2022

### 1064. Are executive search and vetting services included in the prohibition on management consulting services imposed by the determination made pursuant to Executive Order (E.O.) 14071 on May 8, 2022, "Prohibitions Related to Certain Accounting, Trust and Corporate Formation, and Management Consulting Services"?

Yes. For the purposes of this determination, OFAC interprets management consulting services to include services related to strategic business advice; organizational and systems planning, evaluation, and selection; development or evaluation of marketing programs or implementation; mergers, acquisitions, and

organizational structure; staff augmentation and human resources policies and practices; and brand management.  Please see FAQ 1034 for more information.

Released on June 9, 2022

### 1065. Do the prohibitions imposed by the determination made pursuant to Executive Order (E.O.) 14071 on May 8, 2022, "Prohibitions Related to Certain Accounting, Trust and Corporate Formation, and Management Consulting Services," prohibit U.S. persons from serving as voting trustees on behalf of, or for shares of, persons located in the Russian Federation?

Yes, unless otherwise exempt or authorized by OFAC.

Released on June 9, 2022

### 1066. Do the prohibitions imposed by the determination made pursuant to Executive Order (E.O.) 14071 on May 8, 2022, "Prohibitions Related to Certain Accounting, Trust and Corporate Formation, and Management Consulting Services," prohibit the provision of educational services, such as online university courses, on the subjects of accounting, management consulting, or trust and corporate formation to persons located in the Russian Federation?

No, provided such services do not evade or avoid the prohibition on providing the underlying services to persons located in the Russian Federation.

Released on June 9, 2022

### 1068. For the purposes of the determination made pursuant to Executive Order (E.O.) 14071 on May 8, 2022, "Prohibitions Related to Certain Accounting, Trust and Corporate Formation, and Management Consulting Services" ("the determination"), do accounting services include tax preparation and filing?

Yes.  U.S. persons, wherever located, are prohibited from exporting, reexporting, selling, or supplying, directly or indirectly, accounting services, which would include tax preparation and filing services, to any person located in the Russian Federation, unless otherwise exempt or authorized by OFAC.  Please see FAQ 1059 for more information.  Please note the determination excludes the provision by a U.S. person of any service to an entity located in the Russian Federation that is owned or controlled, directly or indirectly, by a United States person, and any service in connection with the wind down or divestiture of an entity located in the

Russian Federation that is not owned or controlled, directly or indirectly, by a Russian person.

**Updated: June 12, 2024**

Released on June 9, 2022

### 1070. What does the gold-related determination pursuant to Executive Order (E.O.) 14068 prohibit?

The determination of June 28, 2022    (as amended by the determination of December 22, 2023) issued pursuant to subsection 1(a)(i)(A) of amended E.O. 14068   , "Prohibitions Related to Imports of Gold of Russian Federation Origin," prohibits the importation into the United States of gold of Russian Federation origin.  Please note that per the determination, the importation into the United States of gold of Russian Federation origin that was located outside of the Russian Federation prior to June 28, 2022 is not prohibited.  For information regarding the term "Russian Federation origin," please see FAQ 1019.

**Date Updated: December 22, 2023**

Released on June 28, 2022

### 1071. Can I wind down financial contracts that may involve transactions prohibited pursuant to section (1)(a)(i) of Executive Order (E.O.) 14071 related to the purchase or receipt of debt or equity securities issued by an entity in the Russian Federation?

Through 12:01 a.m. eastern daylight time, October 20, 2022, Russia-related General License (GL) 45 (this content is no longer available) authorizes all transactions prohibited by section (1)(a)(i) of E.O. 14071    that are ordinarily incident and necessary to the wind down of financial contracts or other agreements that were entered into on or before June 6, 2022 and involve, or are linked to, debt or equity securities issued by an entity in the Russian Federation.

The authorized transactions include the purchase, or facilitating the purchase, by U.S. persons of debt or equity securities issued by an entity in the Russian Federation, if that purchase is ordinarily incident and necessary to the wind down of a financial contract or agreement entered into on or before June 6, 2022.  For example, U.S. persons may purchase securities issued by an entity in the Russian Federation in order to cover or close out a short position, per a securities lending agreement, if such agreement was entered into on or before June 6, 2022.  Please see FAQ 1054 for additional information on the scope of the prohibition in section

1(a)(i) of E.O. 14071, including permissible transactions related to the divestment or transfer of debt or equity securities to a non-U.S. person.

Note that Russia-related GL 46 separately authorizes transactions related to the settlement of credit derivative transactions referencing "the Russian Federation" via an auction process. For further information, please see FAQ 1072. GL 45 does not authorize any transactions involving blocked persons, unless separately authorized.

Released on July 22, 2022

### 1072. What does Russia-related General License (GL) 46 authorize with respect to credit derivative transactions referencing "the Russian Federation"?

Russia-related GL 46 authorizes transactions otherwise prohibited by section (1)(a)(i) of Executive Order (E.O.) 14071 related to the establishment, administration, participation in, and execution of an auction process, as announced by the EMEA Credit Derivatives Determination Committee, to settle credit derivative transactions with a reference entity of "the Russian Federation" ("the auction").

Examples of transactions that may be related to the auction include the submission and acceptance of bids and offers and physical settlement requests by auction participants and their customers, or the delivery and acceptance of the Russian Federation debt obligations and corresponding settlement amounts.

To promote the proper functioning of such auction, GL 46 also authorizes U.S. persons to purchase or receive Russian Federation debt obligations for the period beginning two business days prior to the announced date of the auction and ending eight business days after the conclusion of the auction.

GL 46 also authorizes financial institutions, among others, to facilitate, clear, and settle transactions authorized by GL 46, including the transfer to, or purchase or receipt by, U.S. persons of Russian Federation debt obligations. GL 46 does not require the clearance and settlement of such transactions to be completed within eight business days after the conclusion of the auction. For example, a purchase by a U.S. person of Russian Federation debt obligations made on the seventh business day after the conclusion of the auction does not have to be settled or cleared by the eighth business day. Accordingly, U.S. financial institutions may continue settling or clearing such transactions after the eighth business day following the conclusion of the auction.

Financial institutions processing transactions pursuant to GL 46 may reasonably rely upon the information available to them in the ordinary course of business for

the purposes of assessing whether a transaction is authorized by GL 46, provided that the financial institution does not know or have reason to know that a transaction is not in compliance with GL 46.

Released on July 22, 2022

### 1073. Is Sheremetyevo International Airport blocked as a result of the designation of Alexander Anatolevich Ponomarenko?

No.  OFAC has not designated Sheremetyevo International Airport and, based on information available to OFAC, Sheremetyevo International Airport is not owned 50% or more by blocked persons or otherwise considered the blocked property of Alexander Anatolevich Ponomarenko.

Released on August 2, 2022

### 1074. Is EuroChem Group AG blocked as a result of the designation of Andrey Igorevich Melnichenko?

No.  OFAC has not designated EuroChem Group AG and, based on information available to OFAC, EuroChem Group AG is not owned 50% or more by blocked persons or otherwise considered the blocked property of Andrey Igorevich Melnichenko.

As a general matter, agricultural and medical trade are not the target of sanctions imposed by the United States on Russia in response to its unprovoked and brutal war against Ukraine, and OFAC has issued General License 6B    to authorize certain transactions prohibited by the Russian Harmful Foreign Activities Sanctions Regulations (RuHSR) related to agricultural commodities (including fertilizer), agricultural equipment, medicine, and medical devices, among other things.  For information on exemptions and authorizations pursuant to the RuHSR related to fertilizer and other agricultural commodities, please see "OFAC Food Security Fact Sheet: Russia Sanctions and Agricultural Trade    " and "Fact Sheet: Preserving Agricultural Trade, Access to Communication, and Other Support to Those Impacted by Russia's War Against Ukraine.    "

Released on August 2, 2022

### 1075. Is PhosAgro PJSC blocked as a result of the designation of Andrey Grigoryevich Guryev and Andrey Andreevich Guryev?

No.  OFAC has not designated PhosAgro PJSC and, based on information available to OFAC, PhosAgro PJSC is not owned 50% or more by blocked persons or

otherwise considered the blocked property of Andrey Grigoryevich Guryev and Andrey Andreevich Guryev.

As a general matter, agricultural and medical trade are not the target of sanctions imposed by the United States on Russia in response to its unprovoked and brutal war against Ukraine, and OFAC has issued General License 6B    to authorize certain transactions prohibited by the Russian Harmful Foreign Activities Sanctions Regulations (RuHSR) related to agricultural commodities (including fertilizer), agricultural equipment, medicine, and medical devices, among other things.  For information on exemptions and authorizations pursuant to the RuHSR related to fertilizer and other agricultural commodities, please see "OFAC Food Security Fact Sheet: Russia Sanctions and Agricultural Trade    " and "Fact Sheet: Preserving Agricultural Trade, Access to Communication, and Other Support to Those Impacted by Russia's War Against Ukraine.    "

Released on August 2, 2022

### 1080. I am a U.S. person with an account at a Russian financial institution blocked pursuant to Executive Order (E.O.) 14024.  What am I required or allowed to do under OFAC sanctions with respect to such accounts?

Since Russia's further invasion of Ukraine beginning in February 2022, OFAC has blocked a number of Russian financial institutions pursuant to E.O. 14024 for operating or having operated in the financial services sector of the Russian Federation economy (see FAQ 966).  In addition, all property and interests in property of any financial institution that is owned, directly or indirectly, individually or in the aggregate, 50 percent or more by one or more blocked persons are also blocked.  Accordingly, U.S. persons are prohibited from transacting with these financial institutions unless the activity is exempt or authorized by OFAC.

In practice, this means that accounts held by U.S. persons at any blocked Russian financial institutions generally are themselves considered blocked property, unless exempt.  This includes, for example, checking and savings accounts, credit cards, CDs, loans, and mortgages.  U.S. persons must stop utilizing such accounts and treat them as blocked, even if the designated Russian financial institution does not.  Additionally, within 10 business days of the blocking of the account or other property, U.S. persons are required to file a blocking report with OFAC describing any property or interests in property (e.g., accounts, etc.).  Information on the requirement to report blocked property, including accounts, and on filing initial and annual reports of blocked property with OFAC can be found at FAQs 49, 50, and 646, respectively, and 31 CFR § 501.603.  Please note that the annual filing

requirement for 2022 applies only to persons holding blocked property as of June 30 of this year.

On August 19, 2022, OFAC issued Russia-related General License (GL) 50 authorizing individuals, wherever located, to engage in all transactions ordinarily incident and necessary to close their individual accounts held at a financial institution blocked pursuant to E.O. 14024. GL 50 also authorizes the unblocking and lump sum transfer to the account holder of all remaining funds and other assets in the account at the blocked financial institution, including to an account held at a non-blocked financial institution. Individuals may avail themselves of GL 50 to terminate their accounts with Russian financial institutions blocked pursuant to E.O. 14024 and repatriate the proceeds of any account closures. Individuals who have filed a blocking report with OFAC and are availing themselves of GL 50 must file an unblocking report with OFAC within 10 business days of the unblocking in accordance with 31 CFR § 501.603(b)(3).

Released on September 15, 2022

### 1081. Am I required to show official documentation that I've closed my account at a Russian financial institution blocked pursuant to Executive Order (E.O.) 14024 in order to take advantage of Russia-related General License (GL) 50?

No. GL 50 authorizes individuals with accounts at Russian financial institutions blocked pursuant to E.O. 14024 to unblock and lump sum transfer funds to an account at a non-designated financial institution. Individuals do not need to provide official documentation proving they have closed their account at the blocked Russian financial institution when utilizing the GL.

Individuals who have filed a blocking report with OFAC and are availing themselves of GL 50 must file an unblocking report with OFAC within 10 business days of the unblocking in accordance with 31 CFR § 501.603(b)(3). For guidance related to filing an initial report of blocked property, an annual report of blocked property, and an unblocking report, please see FAQs 49, 50, and 646, respectively, and 31 C.F.R. § 501.603. Please note that the annual filing requirement for 2022 applies only to persons holding blocked property as of June 30 of this year.

Released on September 15, 2022

### 1083. What actions were taken on September 15, 2022 related to certain quantum computing services?

On September 15, 2022, the Director of OFAC, in consultation with the Department of State, issued a determination pursuant to Executive Order (E.O.) 14071 ,

"Prohibitions Related to Certain Quantum Computing Services," prohibiting the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of certain quantum computing services to any person located in the Russian Federation. This determination takes effect on October 15, 2022. This determination excludes from the scope of the prohibited services: (1) any service to an entity located in the Russian Federation that is owned or controlled, directly or indirectly, by a United States person; and (2) any service in connection with the wind down or divestiture of an entity located in the Russian Federation that is not owned or controlled, directly or indirectly, by a Russian person. For more information, please see FAQ 1084.

On September 15, 2022, the Director of OFAC, in consultation with the Department of State, also issued a sectoral determination pursuant to E.O. 14024     that authorizes the imposition of economic sanctions on individuals and entities that are determined to operate or have operated in the quantum computing sector of the Russian Federation economy. The determination regarding this sector pursuant to E.O. 14024 takes effect immediately.


Released on September 15, 2022

### 1084. For the purposes of the determination of September 15, 2022 made pursuant to Executive Order (E.O.) 14071, "Prohibitions Related to Certain Quantum Computing Services" ("the determination"),  what is meant by the term "quantum computing services"?

For the purposes of the determination     , OFAC anticipates publishing regulations defining this term to include any of the following services when related to quantum computing, quantum computers, electronic assemblies thereof, or cryogenic refrigeration systems related to quantum computing:  infrastructure, web hosting, or data processing services; custom computer programming services; computer systems integration design services; computer systems and data processing facilities management services; computing infrastructure, data processing services, web hosting services, and related services; repairing computer, computer peripherals, or communication equipment; other computer-related services; as well as services related to the exportation, reexportation, sale, or supply, directly or indirectly, of quantum computing, quantum computers, electronic assemblies thereof, or cryogenic refrigeration systems related to quantum computing to any person located in the Russian Federation.

For the purposes of the determination, OFAC also anticipates publishing regulations defining the term "person located in the Russian Federation" as set forth in FAQ 1058, as well as regulations defining the term "Russian person" to

mean an individual who is a citizen or national of the Russian Federation, or an entity organized under the laws of the Russian Federation.

Released on September 15, 2022

### 1086. For the purposes of the determination of September 15, 2022 made pursuant to Executive Order (E.O.) 14024, what is meant by the term "quantum computing sector of the Russian Federation economy"?

For the purposes of the determination of September 15, 2022    made pursuant to E.O. 14024    , OFAC interprets the term "quantum computing sector of the Russian Federation economy" to include activities related to products and services in or involving the Russian Federation in research, development, manufacturing, assembling, maintenance, repair, sale, or supply of quantum computing, quantum computers, electronic assemblies thereof, or cryogenic refrigeration systems related to quantum computing.  OFAC also interprets the term "quantum computing sector of the Russian Federation economy" to include any of the following services when related to quantum computing:  infrastructure, web hosting or data processing services; custom computer programming services; computer systems integration design services; computer systems and data processing facilities management services; computing infrastructure, data processing services, web hosting services, and related services; repairing computer, computer peripherals, and communication equipment; other computer-related services; as well as the exportation, reexportation, sale, or supply, directly or indirectly, of quantum computing, quantum computers, electronic assemblies thereof, or cryogenic refrigeration systems related to quantum computing to or from the Russian Federation.

The determination regarding this sector pursuant to E.O. 14024 takes effect immediately.

Released on September 15, 2022

### 1091. Do non-U.S. persons face sanctions risk for supporting Russia following its sham referenda, purported annexation, and continued occupation of the Kherson, Zaporizhzhya, Donetsk, and Luhansk regions of Ukraine?

Yes.  On September 23, G7 Leaders issued a statement condemning Russia's sham referenda and noting their collective readiness to impose further economic costs on Russia, and on individuals and entities both inside and outside of Russia that

provide political or economic support for Russia's illegal attempts to change the status of Ukrainian territory.

The United States is prepared to more aggressively use its authorities under existing U.S. sanctions programs to target such persons whose activities may constitute material assistance, sponsorship, financial, material, or technological support for, or goods or services to, or in support of (together "material support"), sanctioned persons or sanctionable activity.  Particular areas of targeting focus include entities and individuals in jurisdictions outside Russia that provide political or economic support for Russia's illegal attempt to annex Ukrainian sovereign territory.  Examples of activities that could be targeted include those related to:

- Providing material support for the organization of Russia's sham referenda or annexation, as well as economic or other activity that seeks to legitimize Russia's sham referenda or annexation;
- Providing material support to Russia's military and defense industrial base, including significant transactions by entities in third countries that provide material support to Russia's military, defense industrial base, and designated entities and persons operating in Russia's defense industrial base;
- Attempting to circumvent or evade U.S. sanctions on Russia and Belarus; and
- Providing material support to Russian entities or individuals subject to certain blocking sanctions.

Multiple Executive Orders (E.O.) — including E.O.s 13660, 14024, and 14065 — authorize the imposition of blocking sanctions on categories of persons — inside or outside Russia — who provide material support for Russia following its sham referenda, purported annexation, and continued occupation of the Kherson, Zaporizhzhya, Donetsk, and Luhansk regions of Ukraine.

U.S. sanctions are not designed to target Ukraine or the Ukrainian people, including those living in areas occupied or purportedly annexed by Russia.  In addition, as noted in OFAC's Fact Sheet: Preserving Agricultural Trade, Access to Communication, and Other Support to Those Impacted by Russia's War Against Ukraine   and Frequently Asked Question (FAQ) 1007, OFAC sanctions do not target transactions related to the export of food or medicine, the response to the Coronavirus Disease 2019 (COVID-19) pandemic, the official business of an international organization, or the activities of nongovernmental organizations, as well as personal remittances, telecommunications, internet services, or mail.

Finally, OFAC sanctions do not prohibit transactions related to the sale of or transport of crude oil; petroleum; petroleum fuels, oils, and products of their distillation; liquefied natural gas; coal; and coal products of Russian Federation origin, aside from the importation of such products into the United States.  OFAC

will generally not impose sanctions on non-U.S. persons that engage in transactions that would be authorized for U.S. persons. For additional information, please see Russia-related General License (GL) 8C, FAQ 980, and FAQ 1018. OFAC has issued preliminary guidance on the planned maritime services policy and related price exception for seaborne Russian oil and intends to issue additional guidance in coming weeks.

Released on September 30, 2022

### 1092. Do non-U.S. companies risk exposure to sanctions for providing ammunition or other military goods to Russia or for supporting Russia's military-industrial complex?

Yes. Multiple Russia-related sanctions authorities authorize sanctions against non-U.S. persons that provide goods, services, or other support for Russia's military-industrial complex. For example, OFAC may block any person determined to operate or have operated in the defense and related materiel sector of the Russian Federation economy pursuant to Executive Order (E.O.) 14024 of April 15, 2021, "Blocking Property With Respect To Specified Harmful Foreign Activities of the Government of the Russian Federation." In addition, pursuant to E.O. 14024, OFAC may block persons determined to have materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of certain sanctionable activities enumerated in E.O. 14024 or any person whose property and interests in property are blocked pursuant to E.O. 14024. OFAC also has robust targeting authorities pursuant to the Ukraine-/Russia-Related Sanctions Regulations (URSR), 31 C.F.R. part 589, which implement multiple authorities that could provide for the blocking of persons who engage in the provision of ammunition or other military goods to the Russian Federation, including persons determined to operate or have operated in the arms or related materiel sector of the Russian Federation economy, or those who have materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of persons blocked pursuant to the URSR.

Furthermore, E.O. 14024, as amended by E.O. 14114, authorizes the imposition of sanctions on foreign financial institutions that have conducted or facilitated certain transactions involving Russia's military-industrial base. For more information, see OFAC's Advisory to Foreign Banks on Russia Sanctions Risks, and FAQs 1147, 1148, 1149, 1150 and 1151.

OFAC is prepared to use its broad targeting authorities against non-U.S. persons that provide ammunition or other support to the Russian Federation's military-industrial complex, as well as private military companies (PMCs) or paramilitary groups participating in or otherwise supporting the Russian Federation's unlawful

and unjustified attack on Ukraine. OFAC will continue to target Russia's efforts to resupply its weapons and sustain its war of aggression against Ukraine, including any foreign persons who assist the Russian Federation in those efforts.

OFAC and the Department of State have imposed numerous targeted sanctions on the Russian Federation's military-industrial complex, including on State Corporation Rostec, the cornerstone of Russia's defense-industrial base, and multiple other key firms. In addition, the Department of State has identified persons that are part of, or operate for or on behalf of, the defense and intelligence sectors of the Government of the Russian Federation pursuant to Section 231 of the Countering America's Adversaries Through Sanctions Act (CAATSA) (CAATSA 231 List of Specified Persons). Persons determined to knowingly engage in a significant transaction with those identified on the CAATSA 231 List of Specified Persons are subject to five or more sanctions described in Section 235 of CAATSA. The Department of Commerce's Bureau of Industry and Security (BIS) has also imposed highly restrictive controls on the export and reexport of U.S.-origin and certain foreign-produced commodities, software, and technologies to the Russian Federation to cut off its access to inputs and products needed to sustain its military capabilities. For more information on the impact of sanctions and export controls on Russia's military-industrial complex, please see "OFAC-BIS Alert: Impact of Sanctions and Export Controls on Russia's Military-Industrial Complex," published on October 14, 2022 and BIS's Common High Priority Items List.

**Date Updated: February 23, 2024**

Released on October 14, 2022

### 1094. Is crude oil of Russian Federation origin that is loaded onto a vessel at the port of loading for maritime transport prior to December 5, 2022 subject to the price cap?

No, provided the oil is unloaded at the port of destination prior to 12:01 a.m., eastern standard time, January 19, 2023. Crude oil of Russian Federation origin that is loaded onto a vessel at the port of loading prior to 12:01 a.m., eastern standard time, December 5, 2022, and unloaded at the port of destination prior to 12:01 a.m., eastern standard time, January 19, 2023, is not subject to the price cap (also known as the "maritime services policy"). U.S. service providers can continue to provide services related to the maritime transport of crude oil of Russian Federation origin purchased at a price above the price cap, provided that the crude oil is loaded onto a vessel at the port of loading for maritime transport prior to 12:01 a.m., eastern standard time, December 5, 2022, and unloaded at the port of destination prior to 12:01 a.m., eastern standard time, January 19, 2023.

The following is an example of a permissible transaction in line with the maritime services policy:

- A U.S. commodities trader signs a contract on November 1, 2022, to purchase crude oil of Russian Federation origin for shipment to a jurisdiction that has not prohibited the import of such crude oil.  The U.S. commodities trader arranges for the oil to be loaded onto a vessel at the port of loading.  The vessel is loaded on December 1, 2022, and a bill of lading is issued.  The oil is shipped and discharged at the port of destination on December 15, 2022.  U.S. insurance companies provide cover for this shipment/voyage and pay out any related claims, as appropriate.

As noted in OFAC's preliminary guidance , OFAC anticipates implementing the maritime services policy by publishing a determination pursuant to Executive Order 14071  that (i) permits the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of services related to the maritime transport of crude oil or petroleum products of Russian Federation origin, where the price of such crude oil or petroleum products of Russian Federation origin does not exceed the price cap and (ii) prohibits such services if the crude oil or petroleum products of Russian Federation origin are purchased above the price cap.  This determination would take effect at 12:01 a.m., eastern standard time, December 5, 2022, with respect to maritime transport of crude oil of Russian Federation origin loaded on or after 12:01 a.m., eastern standard time, December 5, 2022.

Released on October 31, 2022

### 1096. Do U.S. sanctions prohibit U.S. persons from engaging in transactions that are ordinarily incident and necessary to the official business of diplomatic or consular missions of the Government of the Russian Federation located in or outside the United States?

OFAC issued Russia-related General License (GL) 53  to authorize U.S. persons to engage in all transactions ordinarily incident and necessary to the official business of diplomatic or consular missions of the Government of the Russian Federation ("Russian missions"), where the transactions are prohibited by Directive 4 under Executive Order (E.O.) 14024, Prohibitions Related to Transactions Involving the Central Bank of the Russian Federation, the National Wealth Fund of the Russian Federation, and the Ministry of Finance of the Russian Federation.  This authorization applies to transactions related to Russian missions located in or outside the United States.  For example, GL 53  authorizes the payment of

salaries to employees of Russian missions that may otherwise be prohibited by Directive 4, such as a payment originated by the Ministry of Finance of the Russian Federation from a non-blocked Russian bank.  Importantly, GL 53 does not authorize any transactions involving blocked persons, including blocked Russian financial institutions; nor does it authorize debits to the accounts on the books of U.S. financial institutions of entities subject to Directive 4.  Non-U.S. persons may engage in transactions that are authorized for U.S. persons under this GL without risk of sanctions under E.O. 14024.

Released on November 10, 2022

### 1103. Is there a wind-down period for transactions involving Public Joint Stock Company Rosbank (Rosbank), which was blocked on December 15, 2022 pursuant to Executive Order (E.O.) 14024?  What transactions are authorized during the wind-down period?

OFAC issued General Licenses (GL) 58   and 59   concurrent with the designation of Rosbank.  GL 58 authorizes a wind-down period for transactions involving Rosbank or any entity in which Rosbank owns, directly or indirectly, a 50 percent or greater interest ("Rosbank entities") until 12:01 a.m. eastern daylight time, March 15, 2023.  This includes transactions ordinarily incident and necessary to exit operations, contracts, or other agreements involving Rosbank entities that were in effect prior to December 15, 2022, provided that such transactions do not involve a debit to a blocked account on the books of a U.S. financial institution (see Frequently Asked Question (FAQ) 990).  Wind-down activities covered by GL 58 do not include the continued processing of funds transfers, securities trades, or other transactions that involve a Rosbank entity that were part of ongoing business activities prior to the imposition of sanctions, unless separately authorized (see, e.g., GLs 6B   , 8E   , or 59   ).

In addition, GL 58   authorizes U.S. persons, including U.S. financial institutions, to reject, rather than block, all transactions ordinarily incident and necessary to the processing of funds involving one or more Rosbank entities as an originating, intermediary, or beneficiary financial institution, through 12:01 a.m. eastern daylight time, March 15, 2023.  For individuals holding accounts at Rosbank entities, see FAQ 1080 for guidance, including GL 50, which authorizes individuals to engage in all transactions ordinarily incident and necessary to close their individual accounts held at a financial institution blocked pursuant to E.O. 14024.

GL 59   authorizes U.S. persons to divest or transfer holdings in securities of Rosbank entities to non-U.S. persons, as well as the wind down of certain derivative contracts, subject to certain conditions.  Please see GL 59 for additional details.

Released on December 15, 2022

### 1104. Is Norilsk Nickel blocked as a result of the designation of Vladimir Potanin?

No.  OFAC has not designated Norilsk Nickel and, based on information available to OFAC as of December 15, 2022, Norilsk Nickel is not owned 50% or more by blocked persons or otherwise considered the blocked property of Vladimir Potanin.

Released on December 15, 2022

### 1109. Are petroleum products of Russian Federation origin that are loaded onto a vessel at the port of loading for maritime transport prior to February 5, 2023 subject to the price cap?

No, provided the petroleum products are unloaded at the port of destination prior to 12:01 a.m., eastern daylight time, April 1, 2023.  Petroleum products of Russian Federation origin that are loaded onto a vessel at the port of loading prior to 12:01 a.m., eastern standard time, February 5, 2023, and unloaded at the port of destination prior to 12:01 a.m., eastern daylight time, April 1, 2023, are not subject to the price cap.  U.S. service providers can continue to provide services related to the maritime transport of petroleum products of Russian Federation origin purchased at a price above the price cap, provided that the petroleum products are loaded onto a vessel at the port of loading for maritime transport prior to 12:01 a.m., eastern standard time, February 5, 2023, and unloaded at the port of destination prior to 12:01 a.m., eastern daylight time, April 1, 2023.

The following is an example of a permissible transaction:

- A U.S. commodities trader signs a contract on January 1, 2023, to purchase petroleum products of Russian Federation origin for shipment to a jurisdiction that has not prohibited the import of such petroleum products.  The U.S. commodities trader arranges for the petroleum products to be loaded onto a vessel at the port of loading.  The vessel is loaded on February 1, 2023, and a bill of lading is issued.  The petroleum products are shipped and discharged at the port of destination on February 15, 2023.  U.S. insurance companies provide cover for this shipment/voyage and pay out any related claims, as appropriate.

OFAC anticipates implementing the price cap on petroleum products of Russian Federation origin by publishing a determination pursuant to Executive Order

14071 that (i) permits the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of services related to the maritime transport of petroleum products of Russian Federation origin, where the price of such petroleum products of Russian Federation origin do not exceed the price cap and (ii) prohibits such services if the petroleum products of Russian Federation origin are purchased above the relevant price cap. This determination would take effect at 12:01 a.m., eastern standard time, February 5, 2023, with respect to maritime transport of petroleum products of Russian Federation origin loaded on or after 12:01 a.m., eastern standard time, February 5, 2023.

Released on December 21, 2022

### 1113. If a decedent's estate includes securities issued by non-blocked Russian entities, do the new investment prohibitions in Executive Order (E.O.) 14066, E.O. 14068, or E.O. 14071 prohibit the transfer of such securities, through inheritance, to the relevant beneficiary of the decedent's estate?

No. U.S. persons, including U.S. financial institutions, may transfer securities issued by non-blocked Russian entities from a decedent's estate to the account of a relevant beneficiary or beneficiaries, including a successor entity (e.g., a family trust), provided such transfers (i) are part of the ordinary course administration of the decedent's estate, (ii) do not involve an exchange for value, and (iii) have no other sanctions nexus (including the involvement of blocked persons).

Please note, however, that blocked securities in a decedent's estate must remain blocked. The administration of a decedent's estate requiring the transfer of blocked securities would require a specific license from OFAC. To apply for a specific license, please go to our [License Application Page](#).

Released on February 8, 2023

### 1114. What actions were taken on February 24, 2023 related to the metals and mining sector of the Russian Federation economy?

On February 24, 2023, the Director of OFAC, in consultation with the Department of State, issued a sectoral [determination](#) pursuant to [Executive Order (E.O.) 14024](#) that authorizes the imposition of economic sanctions on any person determined to operate or have operated in the metals and mining sector of the Russian Federation economy. This sectoral determination is effective February 24, 2023. Also on February 24, 2023, OFAC designated certain entities for operating in the metals and mining sector of the Russian Federation economy. The U.S. government may, as appropriate, impose sanctions on additional persons

determined pursuant to E.O. 14024 to operate or to have operated in this sector. For further information, please see FAQ 1115.

Released on February 24, 2023

### 1115. For the purposes of the determination of February 24, 2023 made pursuant to Executive Order (E.O.) 14024, what is meant by the term "metals and mining sector of the Russian Federation economy"?

For the purposes of the determination of February 24, 2023 made pursuant to E.O. 14024, OFAC anticipates publishing regulations defining the term "metals and mining sector of the Russian Federation economy" to include any act, process, or industry of extracting, at the surface or underground, ores, coal, precious stones, or any other minerals or geological materials in the Russian Federation, or any act of procuring, processing, manufacturing, or refining such geological materials, or transporting them to, from, or within the Russian Federation. This is the definition OFAC used to define the same term in the Ukraine/Russia-related Sanctions Regulations (see 31 CFR 589.325).

Released on February 24, 2023

### 1116. Does the determination of February 24, 2023 made pursuant to Executive Order (E.O.) 14024 with regard to the metals and mining sector of the Russian Federation economy mean that all persons that operate or have operated in this sector of the Russian Federation economy are sanctioned by OFAC?

No. The Director of OFAC, in consultation with the State Department, has issued a determination pursuant to E.O. 14024 that authorizes the imposition of economic sanctions on any person determined to operate or have operated in the metals and mining sector of the Russian Federation economy.

A sector determination pursuant to E.O. 14024 exposes persons that operate or have operated in an identified sector to sanctions risk; however, a sector determination does not automatically impose sanctions on all persons who operate or have operated in the sector. Only persons determined pursuant to E.O. 14024 to operate or have operated in the above-identified sector are subject to sanctions.

Certain additional sanctions may apply to dealings in the metals and mining sector of the Russian Federation economy. For example, E.O. 14071 prohibits U.S. persons from new investment in the Russian Federation, including in the metals and mining sector. In addition, certain goods produced by the metals and mining sector of the Russian Federation economy may be prohibited from importation

into the United States pursuant to E.O. 14068, such as non-industrial diamonds and gold of Russian Federation origin.  For more information about prohibitions related to non-industrial diamonds, see Frequently Asked Questions (FAQs) 1022, 1023, 1024, 1026, and 1027 .  For more information about prohibitions related to gold, see FAQs 1029 and 1070 .

Released on February 24, 2023

### 1117. My company provides goods or services to, or engages in trade with, persons that operate or have operated in the metals and mining sector of the Russian Federation economy.  Does my company risk being sanctioned by OFAC?

The determination    made on February 24, 2023 pursuant to Executive Order (E.O.) 14024 authorizes sanctions on any person determined to operate or have operated in the metals and mining sector of the Russian Federation economy.  Non-U.S. persons may also be exposed to sanctions for activities with persons blocked pursuant to E.O. 14024 (see FAQ 980), including persons blocked following a determination that such persons operate or have operated in the metals and mining sector.

However, OFAC does not intend to target persons for operating in the metals and mining sector where the provision of goods or services is solely for the safety and care of personnel, protection of human life, prevention of accidents or injuries, maintenance or repair necessary to avoid environmental or other significant damage, or activities related to environmental mitigation or remediation.  Examples of such goods include personal protective equipment, safety devices, ventilation systems, and alarm systems; examples of such services include rescue and accident response services, cleaning, safety inspections, and services necessary for use of the goods described above.

In addition, non-U.S. persons generally do not risk exposure to U.S. blocking sanctions under E.O. 14024 for engaging in transactions with blocked persons, including in the metals and mining sector, where those transactions would not require a specific license if engaged in by a U.S. person.  For example, non-U.S. persons generally do not risk exposure to U.S. blocking sanctions for engaging in transactions in the metals and mining sector if such transactions would be authorized for U.S. persons by General License (GL) 8F    (authorizing certain energy-related transactions) or by GL 6C    (authorizing certain transactions related to the production, manufacturing, sale, transport, or provision of medicine or medical devices, including certain industrial isotopes used in nuclear medicine, among other things).

Released on February 24, 2023

**1118. As of December 2022, the Government of the Russian Federation may require a so-called "exit tax" payment prior to the divestment of assets located in the Russian Federation, potentially requiring transactions involving the Central Bank of the Russian Federation or the Ministry of Finance of the Russian Federation. Do U.S. sanctions prohibit the payment of this so-called "exit tax"? Does Russia-related General License (GL) 13E authorize transactions that involve the payment of this exit tax?**

The Directive 4 under Executive Order (E.O.) 14024, "Prohibitions Related to Transactions Involving the Central Bank of the Russian Federation, the National Wealth Fund of the Russian Federation, and the Ministry of Finance of the Russian Federation," as amended (Russia-related Sovereign Transactions Directive       ), prohibits the following activities by U.S. persons:  any transaction involving the Central Bank of the Russian Federation, the National Wealth Fund of the Russian Federation, or the Ministry of Finance of the Russian Federation, including any transfer of assets to such entities or any foreign exchange transaction for or on behalf of such entities (collectively, "Directive 4 entities").  As noted in FAQ 1002, this includes both direct and indirect transactions.

OFAC issued the Russia-related Sovereign Transactions Directive with the explicit aim of preventing the Government of the Russian Federation from leveraging these institutions and their holdings of international reserves in ways that would undermine the impact of U.S. sanctions.  Information currently available to OFAC suggests so-called "exit taxes" imposed by the Government of the Russian Federation involve payments to Directive 4 entities.  Consequently, U.S. persons whose divestment from the Russian Federation will involve the payment of such an exit tax require a specific license from OFAC prior to the payment of such tax, unless otherwise authorized by OFAC.

GL 13E       authorizes U.S. persons, or entities owned or controlled, directly or indirectly, by a U.S. person, to pay taxes, fees, or import duties, and purchase or receive permits, licenses, registrations, or certifications involving Directive 4 entities that would otherwise be prohibited by the Russia-related Sovereign Transactions Directive, provided such transactions are ordinarily incident and necessary to such persons' day-to-day operations in the Russian Federation.  Payment of exit taxes is not considered ordinarily incident and necessary to day-to-day operations in the Russian Federation and, thus, is not authorized under GL 13E.

Therefore, U.S. persons whose divestment of assets in the Russian Federation will involve a payment of such an "exit tax" should seek a specific license from OFAC.  Such persons may submit a request for a specific license with OFAC's Licensing Division online at https://ofac.treasury.gov/ofac-license-application-page.  License

applications related to these payments should include information regarding the amount of the exit tax, the amount of ongoing taxes that would otherwise be paid to the Government of the Russian Federation should divestment not occur, the impact of a failure to pay the tax on the employees of the exiting company, the specific economic activity in Russia of the exiting company, and the impact on the Russian Federation of the divestment.  OFAC will expedite its review of such requests, which will be evaluated on a case-by-case basis.

While OFAC is aware that the Commission established by the Russian Federation to review such divestments may include individuals from entities subject to the Russia-related Sovereign Transactions Directive or individuals listed on the Specially Designated Nationals and Blocked Persons List, U.S. persons do not need to seek authorization from OFAC for their Russian buyers to submit an application to the Commission regarding a divestment transaction.

**Date Updated: May 19, 2023**

Released on February 24, 2023

### 1122. Certain transactions related to telecommunications and certain internet-based communications are already authorized by Russia-related General License (GL) 25D.  What additional transactions does Russia-related GL 65 authorize?

The United States generally supports the free flow of information globally as facilitated by telecommunications and certain internet-based communications.  Accordingly, GL 25D authorizes — with certain exceptions and exclusions — (i) all transactions ordinarily incident and necessary to the receipt or transmission of telecommunications involving the Russian Federation that are prohibited by the Russian Harmful Foreign Activities Sanctions Regulations, 31 CFR part 587 (RuHSR); (ii) the exportation or reexportation, sale, or supply from the United States or by U.S. persons, wherever located, to the Russian Federation of services that are incident to the exchange of communications over the internet and that are prohibited by the RuHSR; and (iii) the exportation or reexportation, sale, or supply from the United States or by U.S. persons, wherever located, to the Russian Federation of software, hardware, or technology incident to the exchange of communications over the internet that is authorized for export to Russia by the Department of Commerce if it is subject to the Export Administration Regulations, 15 CFR parts 730-774 (EAR), or that would be eligible for a license exception or otherwise authorized for export to Russia by the Department of Commerce if it were subject to the EAR (see FAQ 1040).

However, certain transactions related to Megafon PAO (Megafon) or Limited Liability Company Digital Invest (Digital Invest) — which were designated by the Department of State on April 12, 2023 pursuant to Executive Order 14024 — or any entity in which Megafon or Digital Invest owns, directly or indirectly, individually or in the aggregate, a 50 percent or greater interest (collectively, "Covered Entities"), may not involve the Russian Federation, and thus, may not be authorized by GL 25D. To ensure certain transactions related to telecommunications and internet-based communications involving the Covered Entities and Tajikistan or Uzbekistan can continue, OFAC issued GL 65. GL 65 authorizes — with certain exceptions and exclusions — (i) all transactions prohibited by the RuHSR that are ordinarily incident and necessary to the receipt or transmission of telecommunications involving the Covered Entities, and involving Tajikistan or Uzbekistan or (ii) the exportation or reexportation, sale, or supply, directly or indirectly, from the United States or by U.S. persons, wherever located, to the Covered Entities of services, software, hardware, or technology incident to the exchange of communications over the internet that is prohibited by the RuHSR. Please note that GL 65 does not relieve persons from compliance with other Federal laws, such as the export licensing requirements maintained by the Department of Commerce's Bureau of Industry and Security.

**Updated: June 12, 2024**

Released on April 12, 2023

**1126. Under Executive Order (E.O.) 14024, "Blocking Property With Respect To Specified Harmful Foreign Activities of the Government of the Russian Federation," any person determined to operate or have operated in certain sectors of the Russian Federation economy may be blocked. How is OFAC defining those sectors?**

Section 1(a)(i) of E.O. 14024 imposes sanctions with respect to any person determined by the Secretary of the Treasury, in consultation with the Secretary of State, to operate or have operated in the technology sector or the defense and related materiel sector of the Russian Federation economy, or any other sector of the Russian Federation economy as may be determined by the Secretary of the Treasury, in consultation with the Secretary of State. As of May 19, 2023, persons may be sanctioned pursuant to E.O. 14024 for operating or having operated in the following sectors of the Russian Federation economy:

| Sector of the Russian Federation Economy | Date of Determination and Effectiveness | Definitions |
| --- | --- | --- |
| technology | | |
| defense and related materiel | April 15, 2021 | |

| Sector of the Russian Federation Economy | Date of Determination and Effectiveness | Definitions |
|---|---|---|
| financial services | February 22, 2022 | |
| aerospace | March 31, 2022 | |
| electronics | | |
| marine | | |
| accounting | May 8, 2022 | FAQ 1038 |
| trust and corporate formation services | | |
| management consulting | | |
| quantum computing | September 15, 2022 | FAQ 1086 |
| metals and mining | February 24, 2023 | FAQ 1115 |
| architecture | May 19, 2023 | see below |
| engineering | | |
| construction | | |
| manufacturing | | |
| transportation | | |

OFAC expects to promulgate regulations that define the terms *(i) architecture sector of the Russian Federation economy, (ii) engineering sector of the Russian Federation economy, (iii) construction sector of the Russian Federation economy, (iv) manufacturing sector of the Russian Federation economy,* and *(v) transportation sector of the Russian Federation economy* consistent with the following:

**Architecture sector of the Russian Federation economy:** The term architecture sector of the Russian Federation economy includes activities such as advising; pre-designing; designing; preparing sketches, reports, studies, assessments, site plans, working drawings, specifications, cost estimates, as-built drawings, or other materials; contract administration; site selection; and inspections concerning architectural and related matters involving the Russian Federation. Such activities may be related to the following types of projects, e.g.: residential, institutional, leisure, commercial, and industrial buildings and structures; recreational areas; transportation infrastructure; land subdivisions; urban planning; landscape architecture; and not necessarily relate to a new construction project. The term additionally includes any related activities, including the provision or receipt of goods, services, or technology to, from, or involving the architecture sector of the Russian Federation economy.

**Engineering sector of the Russian Federation economy:** The term engineering sector of the Russian Federation economy includes activities such as advising; designing; recommending; consulting; constructing; installing, surveying; preparing studies, specifications, cost estimates, working drawings, process flow

diagrams, arrangement drawings, or other materials; map making; planning; testing; analysis; and inspecting for engineering and related matters involving the Russian Federation.  Such activities may be undertaken during any phase of an engineering project of any type and may not necessarily relate to a new construction or development project.  The term additionally includes any related activities, including the provision or receipt of goods, services, or technology to, from, or involving the engineering sector of the Russian Federation economy.

**Construction sector of the Russian Federation economy:**  The term construction sector of the Russian Federation economy includes activities such as the production, procurement, devising, framing, design, testing, financing, distribution, or transport involving the Russian Federation, of goods, services, or technology to fabricate, shape, alter, maintain, or form any buildings or structures, including the on-site development, assembly, or construction of residential, commercial, or institutional buildings, or of transportation infrastructure, in the Russian Federation; and any related activities, including the provision or receipt of goods, services, or technology to, from, or involving the construction sector of the Russian Federation economy.

**Manufacturing sector of the Russian Federation economy:**  The term manufacturing sector of the Russian Federation economy includes activities such as the creation, modification, repair, testing, or financing, of goods by manual labor or machinery involving the Russian Federation and any related activities, including the provision or receipt of goods, services, or technology to, from, or involving the manufacturing sector of the Russian Federation economy.  Note that persons conducting or facilitating transactions that are exempt or authorized by OFAC—such as those related to the provision of agricultural commodities, food, medicine, or medical devices, or related to energy—will not be subject to sanctions under E.O. 14024.

**Transportation sector of the Russian Federation economy:**  The term transportation sector of the Russian Federation economy includes activities such as the production, manufacturing, testing, financing, distribution or transport to, from, or involving the Russian Federation of any mode of transport or any goods, services, or technology for the movement or conveyance of persons or property and the loading, unloading, or storage incidental to the movement of such persons or property; and any related activities, including the provision or receipt of goods, services, or technology to, from, or involving the transportation sector of the Russian Federation economy.

**Technology sector of the Russian Federation economy:**  The term technology sector of the Russian Federation economy includes activities such as the production, procurement, research, development, design, engineering, testing,

servicing, financing, distribution, use, or transport involving the Russian Federation, of software, equipment, electronics, items, tools, materials, or devices, and any components, parts, or accessories of the foregoing, related to the fields of computing, engineering, applied mathematics, or applied sciences involving the Russian Federation and any related activities, including the provision or receipt of goods or services involving the technology sector of the Russian Federation economy.

**Defense and related material sector of the Russian Federation economy:** The term defense and related materiel sector of the Russian Federation economy includes military, armed forces, or security forces of or within the Russian Federation; the use of arms or related materiel by military, armed forces, or security forces of or within the Russian Federation; any person designing, developing, manufacturing, supplying, financing, procuring, or distributing goods, services, or technology to, from, or involving military, armed forces, or security forces of or within the Russian Federation; and any related activities, including the provision or receipt of goods, services, or technology involving the defense and related materiel sector of the Russian Federation economy. The term defense and related materiel sector of the Russian Federation economy also includes acquisition, possession, procurement, research, design, development, testing, evaluation, manufacture, maintenance, upgrade or refurbishment, shipping, supply, sale, transfer, or storage to, from, within, for, transiting, or on behalf of the Russian Federation of arms or related materiel of all types; enablers, aggregates, components, parts, as well as related documentation and instructions for any such arms or related materiel; or training for the use of included systems, provision of simulation equipment, documentation (including training manuals, maintenance orders, or technical bulletins), prototypes, software upgrades, and licensing and manufacturing agreements for such items.

**Aerospace sector of the Russian Federation economy:** The term aerospace sector of the Russian Federation economy includes activities such as the production, procurement, development, design, testing, servicing, financing, distribution, use, or transport involving the Russian Federation and its airspace, of aircraft or any other device used or intended to be used for flight or activities in the air or in space, missiles, unmanned aerial vehicles, space-based vehicles, satellites, high-altitude balloons, any other device that operates above the surface of the earth, and any items, components, parts, or accessories intended for the foregoing; airports or any other area of land or water used or intended to be used for a purpose related to the aerospace sector of the Russian Federation; and any related activities, including the provision or receipt of goods, services, or technology involving the aerospace sector of the Russian Federation economy.

**Date Updated: December 22, 2023**

Released on May 19, 2023

### 1127. What does a determination of a sector pursuant to Executive Order (E.O.) 14024 do?

A sector determination pursuant to E.O. 14024 exposes persons that operate or have operated in an identified sector to sanctions risk; however, a sector determination does not automatically impose sanctions on all persons who operate or have operated in the sector. Only persons determined, pursuant to E.O. 14024, by the Secretary of the Treasury in consultation with the Secretary of State, or by the Secretary of State in consultation with the Secretary of the Treasury, or their delegates, to operate or have operated in the above-identified sectors are subject to sanctions. See FAQ 1126 for the sectors identified pursuant to E.O. 14024 as of May 19, 2023.

Persons sanctioned pursuant to E.O. 14024 for operating or having operated in an identified sector are added to one or more OFAC sanctions lists based on the type of sanction, including the List of Specially Designated Nationals and Blocked Persons (SDN List), the List of Foreign Financial Institutions Subject to Correspondent Account or Payable-Through Account Sanctions (CAPTA List), and the Non-SDN Menu-Based Sanctions List (NS-MBS List).

Released on May 19, 2023

### 1128. Under Executive Order (E.O.) 14071, "Prohibiting New Investment in and Certain Services to the Russian Federation in Response to Continued Russian Federation," U.S. persons are prohibited from providing certain services to persons located in the Russian Federation. How will OFAC define those categories of services?

Section 1(a)(ii) of E.O. 14071 prohibits the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any category of services as may be determined by the Secretary of the Treasury, in consultation with the Secretary of State, to any person located in the Russian Federation. As of April 12, 2024, categories of services identified pursuant to E.O. 14071 include:

| Categories of Services | Date of Determination | Date of Effectiveness | Definitions |
|---|---|---|---|
| Accounting; | May 8, 2022 | June 7, 2022 | FAQ 1034 |

| | | | |
|---|---|---|---|
| Trust and corporate formation services; Management consulting | | | |
| Quantum computing | September 15, 2022 | October 15, 2022 | FAQ 1084 |
| Trading/commodities brokering, financing, shipping, insurance including reinsurance and protection and indemnity, flagging, and customs brokering services as they relate to the maritime transport of crude oil of Russian Federation origin | December 5, 2022 | December 5, 2022 | OFAC Guidance on Implementation of the Price Cap Policy |
| Trading/commodities brokering, financing, shipping, insurance including reinsurance and protection and indemnity, flagging, and customs brokering services as they relate to the maritime transport of petroleum products of Russian Federation origin | February 5, 2023 | February 5, 2023 | OFAC Guidance on Implementation of the Price Cap Policy |
| Architecture; Engineering | May 19, 2023 | June 18, 2023 | See below |
| Covered metals acquisition services | April 12, 2024 | April 13, 2024 | See below |

| Information Technology (IT) consultancy and design services | June 12, 2024 | September 12, 2024 | FAQ 1187 |
|---|---|---|---|
| Cloud-based services for enterprise management software and design and manufacturing software | June 12, 2024 | September 12, 2024 | FAQ 1187 |
| IT support services for enterprise management software and design and manufacturing software | June 12, 2024 | September 12, 2024 | FAQ 1187 |

OFAC expects to promulgate regulations that define the terms architecture services, engineering services, and covered metals acquisition services consistent with the following:

**Architecture services** include advisory services; pre-design services; design services, including schematic design, design development, and final design; contract administration services; combined architectural design and contract administration services; including post construction services; and all other services requiring the expertise of architects.  The prohibition applies to such services as they relate to residential, institutional, leisure, commercial, and industrial buildings and structures; recreational areas; transportation infrastructure; land subdivisions; and not necessarily related to a new construction project.  The term also includes urban planning services (i.e., land use, site selection, and servicing of land for systemic, coordinated urban development) and landscape architectural services.  OFAC intends to interpret this term consistent with UN Central Product Classification (CPC) Codes 86711-86704, 86719, and 86741-86742.

**Engineering services** include assistance, advisory, consultative, design, and recommendation services concerning engineering matters or during any phase of an engineering project.  Engineering design services may be for:  the construction of foundations and building structures (i.e., structural engineering); mechanical and electrical installations for buildings; the construction of civil engineering works; industrial processes and production; or other engineering designs, such as

those for acoustics, vibration, traffic control systems, or prototype development for new products. The term additionally includes geotechnical, groundwater, and corrosion engineering services; integrated engineering services, such as those for transportation infrastructure or other projects; engineering-related scientific and technical consulting services, including geological, geophysical, geochemical, surface or subsurface surveying, and map making services; testing and analysis services of chemical, biological, and physical properties of materials or of integrated mechanical and electrical systems; and technical inspection services. OFAC intends to interpret this term consistent with UN CPC Codes 86721-86727, 86729, 86731-86733, 86739, 86751-86754, 86761-86764, and 86769. Additionally, OFAC does not consider maritime classification services to be subject to the prohibition, as is consistent with the [OFAC Guidance on Implementation of the Price Cap Policy for Crude Oil and Petroleum Products of Russian Federation Origin](#) .

**Covered metals acquisition services** means warranting services for aluminum, copper, or nickel of Russian Federation origin on a global metal exchange and services to acquire aluminum, copper, or nickel of Russian Federation origin as part of the physical settlement of a derivative contract. "Warranting services" refers to issuing, registering, accepting, or acquiring a warrant or the underlying metal on a global metal exchange (i.e., a commodities exchange that provides infrastructure and services for the international trading of base metal derivatives contracts). Examples of such global metal exchanges include, but are not limited to, the Chicago Mercantile Exchange, the London Metal Exchange, and the Shanghai Futures Exchange. "Warrant" means an electronic record or physical document of title to, possession of, or rights in respect of a specified lot of metal (including where such metal is held in a third country within a global metal exchange-approved warehouse). A warrant is created or issued in accordance with the rules of a global metal exchange.

**Updated: June 12, 2024**

Released on May 19, 2023

### 1129. Do blocking sanctions issued by the State Department on May 19, 2023 on Polimetall AO apply to its corporate parent and affiliates?

On May 19, 2023, the Department of State designated Russia-based Polimetall AO pursuant to [Executive Order (E.O.) 14024](#) . These blocking sanctions apply only to this entity and any entities in which it owns, directly or indirectly, a 50 percent or greater interest.

Neither the Department of State nor OFAC have designated this entity's ultimate parent company, Jersey-based Polymetal International PLC, and based on

information available to OFAC, Polymetal International PLC is not owned 50 percent or more by blocked persons or otherwise considered the blocked property of any blocked persons. U.S. persons, therefore, are not prohibited from dealing with Polymetal International PLC, its non-blocked subsidiaries, or non-blocked affiliates to the extent the proposed dealings do not involve any blocked person, any interest in property of a blocked person, or any other activities prohibited pursuant to any OFAC sanctions authorities.

Released on May 19, 2023

### 1131. Is LETTERONE HOLDINGS S.A. (LetterOne) blocked as a result of the designation of Petr Olegovich Aven, Mikhail Maratovich Fridman, German Borisovich Khan, and Alexey Viktorovich Kuzmichev?

No. OFAC has not designated LetterOne and, based on information available to OFAC, LetterOne is not owned 50 percent or more by blocked persons or otherwise considered the blocked property or interest in property of blocked persons, including Petr Olegovich Aven, Mikhail Maratovich Fridman, German Borisovich Khan, and Alexey Viktorovich Kuzmichev.

Released on August 11, 2023

### 1146. What does Executive Order (E.O.) 14114, "Taking Additional Steps With Respect to the Russian Federation's Harmful Activities," do?

E.O. 14114 amends E.O. 14024 and E.O. 14068 to further address the Russian Federation's continued use of its military-industrial base to aid its effort to undermine security in countries and regions important to United States national security and to further counteract the Russian Federation's continued evasion of U.S. sanctions. For additional information and guidance on the amendment to E.O. 14024, see FAQs 1147, 1148, 1149, 1150, 1151, 1152, 1181, and 1182. For additional information on the amendment to E.O. 14068, see FAQs 1154, 1155, 1156, and 1157.

**Updated: June 12, 2024**

Released on December 22, 2023

### 1147. How does Executive Order (E.O.) 14114 amend E.O. 14024, "Blocking Property with Respect to Specified Harmful Foreign Activities of the Government of the Russian Federation"?

E.O. 14114 amends E.O. 14024 to authorize the imposition of sanctions on foreign financial institutions (FFIs) that have engaged in certain transactions involving Russia's military-industrial base, including all persons whose property and interests in property are blocked pursuant to E.O. 14024. Specifically, section 11 of E.O. 14024, as amended, authorizes sanctions on FFIs that have (i) conducted or facilitated any significant transaction or transactions for or on behalf of any person designated pursuant to E.O. 14024 for operating or having operated in the technology, defense and related materiel, construction, aerospace, or manufacturing sectors of the Russian Federation economy or other sectors as may be determined to support Russia's military-industrial base by the Secretary of the Treasury, in consultation with the Secretary of State; or (ii) conducted or facilitated any significant transaction or transactions, or provided any service, involving Russia's military-industrial base, including the sale, supply, or transfer, directly or indirectly, to the Russian Federation, of any item or class of items as may be determined by the Secretary of the Treasury, in consultation with the Secretary of State and the Secretary of Commerce. See determination of December 22, 2023 pursuant to subsection 11(a)(ii) of E.O. 14024 (Russia Critical Items Determination) for the list of items determined under the order, as amended.

Subsection 11(b) of E.O. 14024, as amended, authorizes OFAC (i) to prohibit the opening or prohibit or impose strict conditions on the maintenance of correspondent accounts or payable-through accounts in the United States for such FFIs or (ii) to block such FFIs.

For additional information and guidance on the amendment to E.O. 14024, see FAQs 1148, 1149, 1150, 1151, 1152, 1153, 1181, and 1182.

**Updated: June 12, 2024**

Released on December 22, 2023

### 1148. What activities could expose a foreign financial institution (FFI) to sanctions under section 11 of Executive Order (E.O.) 14024, as amended by E.O. 14114?

FFIs may be sanctioned for engaging in certain transactions, or providing any service, involving Russia's military-industrial base. For example, FFIs may be sanctioned for conducting any significant transaction(s) for any person that has been blocked pursuant to E.O. 14024. FFIs may also be sanctioned for maintaining accounts, transferring funds, or providing other financial services to persons, either inside or outside Russia, for any person blocked pursuant to E.O. 14024, as well as to any person operating in the following sectors of the Russian Federation economy: technology, defense and related materiel, construction, aerospace, or manufacturing. This also includes facilitating the sale, supply, or transfer, directly

or indirectly, to the Russian Federation of certain items critical to Russia's war effort identified in the determination of December 22, 2023 pursuant to subsection 11(a)(ii) of E.O. 14024 (Russia Critical Items Determination ), such as certain machine tools, semiconductor manufacturing equipment, electronic test equipment, propellants and their precursors, lubricants and lubricant additives, bearings, advanced optical systems, and navigation instruments.

For additional information and examples of the types of activities that would expose FFIs to sanctions risks, see OFAC's Advisory to Foreign Banks on Russia Sanctions Risks. For additional information on the specific items identified on the Russia Critical Items Determination, see FAQ 1150.

**Updated: June 12, 2024**

Released on December 22, 2023

### 1149. What sanctions can be imposed on a foreign financial institution (FFI) that engaged in conduct described in section 11 of Executive Order (E.O.) 14024, as amended by E.O. 14114?  What are the obligations of U.S. financial institutions?

Pursuant to subsection 11(b) of E.O. 14024 , as amended, OFAC may block FFIs or prohibit the opening or prohibit or impose strict conditions on the maintenance of correspondent accounts or payable-through accounts in the United States for such FFIs.

For FFIs for which the opening or maintaining of a correspondent account or a payable-through account is prohibited pursuant to subsection 11(b)(i) of E.O. 14024, U.S. financial institutions must close any correspondent account or payable-through account maintained for or on behalf of those foreign financial institutions. Russia-related General License (GL) 84 authorizes the closures of such accounts within 10 days of the imposition of sanctions pursuant to subsection 11(b)(i) of E.O. 14024, subject to certain conditions.

For FFIs subject to blocking sanctions pursuant to subsection 11(b)(ii) of E.O. 14024, all property and interests in property of those FFIs that are in the United States or in possession or control of U.S. persons are blocked and must be reported to OFAC.  Any entities that are owned, directly or indirectly, individually or in the aggregate, 50 percent or more by one or more blocked FFIs (or other blocked persons) are also blocked.

Released on December 22, 2023

### 1150. What does determination of December 22, 2023, "Determination Pursuant to Section 11(a)(ii) of Executive Order (E.O. 14024)" (Russia Critical Items Determination) do?

The Russia Critical Items Determination issued pursuant to subsection 11(a)(ii) of E.O. 14024 identifies certain items that support Russia's military-industrial base. Foreign financial institutions (FFIs) may be sanctioned for having conducted or facilitated any significant transaction or transactions, or provided any service, involving Russia's military-industrial base, including the sale, supply, or transfer, directly or indirectly of these identified items.

FFIs should use the list of specified items for the purpose of mitigating sanctions risk under section 11 of E.O. 14024, as amended. The broader groups in which these items are categorized provide additional context as to why they are critical for Russia's war effort, including for the production of advanced precision-guided weapons and other critical items. OFAC's Advisory to Foreign Banks on Russia Sanctions Risks provides additional guidance to FFIs on the use of the specified items in the Russia Critical Items Determination and the U.S. Department of Commerce's Common High Priority Items List.

**Russia Critical Items Determination**

|  | Items determined pursuant to E.O. 14024, Sec. 11(a)(ii) |
| --- | --- |
| ***Certain machine tools and manufacturing equipment*** | Numerically controlled (CNC) machine tools |
|  | Additive manufacturing (AM) machine tools |
|  | Semiconductor manufacturing equipment |
| ***Certain manufacturing materials for semiconductors and related electronics*** | Silicon boules |
|  | Silicon wafers |
|  | Photoresist materials |
|  | Bare printed circuit boards (PCBs) |
|  | Printed circuit board (PCB) substrates |
| ***Certain electronic test equipment*** | Oscilloscopes |
|  | Automated test equipment |
|  | Data acquisition systems |
|  | Signal generators |
|  | Pulse generators |
|  | Spectrum analyzers |

| | Nitrocellulose |
| --- | --- |
| **Certain propellants, chemical precursors for propellants and explosives** | Smokeless powder |
| | Research Department eXplosive (RDX, also known as Royal Demolition eXplosive, cyclonite, hexogen) |
| | High Melting eXplosive (HMX, also known as High-Molecular-Weight RDX, octogen, cyclotetramethylenetetranitramine) |
| **Certain lubricants and lubricant additives** | Turbine oil |
| | Turbine oil additives |
| **Certain bearings** | High-precision ball and roller bearings |
| | Angular contact (spindle) bearings |
| **Certain advanced optical systems** | Thermal sights |
| | Thermal imaging arrays |
| | Infrared focal plane arrays |
| | Image intensifier tubes (ITTs) |
| **Certain navigation instruments** | Inertial navigation systems (INS) |
| | Inertial measurement units (IMUs) |
| | Fiber-optic gyroscopes (FOGs) |

Released on December 22, 2023

**1151. How does OFAC intend to interpret the following terms in Executive Order (E.O.) 14024, as amended by E.O. 14114: "foreign financial institution," "Russia's military-industrial base," and "significant transaction or transactions"?**

OFAC expects to promulgate regulations that define or interpret these terms as follows:

**Foreign Financial Institution:** As defined in subsection 11(f) of E.O. 14024, foreign financial institution means any foreign entity that is engaged in the business of accepting deposits, making, granting, transferring, holding, or brokering loans or credits, or purchasing or selling foreign exchange, securities, futures or options, or procuring purchasers and sellers thereof, as principal or agent. It includes depository institutions, banks, savings banks, money services businesses, operators of credit card systems, trust companies, insurance companies, securities brokers and dealers, futures and options brokers and dealers, forward contract and foreign exchange merchants, securities and commodities exchanges, clearing corporations, investment companies, employee benefit plans, dealers in precious metals, stones, or jewels, and holding companies, affiliates, or subsidiaries of any of the foregoing. The term does not include the international financial institutions identified in 22 U.S.C. 262r(c)(2), the

International Fund for Agricultural Development, the North American Development Bank, or any other international financial institution so notified by the Office of Foreign Assets Control.

**Russia's military-industrial base** includes all persons blocked pursuant to E.O. 14024, as well as any person operating in the technology, defense and related materiel, construction, aerospace, and manufacturing sectors of the Russian Federation economy (and other sectors as may be determined pursuant to E.O. 14024).  For definitions of those identified sectors, see [FAQ 1126](). Russia's military-industrial base may also include individuals and entities that support the sale, supply, or transfer, directly or indirectly, of critical items identified in determinations pursuant to subsection 11(a)(ii) of E.O. 14024, to the Russian Federation.  See determination of December 22, 2023 pursuant to subsection 11(a)(ii) of Executive Order 14024 ([Russia Critical Items Determination]()    ). See also [FAQ 1150]() for additional information.

**Significant transaction or transactions:** OFAC may consider the totality of the facts and circumstances when determining whether a transaction or transactions are "significant."  As a general matter, some or all of the following factors may be considered:  (a) the size, number, and frequency of the transaction(s); (b) the nature of the transaction(s); (c) the level of awareness of management and whether the transactions are part of a pattern of conduct; (d) the nexus of the transaction(s) to persons sanctioned pursuant to E.O. 14024, or to persons operating in Russia's military-industrial base; (e) whether the transaction(s) involve deceptive practices; (f) the impact of the transaction(s) on U.S. national security objectives; and (g) such other relevant factors that OFAC deems relevant.

**Updated: June 12, 2024**

Released on December 22, 2023

### 1152. Could foreign financial institutions (FFIs) that engage in transactions in non-USD currencies be sanctioned under section 11 of Executive Order (E.O.) 14024, as amended by E.O. 14114?

Yes.  The prohibitions and targeting authorities of amended section 11 of [E.O. 14024]() apply with respect to any currency.  For example, an FFI that processes a significant transaction denominated in a non-USD local currency for a person blocked pursuant to E.O. 14024 or an FFI that processes any significant transaction(s) denominated in a non-USD local currency on behalf of a customer that exports critical items to Russia's military-industrial base, risks being sanctioned by OFAC.  For further information on sanctions risk for FFIs under section 11 of E.O. 14024, see OFAC's [Advisory to Foreign Banks on Russia Sanctions Risks](), [FAQ 1148](), and [FAQ 1149]().

Updated: June 12, 2024

Released on December 22, 2023

### 1154. How does Executive Order (E.O.) 14114 of December 22, 2023 amend E.O. 14068, "Prohibiting Certain Imports, Exports, and New Investment with Respect to Continued Russian Federation Aggression"?

E.O. 14114 of December 22, 2023 amends E.O. 14068 to provide for additional prohibitions on the importation and entry into the United States of certain products.  It does so by maintaining the existing E.O. 14068 importation prohibitions in subsection 1(a)(i)(A) and identifying in subsections 1(a)(i)(B)–(D) additional types of products that may be prohibited upon the issuance of determinations, as described below.

**Subsection 1(a)(i)(B)** authorizes the imposition of importation prohibitions on categories of fish, seafood, and preparations thereof, diamonds, and other products as may be determined, that were mined, extracted, produced, or manufactured wholly or in part in the Russian Federation, or harvested in waters under the jurisdiction of the Russian Federation or by Russia-flagged vessels, *even if such products have been incorporated or substantially transformed into other products outside of the Russian Federation.*

**Subsections 1(a)(i)(C) and (D)** authorize the identification of additional types of products that would be subject to importation prohibitions under the order, upon a determination by the Secretary of the Treasury, in consultation with the Secretary of State, Secretary of Commerce, and Secretary of Homeland Security.

For additional information and guidance on the amendment to E.O. 14068, see FAQs 1155, 1156, 1157, 1164, 1165, and 1166.

**Date Updated: February 23, 2024**

Released on December 22, 2023

### 1155. What does the determination of December 22, 2023, "Prohibitions Related to Imports of Certain Categories of Fish, Seafood, and Preparations Thereof," pursuant to Executive Order (E.O.) 14068, as amended by E.O. 14114 of December 22, 2023, (Seafood Determination) prohibit?

The Seafood Determination issued pursuant to subsection 1(a)(i)(B) of E.O. 14068, as amended, prohibits the importation and entry into the United States, including importation for admission into a foreign trade zone located in the United

States, of salmon, cod, pollock, or crab that was produced wholly or in part in the Russian Federation or harvested in waters under the jurisdiction of the Russian Federation or by Russia-flagged vessels, *even if such salmon, cod, pollock, or crab has been incorporated or substantially transformed into another product outside of the Russian Federation.*

Accordingly, the Seafood Determination expands the importation prohibitions in E.O. 14068 to include salmon, cod, pollock, or crab of Russian Federation origin that have been processed in a third country into a new product.

Released on December 22, 2023

**1156. I have a shipment of a certain product(s) containing the types of seafood listed in the determination of December 22, 2023 pursuant to Executive Order (E.O.) 14068, as amended by E.O. 14114 of December 22, 2023, (Seafood Determination) en route to the United States that was contracted prior to December 22, 2023. Can I complete such import into the United States? Can I find a new buyer for this shipment and/or re-direct the shipment to a country other than the United States?**

Individuals and entities may import the listed types of seafood, for a limited time, into the United States subject to the conditions of General License (GL) 83 . GL 83 authorizes the importation into the United States, through 12:01 a.m. eastern standard time, February 21, 2024, of salmon, cod, pollock, and crab that are subject to the Seafood Determination , provided that the importation is pursuant to written contracts or written agreements entered into prior to December 22, 2023.

Individuals and entities may also find new buyers or re-direct such shipments to other countries. The Seafood Determination prohibits the importation *into the United States* of salmon, cod, pollock, or crab of Russian Federation origin, even if incorporated or substantially transformed into another product in a third country. It does not prohibit U.S. persons from engaging in transactions to sell or re-direct shipments *outside the United States* that were previously destined for the United States.

Released on December 22, 2023

**1157. For the purposes of the determination of December 22, 2023 pursuant to Executive Order (E.O.) 14068, as amended by E.O. 14114 of December 22, 2023, (Seafood Determination) what is meant by the terms "salmon," "cod," "pollock," and "crab"?**

For the purposes of the Seafood Determination , OFAC anticipates publishing regulations defining these terms to include articles defined at the following Harmonized Tariff Schedule of the United States (HTSUS) subheadings:

- "Salmon:" articles defined at HTSUS subheadings 0302.13.0013, 0302.13.0014, 0302.13.0022, 0302.13.0032, 0302.13.0042, 0302.13.0053, 0302.13.0054, 0302.13.0062, 0302.14.0003, 0302.14.0004, 0302.14.0062, 0303.11.0000, 0303.12.0012, 0303.12.0022, 0303.12.0032, 0303.12.0052, 0303.12.0062, 0303.13.0000, 0303.91.4040, 0304.41.00, 0304.41.0010, 0304.41.0020, 0304.41.0090, 0304.52.00, 0304.52.0010, 0304.52.0015, 0304.52.0020, 0304.52.0090, 0304.81.1000, 0304.81.5010, 0304.81.5090, 0305.20.4020, 0305.41.0000, 0305.69.4000, 1604.11.2020, 1604.11.2030, 1604.11.2090, 1604.11.4010, 1604.11.4020, 1604.11.4030, 1604.11.4040, 1604.11.4050, including any subsequent revisions to the list of HTSUS classifications.

- "Cod:" articles defined at HTSUS subheadings 0302.51.0010, 0302.51.0090, 0303.63.0010, 0303.63.0090, 0304.44.0010, 0304.44.0015, 0304.53.0010, 0304.53.0015, 0304.71.1000, 0304.71.5000, 0304.95.1010, 0304.95.1015, 0304.95.1020, 0305.32.0010, 0305.32.0090, 0305.51.0000, 0305.62.0010, 0305.62.0025, 0305.62.0030, 0305.62.0045, 0305.62.0050, 0305.62.0060, 0305.62.0070, 0305.62.0080, including any subsequent revisions to the list of HTSUS classifications.

- "Pollock:" articles defined at HTSUS subheadings 0302.55.1100, 0302.55.5000, 0302.59.5010, 0303.67.0000, 0304.44.0025, 0304.53.0025, 0304.75.1000, 0304.75.5000, 0304.79.1010, 0304.94.1005, 0304.94.1010, 0304.94.1090, 0304.94.9000, 0304.95.1030, 0305.69.1022, 0305.69.1042, 1604.19.1000, 1604.19.2500, including any subsequent revisions to the list of HTSUS classifications.

- "Crab:" articles defined at HTSUS subheadings 0306.14.2000, 0306.14.40, 0306.14.4003, 0306.14.4006, 0306.14.4009, 0306.14.4012, 0306.14.4015, 0306.14.4020, 0306.14.4030, 0306.14.4090, 0306.33.2000, 0306.33.4000, 0306.93.2000, 0306.93.4000, 1605.10.0510, 1605.10.0590, 1605.10.2010, 1605.10.2022, 1605.10.2025, 1605.10.2030, 1605.10.2051, 1605.10.2059, 1605.10.2090, 1605.10.4002, 1605.10.4005, 1605.10.4010, 1605.10.4015, 1605.10.4025, 1605.10.4030, 1605.10.4035, 1605.10.4040, 1605.10.6010, 1605.10.6090, including any subsequent revisions to the list of HTSUS classifications.

Additionally, these terms apply to products of salmon, cod, pollack and crab classified under the HTSUS subheadings 0301.99.0390, 0302.59.1100, 0304.95.1005, 0304.95.1090, 0304.99.1104, 0304.99.1109, 0304.99.1183, 0305.20.4065, 0305.39.6180, 0305.49.4020, 0305.49.4045, 0305.59.0001, 0305.72.0000, 0305.79.0000, 1603.00.9090, 1604.19.2200, 1604.19.3200, 1604.19.4100, 1604.19.5100, 1604.19.6100, 1604.19.8200, 1604.20.0510, 1604.20.0590, 1604.20.1000, 1604.20.1500, 1604.20.2000, 1604.20.2500,

1604.20.3000, 1604.20.4000, 1604.20.5010, 1604.20.5090, 1604.20.6010, 1604.20.6090, including any subsequent revisions to the list of HTSUS classifications.

**Date Updated: January 18, 2024**

Released on December 22, 2023

### 1164. What prohibitions has OFAC implemented with respect to diamonds and diamond jewelry under the Russian Harmful Foreign Activities Sanctions program?

On March 11, 2022, the Biden Administration issued Executive Order (E.O.) 14068, prohibiting the importation into the United States of non-industrial diamonds of Russian Federation origin.  See FAQs 1019 and 1027 for the definition of Russian Federation origin and non-industrial diamonds, respectively.  On December 6, 2023, the G7 Leaders announced a coordinated international effort to impose phased restrictions on the importation of certain Russian diamonds, including diamonds processed in third countries.  As a part of this G7 commitment, OFAC has issued additional restrictions on the importation of non-industrial diamonds mined, extracted, produced, or manufactured wholly or in part in the Russian Federation as well as unsorted diamonds and diamond jewelry.

Specifically, on February 8, 2024, OFAC issued two determinations, "Prohibitions Related to Imports of Certain Categories of Diamonds" pursuant to Executive Order (E.O.) 14068 (the "Diamonds Determination") and "Prohibitions Related to Imports of Diamond Jewelry  and Unsorted Diamonds of Russian Federation Origin and Diamond Jewelry and Unsorted Diamonds Exported From the Russian Federation" pursuant to Executive Order (E.O.) 14068 (the "Diamond Jewelry and Unsorted Diamonds Determination").  These prohibitions are described below, along with the relevant Harmonized Tariff Schedule of the United States (HTSUS) references and a list of illustrative examples of products subject to the prohibitions.

| Import Prohibition | Effective Date | Illustrative Example and Relevant HTSUS References | Additional Information and Guidance |
|---|---|---|---|
| Non-industrial diamonds of Russian | March 11, 2022 | Non-industrial diamonds that | See E.O. 14068 ; FAQs 1024 and 1027 |

| | | | |
|---|---|---|---|
| Federation origin (any weight) | | are products of Russia<br><br>HTSUS Subheading: 7102.31, 7102.39 | |
| Non-industrial diamonds of Russian Federation origin, regardless of whether such diamonds have been substantially transformed in third countries | March 1, 2024: ≥ 1.0 carat<br><br>September 1, 2024: ≥ 0.5 carat | Rough diamond was mined in Russia then cut and polished in a third country<br><br>HTSUS Subheading: 7102.31, 7102.39 | See the Diamonds Determination ; FAQs 1027, 1154, and 1165 |
| Unsorted diamonds of Russian Federation origin or exported from Russia | March 1, 2024 | Unsorted diamonds mined or exported from Russia<br><br>HTSUS Subheading: 7102.10 | See the Diamond Jewelry and Unsorted Diamonds Determination ; FAQs 1027, 1154, and 1166 |
| Diamond jewelry of Russian Federation origin or exported from Russia | March 1, 2024 | Diamond bracelet either made in Russia or made elsewhere but exported from Russia<br><br>HTSUS Heading: 7113, incorporating diamonds | See the Diamond Jewelry and Unsorted Diamonds Determination ; FAQs 1027, 1154, and 1166 |

Released on February 23, 2024

### 1165. What does the determination "Prohibitions Related to Imports of Certain Categories of Diamonds" pursuant to Executive Order (E.O.) 14068 (the "Diamonds Determination"), prohibit?

The Diamonds Determination    prohibits the importation and entry into the United States of two categories of diamonds, effective on the dates indicated below.

Effective March 01, 2024, the Diamonds Determination prohibits the importation of non-industrial diamonds that were mined, extracted, produced, or manufactured wholly or in part in the Russian Federation with a weight of 1.0 carat or greater, even if such diamonds have been substantially transformed into other products outside of the Russian Federation.

Effective September 01, 2024, the Diamonds Determination prohibits the importation of Russian non-industrial diamonds with a weight of 0.5 carats or greater, even if such diamonds have been substantially transformed into other products outside of the Russian Federation.

For example, a non-industrial diamond that is mined in Russia but then undergoes manufacturing operations such as being cut, faceted, or polished in a third country, is prohibited from importation and entry into the United States, if at the time of importation, it is 1.0 carat or greater as of March 01, 2024 or 0.5 carats or greater as of September 01, 2024.

See FAQ 1027 for the definition of non-industrial diamonds. See FAQ 1166 for information on the prohibition related to diamond jewelry and unsorted diamonds.

Pursuant to General License (GL) 104    , U.S. persons are authorized to import into the United States non-industrial diamonds, substantially transformed into other products outside of the Russian Federation, with a weight of 1.0 carat or greater, if those diamonds were physically located outside of the Russian Federation before, and not exported or reexported from the Russian Federation since, March 01, 2024. GL 104 also authorizes the importation into the United States of non-industrial diamonds, substantially transformed into other products outside of the Russian Federation, with a weight of 0.5 carats or greater if those diamonds were physically located outside of the Russian Federation before, and not exported or reexported from the Russian Federation since, September 01, 2024. See FAQ 1189 for additional information.

Date Updated: August 23, 2024.

Released on February 23, 2024

### 1166. What does the determination "Prohibitions Related to Imports of Diamond Jewelry and Unsorted Diamonds of Russian Federation Origin and Diamond Jewelry and Unsorted Diamonds Exported From the Russian Federation" pursuant to Executive Order (E.O.) 14068 (the "Diamond Jewelry and Unsorted Diamonds Determination"), prohibit?

The Diamond Jewelry and Unsorted Diamonds Determination    prohibits the importation and entry into the United States of diamond jewelry and unsorted diamonds of Russian Federation origin, as well as diamond jewelry and unsorted diamonds that were exported from the Russian Federation. For example, it prohibits the importation into the United States of a diamond bracelet that has been manufactured in the Russian Federation, regardless of where the diamonds originated.

This prohibition comes into effect on March 01, 2024. See FAQ 1027 for the definition of diamond jewelry. See FAQ 1019 for the definition of Russian Federation origin. See FAQ 1165 for information on the prohibition related to certain categories of non-industrial diamonds.

Pursuant to General License (GL) 103    , U.S. persons are authorized to import into the United States diamond jewelry if that jewelry was physically located outside of the Russian Federation before, and not exported or reexported from the Russian Federation since, March 01, 2024.

**Date updated: August 23, 2024.**

Released on February 23, 2024

### 1168. What action did Treasury take on April 12, 2024 with regards to aluminum, copper, and nickel of Russian Federation origin?

On December 6, 2023, and February 24, 2024, the G7 Leaders issued statements signaling their intent to reduce Russia's revenues from metals.  On April 12, 2024, in coordination with the United Kingdom, the United States issued two new prohibitions that will further disrupt the revenue that Russia earns from its export of aluminum, copper, and nickel of Russian Federation origin, including through the use of U.S. global metal exchanges.

To implement this action, Treasury issued two determinations.  The first, "Prohibitions Related to Imports of Aluminum, Copper, and Nickel of Russian Federation Origin" (the "Metals Import Determination")    pursuant to Executive

Order (E.O.) 14068, as amended by E.O. 14114, prohibits the importation and entry into the United States, including importation for admission into a foreign trade zone located in the United States, of aluminum, copper, and nickel of Russian Federation origin.  Per the determination, the importation into the United States of aluminum, copper, and nickel of Russian Federation origin that was produced prior to April 13, 2024 is not prohibited.  See FAQ 1019 and 1170 for more information.

The second, "Prohibitions on Certain Services for the Acquisition of Aluminum, Copper, or Nickel of Russian Federation Origin" (the "Metals Services Determination") pursuant to E.O. 14071, prohibits the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of the following categories of services to any person located in the Russian Federation:  warranting services for aluminum, copper, or nickel of Russian Federation origin on a global metal exchange; and services to acquire aluminum, copper, or nickel of Russian Federation origin, as part of the physical settlement of a derivative contract (collectively, "Covered Metals Acquisition Services").  This determination does not apply to services related to aluminum, copper, or nickel of Russian Federation origin that was produced prior to April 13, 2024.  See FAQs 1169, 1170, 1128, 1019, and FAQ 1058 for more information.

Released on April 12, 2024

### 1169. What is prohibited by the determination "Prohibitions on Certain Services for the Acquisition of Aluminum, Copper, or Nickel of Russian Federation Origin" pursuant to Executive Order (E.O.) 14071 (the "Metals Services Determination")?

The Metals Services Determination prohibits the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of the following categories of services to any person located in the Russian Federation:  warranting services for aluminum, copper, or nickel of Russian Federation origin on a global metal exchange; and services to acquire aluminum, copper, or nickel of Russian Federation origin as part of the physical settlement of a derivative contract (collectively, "Covered Metals Acquisition Services").  This determination does not apply to services related to aluminum, copper, or nickel of Russian Federation origin that was produced prior to April 13, 2024.

To ensure compliance with the Metals Services Determination, U.S. global metal exchanges should not accept aluminum, copper, or nickel of Russian Federation origin produced on or after April 13, 2024 ("covered Russian metals").  U.S. global metal exchanges can further comply with the Metal Services Determination by

halting the warranting of covered Russian metals on the exchange; removing brands that produce covered Russian metals from their list of accepted brands; abstaining from adding additional brands of covered Russian metals to their list of accepted brands; ceasing providing clearing services for covered Russian metals; and halting acting as a central counterparty to the trade of covered Russian metals.

U.S. persons are also prohibited from providing services to acquire covered Russian metals as part of a physically settled derivative contract (i.e., the expiration of the contract results in a transfer of ownership of the physical commodity, as opposed to a cash settled derivatives contract in which the derivative expires directly into cash on the maturity date of the trade). In addition, a U.S. trader that is a counterparty to a derivative contract cannot take physical delivery of covered Russian metals when it comes time to settle that contract, even if the importation of the metal would not be into the United States.

As noted above, the Metals Services Determination does not impose any prohibitions on services related to aluminum, copper, or nickel of Russian Federation origin that was produced prior to April 13, 2024. For example, aluminum, copper, and nickel of Russian Federation origin that is already warranted as of April 13, 2024 on a global metal exchange can continue to be traded, and new warranting and trading can continue for aluminum, copper, and nickel of Russian Federation origin that was produced prior to April 13, 2024, including through new derivatives contracts. Market participants and traders may reasonably rely on the Certificate of Analysis and Certificate of Origin of the relevant Russian metal, or other documentation available to them in the ordinary course of business, with respect to the date of production, but should exercise caution if they have reason to believe such documentation has been falsified or is otherwise erroneous.

Released on April 12, 2024

**1170. For the purposes of the determination "Prohibitions Related to Imports of Aluminum, Copper, and Nickel of Russian Federation Origin" pursuant to Executive Order (E.O.) 14068, as amended by E.O. 14114, (the "Metals Import Determination") and the determination "Prohibitions on Certain Services for the Acquisition of Aluminum, Copper, or Nickel of Russian Federation Origin" pursuant to Executive Order (E.O.) 14071 (the "Metals Services Determination"), what is meant by the terms "aluminum," "nickel," and "copper"?**

For the purposes of the Metals Import Determination and the Metals Services Determination, OFAC anticipates publishing regulations defining "aluminum,"

"nickel," and "copper" to include articles or products defined at the following Harmonized Tariff Schedule of the United States (HTSUS) chapter headings:

- "Aluminum": defined at HTSUS Chapter 76.
- "Nickel": defined at HTSUS Chapter 75.
- "Copper": defined at HTSUS Chapter 74.

Released on April 12, 2024

### 1171. Do the determinations "Prohibitions Related to Imports of Aluminum, Copper, and Nickel of Russian Federation Origin" pursuant to Executive Order (E.O.) 14068, as amended by E.O. 14114, (the "Metals Import Determination") and the determination "Prohibitions on Certain Services for the Acquisition of Aluminum, Copper, or Nickel of Russian Federation Origin" pursuant to Executive Order (E.O.) 14071 (the "Metals Services Determination") apply to aluminum, copper, or nickel that has been incorporated or substantially transformed into other products outside of the Russian Federation?

No. FAQ 1019 clarifies that, for purposes of E.O. 14068, as amended by E.O. 14114, and the Metals Services Determination, the term "Russian Federation origin" excludes "any Russian Federation origin good that has been incorporated or substantially transformed into a foreign-made product."

Released on April 12, 2024

### 1172. Does the determination "Prohibitions on Certain Services for the Acquisition of Aluminum, Copper, or Nickel of Russian Federation Origin" pursuant to Executive Order (E.O.) 14071 (the "Metals Services Determination") impose new prohibitions on banks acting as intermediaries for payments related to Russian metals?

No. The processing, clearing, or sending of payments related to Russian metals by a U.S. bank on behalf of non-U.S. persons is not prohibited by the Metals Services Determination where the bank: (1) is operating solely as an intermediary; and (2) does not have any direct relationship with the person providing a service covered by the Metals Services Determination (i.e., the person is a non-account party) as it relates to the relevant transaction. Thus, the Metals Services Determination does not impose any new prohibitions or requirements relating to the processing, clearing, or sending of payments by intermediary banks.

Note that the above does not authorize U.S. banks to themselves provide any of the services prohibited by the Metals Services Determination indirectly or directly

to a person located in the Russian Federation with respect to aluminum, copper, or nickel of Russian Federation origin.

Released on April 12, 2024

### 1181. Effective June 12, 2024, how is Treasury interpreting Russia's military-industrial base under section 11 of Executive Order (E.O.) 14024, as amended by E.O. 14114?

In line with G7 commitments and in response to the Government of the Russian Federation's continued efforts to reorient its economy and government resources to support its war effort, Treasury has updated its definition of Russia's military-industrial base to include all persons blocked pursuant to E.O. 14024. This updated definition reflects Russia's reorientation of its economy and government resources to support its war. This action means that FFIs risk being sanctioned for conducting or facilitating any significant transaction or transactions or for providing any service involving a person blocked pursuant to E.O. 14024.

As updated in FAQ 1151, Russia's military-industrial base includes all persons blocked pursuant to E.O. 14024, as well as any person operating in the technology, defense and related materiel, construction, aerospace, and manufacturing sectors of the Russian Federation economy (and other sectors as may be determined pursuant to E.O. 14024). For definitions of those identified sectors, see FAQ 1126. Russia's military-industrial base may also include individuals and entities that support the sale, supply, or transfer, directly or indirectly, of critical items identified pursuant to subsection 11(a)(ii) of E.O. 14024 to the Russian Federation. See determination of December 22, 2023 pursuant to subsection 11(a)(ii) of Executive Order 14024 (Russia Critical Items Determination ).

OFAC has also updated its Advisory to Foreign Banks on Russia Sanctions Risks to provide additional guidance for FFIs. For additional information, see FAQs 1147, 1148, 1149, 1150, 1151, 1152, and 1182.

Released on June 12, 2024

### 1182. Are foreign financial institutions (FFIs) subject to sanctions risk for providing all financial services involving persons blocked pursuant to Executive Order (E.O.) 14024, as amended? What about agricultural, medical, and other transactions authorized by OFAC General Licenses?

Treasury remains focused on counteracting activity that involves sanctions evasion or third-country support to Russia's military-industrial base. At the same time, legitimate humanitarian activity and agricultural and medical trade are not

the target of our sanctions. Accordingly, FFIs may continue to conduct or facilitate any transaction(s) or provide any service related to activities that are otherwise authorized or exempted under the Russian Harmful Foreign Activities Sanctions program. Foreign persons do not risk the imposition of sanctions for engaging in transactions authorized for U.S. persons under General Licenses issued under the Russian Harmful Foreign Activities Sanctions program.

FFIs may continue to rely on Treasury's existing authorizations in place for transactions related to agricultural commodities, medicine, medical devices and related replacement parts, components, or software updates, the Coronavirus Disease 2019 (General License (GL) 6D), energy-related transactions (GL 8J), certain transactions in support of non-governmental organizations (GL 27), official business of third-country diplomatic or consular missions located in the Russian Federation (GL 20), certain transactions and official business of certain international organizations and entities by employees, grantees, or contractors thereof (31 CFR 587.510). Additionally, the importation or exportation of information or informational materials and transactions ordinarily incident to travel to or from any country are exempt under the International Emergency Economic Powers Act (IEEPA).

See OFAC's Advisory to Foreign Banks on Russia Sanctions Risks for additional guidance.

Released on June 12, 2024

### 1183. What authorizations are in place with respect to the Moscow Exchange (MOEX), National Clearing Center (NCC), and Non-Bank Credit Institution Joint Stock Company National Settlement Depository (NSD)?

On June 12, 2024, OFAC issued Russia-related general licenses (GLs) GL 99, GL 100, and amended GL 8J, authorizing certain transactions involving MOEX, NCC, NSD, or any entity in which one of these entities owns, directly or indirectly, individually or in the aggregate, a 50 percent or greater interest (collectively, "the Blocked Entities").

**GL 99** authorizes the wind down of transactions involving the Blocked Entities, as well as certain transactions related to the divestment to non-U.S. persons of debt or equity issued or guaranteed by, or derivative contracts involving, the Blocked Entities. For example, GL 99 would authorize a U.S. person to divest their equity in MOEX to a non-blocked non-U.S. person. This authorization expires at 12:01 a.m. eastern daylight time August 13, 2024. See GL 99 for more information.

**GL 100**    authorizes certain transactions for the divestment to non-blocked, non-U.S. persons of debt or equity, or for the conversion of currencies, involving one or more of the Blocked Entities solely as a securities, trade, or settlement depository, central counterparty or clearing house, or public trading market.  GL 100 is intended to cover the divestment of debt or equity of non-blocked companies that may be traded on or through one of the Blocked Entities in their capacity as a securities, trade, or settlement depository, central counterparty or clearing house, or public trading market.  For example, GL 100 would authorize a U.S. person to divest their equity in a non-blocked Russian company that is being traded on MOEX to a non-blocked, non-U.S. person.  This example would be distinct from the divestment of equity in MOEX itself, which would be covered by GL 99.  GL 100 would also authorize U.S. persons to transact with one of the Blocked Entities to the extent ordinarily incident and necessary to convert U.S. dollars to another currency, or vice versa.  This authorization expires at 12:01 a.m. eastern daylight time August 13, 2024. See GL 100 for more information.

**GL 8J**    authorizes certain transactions related to energy involving NCC.  See FAQ 976 for more information.

Released on June 12, 2024

### 1184. What action did Treasury take on June 12, 2024 with regards to prohibiting certain information technology (IT) and software-related services?

In line with G7 efforts to disrupt Russia's defense industry's reliance on western IT systems, on June 12, 2024, Treasury issued a determination that restricts the provision of certain IT and software-related services to Russia.  The determination, "Prohibition on Certain Information Technology and Software Services," issued pursuant to Executive Order (E.O.) 14071    (the "IT and Software Services Determination"), prohibits the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, to any person located in the Russian Federation of:  (1) IT consultancy and design services; and (2) IT support services and cloud-based services for the following categories of software: enterprise management software and design and manufacturing software (collectively, "Covered Software").  The IT and Software Services Determination will take effect at 12:01 a.m. eastern daylight time on September 12, 2024.  See FAQs 1185, 1186, 1187, and 1188 for additional information.

The aim of this action is not to prohibit all activity relating to the provision of IT and software-related services to Russia.  The United States strongly supports the free flow of information and communications globally as facilitated by telecommunications and the internet.  These measures do not prohibit internet

access or the delivery of internet-based communications services. Treasury already has in place General License (GL) 25D , which authorizes certain transactions ordinarily incident and necessary to the receipt or transmission of telecommunications involving the Russian Federation and the provision of certain services incident to the exchange of communications over the internet, subject to certain restrictions. For additional information, see FAQ 1040. Treasury has also amended GL 6D to authorize transactions related to certain agricultural and medical activities involving the provision of information technology and software-related services. Additionally, the importation from any country, or the exportation to any country of any information or informational materials, regardless of format or medium, is generally exempt from the scope of sanctions prohibitions under the International Emergency Economic Powers Act. See 50. U.S.C. § 1702(b)(3).

In addition, the IT and Software Services Determination does not prohibit the following IT and software services, which are excluded from its scope: (1) any service to an entity located in the Russian Federation that is owned or controlled, directly or indirectly, by a United States person; (2) any service in connection with the wind down or divestiture of an entity located in the Russian Federation that is not owned or controlled, directly or indirectly, by a Russian person; and (3) any service for software that would be eligible for a license exception or otherwise authorized for export or reexport to Russia by the Department of Commerce.


Released on June 12, 2024

### 1185. What activities are considered prohibited "information technology (IT) consultancy and design services" under the determination, "Prohibition on Certain Information Technology and Software Services," pursuant to Executive Order (E.O. 14071) (the "IT and Software Services Determination")?

IT consultancy and design services include the development and implementation of software, as well as assistance or advice relating to the development and implementation of software, including the supply and installation of bespoke software. However, the retail sale of off-the-shelf software, falling under United Nations' Central Product Classification (CPC) Code 63252, is not included in the scope of IT consultancy and design services. IT consultancy and design services are distinct from information technology (IT) support services, which fall under United Nations' CPC Code 83132. See FAQ 1187 for more information on how OFAC intends to define "IT consultancy and design services." See FAQ 1186 for a description of prohibited "IT support services" and "cloud-based services" for enterprise management software and design and manufacturing software.

The following are examples of activities that **would be** prohibited by the IT and Software Services Determination if such services were provided to a company located in the Russian Federation that is not owned or controlled directly or indirectly by a U.S. person (Russian company):

- A U.S. company signs a contract with a Russian company to assist the Russian company in upgrading its IT systems. The U.S. consulting company advises on, among other matters, the kinds of software and hardware needed for the Russian company's operations and how best to procure such technology.
- A U.S. company works to modify existing web applications to be functional within a Russian company's internal IT environment.
- A U.S. service provider signs a contract with a Russian company for the design and engineering of bespoke (i.e., custom-made) software that the Russian company uses for internal purposes.
- A U.S. person working at a third country company signs a contract with a Russian company to design the structure of their sales website.

The following are examples of activities that **would not be** prohibited by the IT and Software Services Determination:

- A U.S. service provider provides a Russian company with internet access.
- A U.S. service provider provides a Russian company with internet services. The delivery of internet services includes, for example, Domain Name Services.
- A U.S. company provides Russian individuals and entities with continued access to cloud-based, free-of-charge, publicly available web applications, such as email, spreadsheet, and document applications.
- A U.S. company provides virtual private network (VPN) services to customers in the Russian Federation.

Some of these activities – such as the sale of off-the-shelf software – may be subject to other Federal laws or requirements of other Federal agencies, including export, reexport, and transfer (in-country) license requirements maintained by the Department of Commerce's Bureau of Industry and Security under the Export Administration Regulations, 15 CFR parts 730–774 (EAR).

Released on June 12, 2024

**1186. What activities are considered prohibited "IT support services" and "cloud-based services" for enterprise management software and design and manufacturing software (collectively "Covered Software") under the determination, "Prohibition on Certain Information Technology and**

Office of Foreign Assets Control

Software Services", pursuant to Executive Order (E.O.) 14071 (the "IT and Software Services Determination")?

[The IT and Software Services Determination](#) prohibits the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of both IT support services and cloud-based services for the Covered Software to a person located in the Russian Federation.  IT support services include the provision of technical expertise to solve problems for the client in using software, hardware, or an entire computer system.  Cloud-based services include the supply of software and associated services via the internet or the cloud, including through Software-as-a-Service (SaaS).  See [FAQ 1187](#) for more information on how OFAC intends to define "enterprise management software," "design and manufacturing software," "cloud-based services," and "information technology support services."

The following are examples of activities that **would be** prohibited by the IT and Software Services Determination if such services were provided to a company located in the Russian Federation that is not owned or controlled directly or indirectly by a U.S. person (Russian company):

- A U.S. company sells a cloud-based enterprise resource planning software subscription to a Russian company.
- A U.S. employee of a third country company provides customer support services to a Russian company that is experiencing technical difficulties with its human resources software.
- A U.S. company provides a software patch to a Russian company to fix a bug in its computer-aided design software.

The following are examples of activities that **would not be** prohibited by the [IT and Software Services Determination](#):

- A U.S. company sells a cloud-based electronic health records software subscription to a Russian company.
- A U.S. company provides customer support services to a Russian individual who is experiencing technical difficulties with their publicly available cloud-based spreadsheet web application.
- A U.S. person working at a third country company provides customer support services to a Russian individual who is experiencing technical difficulties with their free-of-charge publicly available teleconferencing application.
- A U.S. company provides IT support services to a Russian individual to a non-covered software application.

The IT and Software Services Determination complements regulations to be issued by the U.S. Department of Commerce Bureau of Industry and Security (BIS)

pertaining to the export, reexport, or transfer (in-country) to the Russian Federation of the following types of software subject to the [Export Administration Regulations, 15 CFR part 730–774 (EAR)](#):  Enterprise resource planning (ERP); customer relationship management (CRM); business intelligence (BI); supply chain management (SCM); enterprise data warehouse (EDW); computerized maintenance management system (CMMS); project management software, product lifecycle management (PLM);  building information modelling (BIM); computer aided design (CAD); computer-aided manufacturing (CAM); and engineering to order (ETO).

See [General License (GL) 25D](#) for more information about certain authorizations for transactions relating to the receipt or transmission of telecommunications involving the Russian Federation and the provision of certain services incident to the exchange of communications over the internet.  See [GL 6D](#) for more information on authorizations for transactions related to certain agricultural and medical activities involving the provision of information technology and software-related services.

As noted in [FAQ 1185](#), some of these activities may be subject to other Federal laws or requirements of other Federal agencies, including export, reexport, and transfer (in-country) licensing requirements maintained by the BIS under the [EAR](#).


Released on June 12, 2024

### 1187. How does OFAC intend to interpret the following terms in the determination, "Prohibition on Certain Information Technology and Software Services," pursuant to Executive Order (E.O.) 14071 (the "IT and Software Services Determination"):  "enterprise management software," "design and manufacturing software," "cloud-based services," "information technology support services," and "information technology consultancy and design services"?

OFAC expects to promulgate regulations that define or interpret these terms as follows:

The term ***enterprise management software*** means the following types of software:  enterprise resource planning (ERP), customer relationship management (CRM), business intelligence (BI), supply chain management (SCM), enterprise data warehouse (EDW), computerized maintenance management system (CMMS), project management, and product lifecycle management (PLM) software.

The term ***design and manufacturing software*** means the following types of software:  building information modelling (BIM), computer aided design (CAD), computer-aided manufacturing (CAM), and engineer to order (ETO) software.

The term **cloud-based services** includes the delivery of software via the internet or over the cloud, including through Software-as-a-Service (SaaS), or SaaS cloud services in relation to such software.

The term **information technology support services** is defined consistent with the United Nations' Central Product Classification (CPC) Code 83132 to include:

   i. providing technical expertise to solve problems for the client in using software, hardware, or an entire computer system, such as: (a) providing customer support in using or troubleshooting the software; (b) upgrading services and the provision of patches and updates; (c) providing customer support in using or troubleshooting the computer hardware, including testing and cleaning on a routine basis and repair of information technology (IT) equipment; (d) technical assistance in moving a client's computer system to a new location; (e) providing customer support in using or troubleshooting the computer hardware and software in combination; and

   ii. providing technical expertise to solve specialized problems for the client in using a computer system, such as: (a) auditing or assessing computer operations without providing advice or other follow-up action including auditing, assessing and documenting a server, network or process for components, capabilities, performance, or security; (b) data recovery services, i.e. retrieving a client's data from a damaged or unstable hard drive or other storage medium, or providing standby computer equipment and duplicate software in a separate location to enable a client to relocate regular staff to resume and maintain routine computerized operations in event of a disaster such as a fire or flood; and (c) other IT technical support services not elsewhere classified.

The term **information technology consultancy and design service**s includes both IT consulting services and IT design and development services for applications, and is defined consistent with United Nations' Central Product Classification (CPC) Codes 83131 and 83141, respectively.

- **IT consultancy services** includes providing advice or expert opinion on technical matters related to the use of information technology, such as: (a) advice on matters such as hardware and software requirements and procurement; (b) systems integration; (c) systems security; and (d) provision of expert testimony on IT related issues.
- **IT design and development services for applications** includes services of designing the structure and/or writing the computer code necessary to create and/or implement a software application, such as: (a) designing the structure of a web page and/or writing the computer code necessary to create and implement a web page; (b) designing the structure and content of

a database and/or writing the computer code necessary to create and implement a database; (c) designing the structure and writing the computer code necessary to design and develop a custom software application; (d) customization and integration, adapting (modifying, configuring, etc.) and installing an existing application so that it is functional within the clients' information system environment.

Released on June 12, 2024

### 1188. Does the determination, "Prohibition on Certain Information Technology and Software Services," pursuant to Executive Order (E.O.) 14071 (the "IT and Software Services Determination") prohibit U.S. persons from providing services to persons located outside of the Russian Federation that are owned or controlled by persons located in the Russian Federation?

No, provided that the provision of services is not an indirect export to a person located in the Russian Federation. For the purposes of the IT and Software Services Determination, OFAC interprets the "indirect" provision of the prohibited services to include when the benefit of the services is ultimately received by a "person located in the Russian Federation."

In contrast, OFAC would not consider to be prohibited the provision of services to a third country company that is located outside of Russia, including such a company owned or controlled by persons located in the Russian Federation, provided that the services will not be further exported or reexported to persons located in the Russian Federation.

For example, the following scenarios describe services that **would be** prohibited under the IT and Software Services Determination:

- A U.S. company designs and delivers proprietary supply chain management software to a third country limited liability company (Company X) on behalf of its Russian parent company, which Company X intends to supply to its parent company.
- A U.S. company designs and delivers proprietary accounting software to a third country software re-seller (Company Y), which Company Y indicates that they intend to supply to a Russian company.
- A U.S. consulting company signs a contract to provide enterprise management software and related information technology support services to Company X. Company X provides access to these services to its Russian parent, such that employees from the Russian parent call the U.S. consulting company when they have problems with their enterprise management software.

The following scenarios illustrate services to a non-Russian subsidiary of a Russian person that **would not be** prohibited under the IT and Software Services Determination:

- A U.S. software company assists a U.S. subsidiary of a Russian company in upgrading the U.S. subsidiary's IT systems, including procuring new software and hardware.  The U.S. subsidiary has an office and employees in the United States and conducts business in the United States, and the services will not be exported or reexported to the Russian parent company.
- A U.S. software company signs a contract with the third-country subsidiary (Company Z) of a Russian company for the delivery via cloud of building information software to Company Z.  This subsidiary has an office and employees in the third country and conducts business in this third country, and the software will not be provided to the Russian parent company.
- A U.S. technology company designs a website for the subsidiary of a Russian company located in a third country. This subsidiary has an office and employees in the third country and conducts business in this third country, and the services will not be reexported to the Russian parent company.


Released on June 12, 2024

### 1189. What additional authorizations did Treasury issue on August 23, 2024 with respect to certain diamonds and diamond jewelry prohibited by Executive Order (E.O.) 14068?

Treasury issued two general licenses (GLs), GL 103 and GL 104, authorizing certain transactions with respect to certain diamonds and diamond jewelry that would otherwise be prohibited by E.O. 14068 in "Prohibitions Related to Imports of Certain Categories of Diamonds" (the "Diamonds Determination    ") and "Prohibitions Related to the Imports of Diamond Jewelry and Unsorted Diamonds of Russian Federation Origin and Diamond Jewelry and Unsorted Diamonds Exported from the Russian Federation" (the "Diamond Jewelry and Unsorted Diamonds Determination    ").

General License 103    authorizes the importation into the United States of diamond jewelry if that jewelry was physically located outside of the Russian Federation before, and not exported or reexported from the Russian Federation since, March 01, 2024. This means that the importation ban issued pursuant to the Diamond Jewelry and Unsorted Diamonds Determination under E.O. 14068 no longer applies to diamond jewelry that was located outside of Russia and not exported or reexported from Russia since March 01, 2024.

General License 104    authorizes through September 01, 2025 the importation into the United States of non-industrial diamonds, substantially transformed into other products outside of the Russian Federation, with a weight of 1.0 carat or greater, if those diamonds were physically located outside of the Russian Federation before, and not exported or reexported from the Russian Federation since, March 01, 2024. GL 104 also authorizes the importation into the United States of non-industrial diamonds, substantially transformed into other products outside of the Russian Federation, with a weight of 0.5 carats or greater if those diamonds were physically located outside of the Russian Federation before, and not exported or reexported from the Russian Federation since, September 01, 2024. This means that, for non-industrial diamonds that meet these parameters, the importation ban issued pursuant to the Diamonds Determination under E.O. 14068 no longer applies.

Released on August 23, 2024

### 1192. What is covered by the exclusions under 3(i) and 3(ii) related to the Export Administration Regulations (EAR) with respect to the IT and Software Services Determination?

The IT and Software Services Determination    includes an exception for services related to software subject to the EAR, where: the export to Russia of such software is authorized or licensed by the Department of Commerce (Commerce); or where such software is not subject to the EAR and where the export of such software would be eligible for a license exception or otherwise authorized by Commerce if it were subject to the EAR. IT consultancy and design services for such software or IT support services and cloud-based services for such software are excluded from the scope of the IT and Software Services Determination.

This means that U.S. persons can continue to provide, for example, IT support services and cloud-based services, including Software-as-a-Service (SaaS), for enterprise management software and design and manufacturing software (collectively, "Covered Software"), if such software is or would be authorized or licensed by Commerce. This exclusion includes providing such IT support and cloud-based services for the Covered Software that is excluded by Commerce from license requirements in 15 CFR 746.8(a)(12), including for exports, reexports, or transfers (in-country) to certain civil end users that are wholly owned subsidiaries, branches, sales offices, or joint ventures of companies headquartered in the United States or countries from Country Group A:5 and A:6 in supplement no. 1 to part 740 of the EAR. See 15 CFR 746.8(a)(12)(ii). Commerce's amended regulations come into effect on September 16, 2024.

For guidance on whether specific software is excluded by Commerce for the purposes of the IT and Software Services Determination, please consult with

Commerce's Bureau of Industry and Security (BIS).

Released on September 12, 2024

**1193. I am a U.S. company with a subsidiary organized and located in Russia. Can I provide the employees or contractors of my Russian subsidiary who are located in Russia with the services prohibited by the Information Technology (IT) and Software Services Determination under the exclusion "(1) any service to an entity located in the Russian Federation that is owned or controlled, directly or indirectly, by a U.S. person?**

Yes, as long as the services provided are within the employees' or contractors' scope of employment for or on behalf of the U.S. subsidiary company located in Russia. For additional information on the IT and Software Determination, see FAQs 1184 - 1188, and FAQ 1192.

Released on September 24, 2024

**1194. I am a U.S. company with a subsidiary located in a third country (other than Russia). My third-country subsidiary has an employee or contractor located in Russia. Can I provide that employee or contractor located in Russia with the services prohibited by the Information Technology (IT) and Software Services Determination under the exclusion "(1) any service to an entity located in the Russian Federation that is owned or controlled, directly or indirectly, by a U.S. person"?**

No. The scope of the exclusion applies only to U.S.-owned or controlled entities located in Russia and their employees and contractors acting within the scope of their employment. See FAQ 1193. A U.S. person may not provide a service prohibited by the IT and Software Services Determination to a person located in Russia who is working as an employee or contractor on behalf of a third-country company. OFAC may issue specific licenses on a case-by-case basis. To apply for a specific license, please go to our Licensing Application Page.

For additional information on the IT and Software Services Determination, see FAQs 1184 - 1188, and FAQ 1192.

Released on September 24, 2024

**1195. A U.S. company located in the United States has an employee or contractor located in Russia working directly for the U.S. company. Can the U.S. company provide that employee or contractor located in Russia with the services prohibited by the Information Technology (IT) and**

**Software Services Determination under the exclusion "(1) any service to an entity located in the Russian Federation that is owned or controlled, directly or indirectly, by a U.S. person"?**

No. The scope of the exclusion applies only to U.S.-owned or controlled entities located in Russia, and their employees and contractors acting within the scope of their employment. See FAQ 1193. A U.S. person may not provide a service prohibited by the IT and Software Services Determination to a person located in Russia who is working directly for a company located in the United States. OFAC may issue specific licenses on a case-by-case basis. To apply for a specific license, please go to our Licensing Application Page.

For additional information on the IT and Software Services Determination, see FAQs 1184 - 1188, and FAQ 1192.

Released on September 24, 2024

### 1197. I'm a U.S. person with securities held at the National Settlement Depository (NSD), which were transferred pursuant to Russian Decree 840 to another Russian registrar. Am I required to block these securities?

Yes. On June 14, 2024, OFAC designated the National Settlement Depository (NSD), along with the Moscow Exchange (MOEX) and the National Clearing Center (NCC) pursuant to E.O. 14024 for operating or having operated in the financial services sector of the Russian Federation economy. As noted in the accompanying press release, Russia has reoriented the architecture of its financial system to facilitate investment into its defense industry and acquisition of goods needed to further its aggression against Ukraine.

Alongside this designation, OFAC issued, and subsequently extended, two general licenses to allow for wind-down of certain transactions involving NSD, MOEX, and NCC, and the divestment of securities held at NSD, among other authorized activities. These general licenses (General License 99A and General License 100A) are in place through 12:01 a.m. eastern daylight time, October 12, 2024. Following the expiration of GLs 99A and 100A, any securities in the possession or control of U.S. persons that are held at NSD should be treated as blocked, and dividends or other income received via NSD should be treated as blocked.

OFAC is aware that the Russian Federation has attempted to take action to evade or avoid OFAC sanctions on NSD via Presidential Decree 840 by requiring the transfer of certain securities to local Russian registrars. OFAC cautions that such transfers may not be authorized under the general licenses and may be considered null and void pursuant to OFAC's regulations (see 31 CFR § 587.202). OFAC understands that these transactions may involve other blocked persons, including

certain local Russian registrars. OFAC is also investigating the remaining non-blocked local Russian registrars for future designation under E.O. 14024.  The general licenses do not authorize transactions involving any blocked person other than those identified in the authorizations, and any transfer made in violation of OFAC sanctions is null and void. As such, U.S. persons should continue to treat these securities as blocked.

Released on October 10, 2024



OFFICE OF
TERRORISM AND
FINANCIAL
INTELLIGENCE

**ADDITIONAL RESOURCES**

Privacy Act

Small Business Contacts

Budget and Performance

TreasuryDirect.gov Securities/Bonds

Freedom of Information Act (FOIA)

No FEAR Act Data

Whistleblower Protection

**HELPFUL OFAC LINKS**

Sign Up For OFAC E-mail Alerts

Contact OFAC

**OTHER GOVERNMENT SITES**

USA.gov

USAJOBS.gov