## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------------------------x
MUSAIB ISMAILOVYCH ISMAILOV and           :
AKHMED HADZHYIOVYCH BILALOV,               :
                                           :
            Plaintiffs,                    :
                                           :
                                           :   Case No: 1:24-cv-03287-AT
      -v-                                  :
                                           :
MYKHAILO SAFARBEKOVYCH                      :
HUTSERIEV, STANISLAV                        :
KOSTIANTYNOVYCH KUZNETSOV, and             :
PUBLIC JOINT STOCK COMPANY                  :
"SBERBANK OF RUSSIA",                       :
                                           :
            Defendants.                    :
-------------------------------------------------------------------x
```

### DECLARATION OF MUSAIB ISMAILOVYCH ISMAILOV
### IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
### AND THE SBERBANK DEFENDANTS' MOTION FOR SANCTIONS

MUSAIB ISMAILOVYCH ISMAILOV, under penalty of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746, declares that the following is true and correct:

1.      My name is Musaib Ismailovych Ismailov, and I am a plaintiff in the above captioned action along with Akhmed Hadzhyiovych Bilalov ("Bilalov"; and together, "Plaintiffs").

2.      Save as otherwise appears, the facts set forth herein are within my personal knowledge or derived from documents in my possession.

3.      I respectfully submit this declaration in support of Plaintiffs' consolidated opposition to: (i) the motion to dismiss of defendants Stanislav Kostiantynovych Kuznetsov ("Kuznetsov") and Public Joint Stock Company "Sberbank of Russia" ("Sberbank"; and together with Kuznetsov, the "Sberbank Defendants"; and as to their motion, ECF 52, the "Sberbank

1

Defendants' Motion to Dismiss"); (ii) the motion to dismiss of defendant Mykhailo Safarbekovych Hutseriev ("Hutseriev"; and collectively with the Sberbank Defendants, "Defendants"; and as to Hutseriev's motion, ECF 79, "Hutseriev Motion to Dismiss"); and (iii) the motion for sanctions of the Sberbank Defendants (ECF 69, "Motion for Sanctions"; and collectively as to all of Defendants' motions, the "Motions").[1]

4.      If called as a witness, I could and would testify to the same as stated herein.

5.      I do not and do not intend to waive any legal advice, litigation, or other privilege by referring to any matters in this declaration.

**Personal Background**

6.      I am over the age of 18 and a Ukrainian citizen and resident. At all relevant times, I have been a businessman in Ukraine and Russia.  I am also a trained Ukrainian lawyer; however, my primary occupation is as a businessman.

7.      I am fluent in both Russian and Ukrainian, and I speak English.

8.      I am not and have never been a Russian citizen.

9.      I currently hold a valid Ukrainian Passport. It is set to expire on December 5, 2029. I have utilized this passport for international travel for personal and professional purposes.

10.      Attached hereto as **Exhibit 1** is a true and correct copy of the photo page of my Ukrainian Passport. Personal identifying information has been redacted upon my lawyers' advice.

---

[1] Capitalized terms not defined herein have the same meanings as ascribed to them in the First Amended Complaint (ECF 18, "FAC").

11.     I previously held a B-1/B-2 visa, issued by the United States Department of State, Bureau of Consular Affairs. As I understand it, this visa is for a combination of tourism and temporary business purposes.

12.     Attached hereto as **Exhibit 2** is a true and correct copy of my United States B-1/B-2 Visa that was issued to me on or about May 28, 2014 and that recently expired in May 2024.

13.     While my United States B-1/B-2 Visa was valid, I traveled to the United States several times, including on a trip to New York in August 2023. While there, I met with and consulted with my attorneys at Seiden Law LLP ("Seiden Law"). During that meeting, I formally engaged Seiden Law to represent me in this action to recognize and enforce the Ukrainian Judgment against Defendants.

**Akhmed Hadzhyiovych Bilalov**

14.     I have known Bilalov for over 25 years.  I first met Bilalov in 1999 when I was a student in Russia and Bilalov was starting his political career in the State Duma of the Russian Federation (the Russian Parliament).

15.     After meeting Bilalov in 1999, Bilalov offered me a job as a lawyer within his organizations. Since then, we have collaborated on various projects together. Over the 25 years that we have worked together, we have rarely memorialized in writing any transaction or business relationship. Our agreements have usually been based on the good faith and trust between us and what would be considered a "handshake" deal.

16.     Based on my personal experience, including my multiple decades of doing business in Russia and Ukraine, most business transactions were not memorialized in writing.  Typically, when transactions are written down, the terms are only listed in a very brief document, usually no longer than one to two pages. In the 2010s and in 2013, this was a standard and common practice.

3

17.     During the time that Bilalov was involved in Russian politics, Bilalov, by virtue of his political role, was not permitted to directly own or be involved in a private business.  As a result, I personally held in trust Bilalov's ownership interest in various companies, and I operated and managed those companies on behalf of Bilalov. In exchange, Bilalov would pay me a fee or would provide me with an ownership interest in the company I was managing. In Russia, this was and remains a common practice.

18.     Put simply, I became Bilalov's junior partner on certain projects.

**OJSC Krasnaya Polyana**

19.     On or about September 5, 2001, OJSC Krasnaya Polyana ("Krasnaya Polyana" or the "Company") was founded to construct and develop a competitive ski resort in and around the Sochi region of Russia.

20.     Upon information and belief, Bilalov personally owned shares in the Company that were held in trust by his brother, Magomed. In exchange for Magomed's management of Bilalov's personally-owned shares in Krasnaya Polyana, Bilalov provided Magomed with an ownership interest in the Company.

21.     In 2006, the Company purchased the ski resort Gornaya Carousel ("Ski Resort") in Sochi, Russia.

22.     On July 4, 2007, the International Olympic Committee announced that Russia would host the 2014 Winter Olympic Games and that those Games would be held at the Ski Resort. As a result of this announcement, the Company became an attractive investment vehicle for private investors and public entities.  Sberbank was one of those investors.

23.     Upon information and belief, as of March 2013, Bilalov and Magomed did not hold a majority or controlling interest in the Company.

4

**Zeeland Development Corp.**

24.    Zeeland Development Corp. ("Zeeland"), a British Virgin Islands corporation, was founded on or about April 17, 2009, by Dragan Perovych.

25.    Between 2009 and March 2012, Zeeland purchased 817 shares in Krasnaya Polyana to become a minority owner of the Company.

26.    Prior to March 2013, Zeeland was a minority owner of the Company, having previously purchased 817 shares in Krasnaya Polyana.  As referenced in Paragraphs 15-18 above, attached hereto as part of **Exhibit 3** is a true and correct copy of Zeeland's Securities Purchase and Sales Agreement dated May 23, 2012, for which a certified English translation has been provided, documenting part of Zeeland's purchase of its 817 shares in the Company.  Pursuant to Zeeland's Securities Purchase and Sales Agreement dated May 23, 2012, Zeeland purchased its shares directly from the Company.  Ex. 3 at 57-61.

27.    Beginning in March 2013, I managed and held in trust Bilalov's ownership interest in Zeeland. Specifically, on March 9, 2013, Bilalov and I agreed that I would hold in trust Bilalov's ownership interest in Zeeland and that I would operate Zeeland. This understanding was memorialized in a fully-executed agreement dated March 9, 2013 ("Partnership Agreement"). Attached hereto as **Exhibit 4** is a true and correct copy of the Partnership Agreement, for which a certified English translation has been provided.  In relevant part, the Partnership Agreement states that:

  a. As of March 2013, Zeeland owned 817 shares in the Company (Ex. 4 at 9);

  b. I would become Trustee of Bilalov's interest in Zeeland (Ex. 4 at 9);

  c. I was required to operate and manage Bilalov's ownership in Zeeland on his behalf (Ex. 4 at 10-11, §3.1);

*Musayib Ismailov*

    d.  In exchange for managing Bilalov's ownership in Zeeland for years, I would receive 15% ownership of Zeeland and/or 15% of the value from the sale of Zeeland's 817 shares in the Company (Ex. 4 at 11, §3.3).

28.  On March 15, 2013, Dragan Perovych transferred his ownership in Zeeland to me.

29.  I had no ownership interest and never managed or held the 1426 shares in the Company held in trust by Magomed.

**The Sales Agreement**

30.  On March 15, 2013, on behalf of Zeeland, I met with Hutseriev at his office in Moscow regarding Zeeland's 817 shares in the Company. The meeting occurred at Hutseriev's office in Moscow, located at Pyatnitskaya Street, 69, Moscow, Russia 115054. In attendance were Hutseriev and myself.

31.  At that meeting, Hutseriev presented me with a pre-drafted version of the Sales Agreement, which Hutseriev had already signed. At this meeting, Zeeland and I were unrepresented by independent counsel. The terms of the Sales Agreement were non-negotiable because Bilalov, Bilalov's family, and I had been threatened with bodily harm.

32.  Upon information and belief, Hutseriev and his team prepared the Sales Agreement in full.  I did not contribute to or negotiate the terms of the Sales Agreement. My name is even misspelled in the original, untranslated Russian version.

33.  During this March 15, 2013 meeting, I signed the Sales Agreement and applied Zeeland's corporate seal to the signed Sales Agreement. Then I left Hutseriev's office.

34.  Shortly thereafter, I went to Magomed's office located at Pyatnitskaya Street, 67/7 c1, Moscow, Russia 115054 because Bilalov used this address to receive mail. While there, a package was left for me. Inside the package was the fully-executed version of the Sales Agreement, which I had signed at Hutseriev's office.

6  *Musayib Ismailov*

35.     The fully-executed Sales Agreement was identical to the Sales Agreement I reviewed and signed at Hutseriev's office in Moscow, Russia on March 15, 2013, but it also contained Kuznetsov's signature and Sberbank's corporate seal.

36.     Attached hereto as **Exhibit 5** is a true and correct copy of the fully-executed Sales Agreement, for which a certified English translation has been provided, that I signed at Hutseriev's office in Moscow, Russia on March 15, 2013, and that was counter-signed by Kuznetsov and Hutseriev.  The Sales Agreement contains the following:

    a.  Hutseriev's signature that was consistent with his signature that was on the version of the Sales Agreement that I had signed at Hutseriev's office in Moscow, Russia on March 15, 2013;

    b.  My signature and Zeeland's corporate seal that I had applied to the Sales Agreement at Hutseriev's office in Moscow, Russia on March 15, 2013; and,

    c.  Kuznetsov's signature and Sberbank's corporate seal.

37.     Pursuant to Paragraph 1 of the Sales Agreement, Zeeland was to sell its 817 shares of the Company to BIN Group, an entity controlled by Hutseriev, in exchange for $200 million. Ex. 5 at ¶1.

38.     Pursuant to Paragraph 2 of the Sales Agreement, BIN Group was required to make payment to Zeeland within 30 days of execution of the Sales Agreement. Ex. 5 at ¶2.

39.     Pursuant to Paragraph 3 of the Sales Agreement, BIN Group was to acquire the shares of the Company from Zeeland on behalf of and for the benefit of Sberbank. Ex. 5 at ¶3.

40.     Pursuant to Paragraph 4 of the Sales Agreement, Sberbank was to provide a $15 billion line of credit to BIN Group in exchange for BIN Group's acquisition of the shares of the Company from Zeeland and upon BIN Group's transfer of those shares to Sberbank. Ex. 5 at ¶4.

41.     Pursuant to the forum selection clause within Paragraph 5 of the Sales Agreement,

7

the parties to the Sales Agreement (Zeeland, BIN Group, Sberbank, and accordingly their third-party beneficiaries) agreed to submit all disputes to any court of the Commonwealth of Independent States ("CIS"). Ex. 5 at ¶5. Ukraine is a CIS member country.

42.    Pursuant to Paragraph 5 of the Sales Agreement, the parties agreed that any dispute arising out of the Sales Agreement would remain valid for 10 years from the date of the Sales Agreement. Ex. 5 at ¶5.

43.    Bilalov, Zeeland, and I fully complied with our obligations under the Sales Agreement, as Zeeland's shares of the Company were transferred to BIN Group and put under Hutseriev's control. After the shares of the Company were transferred to BIN Group, the shares were transferred to Sberbank, as more fully set forth below.

44.    Defendants did not meet their obligations under the Sales Agreement; BIN Group, Hutseriev, and Sberbank all failed to pay Bilalov, Zeeland, and me for the sale of the Krasnaya Polyana shares. At no time after the execution of the Sales Agreement did Ismailov, Zeeland, or I receive payment for the sale of the shares in the Company.

**Sberbank's Ownership And Possession Of Zeeland's Shares In The Company**

45.    After the execution of the Sales Agreement and Zeeland's transferring its shares in the Company to BIN Group and Hutseriev, Sberbank became Krasnaya Polyana's majority owner. Several news outlets reported on Sberbank's majority ownership. Attached hereto as **Exhibit 6** is a true and correct copy of the English version of a blackseanews.net article "Sberbank to buy out almost 95% of Krasnaya Polyana shares," published on June 6, 2013. Exhibit 6 sets forth that Sberbank owned 50.03% of the Company and that Hutseriev owned another 42% that would also be sold or transferred to Sberbank.

46.    Attached hereto as **Exhibit 7** are true and correct excerpts of an audit report of

8    *Musayib Ismailov*

Sberbank conducted by Ernst & Young and dated September 30, 2013, for which a certified English translation has been provided. Exhibit 7 sets forth that as of September 30, 2013, Sberbank was the 50.03% owner of the Company. Ex. 7 at 8-10.

47.    Attached hereto as **Exhibit 8** are true and correct excerpts from Sberbank's March 18, 2013 Independent Audit report, conducted by Ernst & Young, for which a certified translation has been provided. Ex. 8 at 9-13. Exhibit 8 sets forth that, as of January 1, 2013, the Company was accounted for on Sberbank's list of its official assets and liabilities and that Sberbank held a 50.03% ownership interest. Ex. 8 at 14. Exhibit 8 also contains excerpts from Sberbank's March 24, 2014 Independent Audit report, conducted by Ernst & Young, for which a certified translation has been provided. Ex. 8 at 15-17. The relevant portions of Sberbank's March 24, 2014 Independent Audit report sets forth that, by December 31, 2013, Sberbank's ownership interest in the Company increased from 50.03% to 92.1% on account of Sberbank's taking possession of the 817 shares in Krasnaya Polyana that Bilalov and I beneficially owned through Zeeland. Ex. 8 at 17.

48.    Attached hereto as **Exhibit 9** are true and correct excerpts from Sberbank's June 2016 Interim Condensed Consolidated Financial Statements and Review Report, in its original form in Russian and for which a certified English translation has been provided. Exhibit 9 sets forth that Sberbank reported Krasnaya Polyana as an asset on its balance sheet until May 2016, at which point Sberbank sold 96.914% of the Company, recognizing a gain of 12.2 billion rubles. Ex. 9 at 14.

**The Ukrainian Action**

49.    After the execution of the Sales Agreement and Zeeland's transfer of its shares in the Company, Bilalov and his family left Russia in fear for their lives. Once Bilalov and his family

9  *Musayib Ismailov*

moved to the United States, and only after Bilalov felt he and his family were safe, we began discussing a possible lawsuit to enforce our rights under the Sales Agreement.

50.     Because I am a Ukrainian citizen residing in Ukraine and because of the provision of the Sales Agreement by which a suit arising under the Sales Agreement could proceed in a court of a CIS country, we decided to pursue a lawsuit in Ukraine. Bilalov and I retained the Ukrainian lawyers Maksym Vaslovych Kucheruk and Valerii Leonidovych Sokolovskyi to commence a lawsuit in Ukraine to enforce our rights under the Sales Agreement.

51.     On March 2, 2023, Bilalov and I commenced a lawsuit before the Skvyra District Court of Kyiv Region ("Ukrainian Court") bearing the case number 376/560/23 ("Ukrainian Action") by filing a Statement of Claim.

52.     A true and correct copy of the March 2, 2023, resolution of the Ukrainian Court confirming the commencement of the Ukrainian Action is annexed hereto as **Exhibit 10** (as translated by web-browser Chrome and downloaded from web address: https://reyestr.court.gov.ua/Review/109441891).

53.     On or about March 23, 2023, the Ukrainian Court sent an email from the Ukrainian Court's official email address, "inbox@sk.ko.court.gov.ua," attaching the Statement of Claim (the Ukrainian Action's initiating document) and summons to appear in court, to the last known email addresses of Defendants. The email notification from the Ukrainian Court advised Defendants of their obligation to appear for a hearing scheduled to be held on May 11, 2023.  A true and correct copy of the Ukrainian Court's March 23, 2023 email notification is annexed hereto as **Exhibit 11**, for which a certified English translation has been provided.

54.     According to the Ukrainian Court's email, transmission to Husteriev and Kuznetsov was successful.  Ex. 11 at 4-6; 20.

10

55.    In addition to the Ukrainian Court's email notification, the Ukrainian Court also notified Defendants of the Ukrainian Action by publication on the official website of the judiciary of Ukraine at least ten days before any hearing in the Ukrainian Action.

56.    Out of an abundance of caution and to ensure that Sberbank could not credibly deny that it was provided with actual notice of the Ukrainian Action, I sent copies of the Ukrainian Action's initiating documents via personal channels in Moldova to Moscow to be mailed to Sberbank directly from Moscow.  On or about March 9, 2023, from a post office in Moscow, the Statement of Claim and the Ukrainian Court's Order to Initiate Proceedings dated March 2, 2023, was mailed to Sberbank at its corporate address, 19 Vavilova Street, Moscow 117312, Russia.[2]

57.    Annexed hereto as **Exhibit 12** is a true correct copy of a mailing inventory and receipt from a Russian post office located at 26 Myansnitskaya Street, 101000 Moscow, Russia, confirming that Sberbank was mailed my and Bilalov's Statement of Claim and the Ukrainian Court's Order to Initiate Proceedings dated March 2, 2023. A certified English translation of these documents has been provided.

58.    Defendants failed to appear before the Ukrainian Court. Likewise, no attorney appeared on their behalf.

59.    On or about May 25, 2023, the Ukrainian Court entered a default judgment against the Defendants ("Ukrainian Judgment"). A true and correct copy of the Ukrainian Judgment is annexed hereto as **Exhibit 13**, for which a certified English translation has been provided.

60.    Under the Ukrainian Judgment, Defendants are jointly and severally liable to me for $30 million. Ex. 13 at 30. Defendants are also jointly and severally liable to Bilalov for $170 million. Ex. 13 at 30.

---

[2] http://www.sberbank.ru/en/individualclients/bankdetails. *See also* Ex. 13 at 31.

61.     To date, Defendants have not paid or otherwise satisfied their judgment debt under Ukrainian Judgment.

**The Prior "*Bilalov*" Action Did Not Involve My Interests**

62.     Separate from the 817 shares in Krasnaya Polyana that were owned by Zeeland, upon information and belief, Bilalov personally owned (through Magomed) another 1426 shares in the Company, as set forth above. These 1426 shares were separate and distinct from the 817 shares in the Company that Zeeland owned.  These 817 shares owned by Zeeland were never directly owned by Bilalov or Magomed.

63.     I never owned, possessed, managed, or otherwise controlled any of the 1426 shares held in trust by Magomed on Bilalov's behalf. I did not have any ownership interest in these 1426 shares.

64.     Besides this present action, I was not involved in Bilalov's decision to bring any other lawsuit in New York seeking damages in connection with the shares in the Company that Bilalov personally owned that were taken from him.  For that reason, I was not involved in and played no role whatsoever in *Bilalov v. Gref et al.*, 1:20-cv-09153 (AT) (S.D.N.Y.).

12       *Musayib Ismailov*

I, MUSAIB ISMAILOVYCH ISMAILOV, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on:＿＿＿11/18/2024＿＿＿     ＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿
                                         MUSAIB ISMAILOVYCH ISMAILOV

13

 **Rapid Translate**

RapidTranslate.org
support@rapidtranslate.org
(844) 473-7832

*ata*

Member # 274316

## CERTIFICATION OF TRANSLATION ACCURACY

We, RapidTranslate, a professional translation services company with a corporate membership to the American Translators Association, hereby certify that a qualified, experienced, and competent professional translator has translated the provided original document to the best of the translator's abilities. In our best judgment, the translated documents and text therein are a true and accurate translation, which reflect the original content, meaning, and style of the originally provided document(s). RapidTranslate has no relation to the client or original owner of the provided documents.

This is to certify the correctness of the translation only. RapidTranslate makes no claims, representation, guarantees, or warranties concerning the authenticity of the original document translated. Further, RapidTranslate disclaims any and all liability for the manner in which the translation is used by the customer or any third party, including end-users of the translation.

A copy of the translation is attached to this certification.

Sincerely,
Authorized Representative
RapidTranslate.org

390 NE 191st St #8058
Miami, Florida 33179

State of: Florida

County of: Miami-Dade

Subscribed and sworn to (or affirmed) before me on November 18, 2024

Notary Public:

CARLA ZENSEN
Notary Public - State of Florida
Commission # HH 50970
My Comm. Expires May 2, 2028
Bonded through National Notary Assn.

 RapidTranslate.org
support@rapidtranslate.org
(844) 473-7832

 Member # 274316

## CERTIFICATION BY TRANSLATOR

I, Aleksei Timashkov, certify that I am competent to translate in the English and Russian languages and that the above/attached document is a complete and accurate translation of the above/attached document.

This document has not been translated for a family member, friend, or business associate.

Name: Aleksei Timashkov

RapidTranslate.org
390 NE 191st St #8058
Miami, FL 33179



[Перевод с английского языка]

# ФЕДЕРАЛЬНЫЙ ОКРУЖНОЙ СУД
# ЮЖНОГО ОКРУГА НЬЮ-ЙОРКА

| | |
|---|---|
| Истцы:<br>МУСАИБ ИСМАИЛОВИЧ ИСМАИЛОВ и<br>АХМЕД ГАДЖИЕВИЧ БИЛАЛОВ,<br><br>Ответчики:<br>МИХАИЛ САФАРБЕКОВИЧ ГУЦЕРИЕВ,<br>СТАНИСЛАВ КОНСТАНТИНОВИЧ<br>КУЗНЕЦОВ и ПУБЛИЧНОЕ<br>АКЦИОНЕРНОЕ ОБЩЕСТВО "СБЕРБАНК<br>РОССИИ" | Дело №: 1:24-cv-03287-AT |

### ВОЗРАЖЕНИЕ МУСАИБА ИСМАИЛОВИЧА ИСМАИЛОВА НА ХОДАТАЙСТВА ОТВЕТЧИКОВ О ПРЕКРАЩЕНИИ ДЕЛА И ХОДАТАЙСТВО ОТВЕТЧИКОВ СО СТОРОНЫ «СБЕРБАНКА» О ВОЗМЕЩЕНИИ СУДЕБНЫХ ИЗДЕРЖЕК

Я, МУСАИБ ИСМАИЛОВИЧ ИСМАИЛОВ, под страхом наказания за дачу ложных показаний в соответствии с законами Соединенных Штатов Америки, согласно §1746 Раздела 28 Кодекса Соединённых Штатов Америки, заявляю, что следующая информация соответствует действительности и является точной:

1. Меня зовут Мусаиб Исмаилович Исмаилов, я являюсь истцом по делу, указанному выше, наряду с Ахмедом Гаджиевичем Билаловым (далее "Билалов"; вместе именуемые "Истцы").

2. За исключением случаев, специально оговоренных, факты, изложенные в данном документе, основаны на моих личных знаниях или документах, находящихся в моем распоряжении.

3. Я выступаю с данным возражением в рамках общего возражения Истцов на:

(i) ходатайство о прекращении дела, которое представили Станислав Константинович Кузнецов («Кузнецов») и Публичное Акционерное Общество «Сбербанк России» («Сбербанк»; вместе именуемые «Ответчики со стороны "Сбербанка"»; их ходатайство ECF 52

1     [Подпись]

именуется «Ходатайство ответчиков со стороны "Сбербанка" о прекращении дела»);

(ii) ходатайство о прекращении дела, которое представил Михаил Сафарбекович Гуцериев («Гуцериев»; вместе с «Ответчиками со стороны "Сбербанка"» именуемые «Ответчики»; его ходатайство, ECF 79, именуется «Ходатайство Гуцериева о прекращении дела»); и

(iii) ходатайство ответчиков со стороны «Сбербанка» о возмещении судебных издержек (ECF 69, «Ходатайство о возмещении судебных издержек»; вместе с другими ходатайствами Ответчиков именуемые «Ходатайства»)[1].

4. Если от меня потребуют выступить под присягой, я смогу подтвердить изложенные здесь факты.

5. Я не отказываюсь и не намерен отказываться от права на юридическую консультацию, судебную тайну или иные привилегии, ссылаясь на вопросы, затронутые в настоящем Возражении.

## **Личные данные**

6. Я старше 18 лет, являюсь гражданином и резидентом Украины. В моменты времени, имеющие отношение к делу, я вел бизнес в Украине и России. Я также являюсь дипломированным юристом в Украине, однако основной род моих занятий – бизнес.

7. Я свободно владею русским и украинским языками, а также говорю по-английски.

8. Я не являюсь и никогда не был гражданином России.

9. У меня есть действующий украинский паспорт, срок действия которого истекает в декабре 2029 года. Я использую этот паспорт для личных и деловых поездок за границу.

10. К настоящему документу Приложением 1является верная и точная копия страницы моего украинского паспорта с фотографией. Личная информация скрыта по рекомендации моих адвокатов.

---

[1] Термины, приведенные с заглавной буквы и не получившие определения в настоящем документе, имеют те же значения, что и в тексте Первого дополненного искового заявления (ECF 18, "FAC").

[Перевод с английского языка]

11. Ранее у меня была виза категории В-1/В-2, выданная Бюро консульских дел Государственного департамента США. По моему пониманию, эта виза разрешает въезд на территорию США с туристическими целями и для совершения краткосрочных деловых поездок.

12. К настоящему документу Приложением 2 является верная и точная копия моей визы США категории В-1/В-2, выданной мне ориентировочно 28 мая 2014 года и недавно истекшей (в мае 2024 года).

13. В период действия моей визы категории В-1/В-2, я несколько раз посещал США, в том числе, посещал Нью-Йорк в августе 2023 года. Во время той поездки я встретился и проконсультировался с моими адвокатами из Seiden Law LLP («Seiden Law»). В ходе нашей встречи я заключил договор с «Seiden Law» на представление моих интересов в данном деле с целью признания и исполнения решения украинского суда против Ответчиков.

**Ахмед Гаджиевич Билалов**

14. Я знаком с Билаловым более 25 лет. Впервые я встретил Билалова в 1999 году, когда я учился в России, а Билалов начинал свою политическую карьеру в Государственной Думе Российской Федерации (парламент Российской Федерации).

15. После нашего знакомства в 1999 году Билалов предложил мне работу юриста в своих организациях. С тех пор мы сотрудничаем в рамках различных проектов. На протяжении 25 лет нашей совместной работы мы редко оформляли какую-либо сделку или деловые отношения в письменной форме. Наши соглашения обычно основывались на добросовестности и взаимном доверии, и на том, что можно назвать «джентльменским соглашением».

16. Исходя из моего личного опыта, в том числе, и насчитывающего десятки лет опыта ведения бизнеса в России и Украине, большинство деловых операций не оформлялись в письменной форме. Как правило, если сделки и фиксировались письменно, их условия излагались в очень сжатом документе, обычно не превышавшем по объему одну-две страницы. В 2010-х годах, в целом, и в 2013 году, в частности, это было стандартной и обычной практикой.

[Перевод с английского языка]

17. В период, когда Билалов вел политическую деятельность в России, он, в силу своего статуса как профессионального политика, не имел права напрямую владеть частным бизнесом или участвовать в его управлении. По этой причине я лично держал в доверительном управлении долю собственности Билалова в различных компаниях и управлял этими компаниями от его имени. Взамен Билалов выплачивал мне вознаграждение или предоставлял долю в компании, которой я управлял. В России это было и остается распространенной практикой.

18. Иными словами, я стал младшим партнером Билалова в определенных проектах.

## ОАО "Красная Поляна"

19. Ориентировочно 5 сентября 2001 года было основано ОАО "Красная Поляна" ("Красная Поляна" или "Компания") для строительства и развития конкурентоспособного горнолыжного курорта в районе г. Сочи, Россия.

20. По имеющимся сведениям и убеждениям, Билалов лично владел акциями Компании, которые находились в доверительном управлении его брата, Магомеда. В обмен на услугу Магомеда по управлению акциями, принадлежащими Билалову в "Красной Поляне", Билалов предоставил Магомеду долю собственности в Компании.

21. В 2006 году Компания приобрела горнолыжный курорт "Горная Карусель" ("Горнолыжный курорт") в г. Сочи, Россия.

22. 4 июля 2007 года Международный олимпийский комитет объявил, что Россия примет зимние Олимпийские игры 2014 года и что эти игры будут проходить на Горнолыжном курорте. В результате этого объявления Компания стала привлекательной для частных инвесторов и государственных организаций с инвестиционной точки зрения. "Сбербанк" был в ряду таких инвесторов.

23. По имеющимся сведениям и убеждениям, по состоянию на март 2013 года Билалов и Магомед не владели контрольным пакетом акций Компании.

## Зиланд Девелопмент Корп. (Zeeland Development Corp.)

24. Зиланд Девелопмент Корп. (Zeeland Development Corp., "Zeeland»), зарегистрированная на Британских Виргинских островах, была основана ориентировочно 17 апреля 2009 года Драганом Перовичем.

25. В период с 2009 года по март 2012 года «Zeeland» приобрела 817 акций в «Красной Поляне», став неосновным владельцем Компании.

26. До марта 2013 года «Zeeland» была неосновным владельцем Компании, ранее приобретя 817 акций в "Красной Поляне". В соответствии со сказанным в пунктах 15-18, Приложение 3 к настоящему документу представляет собой верную и точную копию Договора купли-продажи ценных бумаг «Zeeland» от 23 мая 2012 года и сопровождается сертифицированным переводом на английский язык, в котором задокументирована часть покупки «Zeeland» ее 817 акций в Компании. Согласно Договору купли-продажи ценных бумаг «Zeeland» от 23 мая 2012 года, «Zeeland» приобрела свои акции непосредственно у Компании. Приложение. 3, с. 57-61.

27. Начиная с марта 2013 года, я осуществлял доверительное и оперативное управление долей Билалова в «Zeeland». Точнее, 9 марта 2013 года Билалов и я договорились, что я буду держать в доверительном управлении долю Билалова в «Zeeland» и управлять «Zeeland». Это соглашение было зафиксировано в письменном виде 9 марта 2013 («Партнерское соглашение»). К настоящему документу Приложением 4 является верная и точная копия Партнерского соглашения с сертифицированным переводом на английский язык. В соответствующей части Партнерского соглашения указано, что:

> a. По состоянию на март 2013 года «Zeeland» владела 817 акциями Компании (Приложение 4, стр. 9);
> b. Я становился доверительным управляющим доли Билалова в «Zeeland» (Приложение 4, стр. 9);
> c. Я обязан был осуществлять доверительное и оперативное управление долей Билалова в «Zeeland» от его имени (Приложение 4, стр. 10-11, §3.1);

[Перевод с английского языка]

d. В обмен на управление долей Билалова в «Zeeland» на протяжении нескольких лет я должен был получить 15% доли в «Zeeland» и/или 15% стоимости от продажи 817 акций «Zeeland» в Компании (Приложение 4, стр. ,11, §3.3).

28. 15 марта 2013 года Драган Перович передал свою долю в «Zeeland» мне.

29. Я не имел доли и никогда не управлял 1426 акциями в Компании, которые находились в доверительном управлении у Магомеда.

**Договор купли-продажи**

30. 15 марта 2013 года от имени «Zeeland» я встретился с Гуцериевым в его офисе в Москве по поводу 817 акций Компании, принадлежавших «Zeeland». Встреча проходила в офисе Гуцериева, расположенном по адресу: Россия, 115054, г. Москва, Пятницкая ул., 69. На встрече присутствовали Гуцериев и я.

31. На этой встрече Гуцериев представил мне предварительно подготовленную версию Договора купли-продажи, который он уже подписал. На этой встрече со стороны «Zeeland» и моей не присутствовал независимый консультант. Условия Договора купли-продажи не подлежали обсуждению, так как Билалову, его семье и мне угрожали причинением телесных повреждений.

32. По имеющимся сведениям и убеждениям, текст Договора купли-продажи был полностью подготовлен Гуцериевым и его командой. Я не участвовал в подготовке или обсуждении условий Договора. Мое имя даже написано с ошибкой в оригинальной русской версии, не переведенной на английский язык.

33. На этой встрече, состоявшейся 15 марта 2013 года, я подписал Договор купли-продажи и поставил печать компании «Zeeland» на подписанный документ. Затем я ушел из офиса Гуцериева.

34. Вскоре после этого я отправился в офис Магомеда, расположенный по адресу Россия, 115054, г. Москва, Пятницкая ул., 67/7, так как Билалов использовал этот адрес для получения почты. Там для меня оставили пакет. Внутри пакета находился полностью подписанный экземпляр Договора купли-продажи, подписанный мной в офисе Гуцериева.

35. Полностью оформленный Договор купли-продажи был идентичен тому, с которым я ознакомился и который подписал в офисе Гуцериева в Москве, Россия, 15 марта 2013 года, но он также содержал подпись Кузнецова и был скреплен печатью «Сбербанка».

36. К настоящему документу Приложением 5 является верная и точная копия полностью оформленного Договора купли-продажи, сопровожденная сертифицированным переводом на английский язык. Этот договор я подписал в офисе Гуцериева в Москве, Россия, 15 марта 2013 года, и он был дополнительно подписан Кузнецовым и Гуцериевым. Договор купли-продажи включает в себя следующее:
> a. Подпись Гуцериева, совпадающую с подписью на версии Договора купли-продажи, которую я подписал в офисе Гуцериева в Москве, Россия, 15 марта 2013 года;
> b. Мою подпись и печать «Zeeland», которые я поставил на Договоре в офисе Гуцериева в Москве, Россия, 15 марта 2013 года;
> c. Подпись Кузнецова и печать «Сбербанка».

37. Согласно пункту 1 Договора купли-продажи, "Zeeland» должна была продать свои 817 акций Компании «Группе "БИН"» – организации под контролем Гуцериева - за 200 миллионов долларов США. Приложение 5, п. 1.

38. Согласно пункту 2 Договора купли-продажи, «Группа "БИН"» обязана была произвести оплату «Zeeland» в течение 30 дней с момента заключения договора. Приложение 5, п. 2.

39. Согласно пункту 3 Договора купли-продажи, «Группа "БИН"» должна была приобрести акции Компании у «Zeeland» от имени и в интересах «Сбербанка». Приложение 5, п. 3.

40. Согласно пункту 4 Договора купли-продажи, «Сбербанк» обязался предоставить «Группе "БИН"» кредитную линию на 15 миллиардов долларов США в обмен на приобретение «Группой "БИН"» акций Компании у «Zeeland» и их последующую передачу «Сбербанку». Приложение 5, п. 4.

41. Согласно пункту 5 Договора купли-продажи,

стороны договора («Zeeland», «Группа "БИН"», «Сбербанк», а также их третьи бенефициары) согласились разрешать все споры в любом суде Содружества Независимых Государств («СНГ»). Приложение 5, п. 5. Украина является членом СНГ.

42. Согласно пункту 5 Договора купли-продажи, стороны договорились, что любые разногласия, возникающие в связи с Договором купли-продажи, подлежат урегулированию в срок 10 лет с даты заключения Договора купли-продажи. Приложение 5, п. 5.

43. Билалов, «Zeeland» и я полностью выполнили свои обязательства по Договору купли-продажи, поскольку акции Компании, принадлежавшие «Zeeland», были переданы «Группе "БИН"» и оказались под контролем Гуцериева. После передачи акций Компании «Группе "БИН"», они были переданы «Сбербанку», как это подробно изложено ниже.

44. Ответчики не выполнили своих обязательств по Договору купли-продажи; «Группа "БИН"», Гуцериев и «Сбербанк» не выплатили Билалову, «Zeeland» и мне деньги за продажу акций «Красной Поляны». С момента подписания Договора купли-продажи ни Билалов, ни «Zeeland», ни я не получили оплату за продажу акций Компании.

## **Владение и распоряжение "Сбербанком" акциями Компании, принадлежащими "Zeeland"**

45. После заключения Договора купли-продажи и передачи «Zeeland» своих акций Компании «Группе "БИН"» и Гуцериеву, «Сбербанк» стал основным собственником «Красной Поляны». Несколько информационных агентств сообщили о наличии контрольного пакета акций у «Сбербанка». К настоящему документу Приложением 6 является верная и точная копия статьи с сайта blackseanews.net на английском языке, «"Сбербанк" выкупает почти 95% акций "Красной Поляне"», дата публикации 6 июня 2013 года. В Приложении 6 указано, что «Сбербанку» принадлежало 50,03% Компании, а Гуцериеву – еще 42%, и они тоже должны были быть проданы или переданы «Сбербанку».

46. К настоящему документу Приложением 7 являются верные и точные выдержки из аудиторского отчета

«Сбербанка», проведенного «Ernst & Young» и датированного 30 сентября 2013 года, сопровожденные сертифицированным переводом на английский язык. Согласно Приложению 7, по состоянию на 30 сентября 2013 года «Сбербанк» владел 50,03% Компании. Приложение 7, стр. 8-10.

47. К настоящему документу Приложением 8 являются верные и точные выдержки из независимого аудиторского отчета «Сбербанка» от 18 марта 2013 года, подготовленного «Ernst & Young», сопровожденные сертифицированным переводом на английский язык. Приложение 8, стр. 9-13. В Приложении 8 указано, что по состоянию на 1 января 2013 года Компания учитывалась в списке официальных активов и обязательств «Сбербанка», и «Сбербанк» владел 50,03% акций. Приложение 8, стр. 14. Приложение 8 также содержит выдержки из независимого аудиторского отчета «Сбербанка» от 24 марта 2014 года, подготовленного «Ernst & Young», сопровожденные сертифицированным переводом на английский язык. Приложение 8, стр. 15-17. Соответствующие выдержки из независимого аудиторского отчета «Сбербанка» от 24 марта 2014 года показывают, что к 31 декабря 2013 года доля владения «Сбербанком» в Компании увеличилась с 50,03% до 92,1% в результате приобретения «Сбербанком» 817 акций компании «Красная Поляна», бенефициарными владельцами которых через компанию «Zeeland» являлись Билалов и я. Приложение 8, стр. 17.

48. К настоящему документу Приложением 9 являются верные и точные выдержки из промежуточной консолидированной финансовой отчетности и отчета по результатам обзорной проверки «Сбербанка» за июнь 2016 года, составленных изначально на русском языке и сопровожденных сертифицированным переводом на английский язык. В Приложении 9 говорится, что «Сбербанк» указал «Красную Поляну» в качестве актива на своем балансе до мая 2016 года, после чего «Сбербанк» продал 96,914% Компании, получив прибыль в размере 12,2 миллиарда рублей. Приложение 9, стр. 14.

Украинское производство

49. После подписания Договора купли-продажи и передачи «Zeeland» своих акций Компании Билалов и его семья уехали из России из-за опасений за свою жизнь. После переезда Билалова и его семьи

[Перевод с английского языка]

в Соединенные Штаты Америки, когда Билалов наконец почувствовал, что он и его семья находятся в безопасности, мы начали обсуждать возможность подачи иска для защиты наших прав по Договору купли-продажи.

50. Поскольку я являюсь гражданином Украины и проживаю в Украине, а также учитывая положение Договора купли-продажи, согласно которому иск, вытекающий из данного Договора, может быть рассмотрен судом страны СНГ, мы решили подать иск в Украине. Билалов и я наняли украинских адвокатов Максима Васильевича Кучерука и Валерия Леонидовича Соколовского, чтобы инициировать судебное разбирательство в Украине для защиты наших прав по Договору купли-продажи.

51. 2 марта 2023 года Билалов и я обратились в Сквирский районный суд Киевской области ("Украинский суд"), где было открыто производство за номером 376/560/23 ("Украинский иск") на основании нашего искового заявления.

52. К настоящему документу Приложением 10 является верная и точная копия постановления Украинского суда от 2 марта 2023 года о начале производства по Украинскому иску (это постановление доступно по адресу https://reyestr.court.gov.ua/Review/109441891, а перевод этого постановления на английский язык выполнен средствами веб-браузера Chrome).

53. Ориентировочно 23 марта 2023 года Украинский суд направил на последние известные электронные адреса Ответчиков электронное письмо с официального адреса электронной почты Украинского суда «inbox@sk.ko.court.gov.ua», приложив исковое заявление (документ, на основании которого начато производство по Украинскому иску) и повестку о явке в суд. В электронном уведомлении Украинский суд проинформировал Ответчиков об их обязанности явиться на слушание, назначенное на 11 мая 2023 года. К настоящему документу Приложением 11 является верная и точная копия электронного уведомления Украинского суда от 23 марта 2023 года, сопровожденная сертифицированным переводом на английский язык.

54. Украинский суд также засвидетельствовал электронным письмом факт успешной передачи сообщений Гуцериеву и Кузнецову. Приложение 11, стр. 4-6; 20.

55. В дополнение к электронному уведомлению Украинский суд также уведомил Ответчиков об Украинском иске посредством размещения информации на официальном веб-сайте судебной системы Украины, как минимум за десять дней до начала слушаний по Украинскому иску.

56. Из предосторожности и для того, чтобы «Сбербанк» не имел оснований отрицать, что он был уведомлен об Украинском иске, я отправил копии документов о начале производства по Украинскому иску по личным каналам в Молдове в Москву для последующей отправки «Сбербанку» по почте непосредственно из Москвы. Ориентировочно 9 марта 2023 года из почтового отделения в Москве были отправлены исковое заявление и постановление Украинского суда о начале производства от 2 марта 2023 года на юридический адрес «Сбербанка»: Россия, 117312, г. Москва, ул. Вавилова, 19.[2]

57. К настоящему документу Приложением 12 является верная и точная копия описи отправления и квитанции из российского почтового отделения, расположенного по адресу Россия, 101000, г. Москва, Мясницкая ул., 26, подтверждающая отправку "Сбербанку" моего с Билаловым искового заявления и постановления Украинского суда о начале производства от 2 марта 2023 года. Сертифицированный перевод этих документов прилагается.

58. Ответчики не явились в Украинский суд. Также на слушания не явились представлявшие их интересы адвокаты.

59. Ориентировочно 25 мая 2023 года Украинский суд вынес заочное решение против стороны Ответчиков («Украинское решение»). К настоящему документу Приложением 13 является верная и точная копия Украинского решения, сопровожденная сертифицированным переводом на английский язык.

60. Согласно Украинскому решению, Ответчики несут солидарную ответственность передо мной на сумму 30 миллионов долларов США. Приложение 13, стр. 30. Ответчики также несут солидарную ответственность перед Билаловым на сумму 170 миллионов долларов США. Приложение 13, стр. 30.

---

[2] http://www.sberbank.ru/en/individualclients/bankdetails. См. также Приложение 13, стр. 31.

[Перевод с английского языка]

61. На сегодняшний день Ответчики не выплатили и не погасили каким-либо иным способом задолженность по Украинскому решению.

### Предыдущее дело Билалова не затрагивало моих интересов

62. Отдельно от 817 акций в "Красной Поляне", которыми владела "Zeeland», по имеющимся сведениям и убеждениям, Билалов лично владел (через Магомеда) еще 1426 акциями Компании, как указано выше. Эти 1426 акций были отдельными и отличными от 817 акций Компании, принадлежавших «Zeeland». 817 акций, принадлежавших «Zeeland», никогда не принадлежали напрямую Билалову или Магомеду.

63. Я никогда не владел, не распоряжался, не управлял иным образом 1426 акциями, находившимися в доверительном управлении у Магомеда от имени Билалова. У меня не было права собственности на эти 1426 акций.

64. Помимо настоящего иска, я не участвовал в решении Билалова подать какой-либо другой иск в Нью-Йорке с требованием компенсации в связи с акциями Компании, которыми Билалов лично владел, но которые у него отняли. По этой причине я не участвовал и не играл никакой роли в деле Билалова против Грефа и др. за № 1:20-cv-09153 (AT), слушавшемся в Федеральном Окружном суде Южного округа Нью-Йорка.

[Перевод с английского языка]

Я, МУСАИБ ИСМАИЛОВИЧ ИСМАИЛОВ, заявляю под страхом наказания за дачу ложных показаний в соответствии с законами Соединенных Штатов Америки, что все вышеизложенное является верным и точным.

Составлено:  18.11.2024 года          [Подпись]
                              МУСАИБ ИСМАИЛОВИЧ ИСМАИЛОВ

13