UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------x
MUSAIB ISMAILOVYCH ISMAILOV and : 
AKHMED HADZHYIOVYCH BILALOV, :
: 
          Plaintiffs, :
:
: Case No: 1:24-cv-03287-AT
          -v- :
:
MYKHAILO SAFARBEKOVYCH :
HUTSERIEV, STANISLAV :
KOSTIANTYNOVYCH KUZNETSOV, and :
PUBLIC JOINT STOCK COMPANY :
"SBERBANK OF RUSSIA", :
:
          Defendants. :
---------------------------------------------------------------------x

**DECLARATION OF AKHMED HADZHYIOVYCH BILALOV
IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
AND THE SBERBANK DEFENDANTS' MOTION FOR SANCTIONS**

      I, AKHMED HADZHYIOVYCH BILALOV, declare under penalty of perjury pursuant to 28 U.S.C. § 1746, that the following is true and correct:

      1.    My name is Akhmed Hadzhyiovych Bilalov, and I am a plaintiff in the above captioned action along with Musaib Ismailovych Ismailov ("Ismailov"; collectively, "Plaintiffs"). Save as otherwise appears, the facts set forth herein are within my personal knowledge or derived from documents in my possession.

      2.    I respectfully submit this declaration in support of Plaintiffs' consolidated opposition to: (i) the motion to dismiss of defendants Stanislav Kostiantynovych Kuznetsov ("Kuznetsov") and Public Joint Stock Company "Sberbank of Russia" ("Sberbank"; and together with Kuznetsov, the "Sberbank Defendants"; and as to their motion (ECF 52), the "Sberbank Defendants' Motion to Dismiss"); (ii) the motion to dismiss of defendant Mykhailo Safarbekovych

1

Hutseriev ("Hutseriev"; and collectively with the Sberbank Defendants, "Defendants"; and as to Hutseriev's motion (ECF 79), "Hutseriev Motion to Dismiss"); and (iii) the motion for sanctions of the Sberbank Defendants (ECF 69, "Motion for Sanctions"; and collectively as to all of Defendants' motions, the "Motions").[1]

3.  If called as a witness, I would testify to the same as stated herein.

4.  I do not and do not intend to waive any legal advice, litigation, or other privilege by referring to any matters in this declaration.

**Personal Background**

5.  I am over the age of 18, a Russian citizen, and am lawfully residing in the United States. I am also a businessman who was a shareholder and owner of OJSC Krasnaya Polyana ("Krasnaya Polyana" or the "Company") and Zeeland Development Corp. ("Zeeland").

6.  I have recently been approved for a pathway to obtain a green card by the United States Department of Homeland Security, United States Citizenship and Immigration Services.

**Seiden Law**

7.  On or about August 15, 2023, Ismailov and I met with lawyers at Seiden Law LLP ("Seiden Law") and discussed the facts relevant to this case. As a result of the August 2023 meeting, Ismailov and I retained Seiden Law to represent each of us in the above-captioned matter.

8.  Since retaining Seiden Law, I have met with the lawyers there numerous times (by telephone, video, and in-person) to discuss the facts and legal basis for seeking to recognize and enforce the Ukrainian Judgment against Defendants. During the course of these meetings, I have provided Seiden Law with original versions of relevant documents and true and correct copies of

---

[1] Capitalized terms not defined herein have the same meanings as ascribed to them in the First Amended Complaint (ECF 18, "FAC").

relevant documents to the claims asserted in the above-captioned matter.

9. Since August 2024 and in connection with Seiden Law's preparing papers in opposition to Defendants' Motions, Seiden Law held numerous telephonic and video meetings with Ismailov and me. The purpose of these meetings was to re-confirm the accuracy of the allegations set forth in the FAC and the legal basis for the claims asserted therein.

**Musaib Ismailovych Isamilov**

10. I have known Ismailov for over 25 years. I first met Ismailov in 1999 when he was a student in Russia, and I was starting my political career.

11. After we met in 1999, I offered Ismailov a job as a lawyer. We have worked together ever since in various enterprises. During these 25 years, we have rarely memorialized any transaction or business relationship in writing. Our agreements have usually been based on the good faith and trust between us and what would be considered a "handshake" deal.

12. Based on my personal experience, including my multiple decades of doing business in Russia, most business transactions were not memorialized in writing. Typically, when transactions are written down, the terms are listed on a very brief document only, usually no longer than one to two pages. In the 2010s and through 2013, this was a standard and common practice for Russian and Ukrainian businesses.

13. While I was in Russian politics, I was not permitted to directly own or hold an ownership interest in a private business. As a result, I regularly relied on third parties to hold my personal interests in private businesses in trust under these third parties' names. In exchange for their holding and managing my business interests in their name, I would either pay these third parties or provide them with an ownership interest in that business. For example, both my brother Magomed and Ismailov often held my business interests in their name; as a result, I paid them for

3

this service or provided them with an ownership interest in the business.

**OJSC Krasnaya Polyana**

14. On or about September 5, 2001, Krasnaya Polyana was founded to construct and develop a competitive ski resort in and around the Sochi region of Russia.

15. Krasnaya Polyana was founded by the local government of Sochi and was spearheaded by the Deputy Mayor of Sochi.  It began as a public project where the Russian Federal Government leased about 5000 acres of land to Sochi for a 20-year term.

16. Because the Company was struggling to raise funds, I personally invested between 12 to 18 million dollars in the Company. As a result, the Company transitioned from being a public company to a privately-held one.

17. The shares in the Company that I personally owned were held in trust by my brother Magomed. In exchange for Magomed's holding and managing my shares in Krasnaya Polyana, I provided Magomed with an ownership interest in the Company.

18. In 2006, the Company purchased a ski resort called Gornaya Carousel ("Ski Resort") in Sochi, Russia.

19. On July 4, 2007, the International Olympic Committee announced that Russia would host the 2014 Winter Olympic Games and that those Games would be held at the Ski Resort in Sochi, Russia.  As a result of this announcement, the Company became an attractive investment vehicle for private investors and public entities.

20. Sberbank was one of those investors.

21. In 2008, Sberbank entered into an agreement with Krasnaya Polyana to provide the Company with a $1.2 billion loan to develop the Ski Resort and the surrounding area.  However, Sberbank only gave the Company a $30 million loan.  This was intentional. It financially stressed Krasnaya Polyana and allowed Sberbank to gain a larger ownership interest in the Company.

22. In November 2011, I entered into an agreement with Sberbank by which Sberbank and I agreed that we would endeavor to attract additional foreign investments on behalf of the Company ("2011 Agreement"). Attached hereto as **Exhibit 1** is a true and correct copy of the 2011 Agreement, for which a certified English translation has also been provided.

23. Pursuant to the 2011 Agreement, Sberbank agreed to assist me to raise funds and attract investments on behalf of the Company, and, due to Sberbank's close ties to the Russian government, to assist in "the resolution of administrative matters." Ex. 1 at 5. The 2011 Agreement also provided that Sberbank would permit shares of the Company to be transferred to foreign investors. Ex. 1 at 5.

24. The 2011 Agreement is a one-page document. The 2011 Agreement provided that all disputes arising under the 2011 Agreement be in accordance with and resolved under the laws of the State of New York. Ex. 1 at 5.

25. In March of 2012, upon the request of Sberbank and in accordance with the 2011 Agreement, the Company authorized the issuance of additional shares ("March 2012 Issuance"). Attached hereto as part of **Exhibit 2** are true and correct copies of the following documents related to the March 2012 Issuance, for which a certified English translation has been provided:

   a. The Company's Board of Directors Resolution, approving the issuance of additional shares, dated February 17, 2012, (Ex. 2 at 34-45);

   b. The Company's Notification of State Registration of the Additional Issue of Securities, dated March 5, 2012 (Ex. 2 at 33);

   c. The Company's Report on the Results of the Additional Issue of Securities, dated June 9, 2012 (Ex. 2 at 47-56), and;

   d. Zeeland's Securities Purchase and Sales Agreement, dated May 23, 2012 (Ex. 2 at 57-61).

26. Pursuant to the March 2012 Issuance, the Company approved the issuance of an

additional 6021 shares, increasing the total number of Company shares from 2007 to 8028. Ex. 2 at 35.

27. Before the March 2012 Issuance, Magomed and I personally owned more than 50 percent of Krasnaya Polyana. The March 2012 Issuance caused our personal ownership to be materially diluted and caused us to lose managerial control over the Company.

28. After the Company approved the issuance of additional shares in March 2012, the Company's Board of Directors consisted of Defendant Kuznetsov, Magomed, and several of Defendants' allies, including Ashot Rafailovich Khachaturiants, who was then the CEO of Sberbank Capital and also a member of the Board of Directors of Russneft, the Russian oil company owned by Defendant Hutseriev. Ex. 2 at 51-55.

29. By March 2013, I personally owned through my brother Magomed 1426 shares in the Company. These 1426 shares were entirely separate from the shares in the Company that Zeeland owned. As to the shares I personally owned, those shares were the subject of *Bilalov v. Gref et al.*, 1:20-cv-09153 (AT) (S.D.N.Y.). They are not at issue in this action; the Ukrainiain Judgment did not concern them, and I am not seeking to enforce any rights related to them.

**Zeeland Development Corp.**

30. In April 2009, I founded Zeeland, a British Virgin Islands corporation, through my trustee and agent Dragan Perovych ("Perovych"). As set forth in Paragraphs 12-13 herein, Perovych managed and held in trust my ownership interest in Zeeland, although no written agreement was executed. I completely trust Perovych because I have known and worked with him since 1993.

31. Prior to March 2013, Zeeland was a minority owner of the Company, having purchased and owned 817 shares in Krasnaya Polyana. As a result, I had an indirect ownership

interest in these 817 shares in Krasnaya Polyana.

32. As referenced in Paragraphs 25-26 herein, attached hereto as part of **Exhibit 2** is a true and correct copy of Zeeland's Securities Purchase and Sales Agreement, dated May 23, 2012, documenting part of Zeeland's purchase of its 817 shares of the Company. Pursuant to Zeeland's Securities Purchase and Sales Agreement, Zeeland purchased its shares directly from the Company. Ex. 2 at 57-61.

33. As set forth in Paragraphs 12-13 herein, Ismailov managed and held in trust my ownership interest in Zeeland, which was memorialized in a fully executed agreement dated March 9, 2013 ("Partnership Agreement"). Attached hereto as **Exhibit 3** is a true and correct copy of the Partnership Agreement, for which a certified English translation has been provided.

34. The Partnership Agreement sets forth that:

   a. As of March 2013, Zeeland owned 817 shares in the Company (Ex. 3 at 9);

   b. Ismailov would take over as Trustee of my interest in Zeeland from Perovych (Ex. 3 at 9);

   c. Ismailov was required to operate and manage my ownership interest in Zeeland on my behalf (Ex. 3 at 10-11, §3.1);

   d. In exchange for Ismailov's managing my ownership interest in Zeeland, Ismailov would receive 15 percent of my ownership interest in Zeeland and/or 15 percent of the value from the sale of Zeeland's 817 shares in the Company (Ex. 3 at 11, §3.3).

35. On March 15, 2013, Perovych transferred his ownership interest in Zeeland to Ismailov.

36. Separate from Zeeland's 817 shares in the Company and as set forth above, I personally owned (through my brother Magomed) another 1426 shares in the Company. The 1426 shares held in trust by Magomed were completely distinct from the shares in the Company that Zeeland owned, and the two tranches of shares were never commingled. Ismailov had no

7

ownership in or management of these 1426 shares in the Company that I personally owned.

**The Sales Agreement**

37.     In the months leading up to March 2013, my family, Ismailov, and I were threatened with physical harm if we did not sell our various ownership interests in the Company to Sberbank or its agents.  Upon information and belief, these threats came from Sberbank and its agents, and were done at the direction of the Russian government. The threats made against me, my family, and Ismailov made us fear for our lives.

38.     On or about March 15, 2013, Ismailov, on behalf of Zeeland, met with Hutseriev to discuss Zeeland's 817 shares in the Company. The meeting occurred at Hutseriev's office in Moscow, located at Pyatnitskaya Street, 69, Moscow, Russia 115054.  The details of this meeting are specifically set forth by Ismailov in his contemporaneously-filed declaration.

39.     I did not contribute to or negotiate the terms of the Sales Agreement.  As to the March 15, 2013 meeting, Zeeland was unrepresented by counsel, and the terms of the Sales Agreement were non-negotiable.

40.     Due to the ongoing threats levied against Ismailov, myself, and my family, Ismailov informed me that he felt that he could not negotiate the Sales Agreement.

41.     The threats referenced herein continued after the Sales Agreement was executed. For example, in 2015 after my family and I fled Russia and were living in Germany, I was poisoned with mercury.  Attached hereto as **Exhibit 4** is a true and correct copy of my medical records from Germany, for which a certified English translation is provided, confirming my having been poisoned. Ex. 4 at 5.

42.     Ismailov informed me that after he had signed the Sales Agreement and left Hutseriev's office, a fully-executed copy of the Sales Agreement was delivered to Magomed's

8

office located at Pyatnitskaya Street, 67/7 c1, Moscow, Russia 115054. I used Magomed's office to receive mail. According to Ismailov, the fully executed Sales Agreement was identical to the Sales Agreement he had signed at Hutseriev's office in Moscow on March 15, 2013.

43. Attached hereto as **Exhibit 5** is a true and correct copy of the Sales Agreement that Ismailov signed at Hutseriev's office in Moscow on March 15, 2013, that Ismailov subsequently received, and that was counter-signed by Kuznetsov and Hutseriev, for which a certified English translation has been provided.

44. The Sales Agreement contains the following items:

   a. Hutseriev's signature, which was consistent with his signature that was on the Sales Agreement that Ismailov had signed at Hutseriev's office on March 15, 2013;

   b. Ismailov's signature and Zeeland's corporate seal that Ismailov had applied to the Sales Agreement at Hutseriev's office on March 15, 2013, and;

   c. Kuznetsov's signature and Sberbank's corporate seal.

45. Pursuant to Paragraph 1 of the Sales Agreement, Zeeland was to sell its 817 shares of the Company to BIN Group, an entity controlled by Hutseriev, in exchange for $200 million. Ex. 5 at 3, ¶1.

46. Pursuant to Paragraph 2 of the Sales Agreement, BIN Group was required to make payment to Zeeland within 30 days of execution of the Sales Agreement. Ex. 5 at 3, ¶2.

47. Pursuant to Paragraph 3 of the Sales Agreement, BIN Group was to acquire the shares of the Company from Zeeland on behalf of and for the benefit of Sberbank. Ex. 5 at 3, ¶3.

48. Pursuant to Paragraph 4 of the Sales Agreement, Sberbank was to provide a $15 billion line of credit to BIN Group in exchange for BIN Group's acquisition of the shares of the Company from Zeeland. Ex. 5 at 3, ¶4.

9

49. Pursuant to Paragraph 5 of the Sales Agreement, the parties to the Sales Agreement (Zeeland, BIN Group, Sberbank, and all third-party beneficiaries) agreed to submit all disputes related to the Sales Agreement to any court of the Commonwealth of Independent States ("CIS"). Ex. 5 at 3, ¶5. Ukraine is a CIS member country.

50. Pursuant to Paragraph 5 of the Sales Agreement, the parties agreed that any dispute arising out of the Sales Agreement would remain valid for 10 years from the date of the Sales Agreement. Ex. 5 at 3, ¶5.

51. Ismailov, Zeeland, and I fully complied with our obligations under the Sales Agreement, as Zeeland's shares of the Company were transferred to BIN Group and put under Hutseriev's control. After the shares of the Company were transferred to BIN Group, the shares were transferred to Sberbank, as more fully set forth below.

52. Defendants did not meet their obligations under the Sales Agreement. BIN Group, Hutseriev, and Sberbank all failed to pay Ismailov, Zeeland, and me for the sale of the Krasnaya Polyana shares. At no time after the execution of the Sales Agreement did Ismailov, Zeeland, or I receive payment for the sale of the shares in the Company.

**Sberbank's Ownership And Possession Of Zeeland's Shares In The Company**

53. After the execution of the Sales Agreement and Zeeland's transferring its shares in the Company to BIN Group and Hutseriev, Sberbank became Krasnaya Polyana's majority owner. Several news outlets reported on Sberbank's majority ownership. Attached hereto as **Exhibit 6** is a true and correct copy of the English version of a Blackseanews.net article "Sberbank to buy out almost 95% of Krasnaya Polyana shares," published on June 6, 2013. Exhibit 6 sets forth that

10

Sberbank owned 50.03% of the Company and that Hutseriev owned another 42% that would also be sold or transferred to Sberbank. Ex. 6 at 2.

54. Attached hereto as **Exhibit 7** are true and correct excerpts from Sberbank's March 18, 2013 Independent Audit report, conducted by Ernst & Young, for which a certified English translation has been provided. Ex. 7 at 11-13. Exhibit 7 sets forth that, as of January 1, 2013, Sberbank identified the Company as one of its assets and liabilities, providing that Sberbank had a 50.03% ownership interest in the Company. Ex. 7 at 14. Exhibit 7 also contains excerpts from Sberbank's March 24, 2014 Independent Audit report, conducted by Ernst & Young, for which a certified English translation has been provided. Ex. 7 at 15-17. The relevant portions of Sberbank's March 24, 2014 Independent Audit report sets forth that, by December 31, 2013, Sberbank's ownership interest in the Company increased from 50.03 percent to 92.1 percent. Ex. 7 at 17.

55. Attached hereto as **Exhibit 8** are true and correct portions of an audit report of Sberbank conducted by Ernst & Young containing excerpts from Sberbank's Interim Condensed Consolidated Financial Statements for which a certified English translation has been provided. Exhibit 8 sets forth that as of October 2013, Sberbank's ownership in the Company increased to 92.104 percent. Ex. 8 at 10.

56. Attached hereto as **Exhibit 9** are true and correct excerpts from Sberbank's June 2016 Interim Condensed Consolidated Financial Statements and Review Report, for which a certified English translation has been provided. Exhibit 9 sets forth that Sberbank reported the Company on its balance sheet through May 2016, when Sberbank sold 96.914 percent of its ownership in Krasnaya Polyana, recognizing a gain of 12.2 billion rubles, approximately $124 million (based on a 2024 conversion rate). Ex. 9 at 14.

**Russia's Control Over Sberbank**

57. I first entered Russian politics in 1999 when I was elected to the State Duma of the Russian Federation (the Russian parliament). At that time, Russia was transitioning away from being a communist government. I served in the Russian government from 1999 through 2007.

58. While serving in the State Duma, there would be parliamentary meetings where Vladimir Putin ("Putin"), Russia's Prime Minister and President, would be in attendance.

59. At a State Duma meeting in 2003, Putin first addressed his interest in and the possibility of Russia hosting the Winter Olympics.

60. In 2007, I was elected the Deputy Speaker of the Legislative Assembly of the Krasnodar Territory. As such, I played an active role in the coordination and planning of the 2014 Winter Olympic Games.

61. Through my governmental roles, I interacted with German (a/k/a Herman) Gref ("Gref"). From 2000 to 2007, Gref was the Minister for Economic Development and Trade of Russia. Since 2007, Gref has been Sberbank's CEO and Chairman of its Executive Board.

62. In connection with the 2014 Winter Olympic Games, Gref served as the middleman between Russia and Krasnaya Polyana. Between the announcement that the 2014 Winter Olympics Games would be held at Sochi and the Execution of the Sales Agreement, Gref played an active role in Sberbank acquiring the Company at Russia's direction. During this time, Gref routinely reported back to Putin and the Russian government on progress of the construction of the Ski Resort and Sberbank's acquisition of the Company for Russia's benefit and behalf.

63. Gref was aggressive in his pursuit, and, in 2011, he threateningly suggested to me that the Company would be better off if it were owned and controlled by Sberbank.

64. From that point on, it became clear to me that Russia, through Gref and Sberbank,

was determined to take Krasnaya Polyana from me.

### *Bilalov* Did Not Involve The Same Shares That Zeeland Owned In The Company

65. After arriving in the United States in 2019, and only when I believed that my family and I were safe, I decided to retain counsel and file suit, seeking damages in connection with the shares of Krasnaya Polyana that I had personally owned and that had been held in trust by my brother Magomed.

66. Accordingly, I retained Irina Shpigel ("Shpigel") to represent me and bring a case in the United States District Court for the Southern District of New York. Specifically, that lawsuit was brought to recover 601 shares of the total 1426 shares in the Company that I owned personally through my brother Magomed. As a result, Shpigel commenced *Bilalov v. Gref et al.*, 1:20-cv-09153 (AT) (S.D.N.Y.) ("*Bilalov*").

67. *Bilalov* did not involve any efforts to recover the 817 shares in the Company that were owned by Zeeland that were sold subject to the Sales Agreement.

68. Ismailov was not involved in my or Magomed's ownership of the 1426 shares in the Company. Ismailov was not relevant to the dispute litigated in *Bilalov* because he did not hold any of these shares in trust on my behalf, he did not have an ownership interest in these shares, and he had no reason to be involved in this lawsuit. Similarly, Zeeland and the Sales Agreement were irrelevant to *Bilalov*.

### The Ukrainian Action

69. After I arrived in the United States and prior to and during the pendency of *Bilalov*, Ismailov and I discussed bringing a lawsuit in one of the CIS countries to enforce our rights under the Sales Agreement.

70. Because Ismailov is a Ukrainian citizen who resides in Ukraine, and because of the provision of the Sales Agreement by which a suit arising under the Sales Agreement could proceed

13

in a court of a CIS country, we decided to pursue a lawsuit in Ukraine. We retained the Ukrainian lawyers Maksym Vaslovych Kucheruk and Valerii Leonidovych Sokolovskyi to commence a lawsuit in Ukraine to enforce our rights under the Sales Agreement.

71. On March 2, 2023, Ismailov and I commenced a lawsuit before the Skvyra District Court of Kyiv Region ("Ukrainian Court") bearing the case number 376/560/23 ("Ukrainian Action") by filing a Statement of Claim.

72. A true and correct copy of the March 2, 2023, resolution of the Ukrainian Court confirming the commencement of the Ukrainian Action is annexed hereto as **Exhibit 10** (as translated by web-browser Chrome and downloaded from web address: https://reyestr.court.gov.ua/Review/109441891).

73. A true and correct copy of the Ukrainian Court's March 23, 2023 email notification is annexed hereto as **Exhibit 11**, for which a certified English translation has been provided. According to my Ukrainian lawyers, on or about March 23, 2023, the Ukrainian Court sent an email from the Ukrainian Court's official email address, "inbox@sk.ko.court.gov.ua," attaching the Statement of Claim and the Ukrainian Court's March 2, 2023 order opening the case (collectively "Ukrainian Action's Initiating Documents") and summons to appear in court, to the last known email addresses of Defendants. The email notification from the Ukrainian Court advised Defendants of their obligation to appear for a hearing scheduled to be held on May 11, 2023.  Ex. 11 at 5-6.

74. According to the Ukrainian Court's email, transmission to Husteriev and Kuznetsov was successful.  Ex. 11 at 5-6.

75. In addition to the Ukrainian Court's email notification, the Ukrainian Court also notified Defendants of the Ukrainian Action by publication on the official website of the judiciary

14

of Ukraine at least ten days before any hearing in the Ukrainian Action.

76. Additionally, and to ensure that Defendants could not challenge service, Ismailov informed me that he had sent copies of the Ukrainian Action's Initiating Documents via personal channels in Moldova to Moscow to be directly mailed to Sberbank from within Russia. Ismailov informed me that on or about March 9, 2023, from a post office in Moscow, the Statement of Claim and Ukrainian Court's Order to Initiate Proceedings dated March 2, 2023, were mailed to Sberbank at its corporate address, 19 Vavilova Street, Moscow, Russia, 117312.

77. Defendants failed to appear before the Ukrainian Court. Likewise, no attorney appeared on their behalf.

78. Accordingly, on May 25, 2023, the Ukrainian Court entered a default judgment against the Defendants ("Ukrainian Judgment"). A true and correct copy of the Ukrainian Judgment is annexed hereto as **Exhibit 12**, for which a certified English translation has been provided.

79. Under the Ukrainian Judgment, Defendants are jointly and severally liable to me for $170 million. Ex. 12 at 30. Defendants are also jointly and severally liable to Ismailov for $30 million. Ex. 12 at 30.

80. To date, Defendants have not paid or otherwise satisfied their judgment debt under the Ukrainian Judgment.

I, AKHMED HADZHYIOVYCH BILALOV, declare under penalty of perjury that the foregoing is true and correct.

Executed on: 11/15/24

_____
AKHMED HADZHYIOVYCH BILALOV

16