# EXHIBIT 22



Neutral Citation Number: [2024] EWHC 122 (Comm)

Case No: CL-2021-000731

**IN THE HIGH COURT OF JUSTICE**
**KING'S BENCH DIVISION**
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**
**COMMERCIAL COURT**

Royal Courts of Justice, Rolls Building
Fetter Lane, London, EC4A 1NL

Date: 26/01/2024

**Before** :

**MR JUSTICE JACOBS**

- - - - - - - - - - - - - - - - - - - - -

**Between :**

| | |
|---|---|
| **WWRT LIMITED** | **Claimant** |
| - and - | |
| **KOSTIANTYN VALENTYNOVYCH ZHEVAGO** | **Defendant** |

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**Nathan Pillow KC and Stephen Donnelly** (instructed by **Rosling King LLP**) for the **Claimant**
**James Sheehan and Katherine Ratcliffe** (instructed by **Reynolds Porter Chamberlain LLP**) for the **Defendant**

Hearing dates: 18th – 19th December 2023
- - - - - - - - - - - - - - - - - - - - -

# Approved Judgment

This judgment was handed down remotely at 3:30pm on Friday 26th January 2024 by circulation to the parties or their representatives by e-mail and by release to the National Archives
(see eg https://www.bailii.org/ew/cases/EWCA/Civ/2022/1169.html).

.............................

MR JUSTICE JACOBS

**MR JUSTICE JACOBS:**

## A: Introduction

### A1: The parties and the proceedings

*The application*

1. This is an application by the Defendant ("Mr Zhevago") to challenge the jurisdiction of the English court in relation to proceedings brought against him by the Claimant ("WWRT"). Mr Zhevago is a Ukrainian citizen, and the present proceedings concern his alleged conduct concerning a Ukrainian bank. WWRT is an English company, albeit owned as to 80% by another Ukrainian citizen and a Ukrainian qualified lawyer, Ms Olga Gutovska.

2. By an application notice dated 15 September 2022, Mr Zhevago seeks declarations and orders that:

    (1) The court has no jurisdiction, or alternatively will not exercise its jurisdiction (and the claim will be stayed), in relation to the claim brought by WWRT;

    (2) The Order of Moulder J dated 20 May 2022 granting WWRT permission to serve its claim out of the jurisdiction and for alternative service be set aside.

*The parties*

3. WWRT brings the present proceedings as the ultimate assignee of PJSC Finance & Credit Bank ("the Bank"), which is a Ukrainian entity. WWRT is itself an English company, and it is owned as to 80% by Ms Gutovska and as to 20% by a partner in Rosling King LLP, WWRT's solicitors. WWRT is a special purpose vehicle incorporated on 26 February 2020, which is long after the conduct which forms the subject of its present claims. There is no evidence of any connection between WWRT and either the Bank or Mr Zhevago.

4. Since September 2015, the Bank has been insolvent and its business taken over by the Deposit Guarantee Fund of Ukraine ("the DGF"). WWRT's claim derives from two assignments. The initial assignment was from the DGF to Financial Company Horizon LLC ("Horizon"), and there was then a further onward assignment from Horizon to WWRT.

5. The effect of the DGF/Horizon assignment is a critical question in the context of whether there is a "serious issue to be tried". This is because Mr Zhevago contends that this assignment did not effect a transfer to Horizon of the claims which WWRT seeks to bring in these proceedings. If there was no such transfer to Horizon under the first assignment, WWRT cannot have acquired, under the second assignment, rights which Horizon did not have. This issue is addressed in Section B below.

6. Mr Zhevago's background is described in the witness statement of his solicitor, Mr Daniel Wyatt, who is a partner in Reynolds Porter Chamberlain LLP ("RPC"). He describes Mr Zhevago as a very successful Ukrainian entrepreneur, with substantial management and investment experience gained over a 30-year business career in Ukraine. Since 1996, Mr Zhevago has developed diverse worldwide business interests

across multiple sectors, including in the fields of metallurgy, ferrous deposits and ferromagnetic ore, engineering, transport, manufacturing, food, pharmaceuticals, shipbuilding, energy and banking, employing thousands of workers in Ukraine and elsewhere. Aged 35, he was the first Ukrainian national to list a company, now Ferrexpo plc ("Ferrexpo"), an iron ore miner and trader, to a major international stock exchange in 2007. It is Swiss headquartered with its operating base in central Ukraine, with several large institutional investors as shareholders, and as at 15 September 2022 had a market capitalisation of approximately £887m.

7.  Mr Zhevago had a 95% indirect shareholding in the Bank. In September 2015, the National Bank of Ukraine placed the Bank into administration, and then into liquidation in December 2015, putting the DGF in control of its operations. On 7 November 2019 the DGF assigned the Bank's rights under certain loan agreements to Horizon. On 12 January 2021, Horizon assigned its rights to WWRT.

*The proceedings and the evidence served by the parties*

8.  The present claim was issued by WWRT on 13 December 2021. The four-month period of validity of the claim form for service in the jurisdiction therefore expired on 13 April 2022. WWRT was unable to serve Mr Zhevago within the jurisdiction, and the evidence indicates that this is because he has not in fact come to England at any time since the claim was issued. WWRT therefore, on 12 May 2022, sought permission to serve him out of the jurisdiction. The application for permission to serve out was supported by a witness statement of Ms Gutovska. Her statement exhibited a statement on Ukrainian law from Dr Vadim Tsiura, a Ukrainian attorney, who is a Doctor of Laws and a Professor of Civil Law at the School of Law of Taras Shevchenko National University of Kyiv in Ukraine. His statement addressed issues of substantive Ukrainian law.

9.  On 20 May 2022, Moulder J granted permission to serve out, and also granted an application for alternative service. The methods for alternative service included service on RPC. Moulder J's order was therefore made just under 3 months after the Russian invasion of Ukraine. The effect of that invasion on the Ukrainian court system is a central issue on the forum conveniens issues addressed by the parties.

10. Mr Zhevago's application challenging jurisdiction was issued in September 2022. The evidence in support of the jurisdictional challenge comprised a witness statement from Mr Wyatt, based upon information obtained from Mr Zhevago and/or others assisting him, and expert evidence from Mr Oleg Alyoshin. Mr Alyoshin is a Ukrainian lawyer and a partner in the firm of Vasil Kisil & Partners. Mr Alyoshin addressed a large number of issues of Ukrainian law, as well as questions concerning the functioning of the Ukrainian court system following the February 2022 Russian invasion.

11. WWRT's responsive evidence comprised a further witness statement from Ms Gutovska, a responsive report from Dr Tsiura, and a report from Mr Vadim Medvedev. Mr Medvedev is a practising Ukrainian lawyer, and his report addressed the availability and functioning of the Ukrainian courts following the Russian invasion and various related matters relevant to the forum non conveniens argument.

12. The timetable for service of reply evidence from Mr Zhevago was extended to 9 November 2023, by an order made by Butcher J dated 18 April 2023. That order was later extended until later in November 2023. Mr Zhevago served a witness statement

on 24 November 2023, and Mr Alyoshin served a responsive report (addressing the evidence of Dr Tsiura and Mr Medvedev) on 27 November 2023.

13.    The hearing had by that time long been fixed to take place on 18 and 19 December 2023. Very shortly before the hearing, WWRT served a further relatively short witness statement from Ms Gutovska. Although this raised a number of points, the most significant and controversial point was entirely new. It concerned an allegation that Mr Zhevago had sought to bribe the most senior judge of the Ukrainian Supreme Court. The allegation had been reported in the media approximately 6 months earlier, but had not been raised by WWRT either in correspondence or evidence in the intervening period. The extensive evidence hitherto served by the parties (comprising the various reports of Dr Tsiura, Mr Medvedev and Mr Alyoshin) did not raise any issue concerning alleged corruption on the part of Ukrainian judiciary or any individual member. Mr Zhevago objected to the introduction, at this late stage, of the new case which Ms Gutovska sought to raise on that point. There were also objections to the other aspects of her third witness statement, but those other aspects were of far less importance than the bribery/ corruption point which was then the focus of the parties' arguments at the hearing. During the course of the hearing, Mr Pillow KC for WWRT, and Mr Sheehan for Mr Zhevago, made submissions as to whether this further evidence should be admitted, and also as to its effect in the context of the forum non conveniens arguments.

*The issues on the jurisdiction application*

14.    There were three issues raised by Mr Zhevago, and addressed by the parties, in relation to the jurisdiction application. These can be summarised as follows:

   (1)    Was there a serious issue to be tried?  The question here was whether (there was a serious issue to be tried that) the assignment from DGF to Horizon transferred tortious rights to sue Mr Zhevago. The evidence had debated another issue in the context of serious issue to be tried, namely limitation. In the event, however, Mr Sheehan did not pursue that argument in the context of the present application.

   (2)    Was there a good arguable case that WWRT's case came within the jurisdictional "gateway" on which it relied, namely the tort gateway in CPR PD 6B paragraph 3.1(9)(b)?

   (3)    The forum conveniens issue: could WWRT show that England (as opposed to Ukraine) was clearly and distinctly the more appropriate forum for the resolution of its claim?

15.    Mr Zhevago's application would succeed if his case on any of these points were accepted.

*Earlier proceedings*

16.    The present proceedings follow very similar proceedings brought by, in effect, the same Ukrainian bank from which WWRT now claims to have acquired its claims by assignment: *PJSC Bank "Finance and Credit" v Zhevago* [2021] EWHC 2522 (Ch) Sir Julian Flaux C ("the DGF Proceedings" or "the *DGF* case"). In the DGF Proceedings, jurisdiction over Mr Zhevago was established as of right by service under s.1140 of the

Companies Act 2006 at an address on the register for Mr Zhevago. However, the Chancellor stayed the proceedings on forum grounds, concluding that Ukraine was overwhelmingly the more appropriate forum. The Chancellor's decision was made notwithstanding the fact that, in addition to Mr Zhevago being served as of right within the jurisdiction, there were four defendants in addition to Mr Zhevago – three English companies and one English national residing in the jurisdiction.

17. Mr Sheehan submitted that the question of forum conveniens had, on the face of it, already been determined by the Chancellor's detailed analysis in his judgment, unless WWRT could establish that the circumstances of this case are wholly different. In the end, Mr Pillow did not seek to reargue the points on forum conveniens on which Mr Zhevago had succeeded before the Chancellor, in the context of a case where the burden was on Mr Zhevago to show that Ukraine was clearly and distinctly the more appropriate forum. However, Mr Pillow submitted that there were three particular factors which transformed the picture from that which the Chancellor had been viewing, and which affected the availability and appropriateness of Ukraine as a forum. These were, in summary: (i) the impact of the war in Ukraine, consequent upon the Russian invasion; (ii) the allegation of bribery which had been made against Mr Zhevago; and (iii) the real risk that Mr Zhevago would seek to challenge any judgment in Ukraine on the basis of allegations of unfairness and bias in the Ukrainian legal system. Although this last point had been advanced unsuccessfully before the Chancellor, there was now substantial evidence which showed Mr Zhevago's likely attitude: Mr Zhevago had used such arguments in order successfully to resist, in 2023, Ukraine's application to extradite him from France to face criminal charges in Ukraine. These issues are addressed in Section D below.

**A2: The substantive claim in the present proceedings**

18. The following description of WWRT's claims is derived from WWRT's skeleton argument for the hearing.

19. WWRT's claim against Mr Zhevago is for compensation under Ukrainian law arising from his tortious direction of an alleged scheme ("the Scheme") whose essential features were as follows:

    (1) A number of loans ("the Loans") were issued to various "Borrowers" ("Valsa", "Interprokat", "KPAA", and "ZCP") each owned and/or controlled by Mr Zhevago;

    (2) the Loans were advanced for specified purposes, but were instead diverted, sometimes directly, to other entities owned and/or controlled by Mr Zhevago (such that it is to be inferred that the given purposes were, at Mr Zhevago's direction, deliberately false);

    (3) despite occasional payments of interest by the Borrowers and one repayment of capital in the case of Valsa—generally, so far as WWRT can ascertain, from funds supplied by other entities also owned and/or controlled by Mr Zhevago—no principal was ever repaid on the Loans;

(4) instead, the Loans were continually varied to permit the extension of repayment dates and the ability to draw down further funds (in one instance as many as 106 times between February 2007 and August 2015);

(5) as purported security for two of the Loans as so varied, PJSC "Rosava", an entity also controlled at the relevant time by Mr Zhevago, was caused to pledge its receivables under certain contracts (whether real or fictitious, or a mixture, is unclear to WWRT) in amounts that significantly outstripped any possible true value of such contracts;

(6) while the Loans were outstanding, the business of two of the Borrowers was caused to be taken over by newly incorporated, similarly named 'clone' companies, unencumbered by the liability to repay the Loans, thereby depriving the relevant Borrowers of the trade necessary to enable them to do so; and

(7) save for the payments of interest and principal referred to above, the Loans remain entirely outstanding.

20.    WWRT's case is that Mr Zhevago directed the Scheme while knowing and/or intending that the Borrowers would not and/or could not repay the Loans, whether in full or in part, and so as to benefit personally from the Loans and the wider Scheme, through the entities associated with him, as he in fact did.

21.    The Loans which are the subject of the claim are the "Valsa Loan", the "KPAA Loan", the "ZCP Loans 1, 2, and 3" and the "Interprokat Loans 1 and 2". Most of these Loans were entered into on the express basis that the funds thereunder would be used for working capital. Interprokat Loan 1 was for the stated purpose of purchasing materials, payment of wages, transfer of fees and deductions. ZCP Loan 3 was for the purpose of purchase of securities of Ukrainian enterprises. However, the Loans were not used for the stated purposes. WWRT contends that the Loans were siphons through which Mr Zhevago drew funds from the Bank to his creature entities, with a minimal paper trail in place for appearances' sake.

22.    The purported security for the Valsa Loan and the Interprokat Loan 1 was provided by Rosava under pledge agreements. WWRT contends that, in furtherance of the Scheme, Mr Zhevago procured that Rosava would falsely misstate the value of the collateral provided so as to enhance the appearance that the Loans were adequately secured. For example, one pledge concerned receivables under a contract with an English LLP called Bridgeholm Commercial LLP. However, the LLP's accounts showed that there was no contract with valuable receivables. The figures in that, and other pledges, were false.

23.    The allegation concerning "clone" companies concerned two new Ukrainian companies. One of the companies was LLC "Kamyanets-Podilsky Auto-Unit Plant" or KPAZ. This was registered with the same address as KPAA. The director of KPAZ was a Mr Ostrovskyy, who was also a director of KPAA. KPAA's internet domain name was used by KPAZ. KPAZ used KPAA's trading premises. There was a similar story with another new Ukrainian company, Science and Industry Valsa GTV LLC, which was a clone of Valsa, involving a different Ukrainian director, Mr Vyacheslav Kalashnikov.

24.    WWRT submitted that, on the face of it, it was extraordinary that both of these Borrowers should have allowed this to happen without protest. WWRT contended that both Borrowers were procured to allow it to happen, and that these clone companies were set up by Mr Zhevago in furtherance of the Scheme.

25.    The Bank had made attempts to enforce the Loans by contractual actions against the Borrowers in the Ukrainian courts, but had failed to recover any payments of principal or interest further to those made during the currency of the Scheme.

26.    These matters give rise, in the view of Dr Tsiura, to a claim in tort as a matter of Ukrainian law under Article 1166 of the Civil Code of Ukraine ("the Civil Code" – discussed further in Section B below). WWRT claims to be entitled to compensation under Article 22 of the Civil Code.

27.    WWRT's allegations are denied by Mr Zhevago. The evidence served on his behalf does not address the factual detail of the various claims. It is clear from the expert evidence that a substantial issue will arise in relation to limitation.

## Section B: Serious Issues to be Tried

28.    There were two assignments which, on WWRT's case, had the effect of transferring the rights to bring tortious claims against Mr Zhevago. The initial assignment was from the DGF to Horizon, and then a further onward assignment from Horizon to WWRT. The argument in the case focused on the first assignment, from the DGF to Horizon. Mr Zhevago's case was that this assignment was effective to transfer contractual claims against the Borrowers and sureties under the loan agreements referred to, but that it did not transfer any rights to pursue Mr Zhevago in respect of the tortious claims now relied upon. WWRT contended otherwise. It was not suggested by WWRT that it could acquire any rights other than Horizon had itself acquired. The terms and effect of the first assignment in the chain were therefore critical.

29.    The assignment is governed by the law of Ukraine, and the parties adduced lengthy expert evidence on Ukrainian law relating to assignments. There was agreement, or at least no substantial dispute, on various aspects of Ukrainian law, as summarised below.

*Undisputed areas of Ukrainian law*

30.    First, the experts were substantially agreed on the principal sources of Ukrainian law. As explained by Dr Tsiura, legislation is the main source of Ukrainian law. The Constitution of Ukraine stands in the highest position in the hierarchy of sources, followed by codified legislation and statutes and various other sources of law.

31.    The general principles of civil law, which are the foundation of civil law, are contained in the Civil Code. These principles include, amongst other things, freedom of contract. These general principles are used in the absence of specific legal rules, or in the case of ambiguity of a written rule. Mr Alyoshin described the Civil Code as the principal act of civil (private) law in Ukraine.

32.    Both experts therefore referred to various provisions of the Civil Code in the context of their evidence. The principal articles to which reference was made were: (i) Article 213, which concerned interpretation of contracts; (ii) Articles 512 – 514, which concerned

the transfer of obligations, including assignments; and (iii) Article 1166 which concerned the "liability for inflicted property harm"; i.e. tortious liability. The parties' present arguments did not focus on Article 1166 and the question of whether or not the DGF (and thence Horizon and WWRT) had a valid tortious claim. Rather, the argument was whether any relevant tortious claim was effectively assigned to Horizon and then WWRT. The key issue – i.e. whether rights to pursue tortious claims were transferred by the DGF – is therefore to be approached on the basis that such rights may (as WWRT contends) have indeed existed. The issue is whether they were transferred across. Articles 213 and 512 – 514 are material in that regard.

33.   These various sections of the Civil Code provide as follows (in the translations which were used by the experts):

> "**Article 213. Interpretation of the content of the transaction**
>
> 3. When interpreting the content of the transaction, the meaning of words and concepts, which are the same for the entire content of the transaction, as well as the generally accepted meaning of terms in the relevant sphere of relations, are taken into account.
>
> If the literal meaning of words and concepts, as well as the commonly accepted meaning of terms in the relevant sphere of relations, does not provide the possibility to ascertain the meaning of separate parts of the transaction, their meaning is established by comparing the relevant part of the transaction with the content of its other parts, its entire content, the intentions of the parties.
>
> 4. If, according to the rules established by the third part of this article, it is not possible to determine the true will of the person who committed the transaction, the purpose of a transaction, the content of previous negotiations, the established practice of relations between the parties, principles of business efficacy, subsequent behavior of the parties, the text of the standard contract and others circumstances of significant importance are taken into account.
>
> …
>
> **Article 512. Grounds for the replacement of a creditor in an obligation**
>
> 1. The creditor in the obligation can be replaced by another person due to
>
> > 1) the transfer of his right to another person under the transaction (assignment of claim);
> >
> > 2) legal succession;

3) performance of the debtor's obligation by the guarantor or mortgagor (property guarantor);

4) performance of the debtor's obligation by a third party.

…

### Article 513. The form of the transaction on the replacement of the creditor in the obligation

1. The transaction regarding the replacement of the creditor in the obligation is performed in the same form as the transaction giving rise to such obligation, according to which the assignment of claim is transferred to the new creditor.

…

### Article 514. The scope of the rights transferred to the new creditor in the obligation

1. A new creditor acquires the rights of the original creditor in the obligation in the scope and on the conditions that existed at the time of the transfer of these rights unless otherwise established by the transaction or legal acts.

…

### Article 1166. General grounds of liability for inflicted property harm

1. Property harm inflicted on the personal intangible rights of an individual or a legal entity by unlawful decisions, acts or omissions, as well as harm inflicted to the property of an individual or a legal person shall be compensated in full by the person who inflicted the harm.

2. A person who has inflicted harm shall be released from liability if he proves that the harm was inflicted without his fault.

3. Harm inflicted by the mutilation, other injury or death of a natural person due to force majeure shall be compensated in cases established by law.

4. Harm inflicted by lawful actions shall be compensated in cases established in this Code or another law."

34. In terms of the sources of law, there was a relatively minor disagreement between the experts. Dr Tsiura said that court judgments are "commonly" not recognised as sources of law. He says that court judgments are limited in their application to the specific parties of the case and are compulsory for them but not the public. The only court decisions which the Courts in Ukraine were obliged to follow are decisions of the European Court of Human Rights.

35.    Mr Alyoshin referred, however, to Article 13 of the Law of Ukraine "On Judicial System and Status of Judges", and specifically to Article 13 (6) which provides:

> "Conclusions in relation to the application of rules of law established in resolutions of the Supreme Court shall be taken into account by other courts when applying such rules of law".

36.    Mr Alyoshin said that although strictly Article 13 (6) only requires lower courts to "take into account" decisions of the Supreme Court, in practice such decisions are binding and a failure to follow a decision of the Supreme Court will result in a judgment being set aside on appeal, unless the Supreme Court decides to deviate from its previous position. To that extent, decisions of the Supreme Court can be regarded as effectively a source of law. I did not understand Dr Tsiura to disagree with Mr Alyoshin's view in that regard. In view of Article 13 (6), I consider that I must take into account the application of rules of law established in resolutions of the Supreme Court.

37.    Secondly, it was common ground that the tortious rights of action against Mr Zhevago were capable of being assigned by DGF to Horizon, and thence to WWRT.

38.    Thirdly, there was no substantial dispute that the basic mechanism by which Horizon could acquire the rights of DGF was a contractual assignment. Article 512 provides for a number of methods by which a creditor in an obligation can be replaced by another person. The relevant method in the present case is provided for in Article 512 (1), which refers to "the transfer of his right to another person under the transaction (assignment of claim)". Mr Alyoshin explained the concept, as follows, in terms which would be familiar to an English lawyer:

> "I use the term "assignment" in this report as a legal concept within the meaning given to it by Article 512 (1) of the Civil Code of Ukraine. In particular, the "assignment" refers to a situation where a creditor in an obligation (the original creditor) transfers to a third party (a new creditor), on the basis of a contract concluded between them, the right of claim arising from the obligation in question against a debtor in the same obligation (assignment of the right of claim). As a result of such assignment, the new creditor replaces the original creditor in the obligation, and the obligor now must perform its duties under the obligation to the new creditor".

39.    Fourth, it was common ground that there were no relevant procedural or legal obstacles to the creation of a valid assignment of the rights of DGF to bring tortious claims against Mr Zhevago. Article 513 provided that the "transaction regarding the replacement of the creditor in the obligation is performed in the same form as the transaction giving rise to such obligation, according to which the assignment of claim is transferred to the new creditor". In the present case, as Dr Tsiura said, the various loan agreements were made in the "simple written" form, and therefore a written agreement was sufficient to assign the rights of claim.

*The DGF/ Horizon assignment: contractual interpretation*

40.     In their reports, the experts identified the applicable Ukrainian principles of contractual interpretation – which are in fact set out in Article 213 – and also (as is not unusual) opined on how those principles applied to the assignment in the present case. In his reports, Dr Tsiura referred to various provisions of the DGF/Horizon assignment which, in his view, had the effect of providing (or at least confirming) that the assignment transferred across to Horizon not only contractual rights, but also the relevant tortious rights to claim against Mr Zhevago.

41.     Dr Tsiura's main argument, however, as described in more detail below, was that it was not necessary for the agreement expressly to provide for the transfer of such rights, because there was an automatic transfer of the rights. Indeed, in his first report, he expressed the opinion that it was not in fact possible for DGF to seek to retain the tortious rights, and that they had to be transferred together with the contractual rights. As he said:

> "The Article 1166 CCU [i.e. Civil Code] claim is attached to the right to receive repayment (the gist of harm is that the creditor cannot receive repayment because of the scheme and this constitutes harm). As the right to the money after the assignment belongs to the new creditor, the Bank does not have the right to the money, and so cannot have the Article 1166 CCU claim too."

42.     Thus, he said that it was "not possible to assign only the rights of action, or some rights of action arising out of the loan". Accordingly, the argument posits that Ukrainian law will in substance impose upon the parties an assignment of tortious rights, even if their agreement contains no such assignment and indeed even if the assignor has specifically sought to retain the tortious rights.

43.     In his first report, Dr Tsiura acknowledged that the text of the assignment in the present itself does not refer to an Article 1166 CCU claim. However, this did not matter. His view was:

> "[E]ven if there was no wording related to the third parties in the Agreements at all, the right to claim against any third parties, is transferred together with the rights of creditor under the loan agreements to the new creditor, and here was transferred to Horizon. Horizon became entitled to the sums payable under the loan agreements, and as the repayment is impossible because of the fraudulent scheme, it has the right of claim against third parties whose scheme made the repayment impossible".

44.     Although the expert evidence, and to some extent WWRT's written submissions, indicated that there might be a substantial issue as to how the assignment was to be construed, applying the Article 213 principles of Ukrainian law, this was not ultimately how Mr Pillow on behalf of WWRT put the case. Mr Pillow said at the start of his oral submissions that the case that WWRT ran on the assignment was "not really a question of construction at all" and that I could "largely ignore questions of construction, as much as my learned friend would like it to be about construction". The case therefore advanced was that as a matter of substantive law, the assignment – which referred to

rights "under" the loan agreements – carried with it rights in tort against third parties who have impaired the right to claim the debt.

45.     On behalf of Mr Zhevago, Mr Sheehan's submissions were that, applying the relevant Ukrainian principles of construction – which were not in dispute – there was no serious issue to be tried as to how the agreement was to be construed: it did not include the assignment of the tortious rights which WWRT now sought to pursue. Mr Sheehan's oral submissions carefully addressed the relevant provisions of the assignment, and it is fair to say that Mr Pillow did not respond to those submissions; essentially because, as described above, his argument was based upon the rule of Ukrainian substantive law upon which Dr Tsiura had relied.

46.     As far as concerns the interpretation of the language of the assignment applying the relevant principles of Ukrainian law identified by the experts – and leaving aside for present purposes the alleged rule of substantive Ukrainian law upon which Dr Tsiura relied – I consider that Mr Sheenan's submissions were compelling for the following reasons.

47.     The material terms of the assignment agreement, entered into between the DGF and Horizon, are as follows.

> "1. Under this Agreement in the manner and on the terms specified in this Agreement, the Bank hereby assigns its rights of claim to the New Lender, while the New Lender hereby acquires the Bank's rights of claim on the borrowers and guarantors referred to in Schedules No. 1-2 to this Agreement, hereinafter referred to as the Debtors, including the rights of claim on the Debtors' legal successors, the Debtors' legitimate heirs, or other parties to which the Debtors' obligations under loan agreements and guarantee agreements have been transferred, taking into account all the amendments, annexes and attachments thereto, according to the registers in Annexes No. 1-2 to this Agreement, hereinafter referred to as the Main Agreements, hereinafter referred to as the Rights of Claim. The new creditor shall pay to the Bank for the Rights of Claim monetary funds in the amount and in the manner specified in this Agreement.

> 1.1. The Parties have agreed that the Bank's assignment, to the New Lender, of the rights of claim under the pledge agreements that were entered into to secure the fulfilment of the Debtors' obligations under the Main Agreements takes place under separate agreements which are concluded between the Parties simultaneously with this Agreement.

> 2. Under this Agreement the New Lender on the date of conclusion of this Agreement, but in any case not earlier than the date of the Bank's receipt in full of the funds, in accordance with clause 4 of this Agreement, acquires all the rights of the creditor under the Main Agreements, including: the right to demand the proper fulfilment of the Debtors' obligations under the Main

Agreements, payment of the monetary funds by the Debtors, payment of interest specified in Appendix No. 1 to this Agreement and payment of penalties in the amounts provided for by the Main Agreements. The amount of the Rights of Claim to be transferred to the New Lender is specified in Appendix No. 1 to this Agreement. The rights of the creditor under the Main Agreements shall be transferred to the New Lender in full and on terms existing at the time of assignment of the Rights of Claim, except for the right to conduct contractual debiting of funds from the Debtors' account/accounts provided to the Bank in accordance with the terms of the Main Agreements.

…

5. The documents available to the Bank confirming the Rights of Claim on the Debtors shall be transferred by the Bank to the New Lender under the relevant act no later than 30 (thirty) business days from the date of conclusion of this Agreement.

…

7. The Bank shall not be liable to the New Lender for non-fulfilment or improper fulfilment by the Debtors of their obligations under the Main Agreements. All legal relations arising out of or related to this Agreement, including in relation to the validity, conclusion, execution, modification and termination of this Agreement, as well as interpretation of its terms, determination of consequences of invalidity or violation of the terms and conditions of this Agreement, shall be governed by this Agreement and by the relevant norms of the current legislation of Ukraine.

…

11. The Parties agree that the future invalidation (declaring void) of all or any of the Right of Claim under the Main Agreements will not affect the validity of this Agreement, and the Bank shall not bear any liability in case of invalidation (declaring void) of any of the Main Agreements."

48.    Clause 1 therefore provides for the assignment by the DGF, and thus the receipt, of "rights of claim on the borrowers and guarantors referred to in the Schedules No 1-2" to the Agreement. There is no suggestion that Mr Zhevago was in that list of borrowers and guarantors. Those borrowers and guarantors are defined as "the Debtors".

49.    Clause 1 goes on to specify that the rights of claim include those on "the Debtors' legal successors, the Debtors' legitimate heirs, or other parties to which the Debtors' obligations under loan agreements and guarantee agreements have been transferred". Accordingly, the clause does identify a number of persons who could be described as third parties. However, they are all third parties who can be equated, for one reason or another, with the Debtors themselves, including third parties to which the Debtors had

transferred their legal obligations. There is nothing in this clause which suggests that any wider category of claims against other third parties is transferred to Horizon. In his evidence, Dr Tsiura advanced what in my view was an unconvincing and untenable argument to the effect that Mr Zhevago was a party to which the Debtors' obligations under loan and guarantee agreements had been transferred. Mr Pillow rightly did not seek to persuade me, in his oral submissions, that this argument had any validity. As Mr Sheehan submitted, a tortfeasor is not a party to whom the Debtors' obligations under the loan and guarantee agreements have been transferred.

50.    It is these various rights which are then defined as "the Rights of Claim", and this expression is used later in the agreement. There is nothing in Clause 1, however, which provides that the "Rights of Claim" extend to claims against third party tortfeasors such as (as is alleged) Mr Zhevago.

51.    Clause 2 provides for the acquisition by Horizon of "all the rights of the creditor under the Main Agreements". Those "Main Agreements" have been identified in Clause 1 and refer to the loan and guarantee agreements there identified. It then identifies various rights which are included within the transfer: e.g. the right to demand the proper fulfilment of the Debtors' obligations under the Main Agreement. Clause 2 refers to "payment of interest specified in Appendix No 1 to this Agreement" and also that the "amount of the Rights of Claim to be transferred to the New Lender is specified in Appendix No. 1 to this Agreement". This appears to be a reference to various (untranslated) pages exhibited to Ms Gutovska's first witness statement, and which contain a detailed listing of various matters. There was no suggestion that there was here any reference to any tort claim against Mr Zhevago. Rather, as Mr Sheehan submitted, this referred to amounts of various contractual claims, as Clause 1 had already made clear.

52.    The concluding sentence of Clause 1 refers to the transfer to Horizon "in full" of the "rights of the creditor under the Main Agreements", but there is then a specific carve-out of a right which is not transferred; namely the right to conduct contractual debiting of funds. The carve-out of a specific contractual right is consistent with the provisions which provide for the transfer of contractual rights.

53.    Clause 5 provides for the transfer of documents available to DGF "confirming the Rights of Claim" within 30 days after conclusion of the agreement. Mr Sheehan made the point, based upon statements made by WWRT as to the limited documentation which it had been passed, that it appears to have been contractual documentation which was in fact provided to Horizon, and thence to WWRT. There is, therefore, nothing to suggest that any documents relating to claims in tort against Mr Zhevago were transferred. This was relied upon as further support for Mr Sheehan's submission that tortious rights were not intended to be transferred. Under Article 213 (4) of the Civil Code, the subsequent behaviour of the parties is potentially relevant to issues of contractual interpretation. Mr Sheehan's point here was a fair point, but in my view a fairly minor one; since I did not think that the process of contractual interpretation reached Article 213 (4), which only applies if "it is not possible to determine the true will of the person who committed the transaction" in accordance with the earlier rules of that Article.

54.    Clause 11 refers to the consequences of invalidation of "all or any of the Right of Claim under the Main Agreements". In his evidence, Dr Tsiura sought to derive some support

from this clause for the proposition that tortious rights were transferred. Mr Pillow did not make that point in his written or oral submissions, and for good reason. Clause 11 is of no relevance to the issue of whether the assignment included tortious rights. This was in my view a very poor argument on the part of Dr Tsiura, as indeed was his point on "Debtors" in the context of Clause 1.

55.    Mr Sheehan submitted, in the light of these provisions, that there was no real room for doubt as to what the contract means and what it provides for, and that one does not get beyond Article 213 (3) of the Civil Code when approaching the issue of interpretation under Ukrainian law. The answer, he submitted, is clear whether one looked at the meaning of the relevant words and concepts, including the commonly accepted meaning of terms in the relevant sphere of relations, or the relevant words in the context of the entire contract. In short, there was no assignment of tortious rights. I agree. I do not consider that – approaching the matter as one of interpreting the terms of the written agreement in accordance with the relevant Ukrainian law principles – there is a serious issue to be tried on the question of whether there was an assignment of tortious rights.

56.    I reach this conclusion without reference to the similar conclusion reached by Jack J in the British Virgin Islands, and the Eastern Caribbean Court of Appeal in *WWRT Ltd v Carosan Trading* (Claim No. BVIHC (Com) 2021/0096). I agree with Mr Pillow that I need to address the issues in this case by reference to the evidence and argument before me, rather than by reference to conclusions on Ukrainian law reached by other judges in different cases.

*The automatic transfer argument: the issue*

57.    As already indicated, the essential argument advanced by Mr Pillow, based on the reports of Dr Tsiura, was based upon a substantive principle of Ukrainian law whose effect was to transfer the tortious rights. Thus (in paragraph 143 of his second report), Dr Tsiura said that "claims against third parties are transferred to the assignee together with rights of creditor in the loan, by way of operation of law". The language and theme of a transfer of rights "automatically by operation of the law" was repeated on a number of occasions in Dr Tsiura's reports, in particular his second report. His point is summarised in paragraph 184 of his second report:

> "I agree with Mr Alyoshin that the Bank/ Horizon assignment does not contain any explicit provisions to the effect that the Bank held any tortious claims against the borrowers and/or KZ. The fact that any tortious claims have been assigned by the Bank to Horizon follows from the assignment of rights in the loan agreements, as rights of claim against third parties are transferred automatically with rights of creditor in the loan agreement by operation of law".

58.    The question which I therefore need to consider, in the context of the jurisdiction application, is whether there is a serious issue to be tried on this point. There was no dispute that this involved asking the same question as arises on a summary judgment application, namely whether the case has a real (as opposed to a fanciful) prospect of success.

59.   The relevant principles in a summary judgment context were summarised in the judgment of Picken J in *ArcelorMittal North America Holdings LLC v Ravi Ruia et al* [2022] EWHC 1378 at [26]-[28]:

> "[26] The principles in relation to a defendant's summary judgment application were set out in *Easyair Ltd v Opal Telecom Limited [2009] EWHC 339 (Ch) at [15]*. Those principles have been recited in many subsequent cases, including perhaps most recently by me in *JJH Holdings Ltd v Microsoft [2022] EWHC 929 (Comm) at [11]*:
>
> "(i) the Court must consider whether the claimant has a 'realistic' (as opposed to a 'fanciful') prospect of success; (ii) a 'realistic' claim is one that carries some degree of conviction, which means a claim that is more than merely arguable; (iii) in reaching its conclusion the Court must not conduct a 'mini-trial', albeit this does not mean that the Court must take at face value and without analysis everything that a claimant says in statements before the court; and (iv) the Court may have regard not only to the evidence before it, but also the evidence that can reasonably be expected to be available at trial. Furthermore, where a summary judgment application turns on a point of law and the Court has, to the extent necessary, before it 'all the evidence necessary for the proper determination of the question,' it 'should grasp the nettle and decide it' since the ends of justice are not served by allowing a case that is bad in law to proceed to trial."
>
> [27]  As to (iv), the Court will "be cautious" in concluding, on the evidence, that there is no real prospect of success; it will bear in mind the potential for other evidence to be available at trial which is likely to bear on the issues and it will avoid conducting a mini-trial: *King v Stiefel [2021] EWHC 1045 (Comm) at [21]* (per Cockerill J).
>
> [28]  Furthermore, as Fraser J also recently put it in *The Football Association Premier League Limited v PPLive Sports International Ltd [2022] EWHC 38 (Comm) at [25]* , on a summary judgment application the Court must "always be astute, and on its guard" to an applicant maintaining that particular issues are very straightforward and simple, and a respondent attempting to dress up a simple issue as very complicated and requiring a trial.

60.   An issue of Ukrainian law is viewed, in the context of English proceedings, as an issue of fact, not an issue of law. Where such an issue arises in the context of a summary judgment or "serious issue to be tried" argument, I see no reason why the court should adopt any different approach to that which it usually adopts, when addressing issues of fact in the context of summary judgment applications or deciding whether there is a serious issue to be tried. The court must consider whether the factual point raised carries the necessary degree of conviction to reach the threshold of having a real, as opposed

to a fanciful, prospect of success. A court is therefore not required to take at face value and without analysis everything that a claimant says in statements before the court, and I take the view that this applies equally to statements made by an expert witness as to the law of a particular country, however distinguished that expert might be. Where, as in the present case, experts have provided extensive reports with citations of legal materials, the court is well equipped to understand the basis of the argument being advanced, and to assess whether it has the necessary degree of conviction to pass the relatively low hurdle of "serious issue to be tried".

61.     Mr Pillow emphasised that Dr Tsiura is a very well-qualified expert: he is a Doctor of Laws and is a Professor of Civil Law and Head of Civil Law Department at the School of Law of Taras Shevchenko National University of Kyiv in Ukraine. He also submits that Dr Tsiura's view, as to the substantive principle of law which he identifies, is supported by three decisions of Ukrainian courts, to which I refer below.

62.     Mr Sheehan contends in summary, based on the evidence of Mr Alyoshin, that the question of whether tortious rights were transferred depends upon what the parties actually agreed. Thus, by way of example, Mr Alyoshin said the following in his first report:

> "[256] As I explained above, neither Article 514 UCC, nor other provisions of Ukrainian law support the view that the tortious claims are somehow "embedded" into contractual obligations and automatically "follow" such contractual obligations in case of their assignment. Assignment of the right to claim under the tort against a tortfeasor shall be made by an arrangement between an assignor and an assignee where they reached an agreement upon all material terms of the assignment. Having read the Bank/Horizon Assignment, I have not identified any provision to the effect that (i) the Bank held any tortious claims against the Borrowers and/or the Defendant, and (ii) that any tortious claims, if they even existed, have been assigned by the Bank to Horizon."

63.     Mr Sheehan submitted therefore, that there was no support for the proposition that, irrespective of the parties' contractual agreement, Ukrainian law automatically imposes upon the parties an agreement to transfer certain rights which in fact forms no part of the agreement which they have made. He submitted that there is nothing in the recognised sources of Ukrainian law, identified by both experts, which supports the substantive principle of law relied upon by Dr Tsiura. The three cases relied upon are not recognised sources of Ukrainian law, and in any event do not establish the proposition for which Dr Tsiura contends.

*Discussion*

64.     In his first report, Dr Tsiura expressed the view that the tortious right under Article 1166 could not be retained by the original creditor, when assigning rights under the loan agreements. The transfer of these rights was not dependent on the precise terms of the assignment because the claim was with the person who was entitled to the funds under the loan agreement.

65.     Dr Tsiura's first report was relatively short, and the underlying basis for his opinion was not explained, at least at all clearly. Indeed, I note that Mr Pillow in his oral submissions did not wholly adopt the position which (as it seemed to me) was being taken by Dr Tsiura in that report: namely that the law actually prevented a creditor, who was assigning a loan, from retaining the relevant tortious rights. Mr Pillow thus accepted that it was permissible for the parties to agree that only certain rights were to be transferred. In my view, this must be correct for any number of reasons. In particular, Article 514 refers to the acquisition of the rights in the obligation "in the scope and on the conditions that existed at the time of the transfer of these rights <u>unless otherwise established by the transaction</u> or legal acts". This indicates that, as Mr Pillow submitted, it was open to the parties to exclude particular rights from an assignment. It also seemed to me that this conclusion would follow from the general principle, to which Dr Tsiura referred, of freedom of contract. The Supreme Court decisions, referred to below, are also relevant in this regard; they show that the court attached significance to  the terms which the parties had actually agreed.

66.     As described above, both experts identified the relevant sources of Ukrainian law, and both were agreed that the Civil Code is a prime source. There is, however, nothing in the Civil Code which sets out the principle to which Dr Tsiura refers. On the contrary, Article 514 indicates that the effect of the assignment depends upon the terms which the parties have agreed, which is a central point made by Mr Alyoshin.

67.     Furthermore, Dr Tsiura was unable to point to any Supreme Court authority which supported the proposition for which he contended. By contrast, Mr Alyoshin was able to point to Supreme Court authority in support of the proposition that the effect of the assignment depends upon the terms that the parties have agreed. In paragraph 206 of his first report, Mr Alyoshin says:

> "[206] Normally, assignment is made by the conclusion of a contract between (i) an original creditor (an assignor) holding a right of claim against an obligor and (ii) a new creditor (an assignee) to whom the right of claim is transferred. For a contract to be concluded, the parties must have reached an agreement upon all of its material terms, including its subject matter. As to its subject matter, a contract must indicate the scope, quantum of claim and other relevant details of rights that are being transferred."

68.     The final sentence of that paragraph referred to the Resolution of the Supreme Court dated 21 January 2019 in case No. 909/1411/13. That case involved an issue as to whether there was an effective assignment of particular rights so as to enable an assignee (Trust Finance Financial Company) to replace the original creditor (VS Bank Public Joint Stock Company) as a party to enforcement proceedings. Reliance was placed upon an assignment agreement and Article 512 of the Civil Code. The Commercial Court allowed the replacement, but its decision was overturned by the appeal court. A subsequent appeal to the Supreme Court on that issue failed. One of the arguments raised, by the successful respondent party to the appeal, was that the assignment relied upon did not contain essential terms and conditions.  There appear to have been two particular difficulties with the assignment relied upon in that case, as identified in paragraphs 31 – 33 of the judgment of the Supreme Court. In summary, one difficulty was that the parties in the agreement had agreed that Annex 1 to the

assignment should contain certain details, but the Annex did not contain those details. Another difficulty was that the underlying claim arose under an agreement dated 2005, whereas the parties' agreement referred to a 2008 agreement.

69.     The Supreme Court approved certain resolutions which it had made in a previous case, and referred to Articles 512 and 514 as follows:

> "27. The Resolutions of the Supreme Court of Ukraine dated 7/5/2017 in cases No. 6-459цс-17 and No. 752/8842/14-ц (one of which the court of appeal reasonably took into consideration in this case under review) and of the Supreme Court dated 26/9/2018 in case No. 756/9788/15-ц set out the following legal conclusion: In accordance with Article 512 (1) (1) of the Civil Code of Ukraine, the creditor in an obligation may be replaced with another person by transferring its rights to such person under a legal instrument (assignment of claim).
>
> The transaction for replacement of the creditor in an obligation shall be executed in the same form as the transaction that gave rise to the obligation under which the claims are transferred to the new creditor. A transaction for replacement of the creditor in an obligation that arose on the basis of the transaction that requires the state registration shall be registered in accordance with the procedure established for registration of this transaction, unless otherwise provided by law (Article 513 of the Civil Code of Ukraine).
>
> <u>Article 514 of the Civil Code of Ukraine</u> states that a new creditor shall accrue rights of the original creditor under the obligation to such extent and on such conditions as existed at the time of transfer of these rights, unless otherwise provided in the agreement or the laws.
>
> Thus, as a matter of the applicable law, a claim may be assigned only if it is a valid claim that existed at the time of transfer of such rights.
>
> The scope of the rights to be transferred to the new creditor may be limited under the law and the contract under which the right is transferred. The scope and contents of the rights to be transferred to the new creditor shall be treated as essential terms and conditions of this contract."

70.     The Supreme Court also concluded that the absence of information in Annex 1, contrary to the parties' agreement as to the details which it should contain, meant that "Annex No. 1 to the Claim Assignment Agreement does not contain such conditions as the scope and contents of the rights that existed at the time of the transfer, as required by Article 514 of the Civil Code of Ukraine".

71.     It seemed to me that this case shows, consistent with Mr Alyoshin's evidence, that in the context of assignments and Articles 512 – 514 of the Civil Code, it is critical to look

at what the parties have actually agreed. This might indeed seem to be a fairly obvious and self-evident proposition, in a contractual context. In that case, the parties had agreed that certain details of the rights assigned should be contained in the Annex, but the Annex did not in fact contain those details. This ultimately proved fatal to the application for the assignee to replace the original creditor.

72. The proposition that, in a contractual context, it is necessary to look at what the parties actually agreed is also evident in another Supreme Court decision to which Mr Alyoshin referred: the decision dated 20 February 2020 in Case No. 904/2425/18, in particular paragraphs 5.21 and 5.37 to 5.39. It is not, however, necessary to discuss that case in detail.

73. Dr Tsiura's argument posits, however, that, as a matter of Ukrainian law, there can be (as the result of a principle of substantive law for which he contends) an assignment of rights which goes beyond that which the parties have actually agreed. Applied to the present case, this means that although the parties' agreement concerns the assignment of contractual rights against certain parties arising under certain agreements, the assignment will by operation of law extend the assignment so as to cover tortious rights against different parties. This seems a surprising proposition, because it would have the effect of imposing on the parties a transfer of rights to which they had not actually agreed, and thus to divest the assignor of rights which he had not agreed to give away. As previously indicated, there is no Supreme Court authority which supports this proposition, nor anything in the Civil Code which so provides. The proposition also seems surprising in the context of a Civil Code which has a general principle of freedom of contract. All of these matters reinforce the importance, even in the context of a "serious issue to be tried" argument, of examining whether the legal proposition for which Dr Tsiura contends has a sufficient basis to persuade the court that the prospect of success on the point is real rather than fanciful.

74. In his second report, Dr Tsiura referred to three authorities which, in his view, supported the proposition for which he contended. In his oral submissions, Mr Pillow placed particular reliance on the decision in *Felix v Mr Michael Lagun and others* ("the *Felix* case"), Case No. 757/68688 published on 20 March 2023. This was very much the lynchpin of WWRT and Dr Tsiura's argument. Mr Pillow also relied upon a criminal case, *Investohills Vesta v Person 1* ("the *Investohills* case") Case No. 752/5263/20 published on 28 August 2020. Dr Tsiura also referred to a third case, also a criminal case, *Fintime Capital v Dementienko* Case No. 752/17912/21. However, Mr Pillow accepted that the third case did not take matters further. Indeed, as both experts pointed out, the relevant ruling in *Fintime Capital* had been quashed. It is therefore not necessary to discuss that case.

75. One difficulty with all of these cases is that, on the evidence of both experts, they are not relevant sources of Ukrainian law. However, I accept that if either or both cases provided clear support for the proposition for which Dr Tsiura contended, certainly if the relevant issue had been squarely raised and decided, then the cases could not be disregarded (in the context of deciding a serious issue to be tried argument) on the basis that they were not relevant sources of Ukrainian law. However, the proposition relied upon by Dr Tsiura was not raised in either the *Felix* case or the *Investohills* case, and neither case therefore considered that proposition or decided that it was a correct statement of Ukrainian law. There is therefore nothing in these cases (which, as I have said, are not relevant sources of Ukrainian law anyway) which provides a counterweight

of any significant strength so as to outweigh the matters to which I have already referred.

76.    The *Felix* case involved a claim by an assignee against two people, referred to in the report as Person 1 and Person 2. Both of these people were connected with the assignor bank. Person 1 held the position of Chairman of its supervisory board. Person 2 was the deputy chairman of the bank's board. The essence of the claim was that these people had joined a shareholders' agreement, and had then influenced the assignor bank not to take action to collect debts from a number of debtors. The assignee therefore claimed that it had lost the opportunity fully to collect such debts. The claim was therefore in the nature of a tortious claim against those two persons, and (as the appeal court said in its judgment) was primarily based on a particular statute: Article 58 of the Law of Ukraine "On Banks and Banking Activities" which came into force in March 2015. This statute provided, as the court explained, for "the possibility of imposing liability for the bank's losses on related parties in connection with their actions". Both Dr Tsiura and Mr Alyoshin appear to have understood that the relevant tortious actions relied upon by the claimant had taken place <u>after</u> the assignment. However, this was not a point ultimately pressed by Mr Sheehan: the relevant actions took place in 2014/2015, and the relevant assignment (as Dr Tsiura was able to discover from the record of the first instance hearing) was 2018.

77.    The claim succeeded in the relevant Kyiv District Court, which gave its decision on 26 August 2022. There was then an appeal by Person 1 to the Kyiv Court of Appeal, with appeal papers being filed towards the end of 2022 and the Court of Appeal giving its decision in March 2023. (I mention these dates, because they are potentially relevant to the later issue concerning forum conveniens and the evidence of the existence of a functioning legal system in Ukraine following the Russian invasion.) The appeal of Person 1 was also supported by the DGF on various grounds. Those grounds included that it was only the DGF which had been granted the right to file a claim for damages or losses against persons related to the bank, and also that the claimant had not acquired the right of claim that was the subject of the case.

78.    The decision of the Court of Appeal was that both the appeals of Person 1 and the DGF succeeded. As far as Person 1 was concerned, the appeal succeeded on the basis that the claimant assignee had failed to provide sufficient factual proof in support of its case. Person 1 had not advanced any argument to the effect that there had been no valid and effective assignment of the relevant tortious rights to the claimant assignee. There was therefore no argument (as in there is in the present case) that the only assigned rights were contractual and not tortious. It is in fact difficult to see how any such argument could have been advanced. As Dr Tsiura has identified, the assignment in that case was in wider terms than the assignment with which I am concerned. It provided for the transfer of various contractual rights "as well as other rights related to or arising from the Right of Claim". No point was thus taken that the assignment was ineffective to transfer tortious rights. The Court of Appeal was therefore not required to address an argument that, irrespective of the terms of the assignment, tortious rights were transferred as a matter of law when there is an assignment of contractual rights. There is therefore nothing in the Court of Appeal's judgment, in relation to the successful appeal of Person 1, which supports the proposition that there is an automatic transfer of tortious rights in circumstances where the terms of the parties' agreement only concern contractual rights.

79.     As far as concerns the appeal of DGF, it was indeed part of their argument that the claimant had not acquired the right of claim which was the subject of the case. However, this argument was not based upon the terms of the assignment which the parties had made. Rather, the DGF's argument was based on various statutory provisions concerning bank regulation, and the DGF therefore submitted that the right to apply to court for claims in connection with Article 52 of the relevant law was granted exclusively to the DGF. Thus, the DGF was not saying that the terms of the assignment were not wide enough to effect a transfer of the relevant tortious rights, and that it was confined to contractual rights.

80.     Equally, there is nothing to suggest that the claimant assignee resisted the DGF's appeal on the basis of the proposition of law for which Dr Tsiura contends; i.e. that the assignment of contractual rights carries with it an automatic assignment of tortious rights.

81.     The Court of Appeal's decision was (contrary to one aspect of the DGF's arguments) that the relevant tortious rights relied upon were capable of assignment. However, the DGF succeeded in its argument that the claimant assignor had not actually acquired those rights in that case. The essential reason for that conclusion appears to be one of timing. In "the disputed legal relations", the law in force was that which predated the March 2015 statute, and the relevant powers to bring proceedings "really belong to the exclusive competence of the Fund".

82.     Accordingly, the court's decision on the DGF appeal did not give effect to any supposed principle that the assignment of contractual rights effected an automatic transfer of tortious rights. In fact, far from deciding that the claimant assignee had acquired the relevant rights by reason of the proposition of law for which Dr Tsiura contends, the court's decision was that the claimant assignee had not acquired the particular rights which formed the basis of its claim.

83.     Against this background, I do not consider that the case provides any support for the proposition for which Dr Tsiura contends. Nor does it provide support which (when viewed in the context of matters to which I have already referred) crosses the threshold between a fanciful and real prospect of success.

84.     Particular reliance was placed by WWRT on one paragraph (underlined below) which appears in the following context of the judgment:

> "In this regard, the panel of judges does not share the Fund's position that the right to claim damages under the obligation at issue in this case cannot be assigned.
>
> Pursuant to the provisions of Article 512 of the Civil Code of Ukraine, a creditor in an obligation may be replaced by another person as a result of the transfer of its rights to another person under a transaction (assignment of the right of claim).
>
> Pursuant to Article 514 of the Civil Code of Ukraine, the rights of the original creditor in the obligation are transferred to the new creditor to the extent and on the terms and conditions that existed

at the time of the transfer of these rights, unless otherwise provided by agreement or law.

At the same time, the Court of Appeal draws attention to the clear definition by the legislator of the legal structure of the transfer of the right of claim - within the scope of a specific obligation.

In accordance with the conclusions set out in the Resolution of the Grand Chamber of the Supreme Court of March 16, 2021 in case No. 906/1174/18 (to which the DGF itself referred), the rights of claim under loan agreements and agreements ensuring their fulfillment may be transferred in favor of any person by selling them at auction.

Loan obligations are not obligations that are inextricably linked to the creditor's personality, and therefore, where the creditor may not be replaced (Article 515 of the Civil Code of Ukraine).

<u>In view of the above, in the case of assignment of the right of claim in a loan obligation, the new creditor acquires both the right to claim performance in kind and the right to claim damages from the person who prevented the proper performance of such obligation to the same extent and to the same extent as the original creditor.</u>

Despite the fact that the legal provisions referred to by both the claimant in its claim and the DGF in its appeal provide for the application of some of them to be within the exclusive competence of the DGF and other entities (within certain limits), the court's opinion is that the above refers to the wording of such legal provisions currently in force."

85.     The underlined paragraph appears in the context of paragraphs which indicate that the basis of assignment is contractual. The court was, however, not addressing an argument that the assignment in that case was not sufficiently wide to effect a transfer of tortious rights. As I have said, that argument was not advanced by any party, and the assignment in that case was broadly drafted so as to refer to rights related to or arising from the contractual rights assigned. I do not consider that the paragraph can realistically be read as establishing a general proposition that, irrespective of the terms of the contract between the parties, tortious rights are automatically transferred as a matter of law.

86.     I will deal with the *Investohills* case more briefly. This was a procedural ruling in a criminal context by an investigating judge as to whether a particular party had the status of "victim" in the criminal proceedings. The judge reversed the prosecutor's decision which had denied that status to the successful appellant. There was no argument based on the proposition of law for which Dr Tsiura contends, and I do not consider that the case can be read as providing any support for that proposition.

87.     In summary on this issue, this is a case where the basis of the transfer relied upon is contractual, but where the terms of the critical assignment (from DGF to Horizon) do not effect a transfer of the tortious rights on which WWRT's claim depends. There is

nothing in any of the recognised or authoritative sources of Ukrainian law – specifically the Civil Code and decisions of the Supreme Court – which provides for the automatic transfer of tortious rights in circumstances where the parties have not agreed to such transfer. The proposition that Ukrainian law would impose on the parties an assignment of rights to which they have not agreed is a surprising one, and fits uneasily (to say the least) with the general principle of freedom of contract, and Supreme Court decisions (in the context of assignment) which pay regard to the terms which the parties have actually agreed. The cases upon which WWRT and Dr Tsiura rely, in support of this surprising proposition, are not recognised sources of Ukrainian law, and were not cases in which the proposition was squarely raised or decided. In the circumstances, I consider that there is no serious issue to be tried on this point: WWRT's argument does not reach the threshold of a real prospect of success.

88.    This conclusion means that Mr Zhevago's application succeeds. I will, however, address the other issues, since these also provide reasons why the application succeeds.

## C: The tort gateway

## C1:  Legal principles

89.    The gateway relied upon by WWRT is CPR PD 6B Paragraph 3.1 (9) (b). This concerns a claim in tort where "damage which has been or will be sustained results from an act committed, or likely to be committed, within the jurisdiction".

90.    As reaffirmed in the recent judgment of the Court of Appeal in *Manek v IIFL Wealth (UK) Ltd* [2021] EWCA Civ 264 para [33], the position where jurisdiction is disputed under this gateway is that the test to be applied by the court is that set out in *Metall und Rohstoff AG v Donaldson Lufkin & Jenrette Inc* [1990] 1 QB 391 at 437 E-G. The relevant passage in *Metall und Rohstoff* is as follows:

> "Condition (c) prompts the inquiry: what if damage has resulted from acts committed partly within and partly without the jurisdiction? This will often be the case where a series of acts, regarded by English law as tortious, are committed in an international context. It would not, we think, make sense to require all the acts to have been committed within the jurisdiction, because again there might be no single jurisdiction where that would be so. But it would certainly contravene the spirit, and also we think the letter, of the rule if jurisdiction were assumed on the strength of some relatively minor or insignificant act having been committed here, perhaps fortuitously. In our view condition (c) requires the court to look at the tort alleged in a common sense way and ask whether damage has resulted from substantial and efficacious acts committed within the jurisdiction (whether or not other substantial and efficacious acts have been committed elsewhere): if the answer is yes, leave may (but of course need not) be given. But the defendants are, we think, right to insist that the acts to be considered must be those of the putative defendant, because the question at issue is whether the links between him and the English forum are such as to justify his being brought here to answer the plaintiffs' claim."

91.    In *Manek*, the Court of Appeal emphasised the passage underlined above. *Manek* concerned allegations of deceit, where the claimant was relying upon what was said at two meetings held within the jurisdiction. The judge had decided that the relevant acts relied upon, and committed within the jurisdiction, were not sufficiently "substantial and efficacious". The Court of Appeal reversed that decision, and identified some errors of principle which the judge had made. One error of principle was that the judge had disregarded, as sufficiently substantial, a meeting in London where misrepresentations had allegedly been made, on the basis that the sellers were not at that time persuaded to enter into a sale transaction. The Court of Appeal referred (at paragraph [48]) to the fact that the alleged fraud was an ongoing process, correctly described as an "evolution". It was a continuing fraud because of the concerns and suspicions of the appellants.

> "It is wrong in law to suggest that, in such circumstances, it was only the last misrepresentation or threat, whatever it was that finally broke [the claimant sellers'] resistance, that could amount to the material event for the purposes of the claim in deceit. The absence of immediate reliance on one particular misrepresentation in an evolving fraud cannot be said to render that particular misrepresentation insubstantial or not causative of the eventual loss: it is sufficient if the misrepresentation substantially contributed to the ultimate deception."

92.    Another error of principle in *Manek* was a comparative exercise on which the judge had embarked: see [51] – [53]. The Court said, referring to *Metall und Rohstoff*,

> "[52] Of course, as the judgment in that case makes plain, when considering whether damage resulted from substantial and efficacious acts committed within the jurisdiction, it is important that the court looks at the allegations and the evidence 'in a common sense way'. That means looking at the fraud as a whole. But it is wrong in principle to conclude, as the judge appears to have done, that because what he thought was a more important event (namely the call of 22 August, noted at paragraph 19 above), which was obviously substantial and efficacious, had occurred outside the jurisdiction, this therefore 'emphasises the insignificance of what was said at the first London meeting'.

> [53] The judgment of the court in *Metall und Rohstoff* makes it clear that the court has to ask whether damage has resulted from substantial and efficacious acts committed within the jurisdiction, and not to concern itself with 'whether other substantial and efficacious acts have been committed elsewhere'. That is what the judgment says in express terms. It is not possible to gloss it. In an evolving international fraud like this, with relevant events in London, Vienna, Singapore and India, it is not permissible to embark on a geographical comparison exercise, identifying where each event happened, and then announcing the single winner of the jurisdictional contest by reference to the competing quantities and/or qualities (in terms of causative significance) of the relevant events. The fact that, on the judge's analysis, the telephone call of 22 August was more substantial

and efficacious is irrelevant in principle to the question of whether what was said and done at the meeting in London on 8/9 August 2015 was substantial and efficacious."

93.    When an issue arises as to whether a claim comes within one of the gateways in PD 6B, a claimant must show a good arguable case. Both parties referred me to the helpful decision of Sir Michael Burton in *AltaTrading UK Ltd v Bosworth and others* [2020] EWHC 2757, where he summarises the approach to "good arguable case" following the well-known three-limbed test set out by the Supreme Court in *Goldman Sachs International v Novo Banco* [2018] UKSC 34 at [9] and elaborated by the Court of Appeal in *Kaefer Aislamientos SA de CV v AM Drilling Mexico SA de CV* [2019] EWCA Civ 10. Sir Michael Burton summarised the approach to be taken as follows:

> "[13] My interpretation of the state of the law and the three limb test is straightforwardly as follows:
>
> (i)   In limb (i) the Court must decide if it can who has the better of the case. If it decides that the claimant has the better of the case, he will have a good arguable case or a plausible evidential basis. If the defendant has the better of the case then the claimant fails.
>
> (ii)  Limbs (ii) and (iii). The judge may have to struggle because at the jurisdiction stage the evidence may be wholly uncertain and insufficient and, in particular, because there has been no testing of that evidence by cross-examination or otherwise, and usually no adequate disclosure of documents by either side. He or she may not be able to reach even a provisional conclusion as to which party has the better case, and even if the judge tried to do so he or she may well turn out to be wrong. In such a circumstance where the judge cannot decide, after conscientiously doing his or her best, who has the better of the case, then it is sufficient if the claimant has a plausible evidential basis and that will suffice for a good arguable case."

94.    On appeal, the Court of Appeal said that he had applied the right test: see [2021] EWCA Civ 687 para [6].

## C2:  The parties' arguments

*Mr Zhevago's argument*

95.    On behalf of Mr Zhevago, Mr Sheehan submitted that no substantial and efficacious acts were committed in the jurisdiction. The alleged fraud relied upon by WWRT involved a series of loans and related transactions which concerned the Bank in Ukraine and a number of Ukrainian entities and individuals. It thus had no substantial connections with any other jurisdiction, including England. It was unsurprising that WWRT accepted that the alleged damage occurred in Ukraine.

96.   The conduct relied upon by WWRT was Mr Zhevago's alleged direction or procurement of the steps (described in Section A above) in pursuance of a fraudulent scheme against the Bank in Ukraine. The relevant period in which the conduct was said to have taken place was February 2007 to May 2016. However, during that period Mr Zhevago was domiciled in Ukraine. Although he came to England for specific business and family visits, his visits were brief and he was not resident here at any time. Flight data was available showing that, between 2007 and 2009, Mr Zhevago spent a total of 564 days in Ukraine, compared to just 75 days in England; an average of around 25 days a year. Between 2010 and 2015, he spent the equivalent of approximately 30 days a year in England and up to May 2016, approximately 5 days. The flight data from 2007 and 2009, when Mr Zhevago was flying on a private jet, showed that he typically arrived and left England on the same day (sometimes after just a few hours) or left the day after arriving.

97.   There was therefore no basis for the court concluding that WWRT has the better of the argument that Mr Zhevago took substantial and efficacious steps to direct the alleged Ukrainian scheme whilst on visits to England. There was no evidence to support this. Any other individual to whom, on WWRT's case, Mr Zhevago would have given instructions (e.g. to execute documents or advance monies) could only have been in Ukraine, and Ukraine was overwhelmingly the centre of gravity of the alleged conduct. As far as Mr Zhevago's connections to the jurisdiction are concerned: he was not resident here, did not maintain a home here, and he was only in the jurisdiction for flying visits for specific purposes unrelated to the Bank; either Ferrexpo-related business or visiting family. No inference can sensibly be drawn that he carried out substantial and efficacious acts in England to further an alleged Ukrainian scheme during those visits.

98.   In his oral submissions, Mr Sheehan submitted that it was important to look not only at whether there were substantial and efficacious acts, but also whether they had a causative effect. WWRT's case really amounted to no more than saying that Mr Zhevago was here from time to time. The authorities showed that it was necessary to look for a relevant act carried out within the jurisdiction, and then to ask whether that act was substantial and efficacious. Here, there is no evidence of any act at all. The court is therefore in no position to decide whether any particular act, or series of acts, was substantial and efficacious. The court had nothing to work with in applying the test. The court could not simply infer that some act or acts were carried out here, and then go on to conclude that the act or acts were substantial and efficacious. It would be no more than speculative to conclude that there were any such acts.

99.   Here, the case concerned a Ukrainian Bank and Ukrainian loans. On some facts, for example if a particular defendant was actually living here, it might be possible to draw an inference that a fraud in a different country was procured and directed from England. However, there is no basis for such a conclusion here. Mr Zhevago was in England for only short periods of time, and he had good reasons to be here, in particular to deal with the business of Ferrexpo and to see his children. Even if it were to be assumed (albeit that there is no evidence to that effect) that Mr Zhevago sent some e-mails from England which were related to the alleged fraud, the question would arise as to whether any particular email was substantial and efficacious in the context of the fraud as a whole. He illustrated the point by giving the example of a (theoretical) e-mail which related to the onward transfer of funds from one company to another, when both companies were

very distant from the transaction whereby funds had been fraudulently obtained in the first place. In that example, the email relating to the onward transfer would not be a substantial or efficacious act. Here, however, there had been no attempt by WWRT to identify any specific acts, and there was no basis for a conclusion that any such acts were substantial or efficacious.

100.    Mr Sheehan also emphasised that the various Ukrainian companies which had borrowed from the Bank were not owned by Ferrexpo. There was therefore no basis for an argument that when Mr Zhevago was here on Ferrexpo business, he was dealing with the affairs of the various Borrowers. He referred in that connection to an organisation chart. This showed many entities, but no clear connection between Ferrexpo and the borrowing companies. In Ms Gutovska's second statement, she had said that Ferrexpo plc was "not a defendant to this claim, is not one of the Borrower Companies and is not involved in this claim in any way".

*WWRT's submissions*

101.    On behalf of WWRT, Mr Pillow submitted that there were reasons to be sceptical of Mr Zhevago's account of his time spent in London. However, even assuming that his evidence were to be accepted, his evidence and that of Mr Wyatt provided ample support for WWRT's case on substantial and efficacious acts. In 2007-9 alone, Mr Zhevago spent on average about a month a year in England and one of his primary reasons for doing so was to conduct business. The other primary reason was to visit his family; but Mr Zhevago is by all accounts, his included, a busy man with a number of business interests. It is scarcely beyond plausible inference that even during his visits to family he would regard the financial affairs of the Bank and of what he calls the Ferrexpo Group, including the Borrowers - the more so where he stood personally to gain a great deal by the operation of the Scheme. Mr Wyatt's evidence accepted that Mr Zhevago often worked "on the go" while in England.

102.    The fraudulent scheme relied upon by WWRT was elaborate and executed through an enormous number of transactions between entities in the Ferrexpo Group (on WWRT's case all, ultimately, leading to Mr Zhevago personally). The procurement or direction of any one of those transactions would have been a substantial and efficacious act so as to bring WWRT's claims through the gateway.

103.    Both parties' cases are inescapably inferential: at their highest, Mr Zhevago's submissions are a tenuous hook for the inference that he requires the court to draw, that it is not well arguable that he directed or procured the Scheme by any substantial or efficacious act while in the jurisdiction. The hook is the more tenuous because Mr Zhevago accepts that, whatever his legal ties to Ukraine, he had throughout the operation of the Scheme a transient lifestyle, travelling frequently and stationary nowhere for long. His presence in this jurisdiction stands out in that context as substantial and regular. There is accordingly a plausible evidential basis for the Court to conclude that Mr Zhevago did at least in part direct or procure the Scheme while in the jurisdiction, and that evidential basis exists even if it is inferential.

104.    In his oral submissions, Mr Pillow emphasised that it did not matter whether Mr Zhevago was domiciled or resident here, or whether he spent most of his time abroad or most of his time here. He said that there was some evidence that he was residing here in the sense that he was here for a day a week and had family ties here. But the relevant

question was whether there is a plausible evidential basis to suggest that Mr Zhevago was here enough that he must have committed one or more substantial and efficacious acts from the jurisdiction during his stay. Mr Pillow accepted that the relevant instruments that were used to effect the fraud (loan agreements, supplemental agreements and pledges) were entered into in Ukraine. But this did not matter. Mr Zhevago was not running the document factory in Ukraine: he was directing, procuring and controlling what was happening. The case that was advanced against Mr Zhevago was inferential, but that did not mean that it was not a good case. It was also inferential that there were acts within the jurisdiction which were substantial and efficacious. WWRT did not have any underlying documents, such as e-mails or messages, which show what was done. But it was plausible that one or more of the acts of direction and control and procurement of the scheme, which were substantial and efficacious, were carried out in England. Mr Zhevago was here for a month a year, and it was not plausible that he would have stopped running the fraudulent scheme when he was here.

105.    Mr Pillow pointed out that one of the relevant loan agreements was entered into on 12 February 2009, which was a date when he had arrived in London. Given the volume of loan agreements, it would be surprising if that had not happened more often. He described some work carried out by his junior, Mr Donnelly, which showed that in respect of the period 2007 – 2009, some 25 supplemental loan agreements could be tied to dates on the flight schedule when Mr Zhevago was in London. Mr Sheehan's response to this point was that WWRT had not provided Mr Donnelly's work. However, as far as the 12 February 2009 document is concerned, the flight records showed that Mr Zhevago landed in England at 8.40 pm. This would be 10.40 pm in Kyiv, and it was most unlikely that a person in Kyiv would have been waiting for instructions from Mr Zhevago until that late at night prior to signing the document.

## C3: Discussion

106.    The application for permission to serve out of the jurisdiction was made on a rather different factual basis to the case that WWRT ultimately advanced. In her witness statement in support of the application, Ms Gutovska's evidence was that Mr Zhevago was, at the material times, based in and operated from London, from where he directed and controlled his business interests; that he was living in England from at least September 2003 onwards; that he would likely spend a significant proportion of his time in England; that various documents filed at Companies House, which stated that Mr Zhevago's residence was Ukraine, were inconsistent with various matters including a Mount Street property purchased in 2012 which had been Mr Zhevago's residence since 1 February 2012; and that since Mr Zhevago spent a significant proportion of his time in England, he was likely to a material extent to have directed or procured the operation of the fraudulent scheme from England.

107.    Substantial evidence was adduced by Mr Zhevago on the issue of his connection with England, and the amount of time that he spent here and his reasons for being here. As a result of that evidence, the wide case as advanced in Ms Gutovska's witness statement (as summarised above) was in my view unsustainable. I did not in fact understand Mr Pillow to submit that there was a good arguable case that substantial and efficacious steps in furtherance of the fraudulent scheme were committed in London on the basis that Mr Zhevago was at the material times based here, was directing and controlling his business interests from London, was living in London from at least 2003 onwards, and would spend a significant proportion of this time in England. The case was in the end

advanced on a narrower basis (as summarised in Section C2 above); essentially that although he may not have been living in England or spending a significant proportion of this time here, Mr Zhevago visited England on a very regular basis, that he was working when he was here, and that the inference can be drawn (which met the good arguable case standard) that substantial and efficacious steps in furtherance of the fraud were taken here. This shift in the nature of the case was apparent in Ms Gutovska's second witness statement, where she said that it was not necessary for WWRT to show that Mr Zhevago was resident in England for the periods when the fraud was carried out, but "rather that he spent enough time in the jurisdiction to carry out substantial and efficacious acts here".

108.    In so far as any case was still being advanced based on the alleged factual position set out in Ms Gutovska's first witness statement, there was in my view very substantial evidence which contradicted it. Mr Zhevago had by far the better of the argument as to the factual position, so that any case advanced on the wider basis did not meet the good arguable case standard. The main features of the evidence (also relevant to the case advanced on the narrower basis) on behalf of Mr Zhevago were as follows.

109.    Mr Wyatt's statement, based on information provided to him by Mr Zhevago, was that Mr Zhevago had not been resident in London at the relevant time, or indeed at any time. He had sought to acquire a suitable property in London with a view to potentially basing himself in London in the future, but neither he nor his wife had ever in fact based themselves here. Although he had come to England occasionally over the period, he had stayed either in accommodation provided by Ferrexpo or in hotels. Contrary to suggestions in WWRT's evidence, he had never lived at a property in Mount Street or even spent a single night there: that property was uninhabitable when purchased and building works were, as at September 2022, incomplete.

110.    Mr Wyatt produced flight itineraries for the private jet on which Mr Zhevago travelled for the years 2007, 2008 and 2009. These showed that in the years 2007, 2008 and 2009, Mr Zhevago spent a total of 564 days in Ukraine; an average of 188 days a year. Mr Wyatt explained the basis on which this figure was calculated, and although Mr Pillow had some relatively minor criticisms of the method of calculation, WWRT did not produce any alternative calculation which showed any materially different figure.

111.    By way of comparison, during the same period (2007 – 2009), Mr Zhevago spent approximately 75 days in England (calculated on the same basis as the figure for Ukraine), or an average of 25 days a year. This period of 25 days was not a continual period of time. It comprised a large number of short visits, usually involving a stay of no more than a night or two.

112.    That figure was consistent with the position described in the evidence, served on Mr Zhevago's behalf, in the DGF proceedings before the Chancellor. That evidence confirmed that during the majority of the period relevant in those proceedings, 2010 – 2019, Mr Zhevago spent the equivalent of approximately 30 days a year in England. Mr Pillow submitted that the position in relation to that evidence was not wholly satisfactory, because no equivalent flight itineraries had been provided in respect of that period. In my view, this point had no force. WWRT had never asked for the production of flight itineraries for the post 2010 period, after having been provided with itineraries for the 2007 – 2009 period. The evidence as to the 30 days a year in the later period

was based upon information provided by Mr Zhevago's personal assistant and contained in a witness statement of another partner in RPC (Mr McGregor).

113.    Mr Pillow said that the evidence as to 30 days incorporated into Mr Wyatt's evidence was double hearsay, having been provided by an unnamed personal assistant to Mr McGregor and thence to Mr Wyatt. However, there is in my view nothing to suggest that the evidence as to 30 days (and only 5 relevant days in 2016) can be disregarded as unreliable. Mr Zhevago's personal assistant would be in a position to provide evidence as to the number of days spent in England. The figure is consistent with the evidence of the flight itineraries for the 2007 – 2009 period. WWRT had itself not provided any weighty evidence in support of the proposition that Mr Zhevago was spending more than 30 days a year in England during the later period. If there had been a desire to challenge that evidence, one would have expected WWRT to have at least asked for the flight itineraries for the later period. It is true that WWRT was able to point to a newspaper interview with the Evening Standard, in which Mr Zhevago had referred to spending a day a week in England. But this was obviously a broad estimate and I do not consider that it casts significant doubt upon the evidence of the flight records, and the information provided by Mr Zhevago's personal assistant. As Mr Sheehan submitted, one would not have expected Mr Zhevago to tell the reporter that he was spending 0.5 or 0.6 days a week in London, and one would not have expected the flight records to have been examined at that stage in order to produce a precise figure.

114.    The nature of Mr Zhevago's visits to England were explained by Mr Wyatt, based on what Mr Zhevago had told him, as follows. The visits were typically either (i) for business meetings related to Ferrexpo, and in respect of which Mr Zhevago would usually fly into or near London and leave either the same or the next day; (ii) to visit his children who were being educated in England, or to address matters relating to their education; (iii) to attend charitable events; or (iv) to consider properties which may have been appropriate residences for his family. It was not suggested, in argument on behalf of WWRT, that any of these reasons were in any way implausible: Ferrexpo was listed in London and had an office; Mr Zhevago did have children in education here; there was evidence of Mr Zhevago giving money to a London school as a charitable donation; and the court had concluded in *Lodha Developers 1 GSQ Ltd v 1 GSQ1 Ltd and anr* [2020] EWHC 2356 (Ch) that Mr Zhevago had spent some 8 years looking for a suitable residence in London.

115.    Mr Wyatt said that when in London for business, Mr Zhevago tended to work "on the go" using his laptop or other mobile devices, or at Ferrexpo offices. Mr Zhevago accepted that his lifestyle was such that he travelled frequently and was stationary nowhere for long. His extensive travel for business and pleasure had been a feature of his life for at least the last 20 years.

116.    Mr Wyatt addressed various points of detail made by Ms Gutovska in the witness statement made in support of the application for permission to serve out. For example, some Companies House documents showed Mr Zhevago's correspondence address as Ferrexpo's address in London. However, there were a large number of other Companies House documents (including some which were prior to those relied upon by Ms Gutovska) which had correctly shown Mr Zhevago's residence as Ukraine. Mr Wyatt explained (as had Mr McGregor in the DGF Proceedings) that the correspondence address at Ferrexpo's premises was a result of bulk filings made by Ferrexpo's

administrative staff, and did not mean that Mr Zhevago was resident in London at any time. There were in fact no living quarters at Ferrexpo's address. Prior to the commencement of the present proceedings, the London correspondence address had been legitimately changed.

117.   Mr Wyatt referred to the fact that WWRT had been unable to serve Mr Zhevago in the jurisdiction. This was because he had not entered the UK at any time after the proceedings had been issued, or since early 2021. (It was subsequently stated that Mr Zhevago had not actually been in the UK since 2020.) The operators of the private jet had confirmed that there was no record of Mr Zhevago visiting the UK in that period. The reason that WWRT's attempts to prove that Mr Zhevago was in England in 2022 were futile was that Mr Zhevago had not been here.

118.   In his witness statement served in November 2023, Mr Zhevago said that his position in relation to the jurisdiction application was as set out in Mr Wyatt's witness statement. He confirmed that he had spent 564 days in Ukraine between 2007 – 2009, and only 75 days in England during the equivalent period. He also gave the figure of 30 days for the period between 2010 and 2015, and 5 days in 2016 in the period up to May. He confirmed that the reason for the trips was primarily for the purposes of conducting business related to Ferrexpo and to visit his family. He frequently made use of serviced accommodation provided by Ferrexpo. The Mount Street property had never in fact been used for residential purposes.

119.   Although Mr Pillow said at various points in his submissions that his client did not accept the factual accuracy of what was said by Mr Zhevago or on Mr Zhevago's behalf, he accepted that in a number of respects (for example, whether the Mount Street property was used as a residence) he was unable to "gainsay" it. It seemed to me that, on questions concerning Mr Zhevago's connections with England, the amount of time that he spent here, and the reasons for being here, there are (on the present evidence) no strong or good reasons to doubt the evidence which has been adduced on his behalf, and as summarised above. This means that there is no sufficient case, meeting the good arguable case standard, that there were substantial and efficacious acts committed within the jurisdiction on the factual basis advanced in Ms Gutovska's first witness statement.

120.   However, that is not the end of the argument, and the question remains as to whether there is nevertheless a good arguable case, that the gateway applies, on the narrower factual basis advanced by Mr Pillow. The question is therefore whether, looking at the tort alleged in a commonsense way – and taking into account the fact that Mr Zhevago was a regular visitor to England and that he worked "on the go" – substantial and efficacious acts were carried out in the jurisdiction.

121.   This question needs to be considered in the context of the evidence that Mr Zhevago spent far more time in Ukraine than in England, and that the alleged fraud is a fraud on a Ukrainian bank alleged to have been carried out by a Ukrainian, and with the assistance of other Ukrainians. In their skeleton argument, counsel for Mr Zhevago fairly summarised the factual circumstances of the alleged fraud as follows.

122.   A number of loans were entered into between (i) the Bank, which operated in Ukraine and had no presence or operations in the UK, and (ii) the Borrower Companies, all of which were Ukrainian and had operations exclusively within Ukraine. The purpose of

the loans was said to be to fund each Borrower Company's working capital, i.e. for operations within Ukraine. Most of the loans were advanced in Ukrainian currency and signed on behalf of the Borrower Company by a Ukrainian citizen/resident.

123. The loans were each subject to a series of supplemental agreements between the Bank and the Borrower Companies to amend the terms of the original lending, allowing additional borrowing at lower interest rates and on extended repayment terms. It was not suggested that those supplemental agreements were entered into anywhere other than in Ukraine. They will have been entered into by employees of the Bank and the Borrower Companies following decisions of the management and credit committees of the Bank, which were also in Ukraine.

124. Some of the loans were secured by collateral which WWRT alleges to be spurious. The security provided by two of the Borrower Companies, Valsa and Interprokat, concerned agreements with other Ukrainian companies, one of which was called Rosava. The Valsa Loan was also guaranteed by Rosava until Rosava successfully challenged the validity of the guarantee in the Ukrainian courts.

125. Certain proceeds of the loans were transferred by the Borrower Companies to other companies which WWRT believed to be connected to Mr Zhevago, all of which were also Ukrainian, and these payments were allegedly reciprocal or circular.

126. On two occasions the business of a Borrower Company is alleged to have been transferred to another Ukrainian 'clone' company, which WWRT alleges was part of an attempt to frustrate enforcement of the loans by the Bank.

127. In order to recover the monies owed under the loans, the Bank brought proceedings in Ukraine against each of the Borrower Companies and Horizon subsequently applied to the Ukrainian courts to replace the Bank as the party entitled to enforce the debts due under the loans.

128. In his evidence, Mr Wyatt identified the individuals who had signed relevant documentation, and he inferred that each of them were Ukrainian citizens/residents. Thus, the Valsa Loan and all subsequent amendments to the loan were signed by Mr Vyacheslav Kalashnikov. The KPAA Loan had been signed by Mr Vasyl Bozhuk. The ZCP Loans were signed by Mr M M Hryha. The Interprokat Loans were signed by Mr A.V. Druz and Mr V.P. Bondarenko. There was nothing in WWRT's evidence that suggested that Mr Wyatt was wrong to describe these individuals as Ukrainian citizens/ residents.

129. Against this factual background, there is nothing which suggests that it was necessary for Mr Zhevago to do anything in England in order to accomplish any aspect of the fraud. On the contrary, the centre of gravity of the alleged fraud is clearly Ukraine, and Ukraine is the obvious place where steps would have been required in order to put it in place and accomplish it. The signatories to key documents were in Ukraine, as described above. The evidence indicates that Mr Zhevago was spending considerable amounts of time in Ukraine, and indeed was resident there. This fraud is alleged to have started in 2007, and there was evidence that during the early years of the fraud (2007 – 2009), when one might have expected that the work to put the alleged Scheme in place would have been principally carried out, Mr Zhevago was spending at least half the year in Ukraine. He was therefore there for more than enough time to have the alleged

fraud up and running. If indeed there was a fraud as alleged by WWRT (and I bear in mind that Mr Zhevago has strenuously denied the case advanced against him), then it would seem logical and highly probable (to say the least) that the work necessary to put the fraudulent scheme in place would have been carried out in Ukraine. That is where one would, against the background described above, expect the substantial and efficacious acts, to accomplish the fraud, to be carried out.

130. The decision in *Manek* shows that the fact that substantial and efficacious acts are carried out in one jurisdiction (here Ukraine) does not by any means preclude a conclusion that other substantial and efficacious acts were carried out elsewhere (here England). However, WWRT has been unable to identify or provide evidence of any acts carried out in England in furtherance of the fraud, still less to identify or provide evidence of acts that can be characterised as substantial and efficacious.

131. I do not accept that this gap can, looking at the evidence in a common sense way, be filled by drawing an inference. I have no difficulty in accepting Mr Pillow's argument that cases of fraud are often based on inference. WWRT's pleaded case (to which Mr Pillow referred me in the course of his submissions) sets out the factual basis upon which WWRT will invite the court to infer that Mr Zhevago was party to the alleged fraud. However, it is one thing to infer that acts in furtherance of a fraud were carried out by Mr Zhevago, on the basis of facts such as Mr Zhevago's ownership of companies and the position that he occupied in Ukraine in relation to the Bank. It is quite another thing to infer, without any evidence at all, that acts which had the quality of being substantial and efficacious were carried out in England.

132. Mr Sheehan accepted that on certain facts, the court might be able to draw that conclusion: for example, if the evidence indicated that Mr Zhevago was indeed resident and spending very substantial amounts of time in England, and very little time in Ukraine. Even if those were the facts, a court would not necessarily conclude that WWRT had the better of the argument; in circumstances where the alleged fraud had a Ukrainian centre of gravity, involving acts taking place in Ukraine and concerning a Ukrainian bank, and where the time spent in Ukraine, even if small, would be more than sufficient to enable a Ukrainian fraud to be carried out. In the present case, however, there is ample evidence that the amount of time which Mr Zhevago spent in Ukraine was substantial, and the amount of time spent in England was relatively small, and intermittent.

133. Furthermore, there were on the evidence good reasons for Mr Zhevago to be in England in order to deal with matters which were unrelated to the alleged fraud. Ferrexpo, the company with which he was closely associated, had a London listing and London office. In that regard, I accept Mr Sheehan's point that the fraud is not alleged to have involved, or been connected with, Ferrexpo. Mr Zhevago's children were also being educated here, and that would provide another reason for him to be in London. Taking a common sense view, one would expect – at least in the absence of some evidence to the contrary – Mr Zhevago during his London visits to be dealing with these London aspects of his life, rather than carrying out substantial and efficacious acts related to an alleged Ukrainian fraud with no real connection to London.

134. I therefore consider that the submissions of Mr Sheehan, as summarised above, are far more persuasive than Mr Pillow's contrary argument. The reality is that, on the evidence, WWRT are unable to show that any acts in furtherance of the fraud were

carried out in England. It follows that the court is in no position to carry out the necessary evaluation of those acts in order to decide whether or not they could be regarded as substantial and efficacious. There is no evidence of any such substantial and efficacious acts being carried out in this jurisdiction. Ultimately, WWRT's case boils down to the proposition that because Mr Zhevago visited England on a regular basis, it can be inferred that substantial and efficacious acts in furtherance of the alleged fraud were committed here. I do not see why, on the facts of the present case, that follows at all, and I do not accept that WWRT have established a good arguable case in that regard. Unlike *Manek*, there is no reason to characterise the fraud alleged in the present case as an evolving international fraud. On the facts alleged by WWRT, it is to be characterised as a domestic Ukrainian fraud, albeit allegedly committed by a Ukrainian businessman with substantial international connections.

135. Mr Pillow submitted that one of the difficulties with fraud is that it is covered up and that it is only with the benefit of disclosure that a party will be able to find out what really happened. WWRT does not have the benefit of substantial disclosure from Mr Zhevago, and only a limited number of documents were provided by the Bank pursuant to the obligations in the assignment to provide materials relating to the assignment. (It will be recalled that this was a point which was relied upon by Mr Sheehan, in the context of the first issue, as showing that there was no intention to assign anything other than contractual claims.) All of that may be so. However, ultimately it is for a claimant in the position of WWRT, who wishes to establish English jurisdiction, to put before the court sufficient material to persuade the court that it has the better of the case that there were substantial and efficacious acts committed within the jurisdiction. In my view, WWRT has simply failed to do that, and this is not a case where (to adopt the approach of Sir Michael Burton) I am unable to reach even a provisional conclusion as to which party has the better case.

136. Accordingly, for this additional reason, I will set aside the order of Moulder J for service out of the jurisdiction.

**D: Forum conveniens**

**D1:  Legal principles**

137. The classic exposition of the principles relating to appropriate forum, in the context of both stay applications and (as here) applications for permission to serve out, remains the judgment of Lord Goff in *Spiliada Maritime Corpn v Cansulex Ltd* [1987] 1 AC 460. I was referred by the parties to a number of subsequent authorities on this issue, including: *Altimo Holdings and Investment v Kyrgyz Mobil Tel Ltd* [2012] 1 WLR 1804 (PC); *Dynasty Company for Oil and Gas Trading v Kurdistan Regional Government of Iraq* [2021] EWHC 952 (Comm) (Butcher J); *PJSC Bank "Finance and Credit" v Zhevago* [2021] EWHC 2522 (Ch) (Sir Julian Flaux C); *Golubovich v Golubuvic* [2022] EWHC 1605 (Ch) (Edwin Johnson J); *Município De Mariana v BHP Group (UK) Limited* [2023] EWHC 2030 (O'Farrell J).

138. In the light of these authorities, I agree with Mr Sheehan's submission that the overall principles can be distilled as follows:

(1)  In a permission to serve out case such as this, the burden is on the claimant to establish that this jurisdiction is clearly or distinctly the appropriate forum.

(2) The court is concerned to identify the forum in which the case could most suitably be tried for the interests of all parties and for the ends of justice. The court must consider what is the natural forum for the claim, i.e. the forum with which it has the most real and substantial connection. (Mr Sheehan referred to this as "*Spiliada* limb 1").

(3) If this enquiry points not to England but to another jurisdiction, the claimant must then show that justice requires this court to exercise jurisdiction, e.g. because it is established objectively, by cogent evidence, that there is a real risk that justice will not be obtained in the foreign jurisdiction (Mr Sheehan referred to this as "*Spiliada* limb 2"). Comity requires that the court be extremely cautious before deciding that there is a risk that justice will not be done in the foreign country by the foreign court. Simply pointing to a legitimate personal or juridical advantage to the claimant in suing in England is not enough, so long as substantial justice will be done in the other forum.

(4) A powerful and often decisive factor is the avoidance of a multiplicity of proceedings and the risk of irreconcilable judgments, favouring resolution of all related claims in the jurisdiction in which such a trial is possible.

(5) The court decides the question of forum conveniens (and other questions arising in a service out jurisdiction application) by way of rehearing whether permission to serve out should be given. As a general rule, the question of appropriate forum falls to be considered as at the date of the original order granting permission to serve out (i.e. 20 May 2022). Events occurring since then are only relevant insofar as they may shed light upon considerations which were relevant at that time.

139. In his submissions, Mr Pillow emphasised that there was a single question, namely to identify the forum in which the case could most suitably be tried for the interests of all parties and for the ends of justice. Whilst I agree that ultimately may be so (see *Spiliada* at 480C), it is clear from *Spiliada* itself, and subsequent authorities, that the court should take a structured approach to that question, and that this is important not least because of where the burden of proof lies. Thus, in *Dynasty* (para [157]), Butcher J said that there were two stages involved and (in the context of a stay application rather than, as here, an application for permission to serve out) that the burden of proof differed at each stage. In *Spiliada*, Lord Goff began by identifying the two stages in the context of a stay application. He said ([1987] 1 AC 460, 475C – 478E, omitting internal citations) that:

> "(a) The basic principle is that a stay will only be granted on the ground of forum non conveniens where the court is satisfied that there is some other available forum, having competent jurisdiction, which is the appropriate forum for the trial of the action, i.e. in which the case may be tried more suitably for the interests of all the parties and the ends of justice.
>
> (b) …. If the court is satisfied that there is another available forum which is prima facie the appropriate forum for the trial of the action, the burden will then shift to the plaintiff to show that there are special circumstances

by reason of which just requires that the trial should nevertheless take place in this country (see (f) below).

(c) … the burden resting on the defendant is not just to show that England is not the natural or appropriate forum for the trial, but to establish that there is another available forum which is clearly or distinctly more appropriate than the English forum. …

(d) Since the question is whether there exists some other forum which is clearly more appropriate for the trial of the action, the court will look first to see what factors there are which point in the direction of another forum. These are the factors … indicating that justice can be done in the other forum at "substantially less inconvenience or expense"… [I]t may be more desirable … to adopt the expression … the "natural forum" as being "that with which the action had the most real and substantial connection". So it is for connecting factors in this sense that the court must first look; and these will include not only factors affecting convenience and expense (such as availability of witnesses), but also other factors such as the law governing the relevant transaction … and the places where the parties respectively reside or carry on business.

…

(f) If however the court concludes at that stage that there is some other available forum which prima facie is clearly more appropriate for the trial of the action, it will ordinarily grant a stay unless there are circumstances by reason of which justice requires that a stay should nevertheless not be granted. In this inquiry, the court will consider all the circumstances of the case, including circumstances which go beyond those taken into account when considering connecting factors with other jurisdictions. One such factor can be the fact, if established objectively by cogent evidence, that the plaintiff will not obtain justice in the foreign jurisdiction; … on this inquiry, the burden of proof shifts to the plaintiff."

140.  Lord Goff then said, at 480G, that the burden of proof in service out cases (i.e. such as the present) is upon the claimant at both stages.

141.  WWRT's argument in the present case is focused, at least principally, on the second stage, or "limb 2" as Mr Sheehan called it. The principal argument was based on the undisputed fact that Ukraine is, and was as at 20 May 2022, at war. Mr Pillow submits that Ukraine is therefore an "available" forum, only (as he put it) at best in an attenuated sense. He submitted that this was a point which straddled availability and appropriateness as a forum. It seemed to me that this was really a second stage argument. It was not concerned with identification of any of the connecting factors identified by Lord Goff in *Spiliada*. Furthermore, as will be apparent from the

discussion below, I was not persuaded that it could properly be said that Ukraine was not available as a forum at all. Even if it were correct that Ukraine was only available in an "attenuated" sense, that does not mean that a forum has ceased to be available at all. Attenuated denotes that something is reduced in effect, force or value, and the question here is therefore whether any such attenuation means that justice requires that the proceedings be permitted to continue in England. In any event, whether WWRT's case falls within the first or second limb, it will be apparent from my discussion below that I reject it.

142.   WWRT advanced, in substance, two further arguments, both of which again seemed to me to be (if anything) "limb 2" arguments.  One argument, clearly a limb 2 argument, was that there was a real risk that Mr Zhevago would seek improperly to influence the Ukraine courts. This argument, raised very late in the day, was not supported by any expert evidence as to the susceptibility of the Ukrainian judiciary to corruption. It rested upon an accusation that has been made against Mr Zhevago, albeit that this has not yet resulted in any charge, let alone any proof that he has corrupted any Ukrainian judge.

143.   The legal position in relation to allegations of this kind is addressed in detail in the judgment of Lord Collins (giving the judgment of the Privy Council) in *Altimo*. Lord Collins said:

> "[95] The better view is that, depending on the circumstances as a whole, the burden can be satisfied by showing that there is a real risk that justice will not be obtained in the foreign court by reason of incompetence or lack of independence or corruption. Of course, if it can be shown that justice 'will not' be obtained that will weigh more heavily in the exercise of the discretion in the light of all other circumstances.
>
> [96] Is the court able to find that justice will not, or may not, be done because of endemic corruption in the foreign system? …
>
> [97] Comity requires that the court be extremely cautious before deciding that there is a risk that justice will not be done in the foreign country by the foreign court, and that is why cogent evidence is required. But, contrary to the appellants' submission, even in what they describe as endemic corruption cases, (ie where the court system itself is criticised) there is no principle that the court may not rule …
>
> …
>
> [101] The true position is that there is no rule that the English court … will not examine the question whether the foreign court or the foreign system is corrupt or lacking in independence. The rule is that considerations of international comity will militate against any such finding in the absence of cogent evidence …"

144.   In *Dynasty*, Butcher J further discussed this issue as follows:

"[174] Some consideration to what might or might not constitute "cogent evidence" was given by Andrew Smith J in *Ferrexpo AG v Gilson Investments Ltd* [2012] 1 Lloyd's Rep 588 ; [2012] CLC 645. The judge there rejected the submission that because there was evidence from a distinguished expert as to a risk of injustice, that would suffice to establish one. While recognising that allegations of the risks of injustice in the foreign forum are ones on which it may be difficult for the claimant to present "direct or primary evidence" (para 43) he continued, at para 44:

> "44. But this is no reason that allegations of the kind made by Ferrexpo need not be supported with evidence that enables the court to examine their basis, and which is sufficiently detailed and focused to justify them. In my judgment, some of Ferrexpo's evidence, including evidence upon which Professor Koziakov relied, is not of this quality. Some of it could properly be described as mere 'press or political comment' unsubstantiated by independent evidence …"

[175] I was also referred by both sides to, and found helpful, the commentary of Professor Briggs in *Civil Jurisdiction and Judgments* (6th Edition). At para 4.30, in relation to the second stage of the *Spiliada* test, he says:

> "… What is required of the claimant is that he establish, by clear and cogent evidence, the grounds on which he says it would be unjust to leave him to go to a foreign court. An English court will not proceed on the basis of whisper or suggestion, and it will not be at all receptive to a general disparaging of a foreign court's procedure. Despite the occasional surprising decision, it is only rarely that the strong presumption of a stay will be rebutted on these grounds."

[176] At para 4.35, in considering "direct attacks on the integrity of the foreign court", he comments on the general difficulties of an English court conducting "some kind of quality audit" of the judicial systems of friendly states, and the absence of 'judicially manageable standards by which this could be done'. Subsequently, having referred to the development of the law ratified in *A K Investment CJSC*, Professor Briggs says:

> "There can be no objection to this development if there is proper and focused evidence that the foreign court will not (or would be acting quite out of character if it were to) do justice according to the law. But 'a real risk' may set the bar rather low. It immediately raises the question what manner of evidence would be needed to sustain such a contention, and the answer is that there is no answer. Evidence of judicial propensity in general, or of judicial propensity when one of the litigants is well connected, may suffice; rather less focused observations from organisations which have given themselves

> grand names and which compile 'indexes of corruption', for example, may be accorded rather less weight. But as the circumstances of each case will be individual, the question of how to discharge the burden of proof will vary from case to case."

> [177] Aspects of the cautions enunciated by Professor Briggs are in my view well founded. The bar should not be set too low. It must be borne in mind that in being invited by the claimant to act on a risk that justice will not be done in the other forum, the court is also being invited to take the risk of other undesirable results, including that the case is tried in a forum other than the natural one in circumstances where justice could in fact have been done in the natural forum, as well as acting in a manner which may be contrary to comity.

> [178] In addition, as the passage quoted indicates, there are reasons for circumspection in having regard to general statements as to a country's legal system, even coming from reputable organisations. Unless the court can see what underpins such statements, it is very difficult to place weight upon them. General statements are easily made, but may embody an opinion by the author with which others might not agree, based on evidence which others might not find convincing."

145.    In that case, Butcher J concluded (at [189]) that it had not been shown, by cogent evidence, that there was a real risk that the courts of the Kurdistan Region of Iraq were so lacking in independence of the Kurdistan Regional Government of Iraq that they would not do justice in accordance with the applicable law. Mr Sheehan's initial argument is that, because of its lateness and prejudicial impact, the argument should not be entertained at all. However, if entertained, Mr Sheehan submitted that it could be readily dismissed, because there was no cogent evidence of a real risk.

146.    The third argument concerned what WWRT submitted was Mr Zhevago's likely attitude to enforcement of any Ukrainian judgment. It was submitted that if a judgment was obtained against him, Mr Zhevago was likely to resist enforcement on the basis of arguments, whether well-founded or not, of unfairness and bias on the part of judges in Ukraine. Mr Pillow submitted that this was one factor which should be included in the mix and which meant that justice required that the proceedings should be allowed to continue in England. In my view, this is also, if anything, a "limb 2" argument: it is not related to connecting factors, but could come within "all the circumstances of the case" referred to by Lord Goff at subparagraph (f).  A very similar argument was advanced, and rejected, by Sir Julian Flaux C in his judgment in the *DGF* proceedings at [161]:

> "I agree with Mr McGrath QC that, in circumstances where the first defendant wants the case tried in Ukraine and will submit to the Ukrainian jurisdiction, any court where the claimants sought to enforce a Ukrainian judgment against him would be likely to give pretty short shrift to any inappropriate or fanciful argument on the part of the first defendant that, notwithstanding, he had not obtained justice in Ukraine. However, there might be

> circumstances in which the first defendant had a legitimate cause
> for complaint about how the case was dealt with and it seems to
> me that it would be wrong for this court to seek to second guess
> what such circumstances might be or to preclude the first
> defendant from raising legitimate arguments hereafter."

147.   WWRT submits, however, that the position on the evidence is now materially different
       to that considered by the Chancellor, in the light of arguments that Mr Zhevago
       successfully advanced in France when resisting extradition to Ukraine to face criminal
       charges.

**D2: "Natural forum"/ the forum with which the action has the most real and substantial
connection**

148.   There was no real argument advanced on behalf of WWRT to the effect that England –
       or indeed any forum other than Ukraine – was the natural forum for the resolution of
       the dispute, or the forum with which the action had the most real and substantial
       connection.  I consider that the relevant connecting factors to Ukraine are powerful and
       overwhelming, and such connections as exist with England are of no weight. The
       significant points are in my view as follows, largely reflecting the points made by Mr
       Sheehan.

149.   On any view, the centre of gravity of the alleged tort is Ukraine. As discussed in Section
       C above, WWRT has failed to show any substantial and efficacious act being carried
       out in England. Even if that conclusion were wrong, however, any such act does not
       detract from the fact that thus case involves, at its heart, an allegation of  a domestic
       fraud carried out in Ukraine by Ukrainians on a Ukrainian bank, as described in Section
       C above. As far as connecting factors are concerned, this is a case which is
       overwhelmingly connected with Ukraine for the reasons set out below.

150.   *(1) Ukrainian law*. The claims are all governed by Ukrainian law, and the natural forum
       for resolving such disputes is Ukraine. A Ukrainian court is likely to apply its own law
       more reliably than a non-Ukrainian court, and also to do so without the need for
       potentially expensive expert evidence. The expert evidence filed hitherto, amounting to
       approximately 250 pages, indicates that very substantial issues of Ukrainian law will
       arise in this case. The issue considered in Section B above only scratches the surface of
       the issues which are in dispute under Ukrainian law. There are, plainly, significant
       differences between the common law applied in England and the civil law applied in
       Ukraine. For example, Article 1166 has no English equivalent, and it is apparent that
       the law of limitation is not the same.

151.   In the *DGF* case, the Chancellor said (at [141]) that it was far more appropriate that the
       relevant complex issues of Ukrainian law should be determined by the Ukrainian courts.
       He referred to reasons given by Cockerill J in the *Antipinsky Refinery* case (see below),
       where the judge had said that it was an unappealing prospect for a judge of the English
       Commercial Court to be required to express a view on hotly contentious issues of
       foreign law (there Russian) which were also in the process of development. That was
       the more so when any appeal from a decision on the foreign law would, in England, be
       impeded because it would be a decision on facts and expert evidence, whereas in the
       foreign court a full appeals process would be followed. I consider that these conclusions
       are equally applicable in the present case.

152.    *(2) Connection of the parties.* The parties' strongest connections are with Ukraine, not England. Mr Zhevago is, as discussed above, Ukrainian and he has not visited England for over 3 years. In the *DGF* case, paragraph [136], the Chancellor said that although Mr Zhevago was a fugitive from justice in Ukraine, that was still the jurisdiction with which he had his closest connection. I do not consider that the position has materially changed in the light of the evidence in this case. It is true, of course, that WWRT is an English company, and that its directors include an English solicitor. However, its main shareholder and a director of the company, Ms Gutovska, is a Ukrainian national who is a partner in a Ukrainian law firm, albeit that she is now living in England. Furthermore, the rights which WWRT seeks to enforce, as assignee, are derived from the Ukrainian bank which is alleged to have been defrauded.

153.    *(3) Witnesses.* As far as witnesses are concerned, the position is that nearly all potential factual witnesses are either Ukrainian (with Ukrainian as their first language) or in Ukraine, or both. I recognise that, at the present stage, the factual issues in the case are a long way from being fully developed. Although Mr Zhevago strenuously denies the allegations, the details of his factual case have not yet been articulated. A defendant is not required to do so at this stage: see *VTB Capital plc v Nutritek International Corpn* [2013] UKSC 5, para [39] (Lord Mance), [91] (Lord Neuberger), and [193] (Lord Clarke). If, however, no insight is given, then Lord Clarke's judgment indicates that the focus of the court should be on the ingredients of the claim to be established by the claimant, and that the court should not speculate about the nature of any positive case that might be advanced in the future. Similarly, Lord Neuberger said that if a defendant is "wholly reticent about his case, he can have no complaint if the court does not take into account what points he may make, or evidence he may call, at any trial".

154.    The ingredients of WWRT's claim will require them to prove the underlying facts on which they rely. This is likely to require some evidence from Ukrainian witnesses who can speak to the facts either because they were there at the time or were involved in investigations.

155.    It is clear at the present stage that substantial issues will arise on Ukrainian law. The parties' existing Ukrainian legal experts are in Ukraine. It is also clear that there will be a significant issue on limitation. WWRT will need to address the factual issues on limitation in its evidence, and it is likely that Mr Zhevago will also wish to adduce evidence from witnesses on the issue. The potential witnesses here include Ukrainian individuals within the Bank and/or the DGF who conducted the liquidation of the Bank and any investigations into the alleged schemes and claims. Mr Wyatt identified, for example, Ms Cherniavska and her colleagues who carried out investigations into the Bank's affairs, and a number of other individuals previously identified by Mr McGregor. Mr Alyoshin's evidence confirms that if any witnesses refused to co-operate, the Ukrainian courts had power to compel them to give evidence.

156.    There is then the position of Mr Zhevago. Mr Pillow referred to the fact that Mr Zhevago was not in Ukraine, and that he was a potentially important witness that WWRT would wish to cross-examine. However, he is not in England either. He is currently in France, and his successful resistance to extradition from France means (as Mr Sheehan explained in his submissions) that he is no longer willing to come to England, where there would be the possibility of a further attempt at extradition. Thus, whether the proceedings were in England or Ukraine, Mr Zhevago – if he were to give evidence at all – would need to give evidence by video-link. According to the expert

evidence of Mr Alyoshin, that would be possible, although Mr Zhevago would need to be in a court room (not necessarily a Ukrainian court room) in order to do this. It is clear, from two cases shown to me, that the Ukrainian courts are willing to receive video evidence from overseas. I was told by Mr Pillow that, in those cases, the evidence had not ultimately in fact been given. There was, however, no evidence to this effect, and it was unclear as to why (if it be the case) the evidence was in the event not given in those cases. The important point, to my mind, is that the cases show the willingness of the Ukrainian courts to make orders which will facilitate the giving of evidence by video-link from overseas.

157. Mr Pillow also submitted that there was no evidence which positively showed that Mr Zhevago would be permitted, in France, to give evidence from a French courtroom; and that therefore the case that Mr Zhevago could give evidence by video-link in the present case had not been proven. I did not think that this point led anywhere. I remind myself that the burden of proof on both stages of the forum conveniens argument rests upon WWRT, which has not adduced any evidence of difficulty in Mr Zhevago giving evidence from France. Even if there were some prohibition in French law on witnesses giving evidence to foreign courts, then that would presumably apply equally to both England and Ukraine.

158. Furthermore, it seems to me that if there is a difficulty in this regard, it is Mr Zhevago's problem, not that of WWRT. WWRT ought to be in a position to prove its case without resort to Mr Zhevago's evidence. If the proceedings were in England, WWRT would have no right to summon Mr Zhevago to give evidence and to be cross-examined at the trial, at least unless he was present in the jurisdiction. Even then, it would be highly unusual for a claimant to call an alleged fraudster as its own witness in English proceedings, and it would not necessarily be permitted to cross-examine him even if this were to be done. If Mr Zhevago does, therefore, wish to give evidence – and even assuming that he cannot do so from France – it will be for Mr Zhevago to make the necessary arrangements to enable him to do so, if necessary by moving to another jurisdiction which will enable him to give evidence by video link.

159. In summary, the position of Mr Zhevago does not provide any significant connection to England, rather than Ukraine, as a connecting factor.

160. It is also a significant factor that all Ukrainian witnesses, including Mr Zhevago, will be able to give evidence in their native language, without the need for translation. This not only results in significantly less expense and time, but also is advantageous in that the court can more readily understand the evidence as it is given.

161. Another relevant factor here is that there is evidence that, as a result of the war, WWRT's Ukrainian law expert cannot leave Ukraine, and it may be that other Ukrainian witnesses are in the same position. This means that at least one important potential witness, and perhaps more, would have to give evidence (were the trial in England) by video link. This counterbalances the fact that Mr Zhevago – and perhaps other witnesses to be called by WWRT – would be giving evidence by video-link in Ukraine.

162. In relation to that matter, WWRT has indicated that it would or might wish to call Ms Gutovska, and that she would be unwilling to travel to Ukraine. However, it is far from clear that Ms Gutovska would have any relevant evidence to give: she had no

involvement at the time of the relevant events, and has only become involved in this matter as a result of WWRT's assignment. Furthermore, the evidence indicates that, despite her reluctance to go to Ukraine, she has in fact done so from time to time subsequent to the start of the war. If her oral evidence was for some reason required, then there presently appears to be no reason why she should not use or pay one of her visits to Ukraine for that purpose.

163.    WWRT has also identified its English expert, Mr Pughe, as a witness that it would wish to call: Mr Pughe is a forensic accountant who has done the work which lay behind WWRT's Particulars of Claim. However, this case is at a relatively early stage and if the case were to be heard in Ukraine, WWRT could instruct a forensic accountant there who would be in a position to build on Mr Pughe's work, and would have the advantage of giving evidence to the Ukrainian court in Ukrainian. The fact that WWRT has chosen to instruct an English expert, in the context of a case where it was always likely or at least a strong possibility that English jurisdiction would be disputed, does not in my view provide a strong connecting factor with England. There was force in Mr Sheehan's submission that the reliance placed on Mr Pughe was "something of a bootstraps argument", and did not advance the argument: WWRT had chosen an English expert because they wanted to sue in England. I consider that the involvement of Mr Pughe, based in England, certainly does not outweigh the other points to which I have referred. Nor does the fact that Mr Pughe has acquired some familiarity with the case. The same can also be said of the Ukrainian legal representatives who have been instructed by Mr Zhevago in relation to the DGF proceedings, following the decision of the Chancellor.

164.    (4) *Documents and records*. The documents and records on which the claim is based are in Ukrainian, and I agree with Mr Sheehan's submission that it is preferable to work with them in their original language. This is a point which has been made in previous cases: see *VTB Commodities Trading DAC v JSC Antipinsky Refinery* [2021] EWHC 1758 (Comm) paragraphs [233] – [234].  In a case involving large number of documents in Ukrainian, it is probable (or at least there is a very serious risk) that issues will arise in relation to whether translations are accurate. The process of translation, and resolving any disagreements between translators, will be an expensive one. None of these points are in my view outweighed by various points relied upon by WWRT, in particular: the fact that some documents have already been translated; that there will be many documents of a financial character containing figures; and that the minority shareholder of WWRT is English and would want documents to be translated anyway.

165.    WWRT has said that, as assignee, it is not presently in a position to give much disclosure, beyond documents that it received at the time of the assignment. This gives rise to the strong possibility of third party disclosure applications being made against the Bank or other parties in Ukraine; for example in relation to the DGF's investigation into the Bank's collapse and into the Loans, which may be relevant both in relation to the facts relevant to the fraud as well as limitation. If the proceedings were in Ukraine, the parties would be in a position, as Mr Alyoshin explains, to make an application to a Ukrainian court in order to obtain these and similar documents. If a trial were to take place in England, the parties would need to resort to the somewhat cumbersome letter of request procedure.

166.    (5) *Overall expense.* There was evidence that a trial in England would be much more expensive than a trial in Ukraine. Mr Alyoshin's evidence was that in similar cases, if a party was represented by a top Ukrainian law firm, the cost would vary between USD

500,000 and USD 1 million. Mr Medvedev agreed with this, and other aspects of the figures for costs which were put forward by Mr Alyoshin. I would expect that the costs of proceedings in England would be a high multiple of the figures for proceedings in Ukraine. In the *DGF* case, the Chancellor said (at [154]), in relation to a similar point, that although this was not a decisive factor, it was a further pointer towards Ukraine being the most appropriate forum.

167.    (6) *Related proceedings*. Mr Wyatt's evidence is that other proceedings have been advanced in Ukraine against various of the Borrower companies. These proceedings have been brought by different claimants, namely WWRT's predecessor holders of contractual rights, Horizon and before it the Bank. Ms Gutovska described, in her first witness statement, various sets of proceedings (including enforcement proceedings) concerning contractual claims against Valsa, KPAA, ZCP and Interprokat. A similar point was successfully advanced before Sir Julian Flaux C, who concluded (at [153]) that it was far better if all proceedings were in one jurisdiction, Ukraine. This was again not a determinative factor but was another pointer towards Ukraine being the most appropriate forum, particularly when taken with the complex issues of Ukrainian law. The fact that proceedings against Mr Zhevago are now (following the Chancellor's judgment) taking place in Ukraine, albeit in relation to other loans, reinforces that point.

168.    In the light of these matters, I conclude that by far the stronger connecting factors are with Ukraine than England, and that Ukraine is indeed the natural forum for the resolution of the present case. Indeed, any other conclusion would in my view be bizarre in the light of the decision of the Chancellor to that effect in the *DGF* case.

169.    *Arguments advanced by WWRT*. As previously described, the focus of Mr Pillow's arguments was not on "limb 1" connecting factors, but principally on the war and the allegation of bribery against Mr Zhevago. Nevertheless, Mr Pillow relied upon a number of matters in support of the proposition that the factors connecting the case to Ukraine were considerably weaker than Mr Zhevago had suggested. This submission was aimed at persuading the court that the weakness of the connecting factors meant that the most powerful factors in the present case were (principally) the war and the allegation of bribery, and hence the unavailability of Ukraine as a forum where justice could be done. His written argument seemed to go further, however, and suggest that the factors (summarised below) were such as to make England & Wales clearly and distinctly the appropriate forum.

170.    In support of the submission as to the weakness of Ukrainian connecting factors, and the suggestion that England & Wales was clearly and distinctly the appropriate forum, WWRT's written submissions referred to various points: neither of the parties was likely to be based in Ukraine for the foreseeable future; in practical terms, as matters stood, Ukraine was a forum where Mr Zhevago could not be present – he could only attend by video link; it would not be fair to expect WWRT or its representatives to travel to Ukraine in view of ongoing air raids; the location of documents was irrelevant, because they could be easily scanned; the language of documents was less relevant in a case such as the present, whether the bulk of the evidence consists in analysis of banking records; Mr Zhevago had not identified any particular witness that he might be inclined to call at trial in Ukraine. Accordingly, the only point of any force is that the claim is brought under Ukrainian law. However, claims under Ukrainian law are tried here without undue difficulty in more complex cases than the present. Here, the parties had already filed extensive expert evidence.

171.    I have addressed the substance of these points above. Furthermore in his oral submissions, however, Mr Pillow accepted that – other things being equal – he could not say that Ukraine was not the natural forum for the present dispute. For the reasons I set out above, I agree that Ukraine is the natural forum and consider that the connecting factors point overwhelmingly to Ukraine. I do not accept that the connecting factors can be regarded as weak, and I reject any argument (to the extent that it was advanced) that, when considering the relevant connecting factors, England and Wales is clearly and distinctly the appropriate forum for trial. The question is therefore, as Mr Pillow put it in his oral argument, whether his client could get justice in Ukraine. At the forefront of that argument was the case based upon (i) the war and (ii) the alleged bribery by Mr Zhevago of the head of the Supreme Court.

### D3:  The war in Ukraine

*The evidence*

172.    The evidence concerning the war in Ukraine began with Ms Gutovska's witness statement served in support of the application for permission to serve out. That witness statement was dated 12 May 2022. She said that there was currently no functioning court system in Ukraine due to the ongoing war with Russia. The impact of the war on the lives of ordinary Ukrainians had been devastating. She referred to various facts supported by documents that she exhibited. Her principal point was that there was no functioning judicial system in Ukraine which could try the case: the civil justice system had been shattered by the conflict. Martial law had been imposed on 24 February 2022. On 3 March 2022, the Council of Judges of Ukraine had issued a press release addressed to all the courts in Ukraine, which contained recommendations for the work of the courts under martial law. This included advice to postpone proceedings, if possible, except for urgent court proceedings. The focus should exclusively be on conducting urgent court cases, such as detention and extension of detention. She referred to a Facebook posting by the Kyiv Court of Appeal on 28 February 2022, which said that the court would deal with urgent cases. However, judicial review of all other categories of matters (including civil, administrative and criminal cases where a person was not in custody) would be removed from consideration.

173.    Ms Gutovska confirmed, from her personal communication with other lawyers in Ukraine, that the courts were not in fact functioning. She referred to a conversation with a practising attorney in Western Ukraine: the Lutsk courts were only considering urgent criminal cases, and the attorney and other colleagues were busy volunteering for the local defence forces. One of her colleagues in Kyiv had attempted to enter court buildings on various dates in March 2022, but the building was closed.

174.    She tried to open the websites of various courts on dates between 28 February and 31 March 2022, but the sites were not available or had been taken down or hacked. This included the Shevchenkivsky District Court of Kyiv, which would be the court which would otherwise take jurisdiction in a case against Mr Zhevago. She described how judges were mobilised into the army. She was not aware of any operating court in Ukraine which would be available to deal with WWRT's claim against Mr Zhevago. In addition to the physical closure of the courts and civil justice system generally, her own experience was that the entire legal sector in Ukraine had been thrown into disarray. Many lawyers had completely ceased their normal operations. A leading firm, Asters, had announced on 14 March 2022 that top lawyers had completely ceased their normal

operation. She described how a court building in the Borodyanka district court of Kyiv had been destroyed. She rejected any argument that life was starting to return to normal in Kyiv following the withdrawal by the Russian army from the surrounding areas in April 2022, or that the courts there would soon begin to operate as normal. This was unrealistic, in her view. She referred to a colleague who had visited the court building in Kyiv on several occasions since the outbreak of the war, during March and April 2022. On each occasion, the court building was closed. Even if the courts were open and the civil justice system was functioning, there was no infrastructure or resources currently in Ukraine to commence or progress a civil case and obtain justice there. She could not see the situation improving as the conflict continues. Neither she nor her UK-based experts were willing to risk their lives by going to Ukraine.

175.    The principal response to this evidence was from Mr Alyoshin, in his report dated 14 September 2022 (in other words, just under 4 months after Moulder J's order for service out). He acknowledged that the invasion impacted all spheres of life, including justice. However, as of 20 May 2022, and also as of September 2022, the situation was much improved. The effect of martial law, imposed on 24 February 2022 and subsequently continued, was not to terminate the powers of Ukrainian courts. If, in a given territory, the administration of justice was impossible, then the location of the courts with territorial jurisdiction would change. As the situation had improved, the jurisdiction of most courts in the "deoccupied" territory (i.e. the territory previously occupied by Russia), including the Kyiv region, had been reinstated. By 20 May 2022, therefore, all the courts in the Kyiv region, except for one, had been reinstated, and the remaining court (the Borodyansky district court) had been reinstated by 12 July 2022. No court in the city of Kyiv itself had its jurisdiction altered due to the war.

176.    Mr Alyoshin explained that on 2 March 2022, the Ukrainian Judicial Council adopted recommendations which included that all employees should be transferred, if possible, to remote work, and also (as Ms Gutovska had explained) that the focus would be on conducting urgent cases. This had the effect of temporarily restricting access to court buildings. However, the Head of Ukrainian Judicial Council commented in April 2022 that, even under those conditions, justice was "administered as usual. Courts work cases are heard and citizens seek protection of their rights. Of course with the exception of the occupied territories". Statistics showed that approximately 11,500 decisions were being taken each day during the war, a figure reduced from 30,000 prior to the war.

177.    Following deoccupation of the northern regions, the courts of the Kyiv region returned to full operation. For instance, in a press release on 11 April 2022, the Commercial Court of the city of Kyiv reported that it was working and performing its functions as a judicial body. The number of lawsuits as of 5 April 2022 reached 3000. Mr Alyoshin compared this to an equivalent figure of 4,305 lawsuits for the equivalent period in 2021. The Ukrainian Judicial Council reported that in the period from 24 February to 31 May 2022, courts had issued 1,279,548 decisions, including 30,569 decisions of the Supreme Court and a large number of decisions from courts at all levels. On 20 June 2022, the State Judicial Administration of Ukraine restored general access to the Unified State Register of Court Decisions and the "Case Status" service.

178.    Mr Alyoshin emphasised that no court in the city of Kyiv was ever under occupation, and thus no court in that city had ever formally stopped operating. In any event, since April 2022 the Commercial Court of the city of Kyiv had been fully operating, had conducted court hearings, and had made 24,000 court decisions in the period between

24 February and 8 September 2022 (compared with 45,000 court decisions in the equivalent period in the previous year). In fact, it is not the Commercial Court in Kyiv which has jurisdiction over a claim against an individual such as Mr Zhevago. The court with jurisdiction over the present claim is the Shevchenkivsky district court of the city of Kyiv. That court had not made any official press statements concerning the war. As of 20 May 2022, and also as of September 2022, that court was fully operating. It was conducting approximately 200 court hearings a day. Between 24 February and 20 May 2022, the court made 3,373 decisions of all types, and a total of almost 14,000 in the period between 24 February 2022 and 8 September 2022.

179.   Mr Alyoshin therefore concluded that there were no obstacles to hearing the present dispute in Ukraine, and that Ukraine was an available legal forum as the judicial system in Kyiv was fully operating.

180.   Mr Alyoshin's evidence was supported by evidence from Mr Wyatt. He referred to the public knowledge that Ukraine's resistance to the invasion had been fierce. The ability to repel the Russian forces meant that many of the functions of the state had returned to normal, or substantially normal, within a relatively short period and in any event by May 2022. Ms Gutovska was therefore wrong to submit that Ukraine was not an available forum, and there were no obstacles to the case being heard in Ukraine. He said that Ms Gutovska's evidence as to the current situation in Ukraine was outdated even by the date she gave it. Mr Wyatt picked up on various points which Ms Gutovska had made. For example, the Kyiv-based law firm Asters had (subsequent to the 14 March Facebook post relied upon by Ms Gutovska), on 1 May 2022, published a post which said that the firm "continues to work and protect clients' interests during the war". If the war had the effect of delaying proceedings, that did not mean that Ukraine was not an available forum.

181.   WWRT's principal response to this evidence was the expert report of Mr Vadim Medvedev, served on 26 April 2023. In the summary of his conclusions at the start of his report, Mr Medvedev accepted that the Shevchenkivskiy district court of the city of Kyiv would most likely be the appropriate court to hear the claim. He referred to the severe disruption of the functioning of the Ukraine court system after the Russian invasion. He accepted, however, that after severe disruption in the first months of the war, the Ukrainian court system had managed to restore some of its functioning and was now operating to some extent. However, the war still affected the administration of justice, and there was still disruption due to a significant backlog of cases, understaffing, difficulties with service, air raids, power outages and proximity to active war zones. The war also brought a high degree of unpredictability, amplifying risks to a proper administration of justice in a given case over time. The current capacity of the Shevchenkivskiy district court was "significantly limited", its functioning affected by the various factors (such as the backlog of cases) referred to above. It was one of the most overloaded courts in Kyiv, currently. Normally, the present case would have taken 3 – 4 years to resolve based on the procedural history of similar cases heard before the invasion. However, taking into account the current overload of cases and delays during the war, it would now take at least 5 years from the date of filing of the claim to final decision.

182.   Mr Medvedev then expanded on these conclusions in the remainder of his report. He referred to a statement issued by the Shevchenkivskiy court on its Facebook page on 27 February 2022, in which it said that it could not consider non-urgent cases. He said that

against that backdrop, it was unlikely that the Shevchenkivskiy court would have been able to consider the claim in May 2022. He therefore tended to agree with Ms Gutovska that the administration of justice in May 2022 was still in a state of havoc, and that the Shevchenkivskiy court was not an available forum to try the case at that time.

183.    He agreed with Mr Alyoshin that the overall situation with access to justice began to improve throughout the summer of 2022, but this was well after Ms Gutovska's statement had been filed. He disagreed with Mr Alyoshin's proposition that there were no obstacles to the court hearing the dispute in the present case in Ukraine. He expanded upon the areas of difficulty: the significant backlog of cases, understaffing, difficulties with service, air raids, power outages and proximity to active war zones. The backlog was one of the biggest stumbling blocks in the way of the efficient administration of justice: there was a significant backlog before the invasion, and this had contributed to a further increase. His conclusion was that despite functioning to some extent, the Ukrainian justice system remains disrupted. He agreed, however, that the Shevchenkivskiy court was operating as at April 2023, and also that it was conducting 200 court hearings a day in September 2022 and then 300 a day in March 2023. It was, however, an overloaded court. He gave a figure of 5-6 years from filing to a final decision, compared to a normal period of 3 – 4 years.

184.    In her second statement, Ms Gutovska echoed the points made by Mr Medvedev. She referred to disruption of hearings by air raid warnings. She gave evidence as to a drone strike in October 2022 in the Shevchenkivskiy district which had killed 4 people, and to another drone strike which had damaged an administrative building there in December 2022. She said that she had spent some time in Ukraine since the beginning of the war, for personal and family reasons and work related to support the Ukrainian army. However she did not feel safe in Kyiv. It was not reasonable or just to require Ms Rafferty (a partner in Rosling King) or WWRT's legal team to endanger their lives by going to Kyiv in order to pursue the claim. The Foreign, Commonwealth and Development Office was advising against all travel to Ukraine.

185.    In his reply report served in November 2023, Mr Alyoshin said that 7 months had passed since Mr Medvedev's report had been served. The majority of conclusions in that report were now outdated. He described the continuing improvement in the overall situation in Ukraine, with courts able to function more effectively. Air raids no longer disrupted court cases to any material degree. There had been other progress: for example, the Shevchenkivskiy district court now employed 3 more judges. It was now compulsory to use an electronic filing system, and courts were obliged to serve documents through that system.

186.    In a third witness statement (to which objection was taken), Ms Gutovska briefly addressed the current position in Ukraine. She agreed that air raids were less frequent, but said that they were still disruptive of court proceedings and she expressed the view that they would increase again. She also referred to the frequency of power outages. Reliance was also placed on what had been said, on Mr Zhevago's behalf, in his successful resistance to extradition from France.

*The parties' submissions*

187.    On behalf of Mr Zhevago, Mr Sheehan submitted that the evidence fell far short of showing a real risk, on cogent evidence, that WWRT would not get a fair trial in

Ukraine. The court could not properly condemn the entire judicial system in Ukraine by finding that any litigant bringing proceedings during wartime faced the risk of an unfair trial. The war would create inconvenience for a trial in Ukraine, and it would take longer than in England or during normal times in Ukraine. However, as at the relevant date (20 May 2022), the civil justice system in Ukraine was functioning: the judiciary were continuing to hear cases regularly, thereby ensuring continued access to justice. The Shevchenkivsky courts were fully functioning by 20 May 2022. As at that date, proceedings could have been commenced in Ukraine, and the evidence showed significant and continuing improvements since then. Mr Zhevago was himself actively participating in ongoing proceedings in Ukraine. The situation was a long way from being so dire that there was a real risk of the proceedings, and the resulting decision, being unfair. There was no cogent evidence to that effect. The dangers created by the war were real, but they were a long way from creating a situation of practical impossibility of obtaining justice in Ukraine.

188.    In his oral submissions, Mr Sheehan emphasised (by reference to the decision of Butcher J in *Dynasty*) the need for cogent evidence of a real risk of the trial being unfair and that WWRT would not receive substantial justice, but also that the risk was not all on one side: see paragraph [177] where Butcher J said that "the court is also being invited to take the risk of other undesirable results, including that the case is tried in a forum other than the natural one in circumstances where justice could in fact have been done in the natural forum, as well as acting in a manner which may be contrary to comity". In his reply submissions, he said that WWRT did not show a real risk of injustice simply by showing that it would be more convenient for the case to be in London where there was no war. There was nothing here to show that substantial injustice would not be obtained in Ukraine or that there was a real risk of that.

189.    On behalf of WWRT, Mr Pillow submitted that Ukraine was only available, at best, in an attenuated sense. He referred to the up-to-date position described in Ms Gutovska's third witness statement, that more than 120 premises of 115 judicial institutions had suffered varying damage in consequence of air raids; a point referred to in the decision of the French Cour de Cassation, refusing extradition. The French court had not only referred to the destruction of court buildings, but also the threat to participants. This was a highly persuasive decision. He submitted that, as at the critical date, Ms Gutovska's evidence, that there was currently no functioning civil justice system, was fair at the time that it was made.

190.    In his oral submissions, Mr Pillow emphasised that Ukraine was a war-torn country where there was a serious problem of physical risk to life. Mr Zhevago's lawyers had themselves relied upon the bombardment of Ukraine and the damage to court buildings in his resistance to extradition.

*Discussion*

191.    The question which I am considering here is whether the war creates circumstances by reason of which justice requires that the present proceedings should continue in England rather than in their natural forum, Ukraine. The question posed in *Spiliada* (see paragraph (f) on page 478) is whether (the burden being on the claimant) there is cogent evidence that the claimant will not obtain justice in the foreign jurisdiction, Ukraine. The decision in *Altimo* shows that the question is whether there is a real risk that justice

will not be obtained in the foreign court, with cogent evidence being required to establish the existence of that real risk.

192. I do not consider that WWRT has established this in the present case. The invasion of Ukraine in late February 2022 obviously had a significant impact, initially, on Ukraine's civil justice system. However, by early April 2022, the Russian army had retreated from the area closest to Kyiv. If one looks at the position as at 20 May 2022, it is clear that there had been very significant improvements from the position as at the end of February, and furthermore that there was an improving trend. There was, therefore, as at 20 May 2022, a functioning civil justice system. In particular, the court which would take jurisdiction in this case, the Shevchenkivskiy court, was functioning. The statistical information provided by Mr Alyoshin in his first report was not disputed by Mr Medvedev. That court was, by September 2022, conducting approximately 200 court hearings a day at that time; and between 24 February and 20 May 2022, the court made 3,373 decisions of all types.

193. I do not consider that the evidence shows that, as at 20 May 2022, there was any significant obstacle to WWRT issuing proceedings in that court, or at least (given the improving trend) being able to do so in the relatively near future. It is true that the case would not have been treated as an urgent case, which were being given priority at that time. However, there is nothing in the evidence to suggest that any particular matters needed to be addressed rapidly, in order to progress the case. Even absent the war, WWRT would not have anticipated obtaining a rapid decision on the merits from that court: Mr Medvedev's evidence indicates that a period of up to 4 years might be required. Given that the Russian army had retreated, that there was a functioning civil justice system in Kyiv (where the courts had never in fact ceased to function), and that the trend was one of improvement, it is in my view clear (contrary to one way in which Mr Pillow put the case) that there was indeed an alternative available forum for the present proceedings. Whilst the evidence indicates that, as at May 2022, there was still some disruption – and indeed there is still some disruption including increased backlogs – disruption is in my view a long way from a case of a real risk that justice will not be obtained.

194. It was common ground, of course, that there is some risk to life in Kyiv, which does not exist in London, because of air raids. However, this does not mean that there is a real risk that justice cannot be done in a country which has a functioning civil justice system. One aspect of that functioning system is that there still remains a functioning legal profession, with lawyers continuing to take and argue cases. Indeed, I understand that Ms Gutovska's own firm continues to function there, and there was no suggestion in the evidence that WWRT could not find lawyers to represent them, or expert witnesses to assist in their case. Indeed, in the opening conclusions of Mr Medvedev's report, he indicates that the impact of the war is to increase the length of time for resolution of the case by a comparatively small time period: from 4- 5 years to 6 years. It was rightly not suggested in argument that a delay of that length could be equated to a denial of justice or a real risk thereof.

195. It seemed to me that much of the evidence of Ms Gutovska, in support of the application for leave to serve out, focused on dates in February immediately after the invasion, and to some extent in March. These dates were prior to the Russian army's withdrawal from the areas north of Kyiv, and did not therefore reflect the improving situation thereafter, prior to 20 May 2022, described by Mr Alyoshin. It is significant, in my view, that

Ukraine was mounting a fierce defence of the country and showing a determination to return, as far as possible, to the ordinary functioning of the state. The fact that the civil justice system continued to function is consistent with that.

196.    Furthermore, I do not consider that it would be right to view the position as at 20 May 2022 in isolation from subsequent events. The decision in *Golubovich*, and the authorities there referred to, show that subsequent events can cast light on the situation at an earlier date. The factual position is that the Russian invasion did have an immediate impact on functioning of the civil justice system in Ukraine. However, even if were to be assumed that, as at the end of February, the civil justice system had ceased to function, the question would arise: was that temporary or likely to be long-term or permanent? The evidence indicates that by 20 May 2022, as far as the Kyiv courts were concerned, the answer was: temporary only. There were already significant improvements by 20 May 2022, and the evidence of subsequent events confirms that the Kyiv courts had not and would not suffer a long-term or permanent cessation.

197.    Much reliance was placed by Mr Pillow on the arguments deployed, and to some extent accepted, by the Cour de Cassation in the context of the attempted extradition of Mr Zhevago to face criminal proceedings in Ukraine. I agree with Mr Sheehan that that is a very different context to the issue which I am considering, not least because a consequence of the proposed extradition was that Mr Zhevago would likely be facing a period of detention prior to trial. However, I was in any event not persuaded that it was right to focus on the factual conclusions reached by the Cour de Cassation. In the context of Mr Zhevago's attempt to rely upon the factual conclusions (on Ukrainian law) of the BVI courts, Mr Pillow submitted that these were inadmissible and that I should therefore focus on the factual evidence adduced in the present case. I consider that I should indeed focus on the evidence adduced before me, in the context of the legal test that I should apply on a forum non conveniens issue. On the evidence which I have described, WWRT has failed to satisfy the burden which it must discharge. That remains the case notwithstanding the arguments advanced in the extradition proceedings, and the conclusions of the Cour de Cassation.

198.    Accordingly, WWRT's case based upon the impact of the Ukrainian war fails.

**D4:    The allegation of corruption**

*The background to the allegation, and the parties' arguments*

199.    The next aspect of WWRT's case concerns, using the headline in its skeleton argument, Mr Zhevago's alleged subversion of the judicial system of Ukraine. Relying on the Privy Council judgment in *Altimo* (Lord Collins), WWRT submitted that there was cogent evidence of a real risk that justice would not be obtained in Ukraine by reason of lack of independence or corruption. In the extensive evidence served on behalf of WWRT between May 2022 and April 2023, there was no hint of any such case being advanced. Accordingly, none of the evidence served on behalf of Mr Zhevago addressed any such case. The last round of evidence served in accordance with the court's orders comprised the witness statement of Mr Zhevago served on 24 November 2023, and an expert reply report of Mr Alyoshin served on 27 November 2023.

200.    The first time that any case to that effect was advanced was in the third statement of Ms Gutovska. An application to adduce that evidence was made on 11 December 2023,

which was 7 days before the hearing. The evidence itself had been provided to Mr Zhevago's solicitors in the previous week. The covering letter was inaccurate in asserting that the witness statement was only updating the court on matters referred to in Ms Gutovska's second witness statement. The application notice was inaccurate in asserting that it was a "central argument" in the jurisdiction application as to whether the Ukrainian civil justice system was fair and unbiased. That point had not previously been raised.

201.    In her witness statement, Ms Gutovska referred to two matters in support of the case which WWRT wished to advance on this issue. The principal matter was that the National Anti-corruption Bureau of Ukraine had, in May 2023, notified Mr Zhevago of its suspicion that he had paid US$ 2.7 million to his lawyer with a substantial element of that sum being a bribe for the head of Ukraine's Supreme Court for favourable decisions. The amount of the alleged bribe was US$ 1.8 million. The notification was supported by the Bureau's audio recording apparently of Mr Zhevago arranging for the bribes. The second matter was that there was a report, in July 2023, that Mr Zhevago had been implicated in fixing the allocation of Ukrainian judges to cases. In his oral submissions, Mr Pillow said that this second point, which was based exclusively on a press report without any underlying materials, was of far less importance for present purposes.

202.    WWRT submitted that it could not free itself from the risk that it would not have a fair trial in Ukraine. Mr Zhevago had been revealed to be suspected in criminal enterprises going to the essence of the fairness of the civil courts in Ukraine. His links to and influence over the judiciary remain, even if steps had been taken to eradicate them in fact: the evidence was that the head of Ukraine's Supreme Court had been arrested and imprisoned.

203.    In his oral submissions, Mr Pillow made it clear that WWRT had not set out to prove, and need not prove, that Mr Zhevago had in fact paid the bribe which as alleged. The court was in no position now to decide whether or not he had done so. There was an ongoing investigation into the allegation. It was only necessary to decide whether or not there was a real risk of injustice. The court had to take into account the fact that it was now public knowledge that Mr Zhevago was a suspect in the alleged bribery of the head of the Supreme Court, and it could not shut its eyes to that fact when considering the forum issues and specifically the question of whether there was a real risk of injustice if the matter were to proceed in Ukraine.

204.    WWRT did not dispute that it had known of the allegations at around the time that they became public in the summer of 2023, and that no point had been raised in that connection until December 2023. However, Mr Pillow submitted that it was entirely reasonable for WWRT to have assumed that Mr Zhevago would deal, in his evidence which was to be served in November 2023, with the allegation that he had bribed the head of the Supreme Court. The deadline for service of Mr Zhevago's evidence was, originally, 9 November 2023. Had that evidence been served in time, then the bribery/corruption point would have come to the fore much earlier, and in sufficient time for it to have been fairly addressed at the 18 December hearing. Mr Zhevago was therefore at least a co-equal cause of the point having been raised when it was.

205.    Mr Pillow submitted that one reason why it was natural to assume that Mr Zhevago would deal with the bribery allegation was that, as part of his case, he had offered an

undertaking to the English court not to challenge the jurisdiction of the Kyiv court (in the event that the jurisdictional challenge in England were to succeed). Such an undertaking could not properly be offered by a person who was under suspicion of having bribed the head of the Supreme Court, and it would bring the English court into disrepute if such an undertaking were to be accepted. WWRT could properly assume that Mr Zhevago would need to explain how he could contend that Ukraine was a fair place to have a trial in circumstances where he stood accused of bribing the head of the Supreme Court. It was misleading for Mr Zhevago to put forward evidence to the effect that the Ukrainian courts would be fair, without saying that he knew that he had been accused of bribing the head judge in the division that would be deciding the case.

206.    Had the point been raised earlier, the landscape would have been very much the same as it was at the hearing. In the correspondence from his solicitors RPC since the point was raised, Mr Zhevago had denied the allegation. The court would not be in a position to decide the substantive allegation of bribery. Mr Zhevago would also have made the point that, as with other allegations against him by the state, the bribery allegation is politically motivated. He would also have made the argument that the Ukrainian investigator had improperly failed to close the investigation.

207.    Mr Pillow laid emphasis on the fact that WWRT was not advancing a case of endemic corruption on the part of the Ukrainian judiciary. Its case was that Mr Zhevago represented a real risk of corrupting the judges, because it was now known that he was suspected by the state of doing so. There was a real risk that he might have bribed judges, or had actually bribed them. The case of corruption was therefore specific and confined to Mr Zhevago, and WWRT did not attempt to make a wider case – although such case could be made on the material that Mr Pillow said that he had seen.

208.    Mr Sheehan submitted that this point had been raised far too late in the day. WWRT needed permission to adduce the evidence on this issue of Ms Gutovska in her third statement, and this permission should be refused. Mr Sheehan referred to paragraph 7.2 of CPR PD 23A. Subsequent to October 2023, this required a respondent to an application, who wishes to rely on evidence, to serve it as soon as possible and in accordance with any direction of the court. Prior to October 2023, the wording of the relevant paragraph had been different, but not materially so. Here, WWRT had known of the bribery allegation by around May 2023 but had deliberately not raised it until December. No evidence had been served on that issue, and the point had not even been raised in correspondence. There had been a deliberate decision not to raise it, allegedly because WWRT decided to wait to see what, if anything, Mr Zhevago said about it. Mr Sheehan submitted that this was nothing less than an ambush, but that in any event there was no reasonable basis for failing to raise the point as soon as WWRT became aware of it and had formed the intention of relying upon it. All the underlying material relied upon had been available for months. Mr Zhevago could not reasonably have been expected to deal, in his evidence to be served in November 2023, with a point that had never been raised, and he could not be blamed for any delay. WWRT's point on Mr Zhevago's undertaking was a "red herring": the undertaking did not give rise to any requirement on the part of Mr Zhevago to deal with an allegation of bribery which had never been relied upon by WWRT as part of its case. It was not for Mr Zhevago, in his reply evidence, to address points which were not being made.

209.    When the point had finally been raised, Mr Zhevago and his solicitors had done their best to address it in correspondence. But this was not easy to do, in circumstances where

Mr Zhevago is not in England and where there was limited time. However, Mr Zhevago had not had a fair opportunity to put forward materials which might bear upon the cogency of the evidence relied upon in support of the bribery allegation. For example, Mr Zhevago's solicitors had referred to a document, which was not before the court, which cast doubt on the authenticity of the audio recording relied upon by the National Anti-Corruption Bureau.

210. Mr Sheehan emphasised that all that had happened was that a notice of suspicion had been issued. Mr Zhevago had not been charged, still less convicted of any offence. Under Ukrainian law, as is clear from one of the documents in the hearing bundle, a person is considered innocent until proven guilty. If there was a sufficiently strong case of corruption, why had Mr Zhevago not been charged? Mr Sheehan also referred to the fact that Mr Zhevago had offered to be interviewed in France, but his various offers had not been acted upon. Even if WWRT were to be permitted to advance the present case, the evidence did not amount to anything like the cogent evidence which would be required to sustain a case of a real risk of an injustice because of corruption.

*Discussion*

211. I broadly accept the submissions of Mr Sheehan, as summarised above, in relation to both the timing of the application to adduce the evidence relied upon and also as to its substance.

212. As far as timing is concerned, I refuse permission to adduce Ms Gutovska's 3rd statement in so far as it concerns the allegation of bribery, because I consider that the point was raised far too late to enable Mr Zhevago and his advisers to deal with the argument properly and fairly, including being able to adduce evidence in response to it. The bribery allegations, on which reliance is now placed, were made public in May 2023. If WWRT was minded to place reliance upon them, as part of its resistance to Mr Zhevago's jurisdiction application, then its case in that regard should have been made clear a long time prior to December 2023. The belated service of the evidence has all the hallmarks of being a late ambush, since I do not accept the argument that WWRT could reasonably have expected Mr Zhevago, in his reply evidence, to deal with an allegation of bribery which had never been raised even in correspondence. However, whether it was an attempted ambush or not, it is clear – as Mr Sheehan submitted – that WWRT deliberately held the point back, whilst waiting to see what Mr Zhevago said about it. I do not consider that this is consistent either with the express terms of paragraph 7.2 of PD 23, or with the 'cards on the table' approach that can reasonably be expected in commercial litigation when a party has it in mind to raise a point, in response to an application of the present kind, which has not previously been raised in evidence or correspondence.

213. In the present case, Mr Zhevago and his advisers could reasonably proceed on the basis that no case was being advanced to the effect that there was a real risk of unfairness in Ukraine because of corruption. A point to that effect had been raised in the DGF proceedings before Sir Julian Flaux C, but it had been rejected. It had not then resurfaced in any guise until December 2023, when Ms Gutovska's 3rd witness statement had been served. I see no reason why Mr Zhevago in his reply evidence, ordered to be served in November 2023, should have considered it necessary to address a point that had never been raised by WWRT. That reply evidence was properly focused on a response to the points made in evidence that had been served, and not upon a point

which had not been raised. I reject WWRT's argument that Mr Zhevago bears a significant, or indeed any, measure of responsibility for the point having surfaced at a late stage.

214.    I do not consider that the undertaking provided by Mr Zhevago makes any difference, or somehow justified WWRT in taking the position that they would delay raising a point which they apparently intended to advance. An undertaking not to challenge the jurisdiction of the Kyiv courts had been provided on behalf of Mr Zhevago in the first round of evidence served in September 2022. The propriety and effectiveness of that undertaking is not, in my view, affected by the fact that Mr Zhevago has received notice that he is under suspicion of bribery. Such undertakings are not uncommonly offered by a party challenging jurisdiction in England, in order to assuage any concerns on the part of the English court that a successful jurisdictional challenge in England might then lead to a refusal to accept the jurisdiction of the alternative forum. A party may therefore wish to put the position beyond doubt by offering an undertaking, even though such an undertaking is not essential. In the present case, it does not seem to me to be essential, in circumstances where there is no dispute that the Shevchenkivsky District Court of Kyiv has jurisdiction over the claim against Mr Zhevago and where Ukraine is the natural forum for the resolution of the dispute. However, whether or not it is essential, there is nothing in the bribery allegation which would reasonably lead to a concern that Mr Zhevago might not comply with the undertaking. Nor does the undertaking mean that Mr Zhevago was required to deal with the bribery allegation despite no point ever having been raised on that score by WWRT.

215.    I also do not accept Mr Pillow's argument that the landscape of the case, at the time of the application, is very much the same as it would have been if the point had been raised earlier. The argument suggests that there is nothing that Mr Zhevago could have adduced, by way of evidence, which would have materially assisted his response to the case belatedly advanced, and that all the available arguments had been identified in correspondence from his solicitors after the point had been raised. In my view, this is not how litigation generally works and in particular when an allegation is made involving the alleged corruption on the part of the judiciary in an alternative forum. The decision of Butcher J in the *Dynasty* case shows the nature of the evidence, including expert evidence, that a party can properly adduce in order to deal with such a case. In the present case, Mr Zhevago has not had a fair opportunity to adduce any evidence responsive to the particular allegation of bribery, or any expert evidence bearing on the question of whether there is a real risk that the courts of Ukraine are so susceptible to corruption by Mr Zhevago that they will not do justice in accordance with the applicable law. I do not accept that there is no room for expert evidence on such issues. An expert could, for example, place the present allegation in the context of the integrity of the Ukrainian system as a whole, and (as in *Dynasty*) potentially adduce evidence of court decisions adverse to Mr Zhevago or others in a similar position. When a substantial allegation such as the present is raised very late, leaving the other party with no fair opportunity to consider it and see how best to respond to it, a court will need some persuasion that there is no injustice by reason of the delay in raising it. I am far from persuaded that there is no injustice here.

216.    Accordingly, in the exercise of my discretion, I refuse WWRT permission to rely on the evidence of Ms Gutovska in so far as it concerns bribery and corruption. The oral argument was focused on those aspects of her third statement, and the other aspects of

that statement did not feature significantly in the parties' arguments. In so far as her statement sought to correct earlier matters, I am prepared to grant permission for that evidence to be adduced. Similarly, in so far as she gave evidence as to the current position in relation to the impact of the war in Ukraine, I would be prepared to grant permission for that evidence to be adduced.

217.    My conclusion as to the admissibility of the late evidence means that I do not need to consider in detail whether it is sufficiently cogent to give rise to the real risk of injustice which WWRT needs to establish. However, I do not consider that it does. Mr Pillow did not advance a case of what might be called (see Lord Collins in *Altimo*) endemic corruption on the part of the Ukrainian judiciary. There was no expert evidence which supported a case of either endemic corruption, or indeed corruption on the part of the powerful individuals. The overall integrity of the Ukrainian system of civil justice was, therefore, not challenged nor indeed attacked on the basis of any cogent evidence or otherwise. The case of alleged interference by Mr Zhevago with the system of allocating judges to cases is based on insubstantial evidence: there is nothing more than a press report, with no underlying material. Accordingly, there is no cogent evidence of an ability on the part of Mr Zhevago to interfere with the process whereby the judge, who is to hear his case, is selected.

218.    WWRT's case therefore comes down to a case which depends exclusively on a single allegation which has been made against Mr Zhevago – in the context of an overall system which is not attacked – and which was made some months ago, but has not resulted in any charge let alone conviction. I do not consider that this is sufficient to provide cogent evidence of the real risk for which WWRT contends.

## D5: Enforceability of a Ukrainian judgment

*The parties' arguments*

219.    A further factor advanced by WWRT as to why there was a real risk that justice would not be obtained in the foreign jurisdiction concerned the enforceability of a Ukrainian judgment in WWRT's favour. This was not a point which featured at all prominently in WWRT's written skeleton argument, but it was an argument which Mr Pillow developed in his oral submissions. He described it as a point which arose independently of the arguments on the war and bribery, although it went into the same basket as the other points.

220.    Mr Pillow submitted that although Mr Zhevago had given an undertaking to submit to the jurisdiction of the Ukrainian courts, there was nothing to stop him from then refusing to participate in the Ukrainian proceedings, or refusing to engage lawyers to defend them, thereby leaving WWRT with a default-type judgment. This would not happen if the case were in England, because Mr Zhevago would wish to do all that he could to prevent an English judgment against him, given the ready enforceability of an English judgment. That was not the position with a Ukrainian judgment in circumstances where Mr Zhevago had made no offer not to resist enforcement of the Ukrainian judgment. It could be anticipated that Mr Zhevago would take whatever points he could against enforcement; for example on the basis that he had not been present in Ukraine, that he was not questioned, that he did not participate, or because the procedure was unfair or that the proceedings or the result were politically or

otherwise improperly motivated. There was therefore a real risk that a Ukrainian judgment in WWRT's favour would be a pyrrhic victory.

221.    Mr Pillow submitted that the facts of the present case went substantially beyond WWRT simply preferring to have an English judgment. Mr Zhevago had in the past, and more recently, expressed strong criticisms of various aspects of Ukraine including Ukrainian justice. In the French extradition proceedings, he had argued very strongly that everything was stacked against him in Ukraine politically, because of President Zelensky's anti-oligarchisation laws which had been introduced in October 2021. Those laws, and the French extradition proceedings, had post-dated the judgment of Sir Julian Flaux C in the *DGF* case. In that case, the Chancellor had been willing to treat the criticisms of Ukrainian justice which Mr Zhevago had advanced in an earlier case, *Ferrexpo AG v Gilson Investments Ltd* [2012] EWHC 721 (Comm) (Andrew Smith J)*,* as being historic. Subsequent to that judgment, however, Mr Zhevago had continued to voice criticisms: the argument against Ukraine in the *Ferrexpo* case was not water under the bridge. If the present case were to go to Ukraine, it was inevitable that Mr Zhevago would resist enforcement of a judgment on those or similar grounds.

222.    In relation to this point, WWRT referred to a number of documents. A French press article, concerning Mr Zhevago's arrest in France in early 2023, quoted Mr Zhevago as stating that the extradition proceedings and charges against him were politically motivated. Similar points were made on his behalf in the course of argument in the extradition proceedings before the Investigating Chamber of the Court of Chambéry on 16 March 2023.  On 23 January 2023, Mr Zhevago gave a lengthy interview to a TV station which is apparently controlled by his son. The interview contains various criticisms by Mr Zhevago of the Office of the Prosecutor General which was responsible for the proceedings against him, and of the Pechersk court of Kyiv. The latter was likened to courts in dictatorships, specifically in Moscow or other republics of the former Soviet Union. Mr Pillow submitted that the thrust of the interview was that Ukraine was being run as a dictatorship by President Zelensky, and that Mr Zhevago was being persecuted for the President's political benefit.  He said that all of this would be raised as a public policy argument against enforcement of any judgment in favour of WWRT.  Whilst Mr Zhevago did say, later in the interview, that he trusted the Ukraine Supreme Court, as being a court where justice could be achieved, the reason why Mr Zhevago was willing to say this was now apparent: Mr Pillow was there referring to the allegation of bribery discussed in Section D4 above.

223.    On behalf of Mr Zhevago, Mr Sheehan's overall submission, on this as on the other points, was that WWRT had failed to show a real risk of injustice. Statements made by or on behalf of Mr Zhevago in the context of criminal proceedings, and the extradition process, had to be viewed in that context: a context which was very different to the civil process. The decision of the Cour de Cassation, to refuse extradition of Mr Zhevago, was also made in a criminal context: the question of a trial within a reasonable time is not the same in a criminal context, when a person is in detention, as it is in civil proceedings. Mr Zhevago was, therefore, not taking inconsistent positions when comparing the position which he took in the extradition proceedings, and his position as to where the trial of the present civil case should take place. At best, however, all that WWRT can say is that Mr Zhevago's positions are inconsistent. That is not sufficient to show a real risk of injustice if the present proceedings were to take place in Ukraine. In the *DGF* case, the Chancellor had rejected the argument based upon

difficulties in enforcing a Ukrainian judgment, and Mr Zhevago's later statements and positions in relation to the criminal and extradition proceedings do not materially alter the picture. An argument had also been advanced (see paragraph [146] of the Chancellor's judgment) concerning the possibility of requiring an undertaking by Mr Zhevago to participate in the Ukrainian proceedings, but in the event no such undertaking was required by the judge.

*Discussion*

224.    It is understandable that WWRT would prefer, from an enforceability perspective, to have an English rather than a Ukrainian judgment. However, the fact that English proceedings may possibly be advantageous to WWRT in that respect is not enough, so long as substantial justice will be done in the other forum: see *Spiliada* at 482B – 483C. None of the present arguments advanced on enforceability seem to me to have any substantial bearing on the question of whether there is a real risk that substantial justice will not be done in Ukraine. They amount, in essence, to an argument that it is possible that points on enforceability of a Ukrainian judgment may be taken in due course. However, at the stage when an English court is considering a jurisdiction application, it will never be possible to predict whether there will be any legitimate points on enforceability which will be available to an unsuccessful party at the end of a civil trial in a different country. As the Chancellor recognised in paragraph [161] of his judgment in the *DGF* case, the availability of legitimate points on enforcement will necessarily depend upon what actually happens in the trial itself. The possibility that points on enforceability of a foreign judgment may be taken by a defendant in due course cannot generally be, and is not in this case, a reason why an English court should decide that a case should be determined in a forum which is not the natural forum. The contrary argument in substance invites the English court to decide that its processes are superior to those of the foreign court, which cannot be trusted to decide the case in a proper fashion so as to give rise to a judgment which will be enforced elsewhere. This is not an invitation which, in my view, the English court should accept, at least without cogent evidence as to why there is a real risk that any judgment from the foreign court will be unenforceable because of the way in which the processes of that court operate. An argument that a particular defendant cannot be trusted not to take points on enforceability is a very long way from what a claimant needs to show.

225.    I am also not persuaded that the position, in relation to this point, is materially different to the position as it stood before the Chancellor when a similar argument was raised and rejected. In the present proceedings, Mr Zhevago has emphasised in his evidence the fairness of the Ukrainian civil process, and (as in the *DGF* case) has actively sought a trial in Ukraine. Here, as Flaux C said in the *DGF* case, any court would be likely to give short shrift to any inappropriate or fanciful argument on the part of Mr Zhevago that, notwithstanding the argument advanced on his behalf in these proceedings, he could not or had not obtained justice in civil proceedings in Ukraine. I do not consider that the statements made by Mr Zhevago, and the arguments advanced on his behalf, in the context of criminal and extradition proceedings, alter the position. The context of those proceedings is, as Mr Sheehan submitted, very different. None of the statements, to which Mr Pillow referred, amounted to an attack by Mr Zhevago on the system of civil justice in Ukraine. I also agree with Mr Sheehan that even if there had been such an attack, it would not in itself establish what WWRT needs to establish, namely a real risk that substantial justice will not be done in Ukraine.

226.    Accordingly, this line of argument also fails. I have considered each *Spiliada* "limb 2" line of argument separately, but I have also stood back and considered what Mr Pillow described as the "basket" of points as a whole. I do not consider that any of the points raised, either individually or collectively, provides a sufficient reason why the present case should be tried in England rather than its natural forum Ukraine.

**D6: Conclusion on forum issues**

227.    I therefore conclude that, applying the *Spiliada* principles, Mr Zhevago's application succeeds. It is therefore unnecessary to express any views on the further points that were taken by Mr Sheehan in relation to undue delay and the order for service by alternative means.

**E: CONCLUSION**

228.    For all of the above reasons, the application on behalf of Mr Zhevago succeeds. I invite counsel to agree the appropriate form of order to give effect to this judgment.