Категорія справи №

**376/1329/24**
**: Цивільні справи (з 01.01.2019); Справи позовного провадження; Справи у спорах, що виникають із правочинів, зокрема договорів (крім категорій 301000000-303000000), з них; надання послуг.**
Надіслано для оприлюднення: **08.11.2024.** Зареєстровано: **09.11.2024.** Забезпечено надання загального доступу: **11.11.2024.**
Дата набрання законної сили: **04.11.2024**
Номер судового провадження: **2/376/730/2024**

---

Сквирський районний суд Київської області

Справа № 376/1329/24

Провадження № 2/376/730/2024

## РІШЕННЯ

## ІМЕНЕМ УКРАЇНИ

"04" жовтня 2024 р. Сквирський районний суд Київської області у складі:

Головуючого судді Коваленка О.М.,

за участю секретаря Щур Л.А.,

розглянувши у відкритому судовому засіданні в м. Сквира Київської області цивільну справу за позовом ОСОБА_1 , ОСОБА_2 до Публічного акціонерного товариства «Сбербанк росії» про стягнення збитків,

Встановив:

Позивачі звернулися до Сквирського районного суду Київської області з позовом, у якому, з урахуванням уточнених позовних вимог, просили стягнути з ПАТ «Сбербанк росії» на користь ОСОБА_1 збитки у розмірі 40643176,50 доларів США та на користь ОСОБА_2 збитки у розмірі 772220353,50 доларів США.

08.05.2024 ухвалою суду відкрито провадження у справі.

ПАТ «Сбербанк росії» є іноземною юридичною особою.

Судом відкрито провадження у справі з іноземним елементом з огляду на наступне.

Положеннями абз. 2 та 4 п.2 ч.1 ст. 1 Закону України «Про міжнародне приватне право» визначає пріоритетність правового регулювання окремих юридичних питань саме Законом України «Про міжнародне приватно право», а правовідносини є такими, що обтяжені іноземним елементом зокрема, але не виключно у таких випадках коли: хоча б один учасник правовідносин є громадянином України, який проживає за межами України, іноземцем, особою без громадянства або іноземною юридичною особою; юридичний факт, який створює, змінює або припиняє правовідносини, мав чи має місце на території іноземної держави.

Одним із питань, які знаходяться у сфері правового регулювання Закону України «Про міжнародне приватне право» є вибір суду у приватноправових відносинах з іноземним елементом.

Положеннями п.1, 5 ч.1 ст. 76 Закону України «Про міжнародне приватне право» унормовано, що суди розглядають будь-які правовідносини з іноземним елементом, зокрема, якщо у справі про відшкодування шкоди позивачем є фізична особа, яка має місце проживання в Україні.

ОСОБА_1 є громадянином України та має місце проживання на території України (а.с. 4), відтак судовий імунітет України безпосередньо поширюється на спірні правовідносини на підставі ст. 4-1, 76 Закону України «Про міжнародне приватне право», а спірні правовідносини підлягають розгляду у межах юрисдикції України.

Статтею 10 ЦПК України визначено, що суд при розгляді справи керується принципом верховенства права.

Суд розглядає справи відповідно до Конституції України, законів України, міжнародних договорів, згода на обов`язковість яких надана Верховною Радою України.

Суд застосовує при розгляді справ Конвенцію про захист прав людини і основоположних свобод 1950 року і протоколи до неї, згоду на обов`язковість яких надано Верховною Радою України, та практику Європейського суду з прав людини як джерело права.

Забороняється відмова у розгляді справи з мотивів відсутності, неповноти, нечіткості, суперечливості законодавства, що регулює спірні відносини.

Підтримання юрисдикційного імунітету російської федерації позбавить позивача ефективного доступу до суду для захисту своїх прав, що є несумісним з положеннями пункту 1 статті 6 Конвенції про захист прав людини і основоположних свобод

Верховний Суд виходить передусім із того, що право на звернення до суду (право на захист у процесуальному розумінні) гарантується Конституцією України та законами України.

Відповідно до частини першої статті 2 ЦПК України завданням цивільного судочинства є справедливий, неупереджений та своєчасний розгляд і вирішення цивільних справ з метою ефективного захисту порушених, невизнаних або оспорюваних прав, свобод чи інтересів фізичних осіб, прав та інтересів юридичних осіб, інтересів держави.

Згідно з частиною першою статті 4 ЦК України кожна особа має право в порядку, встановленому цим Кодексом, звернутися до суду за захистом своїх порушених, невизнаних або оспорюваних прав, свобод чи законних інтересів.

Положення цієї статті ґрунтуються на нормах Конституції України, які закріплюють обов`язок держави забезпечувати захист прав і свобод людини і громадянина судом (стаття 55).

У статті 129 Конституції України закріплені основні засади судочинства, які є конституційними гарантіями права на судовий захист.

Відповідно до пункту 1 статті 6 Конвенції про захист прав людини і основоположних свобод кожен має право на справедливий і публічний розгляд його справи упродовж розумного строку незалежним і безстороннім судом, встановленим законом, який вирішить спір щодо його прав та обов`язків цивільного характеру.

Відповідно до прецедентної практики Європейського суду з прав людини (далі ЄСПЛ) «у випадках, коли застосування правила державного імунітету від юрисдикції обмежує здійснення права на доступ до суду, суд має встановити, чи обставини справи виправдовують таке обмеження» (Sabeh El Leil v. France (скарга № 34869/05), рішення від 29 червня 2011 року, § 51; Oleynikov v. Russia (скарга №36703/04), рішення від 14 березня 2013 року, § 59).

Згідно з усталеною практикою ЄСПЛ, обмеження права на справедливий суд, зокрема шляхом застосування судового імунітету держави, є таким що відповідає пункту 1 статті 6 Конвенції про захист прав людини і основоположних свобод (далі Конвенція 1950 року) лише у разі, якщо таке обмеження: 1) переслідує законну мету, 2) є пропорційне меті, яка переслідується, та 3) не порушує самої сутності права на доступ до суду (Ashingdane v the United Kingdom (скарга № 8225/78), рішення від 28 травня 1985 року, § 57; Oleynikov v. Russia (скарга № 36703/04), рішення від 14 березня 2013 року, § 55; Fogarty v. the United Kingdom (скарга № 37112/97), рішення від 21 листопада 2001 року, § 33; Cudak v. Lithuania (скарга № 15869/02), рішення від 23 березня 2010 року, § 55).

ЄСПЛ неодноразово визнавав, що «надання імунітету державі в ході цивільного судочинства переслідує законну мету дотримання міжнародного права зі сприяння ввічливості та добрих відносин між державами через повагу до суверенітету іншої держави» (Oleynikov v. Russia (скарга № 36703/04), рішення від 14 березня 2013 року, § 60; Cudak v. Lithuania (скарга № 15869/02), рішення від 29 червня 2011 року, § 52; Wallishauser v. Austria, (скарга № 156/04), рішення від 17 липня 2012 року, § 60).

Таким чином, у контексті наведеної практики ЄСПЛ, застосування судового імунітету російської федерації у справі за позовом про відшкодування шкоди повинно мати законну мету, зокрема сприяння ввічливості та добрих відносин між державами через дотримання міжнародного права. У той же час, збройна агресія проти України, здійснена російською федерацією в порушення основоположних принципів і норм міжнародного права, зокрема Статуту ООН, вчинені її збройними силами міжнародно-правові злочини в Україні виключають, з ініціативи російської федерації, питання ввічливості та добрих відносин між країнами.

Це позбавляє застосування судового імунітету російської федерації, що обмежує право позивача на справедливий суд, законної мети.

Відповідно до прецедентної практики ЄСПЛ, «обмеження буде несумісне з пунктом 1 статті 6 Конвенції 1950 року, якщо … не існує розумної пропорції між використовуваними засобами та метою, яка переслідується». Також, при розгляді питання про доступ до суду в контексті застосування юрисдикційного імунітету держави, «необхідно переконатися, що обмеження, що застосовуються, не обмежують і не скорочують доступ, що залишився особі, таким чином або такою мірою, що порушується сама сутність права [доступу до суду]» (Ashingdane v the United Kingdom (скарга № 8225/78), рішення від 28 травня 1985 року, § 57; Oleynikov v. Russia (скарга № 36703/04), рішення від 14 березня 2013 року, § 55). В іншому випадку, повне перешкоджання у розгляді справи, без будь-якої провини з боку позивача, буде суперечити пункту 1 статті 6 Конвенції 1950 року (McElhinney v. Ireland (скарга № 31253/96), рішення від 21 листопада 2001 року, Окрема думка Судді L. Лукейдіса).

Загальновідомо (тобто таке, що не потребує доказування частина третя статті 82 ЦПК України), що російська федерація відкидає визнання будь-якої відповідальності за свою протиправну військову діяльність в Україні, включаючи не тільки повномасштабну збройну агресію, але і будь-яку участь своїх збройних сил у військових діях в Донецькій та Луганській областях з 2014 року. Не існує жодної розумної підстави припустити, що порушене право позивача, за захистом якого він звернувся до українського суду, могло би бути захищене шляхом подання позову до суду, в якому би російська федерація не користувалася судовим імунітетом, тобто до суду російської федерації.

Таким чином, звернення позивача до українського суду є єдиним розумно доступним засобом захисту права, позбавлення якого означало б позбавлення такого права взагалі, тобто заперечувало б саму сутність такого права.

За таких обставин, застосування судового імунітету російської федерації (зокрема, частиною першою статті 79 Закону України «Про міжнародне приватне право») у даній справі не буде узгоджуватися із обов`язком України як держави і суду зокрема забезпечити реалізацію права позивача на справедливий суд. З огляду на відсутність інших ефективних засобів судового захисту порушеного права позивача, застосування судового імунітету російської федерації буде порушенням самої сутності права на справедливий суд. Також, зважаючи на військову агресію російської федерації, якою порушується державний суверенітет України, застосування судового імунітету російської федерації буде непропорційним до своєї мети.

Аналогічна правова позиція висловлена Верховним Судом у постанові від 18.05.2022 у справі №760/17232/20-ц.

19.08.2024 ухвалою суду закрито підготовче провадження та призначено справу до розгляду по суті.

Позивачі свою позицію обґрунтували тим, що з 2012 року було заплановано проведення зимових олімпійських ігор в росії у 2014 році.

Переслідуючи економічний інтерес та з метою підготовки до проведення зимових олімпійських ігор в росії, за вказівкою ОСОБА_2 17 квітня 2009 року на території Британських Віргінських Островів засновано та зареєстровано компанію « ОСОБА_3 ».

У той же день директором компанії «Зіланд Девелопмент Корп.» призначено ОСОБА_4 , ІНФОРМАЦІЯ_1 , громадянина Республіки Естонія, особистий код НОМЕР_1 , а засновником та бенефіціарним власником компанії «Зіланд Девелопмент Корп.» був ОСОБА_5 .

У період з вересня 2009 року до березня 2012 року здійснювалася поетапна емісія акцій ВАТ «Красная поляна» на загальну суму 12771066 тис. рублів. При цьому, номінальна вартість однієї акції 50000 рублів, а ціна розміщення за одну акцію 6270 тис. рублів (ринкова вартість за станом на 05.03.2012 року).

У вищезазначений період ОСОБА_2 через довірених осіб, а саме ОСОБА_4 та ОСОБА_6 , які були директором та учасником компанії «Зіланд Девелопмент Корп.», набув у власність 817 акцій відкритого акціонерного товариства «Красная поляна», загальною номінальною вартістю у розмірі 40850тис. рублів. При цьому, ринкова вартість акцій становила 5122590 тис. рублів, що було еквівалентно 175131282 доларів США, згідно з офіційним курсом долара США до російського рубля, встановленим національним банком росії станом на 05

березня 2012 року. Відповідно управління даними акціями ОСОБА_2 проводив через компанію «Зіланд Девелопмент Корп.» та зазначених довірених осіб.

У свою чергу відкрите акціонерне товариство «Красная поляна» володіло земельною ділянкою біля м. Сочі, на якій було заплановано будівництво гірсько-лижного курорту та готельно-розважального комплексу для його використання у зимових олімпійських іграх 2014 року.

09.03.2013 між ОСОБА_2 та ОСОБА_7 укладено Угоду, за якою ОСОБА_7 набував повноважень довірчого управителя компанії «Зіланд Девелопмент Корп.», а також активів, які перебувають у власності компанії «Зіланд Девелопмент Корп.».

15.03.2013 на підставі Угоди про передання акцій ОСОБА_5 передав у власність ОСОБА_7 компанію « ОСОБА_3 ». Будучи номінальним бенефіціарним власником компанії «Зіланд Девелопмент Корп.», приватний інтерес ОСОБА_7 охоплював отримання частини прибутку від відчуження акції, у розмірі 15 % від вартості їх продажу. У свою чергу приватний інтерес ОСОБА_2 був у тому, щоб отримати 85 % від вартості продажу акцій ВАТ «Красная поляна».

У той же день 15.03.2013, переслідуючи комерційний інтерес ОСОБА_2 та приватний комерційний інтерес отримання прибутку від суми продажу акцій ВАТ«Красная поляна», ОСОБА_7 від імені компанії «Зіланд Девелопмент Корп.» підготовлено, підписано і скеровано ОСОБА_8 та ОСОБА_9 угоду про продаж 23,736% акцій ВАТ «Красная поляна» в кількості 817 шт на загальну суму 200000тис. доларів США. Відповідно до умов угоди ОСОБА_8 купує дані акції в інтересах кредитора ПАТ «Сбербанк росії» (представник ПАТ «Сбербанк росії» за дорученням ОСОБА_9 ) з метою отримання підконтрольною ОСОБА_8 групою компаній «БИН» кредитної лінії в розмірі 15000000 тис. доларів США від ПАТ «Сбербанк росії».

За змістом пп. 2 та 4 зазначеної Угоди ОСОБА_8 та підконтрольна йому група компаній «БИН» зобов`язувалась виплатити суму купівлі акцій протягом 30 (тридцяти) календарних днів з дня підписання Угоди, а Кредитор ПАТ «Сбербанк росії» зобов`язувався відкрити відповідну кредитну лінію на користь групи компаній «БИН» протягом 10 (десяти) десяти календарних днів з моменту передачі акцій, придбаних у компанії «Зіланд Девелопмент Корп.» у власність ПАТ «Сбербанк росії».

Разом з тим у пункті 5 вказаної вище Угоди сторони погодили, що у випадку виникнення будь-яких спорів, які виникають зі змісту Угоди чи пов`язані з порядком виконання зобов`язань сторонами Угоди, то сторони, які підписали Угоду мають право вирішити спірну ситуацію по законодавству країн СНГ та/або по законодавству штату Нью-Йорк протягом 10 (десяти) років з дати підписання Угоди.

Вказана Угода була погоджена та підписана як ОСОБА_9 зі сторони ПАТ «Сбербанк росії», так і ОСОБА_8 .

Утім, після 15.03.2022 і ОСОБА_8 , і ОСОБА_9 перестали виходити на зв`язок.

Окрім того колишній номінальний засновник компанії «Зіланд Девелопмент Корп.» ОСОБА_5 та номінальний директор Тоомас Труувер теж почали проявляти неоднозначну поведінку та протягом значного проміжку часу відмовлялися передавати ОСОБА_7 установчі та фінансово-господарські документи компанії «Зіланд Девелопмент Корп.».

Не отримавши належного виконання угоди щодо продажу акцій, у квітні 2013 року ОСОБА_2 почав вимагати від ОСОБА_7 вжиття необхідних дій для вирішення питання про виконання угоди від 15.03.2013. Зважаючи на те, що останній не вживав ніяких дій, щоб розібратися в ситуації, ОСОБА_2 поставив вимогу передати право власності особі, яку він зазначить.

02.07.2013 на підставі Угоди про передання акцій ОСОБА_7 передав у власність ОСОБА_1 компанію « ОСОБА_3 ».

Будучи номінальним бенефіціарним власником компанії «Зіланд Девелопмент Корп.», приватний інтерес ОСОБА_1 охоплював отримання частини прибутку від відчуження акцій, вартість яких станом на 2013 рік значно виросла, а саме 1 % від вартості їх продажу. У свою чергу приватний інтерес ОСОБА_2 був у тому, щоб отримати 99 % від вартості продажу акцій ВАТ «Красная поляна». Дана домовленість була зафіксована в угоді від 01.07.2013, копія якої додається.

У подальшому ОСОБА_1 та ОСОБА_2 змінили свої домовленості щодо розподілу майбутнього прибутку, таким чином, що приватний інтерес ОСОБА_1 охоплював отримання частини прибутку від відчуження акцій у розмірі 5 %, про приватний інтерес ОСОБА_2 відповідно був у тому, що отримати 95 % від вартості продажу акцій ВАТ «Красная поляна».

З метою отримання особистого економічного інтересу та звернення до суду щодо отримання грошових коштів, обумовлених договором між ОСОБА_2 та ОСОБА_7 в угоді від 09.03.2013, останній витребував в ОСОБА_6 пакет статутних та фінансово-господарських документів компанії «Зіланд Девелопмент Корп.», з яких було встановлено наступні обставини:

-11 березня 2013 року директор «Зіланд Девелопмент Корп.» Тоомас Трууверт в м.Талін надав нотаріальну довіреність на ім`я ОСОБА_10 (рідного брата ОСОБА_2 ) з правом повного представництва компанії, фактично передав власні повноваження ОСОБА_10 ;

-11 березня 2013 року нібито між ОСОБА_10 та ОСОБА_8 підписано Меморандум (угода про наміри) якою передбачено, що ОСОБА_10 від свого імені зобов`язується здійснити продаж 41,429% акцій ВАТ «Красная поляна» в

кількості 1426 шт (601 акція власності ОСОБА_10 , 404 акції власності «Зіланд Девелопмент Корп.» та 421 акцію «Камбара ОСОБА_11 ») від свого імені та, діючи за дорученням зазначених компаній, за ціною 20 млн дол США на користь офшорних компаній «Велен Фінанс ЛТД», «Товнфолк трейдінг інвестмент ЛТД» та «Ханберг фінанс ЛТД», які представляв ОСОБА_8 . Також, у цьому Меморандумі в п.3 визначено, що дана попередня угода кваліфікується як попередній договір купівлі-продажу вищезазначених акцій.

-13 березня 2013 року до вищевказаного Меморандуму підписано доповнення №1, яким передбачено, що у випадку майбутнього продажу Покупцем акцій за ціною більшою ніж ціна купівлі, Продавцю буде виплачена різниця їх ринкової вартості. Орієнтовно різниця становила 80млндол США.

-13 березня 2013 року директором «Зіланд Девелопмент Корп.» Тоомасом Труувертом та її власником ОСОБА_12 нотаріально підписано одноголосні письмові рішення на підтвердження довіреності від 11 березня 2013 року виписаної ОСОБА_13 на ім`я ОСОБА_10 , яке апостильовано 18 березня 2013 року нотаріусом Пілія І.О. у м. москва.

-18 березня 2013 року нібито за підписом ОСОБА_10 від імені « ОСОБА_3 » підписаний договір купівлі-продажу 404 акцій ВАТ «Красная поляна» на користь компанії «Товнфолк трейдінг інвестмент ЛТД» за підписом директора Клео Васіліо. При цьому у договорі здійснено посилання на попередній договір купівлі-продажу акцій від 12 березня 2013 року, який у дійсності датований від 11.03.2013. У договорі відсутня норма відшкодування різниці у випадку майбутнього продажу акцій їх вигодонабувачем. Договір не підписувався та не візувався ОСОБА_8 .

Стягнення збитків вимагає наявність усіх елементів складу цивільного правопорушення: протиправної поведінки, збитків, причинного зв`язку між протиправною поведінкою і збитками, вини.

18.11.2011 між ОСОБА_2 та ПАТ «Сбербанк росії», від імені якого діяв ОСОБА_9 , було укладено Угоду за умовами якої ОСОБА_2 та ПАТ «Сбербанк росії», маючи спільний комерційний інтерес, зобов`язувались залучати іноземний капітал та інвесторів до ВАТ «Красная поляна» та на цьому підґрунті сприяти один одному у досягненні названих цілей.

З боку ПАТ «Сбербанк росії» угоду від 18.11.2011 було підписано уповноваженою посадовою особою ОСОБА_9 .

Однак з огляду на фактичні обставини, які описані у позовній заяві, вбачається, що ПАТ «Сбербанк росії», від імені якого діяли його посадові особи, зокрема заступник голови правління ОСОБА_9 , мало інші комерційні інтереси, які не відповідали суті взятих на себе зобов`язань за Угодою від 18.11.2011, що виразилось у вчиненні організованих протиправних дій спрямованих на незаконне та протиправне вилучення акцій ВАТ «Красная поляна» у ОСОБА_2 ,

які перебували на балансі підконтрольної йому компанії «Зіланд Девелопмент Корп.» та були його власністю, на користь ПАТ «Сбербанк росії».

Зокрема у ході розгляду цивільної справи № 376/560/23 було встановлено, що акції ВАТ «Красная поляна», в тому числі і 817 штук, які знаходилися на балансі « ОСОБА_3 » були відчужені на підставі підробних документів на користь компаній, від імені та в інтересах яких діяв ОСОБА_8 .

Так, 41,429% акцій ВАТ «Красная поляна» в кількості 1426 шт (601 акція власності ОСОБА_10 , 404 акції власності «Зіланд Девелопмент Корп.» та 421 акцію «Камбара Оверсаз С.А.», 413 з яких перейшли від « ОСОБА_3 ») були відчужені на користь офшорних компаній «Велен Фінанс ЛТД», «Товнфолк трейдінг інвестмент ЛТД» та «Ханберг фінанс ЛТД», які представляв ОСОБА_8 на підставі підробних Меморандуму (угоди про наміри) від 11.03.2013, Доповнення № 1 від 13.03.2013 до Меморандуму (Договору про наміри) від 11.03.2013 та договору купівлі-продажу від 18.03.2013.

Факт підробки підписів зі сторони продавців на Меморандумі (угоді про наміри) від 11.03.2013, Доповненні № 1 від 13.03.2013 до Меморандуму (Договору про наміри) від 11.03.2013 та договорі купівлі-продажу від 18.03.2013 підтверджується висновком експерта № 62 від 19.12.2022, наданого за результатами проведення почеркознавчої експертизи у рамках кримінального провадження № 12022100030002505 від 28.09.2022, потерпілим у якому визнаний ОСОБА_7 .

У кінцевому результаті в 2013 році акції ВАТ «Красная поляна» в кількості 817 штук, які знаходилися на балансі «Зіланд Девелопмент Корп.», перейшли у власність ПАТ «Сбербанк росії». Дане повністю підтверджується аудиторським висновком ЗАТ«Ернст енд Янг Внешаудит» від 24.03.2014, у якому зазначено, що ПАТ «Сбербанк росії» володіє 92,10 % акцій ВАТ «Красная поляна».

Відповідно до експертного висновку про розмір збитків, понесених бенефіціарним власником 1426 звичайних іменних бездокументарних акцій ВАТ «Красная поляна» встановлено, що потенційний дохід від інвестування неотриманих доходів від продажу інвестиційного активу (1426 акцій ВАТ «Красная поляна») становить 1418,61 млн доларів США.

За таких обставин потенційний дохід від інвестування неотриманих доходів від продажу інвестиційного активу, який належав ОСОБА_2 та управління яким здійснювалося ОСОБА_1 через « ОСОБА_3 », а саме 817 акцій ВАТ «Красная поляна» (57,3 % від 1426 акцій) становить 812863,53 тис. доларів США.

Зазначена сума є упущеною вигодою позивачів, оскільки саме таку б суму вони мали б можливість отримати, реалізувавши через « ОСОБА_3 » інвестиційну діяльність, пов`язану з володінням акціями ВАТ «Красная поляна».

Зважаючи на домовленості між ОСОБА_2 та ОСОБА_1 , суть порушеного права останніх полягає у тому, що внаслідок відчуження 817 акцій ВАТ «Красная поляна», які належали ОСОБА_2 та управління якими мав здійснювати ОСОБА_1 через « ОСОБА_3 », на підставі підробних документів на користь ПАТ «Сбербанк росії», неотриманим доходом ОСОБА_1 є 5 % від розміру завданих збитків, що становить 40643176,50 доларів США, а неотриманий дохід ОСОБА_2 772220353,50доларів США.

Незаконне заволодіння ПАТ «Сбербанк росії» акціями ОСОБА_2 , які належали йому та обліковувалися за підконтрольною йому компанією « ОСОБА_3 », призвело до прямих збитків у формі неотриманих доходів (упущеної вигоди) ОСОБА_2 та ОСОБА_1 .

Тому відповідальним за шкоду є ПАТ «Сбербанк росії», в інтересах якого здійснювалось незаконне вилучення акцій ВАТ «Красная поляна» з володіння компанії «Зіланд Девелопмент Корп.»

Під час підготовчого судового засідання позивач ОСОБА_2 направив до суду письмові пояснення в доповнення до обгрунтувань, зазначених у позовній заяві, у яких повідомив, що у 2006 році ним було придбано гірськолижний курорт «Горная карусель», розташований у смт Червона Поляна, Сочинський регіон, росія для реалізації бізнес-проекту з будівництва нової швидкісної автомагістралі, гірськолижної траси, підйомника та комерційної нерухомості (готельного комплексу). 2006 року, оскільки ОСОБА_2 обіймав публічну політичну посаду, даний об`єкт було оформлено на його рідного брата ОСОБА_14 у вигляді 84,85% акцій ВАТ «Красная поляна».

У 2007 році Олімпійський комітет присудив проведення зимових Олімпійських ігор 2014 року місту Сочі. У результаті уряд російської федерації оголосив, що ВАТ «Красная поляна» буде включена до складу перспективних олімпійських проектів з будівництва трампліну, комплекс розрахований на 15 000 місць. Проект також включав курорт «Горная карусель», де мали бути побудовані гірська медіа-село та готелі на 2658 номерів.

У 2008 році з ініціативи ПАТ Сбербанк росії» та відповідно до вказівок уряду російської федерації, голови ПАТ Сбербанк росії» Германа Грефа та його заступника Станіслава Кузнєцова, інвестором ВАТ «Красная поляна» стала компанія «Сбербанк Капітал», 100% дочірня компанія ПАТ «Сбербанк росії».

Відповідно до умов цієї угоди ПАТ «Сбербанк росії» і Сбербанк Капітал взяли на себе фінансову відповідальність за надання кредитної лінії у розмірі 40 мільярдів рублів на будівництво комплексу для стрибків з трампліну та інших об`єктів інфраструктури.

Однак зобов`язання так і не було виконано. ПАТ «Сбербанк росії» надав лише проміжний кредит у розмірі 1 млрд. рублів під процентну ставку 10%-15%. Сбербанк переглянув фінансові зобов`язання на 40 мільярдів рублів (1,5

мільярда доларів на той момент) і натомість запропонував безпосередньо купити 25% компанії. Внаслідок відмови ПАТ «Сбербанк росії» профінансувати проект, ВАТ «Красная Поляна» було змушене отримати додаткові кредити під високі відсотки від ВнешЕкономБанку («ВЕБ») для забезпечення своїх акцій, які були передані у заставу.

У той же час ОСОБА_9 , заступник голови правління ПАТ «Сбербанк росії» Германа Грефа, став головою правління ВАТ «Красная Поляна», після чого ОСОБА_15 розробив план з отримання контролю над компанією, шляхом неправомірного впливу, шахрайства та загрози тілесних ушкоджень за допомогою як приватних, так і державних гравців, до яких входять ПАТ «Сбербанк росії», Сбербанк Капітал, ОСОБА_16 , його син ОСОБА_17 (як бенефіціар), ОСОБА_9 , ОСОБА_18 , турецька будівельна компанія «Сембол», як компанія, яка мала корупційні зв`язки зі Сбербанк Капітал, ОСОБА_16 і ОСОБА_9 , ОСОБА_8 , ОСОБА_19 , ОСОБА_20 (зять губернатора Краснодарського краю Ткачова Олександра), яке обманним шляхом отримало 41,429% акцій ВАТ «Красна поляна»

18.11.2011 ОСОБА_21 , та ВАТ «Сбербанк росії», уповноваженою посадовою особою ОСОБА_9 , підписано Угоду за умовами якої сторони маючи спільний комерційний інтерес, зобов`язалися залучати іноземний капітал та інвесторів у ВАТ «Красная Поляна» і на цій основі сприятиме один одному сприяння у досягненні цих цілей.

До 2012 року будівництво об`єкту здійснювалося компанією «Транскомстрой», яка контролювалася братом ОСОБА_2 . Магомедом. Однак, у середині 2012 року, під тиском голови Сбербанку ОСОБА_22 і без будь-яких достатних підстав, субпідрядник «Транскомстрой», який виконував будівництво об`єкта за ціною, що не перевищую 1800,00 доларів США за 1 кв.м., була замінена турецькою будівельною компанією «Сембол» (партнер Rixos, яку на той момент будувала санаторій ОСОБА_23 в Криму), яка виставила рахунок за той же обсяг робіт на суму понад 3000 доларів США за 1 кв.м. та не гарантував дотримання термінів здачі об`єкта.

Коли ОСОБА_15 представив « ОСОБА_24 », як генерального підрядника, він наполягав на інвестуванні додаткового капіталу в розмірі 50 мільйонів доларів США, що було зроблено ОСОБА_2 , щоб гарантувати, що вартість ВАТ «Красная поляна» перевищить 800 млн. дол. США, після чого ПАТ «Сбербанк росії» та ОСОБА_15 отримали контрольний пакет акцій компанії та стали керуючими партнерами. Вартість кампанії в 800 млн. дол США також відображена в щорічному аудиті, який проводить щороку американська аудиторська компанія «Ернст енд Янг».

Ця ситуація призвела до конфлікту між братом ОСОБА_2 та ОСОБА_25 , внаслідок якого ОСОБА_15 та його спільники змогли усунути ОСОБА_10 від управління ВАТ «Красная Поляна» і почали загрожувати позивачеві ОСОБА_2 та його родині тілесними ушкодженнями.

Таким чином, з середини 2012 року реалізація проекту та управління будівництвом, які здійснюються ВАТ «Красная поляна», перебували під особистим контролем ОСОБА_22 , ОСОБА_19 (партнер через компанію Альтера капітал) та його заступника Станіслава Кузнєцова.

З цього моменту ні ОСОБА_2 , ні його брат більше не брали участі в управлінні компанією або прийнятті управлінських рішень.

Станом на березень 2013 року ОСОБА_2 та його брат ОСОБА_26 були фактичними власниками 41,429% (1426 звичайних акцій) ВАТ «Красная Поляна».

Відповідно до фінансового аналізу (номінальна, а не ринкова вартість), підготовленого ПАТ «Сбербанк росії», загальна вартість 41,429% акцій або 1426 звичайних акцій (акцій ВАТ «Красная поляна») склала 328 мільйонів доларів США (800 мільйонів х 41/100), які офіційно розподілялися так:

- 817 акцій - 23,736% - компанія «Зіланд Девелопмент Корп.»

- 601 акцій - 17,461% - ОСОБА_10 ;

- 8 акцій - 0,232% - ОСОБА_27 .

На початку березня 2013 року до ОСОБА_2 звернувся ОСОБА_28 , який користуючись ситуацією, що склалася, а також давніми дружніми відносинами запропонував викупити 23,736% (817 акцій ВАТ «Красная Поляна») за ціною 200 мільйонів доларів США, оскільки йому потрібні були кошти з ПАТ «Сбербанк росії» для викупу у ПАТ «Сбербанк росії» та компанії Система (власник ОСОБА_29 ) 51% акцій нафтової компанії Русьнафта за 1,3 мільярда доларів, а також кредитна лінія у розмірі 15 млрд доларів США для різних поглинань на ринку.

Того ж дня, на виконання домовленостей із ОСОБА_30 , ОСОБА_7 підготовлено, підписано та направлено ОСОБА_8 та ОСОБА_9 угоду про продаж 23,736% ВАТ «Красная Поляна» у кількості 817 шт на загальну суму 200 млн. дол. США. Відповідно до умов угоди, ОСОБА_8 купує цей пакет акцій на користь власного кредитора ВАТ «Сбербанк росії», з метою отримання підконтрольної ОСОБА_8 групи компаній «БИН» кредитної лінії у розмірі 15 млрд. дол. США. При цьому розрахунок за акції ОСОБА_8 повинен був зробити протягом 30 днів, а отримати кредитну лінію протягом 10 днів. Ця угода від групи компаній «БИН» була підписана ОСОБА_8 , від ВАТ «Сбербанк росії» ОСОБА_9 .

Після підписання угоди від 15 березня 2013 року, ОСОБА_8 та ОСОБА_9 перестали виходити на зв`язок з ОСОБА_2 та з ОСОБА_7 .

У свою чергу, група компаній «БИН», від імені якої діяв ОСОБА_8 , у процесі реалізації угоди від 15.03.2013 (підписаної ОСОБА_7 , ОСОБА_8 та ОСОБА_9 ) отримала від компанії «Зіланд Девелопмент Корп.» 817 штук акцій ВАТ «Красная Поляна» у результаті підробки документів і згодом розпоряджалася ними на свій розсуд, а саме передала їх ПАТ «Сбербанк росії». Жодні кошти не були виплачені групою компаній «БИН» на користь « ОСОБА_3 », і не були перераховані інакше.

Так, внаслідок використання підроблених ОСОБА_8 та ОСОБА_9 документів, ПАТ «Сбербанк росії» незаконно було отримано 817 акцій ВАТ «Красная Поляна» та 601 акцію ВАТ «Красная Поляна», що належали ОСОБА_10 .

Також позивач стверджує, що організатором вищезгаданої схеми є голова правління ПАТ «Сбербанк росії» ОСОБА_16 з метою отримання неправомірної вигоди в рахунок підвищення вартості квадратного метра забудови на суму понад 1200 доларів США, в рахунок кредитних коштів, що виділялися ПАТ «Сбербанк росії».

Свої дії він проводив та проводить через свого заступника ОСОБА_9 , який є технічним заступником та самостійних рішень не приймає.

Зрештою ВАТ «Красная поляна» була перепродана зятю губернатора Краснодарського краю ОСОБА_20 , який досі керує компанією на користь ОСОБА_31 та ОСОБА_19 .

Внаслідок такого стану справ, на підставі договору від 09.03.2013, ОСОБА_2 вимагав від ОСОБА_7 контролювати виконання угоди від 15.03.2013. З урахуванням того, що на той момент ОСОБА_7 , посилаючись на зайнятість в іншому бізнес-проекті, не приділяв належної наполегливості та відповідних дій, ОСОБА_2 поставив питання про передачу права власності на компанію « ОСОБА_3 » іншій особі, на що ОСОБА_7 погодився.

02.07.2013, на підставі угоди про передачу акцій, ОСОБА_7 передав у власність ОСОБА_1 компанію « ОСОБА_3 ». З номінальним бенефіціарним власником компанії «Зіланд Девелопмент Корп.» ОСОБА_1 на той момент було укладено договір, за умовами якого частка прибутку, отриманого від можливого відчуження акцій ВАТ «Красная поляна» становитиме 1%. Ця письмова домовленість була зафіксована в угоді від 01.07.2013.

Після подій 2014 року, неспровокованої агресії росії щодо України, ОСОБА_1 неодноразово звертався до ОСОБА_2 із пропозицією переоформити з нього корпоративні права компанії «Зіланд Девелопмент Корп.». У свою чергу ОСОБА_2 вдалося переконати ОСОБА_1 виконувати умови угоди від 01.07.2013, з урахуванням того, що на той момент була наявна інформація про протиправне відчуження акцій і за домовленістю комерційний інтерес ОСОБА_1 був підвищений до 5%.

У вересні 2016 року ОСОБА_7 повідомив ОСОБА_2 , що поштою ОСОБА_5 передав йому пакет копій статутних та фінансово-економічних документів компанії «Зіланд Девелопмент Корп.». Вивчивши ці документи, ОСОБА_7 повідомив, що підпис ОСОБА_10 , який був відтворений на аркушах Договору купівлі-продажу акцій від 18.03.2013 та на Меморандумі від 11.03.2013, більше всього підроблений і не відповідає його дійсному підпису, який, у тому числі, був представлений на Договорі від 18.11.2011, де ОСОБА_10 особисто оформив свій підпис.

Позивачі та їх представники в судове засідання не з`явилися. Представник позивачів адвокат Кучерук М.В. направив до суду заяву, в якій підтримав позовні вимоги та просив провести розгляд у його відсутність та відсутність позивачів.

Відповідач у судове засідання свого представника не направив, про час та місце розгляду справи повідомлений належним чином, шляхом розміщення оголошення на сайті суду та направлення копії позовної заяви з додатками, ухвал суду та повідомлень про виклик на адресу електронної пошти Посольства російської федерації в Молдові.

Відповідно до ч. 2 ст. 247 ЦПК України фіксування судового засідання технічним засобом здійснює секретар судового засідання. У разі неявки в судове засідання всіх учасників справи чи в разі якщо відповідно до положень цього Кодексу розгляд справи здійснюється судом за відсутності учасників справи, фіксування судового процесу за допомогою звукозаписувального технічного засобу не здійснюється.

Згідно з вимогами ч. 3 ст. 211 ЦПК України учасник справи має право заявити клопотання про розгляд справи за його відсутності. Якщо таке клопотання заявили всі учасники справи, судовий розгляд справи здійснюється на підставі наявних у суду матеріалів.

Виходячи з наведеного, суд дійшов висновку про можливість ухвалення рішення у справі при проведенні судового засідання на підставі вимог ст. 211, 247 ЦПК України.

Суд, дослідивши матеріали справи, дійшов таких висновків.

Відповідно до ч. 1 ст. 4 та ч. 1 ст. 5 ЦПК України кожна особа має право в порядку, встановленому цим Кодексом, звернутися до суду за захистом своїх порушених, невизнаних або оспорюваних прав, свобод чи законних інтересів. Здійснюючи правосуддя, суд захищає права, свободи та інтереси фізичних осіб, права та інтереси юридичних осіб, державні та суспільні інтереси у спосіб, визначений законом або договором.

Частинами 3, 4 ст. 12 ЦПК України встановлено, що кожна сторона повинна довести обставини, які мають значення для справи і на які вона посилається як

на підставу своїх вимог або заперечень, крім випадків, встановлених цим Кодексом. Кожна сторона несе ризик настання наслідків, пов`язаних із вчиненням чи невчиненням нею процесуальних дій.

Згідно з ч. 1 ст. 81, 89 ЦПК України, кожна сторона повинна довести ті обставини, на які вона посилається як на підставу своїх вимог або заперечень, крім випадків, встановлених цим Кодексом. Суд оцінює докази за своїм внутрішнім переконанням, що ґрунтується на всебічному, повному, об`єктивному та безпосередньому дослідженні наявних у справі доказів. Жодні докази не мають для суду заздалегідь встановленої сили. Суд оцінює належність, допустимість, достовірність кожного доказу окремо, а також достатність і взаємний зв`язок доказів у їх сукупності.

Судом встановлено, що 05.09.2001 було створено Відкрите акціонерне товариство «Красная поляна» (п. 1.1. статті 1 Статуту в редакції від 16.07.2009).

Відповідно до п. 3.1.Статуту встановлено, що метою товариства є розробка і супроводження інвестиційного проекту створення і розвитку конкурентоздатного на міжнародному ринку спортивно-туристичних послуг вітчизняного гірськолижного, оздоровчого і курортного комплексу «Горная карусель», а також отримання прибутку шляхом насичення ринку товарами і послугами.

Згідно п. 7.1. Статуту визначено, що статутний капітал товариства визначає мінімальний розмір майна товариства, що гарантує інтереси його кредиторів, та складається з номінальної вартості розміщених акцій товариства, придбаних акціонерами (розміщення акцій). Всі акції товариства є іменними. Статутний капітал товариства розділений на 2007 (Дві тисячі сім) акцій.

17.04.2009 на території Британських Віргінських островів було засновано комерційну компанію «Зіланд Девелопмент Корп.». Директором призначено ОСОБА_4 , а засновником та беніфіціарним власником компанії Зіланд був ОСОБА_5 .

18.11.2011 між ОСОБА_2 та ВАТ «Сбербанк росії», від імені якого діяв ОСОБА_9 , було укладено договір, за умовами якого ОСОБА_2 та ВАТ «Сбербанк росії», маючи спільний комерційний інтерес, зобов`язувались залучати іноземний капітал та інвесторів до проекту ВАТ «Красная поляна» та на цьому підґрунті сприяти один одному у досягненні названих цілей. Компанія «Зіланд Девелопмент Корп.» набуває у власність 602 акції ВАТ «Красная поляна».

05.03.2012 ВАТ «Красная поляна» на підставі рішення Ради директорів про додатковий випуск цінних паперів від 17.02.2012 № 112, прийнятого на основі рішення про збільшення статутного капіталу акціонерного товариства шляхом розміщення додаткових акцій, прийнятого на Позачергових загальних зборах акціонерів ВАТ «Красная поляна» від 06.02.2012, Протокол від 06.02.2012 № 53,

здійснено додаткове розміщення акцій по закритій підписці у кількості 1 435 штук. Державний реєстраційний номер випуску 1-01-33085-Е-006D.

Після 05.03.2012 статутний капітал ВАТ «Красная поляна» є таким, що розділений на 3 442 (Три тисячі чотириста сорок дві) акції.

Частину акцій ВАТ «Красная поляна» з нового випуску, а саме 215 штук придбаває «Зіланд Девелопмент Корп.» на підставі договору купівлі продажу цінних паперів № 6 від 23.05.2012.

Як вбачається з доповідної записки головного бухгалтера ВАТ «Сбербанк росії» станом на 04.02.2013 компанія «Зіланд Девелопмент Корп.» володіє акціями ВАТ «Красная поляна» у кількості 817 штук, що становить 23,736 % статутного капіталу. В свою чергу ВАТ «Сбербанк росії» володіє акціями ВАТ «Красная поляна» у кількості 1722 штуки, що становить 50,029 % статутного капіталу, що також підтверджується аудиторським висновком ЗАТ «Ернст енд Янг Внешаудит» від 18.03.2013.

09.03.2013 між ОСОБА_2 та ОСОБА_7 було укладено договір про передачу в довірче управління акцій ВАТ «Красная поляна» в кількості 817 штук, які знаходяться на балансі «Зіланд Девелопмент Корп.» За вказаним договором ОСОБА_7 на підставі документа про передачу акцій зобов`язується прийняти у власність акції « ОСОБА_3 » від попереднього довірчого керуючого Драгана Перовича на умовах зазначених у цьому договорі.

15.03.2013 на підставі документа про передачу акцій ОСОБА_5 передав у власність ОСОБА_7 компанію « ОСОБА_3 », передавши йому 1 акцію, що було 100 % статутного капіталу. Водночас у власність ОСОБА_7 перейшли також активи компанії «Зіланд Девелопмент Корп.» у вигляді 817акцій ВАТ «Красная поляна».

15.03.2013 між компанією «Зіланд Девелопмент Корп.», від імені якої діяв власник ОСОБА_7 (Продавець), ОСОБА_8 (Покупець) та ВАТ «Сбербанк росії», від імені якого діяв ОСОБА_9 , на підставі довіреності від 10.11.2010 №01-1/1025, вчиненої від імені ВАТ «Сбербанк росії», Президентом, Головою Правління ОСОБА_32 та посвідченої ОСОБА_33 , тимчасово виконуючим обов`язки нотаріуса міста москва Казанової О.Ю. (Кредитор), було укладено договір купівлі-продажу акцій ВАТ «Красная поляна».

Згідно з п. 1 договору від 15.03.2013 Продавець передає у власність Покупця 23,736 % акцій ВАТ «Красная поляна» в кількості 817 штук оціночною вартістю 189800000 (Сто вісімдесят дев`ять мільйонів вісімсот тисяч доларів США) (далі Акції) за ціною 200000000 (Двісті мільйонів доларів США).

Покупець зобов`язується сплатити Продавцю 200000000 (Двісті мільйонів доларів США) в рахунок придбання акцій, указаних в п. 1 цього Договору протягом 30-ти днів (п. 2 договору від 15.03.2013).

Відповідно до п. 3 договору від 15.03.2013 Покупець купує Акції за дорученням і в інтересах Кредитора (ВАТ «Сбербанк росії») в рамках реалізації проекту надання кредитної лінії на користь підприємств Покупця Групи компаній «БИН».

Даним договором, після передачі Покупцем Акцій Кредитору, придбаних за його дорученням і в його інтересах, Кредитор гарантує надання Групі компаній «БИН» кредитної лінії на загальну суму 15000000000 (П'ятнадцять мільярдів доларів США) протягом 10 днів (п. 4 договору від 15.03.2013).

Не отримавши належного виконання угоди щодо продажу акцій, у квітні 2013 року ОСОБА_2 почав вимагати від ОСОБА_7 вжиття необхідних дій для вирішення питання про виконання угоди від 15.03.2013. Зважаючи на те, що останній не вживав ніяких дій, щоб розібратися в ситуації, ОСОБА_2 поставив вимогу передати право власності особі, яку він зазначить.

01.07.2013 між ОСОБА_2 та ОСОБА_1 було укладено договір про передачу в довірче управління акцій ВАТ «Красная поляна» в кількості 817 штук, які знаходяться на балансі «Зіланд Девелопмент Корп.» За вказаним договором ОСОБА_1 на підставі документа про передачу акцій зобов'язується прийняти у власність акції « ОСОБА_3 » від попереднього довірчого керуючого Ісмаілова М.І. на умовах зазначених у цьому договорі.

Відповідно до договору про передачу в довірче управління акцій ВАТ «Красная поляна» від 01.07.2013 приватний інтерес ОСОБА_1 охоплював отримання частини прибутку від відчуження акцій у розмірі 1 % від вартості їх продажу, а приватний інтерес ОСОБА_2 був у тому, щоб отримати 99 % від вартості продажу акцій ВАТ «Красная поляна».

У подальшому ОСОБА_2 та ОСОБА_1 змінили свої домовленості щодо розподілу майбутнього прибутку, таким чином, що приватний інтерес ОСОБА_1 охоплював отримання частини прибутку від відчуження акцій у розмірі 5 %, про приватний інтерес ОСОБА_2 відповідно був у тому, щоб отримати 95 % від вартості продажу акцій ВАТ «Красная поляна», про що представником позивачів була подана заява про уточнення позовних вимог.

02.07.2013 на підставі документа про передачу акцій ОСОБА_7 передав у власність ОСОБА_1 компанію « ОСОБА_3 », передавши йому 1 акцію, що було 100 % статутного капіталу. Перехід права власності на компанію « ОСОБА_3 » також підтверджується реєстром акціонерів. Водночас, як вважали позивачі, фактично у власність ОСОБА_1 перейшли також активи компанії «Зіланд Девелопмент Корп.» у вигляді 817акцій ВАТ «Красная поляна».

Також судом встановлено, 11.03.2013 директор «Зіланд Девелопмент Корп.» Тоомас Трууверт в м. Талін надав нотаріальну довіреність на ім'я ОСОБА_10 (рідного брата ОСОБА_2 ) з правом повного представництва компанії, фактично

передав власні повноваження ОСОБА_10 . При цьому в довіреності відсутній зразок підпису повіреної особи.

У подальшому акції ВАТ «Красная поляна», в тому числі і 817 штук, які знаходилися на балансі « ОСОБА_34 » були відчужені на підставі підробних документів на користь компаній, від імені та в інтересах яких діяв ОСОБА_8 , а саме 41,429% акцій ВАТ «Красная поляна» в кількості 1426 шт (601 акція власності ОСОБА_10 , 404 акції власності «Зіланд Девелопмент Корп.» та 421 акцію «Камбара Оверсаз С.А.», 413 з яких перейшли від « ОСОБА_3 ») були відчужені на користь офшорних компаній «Велен Фінанс ЛТД», «Товнфолк трейдінг інвестмент ЛТД» та «Ханберг фінанс ЛТД», які представляв ОСОБА_8 на підставі підробних Меморандуму (угоди про наміри) від 11.03.2013, Доповнення № 1 від 13.03.2013 до Меморандуму (Договору про наміри) від 11.03.2013 та договору купівлі-продажу від 18.03.2013.

Факт підробки підписів зі сторони продавців на Меморандумі (угоді про наміри) від 11.03.2013, Доповненні № 1 від 13.03.2013 до Меморандуму (Договору про наміри) від 11.03.2013 та договорі купівлі-продажу від 18.03.2013 підтверджується висновком експерта № 62 від 19.12.2022, наданого за результатами проведення почеркознавчої експертизи у рамках кримінального провадження № 12022100030002505 від 28.09.2022, потерпілим у якому визнаний ОСОБА_7 .

У кінцевому результаті в 2013 році акції ВАТ «Красная поляна» в кількості 817 штук, які знаходилися на балансі «Зіланд Девелопмент Корп.» перейшли у власність ПАТ «Сбербанку росії». Дане повністю підтверджується аудиторськими висновком ЗАТ«Ернст енд Янг Внешаудит» від 18.03.2013 та від 24.03.2014, з яких вбачається, що ВАТ «Сбербанк росії» у 2012 році володіло 50,029 % акцій ВАТ «Красная поляна», а в 2013 році у власності ВАТ «Сбербанк росії» знаходиться 92,10 % акцій ВАТ «Красная поляна».

У подальшому після 2013 року Відкрите акціонерне товариство «Сбербанк росії» було перейменовано на Публічне акціонерне товариство «Сбербанк росії».

Дані обставини також були досліджені у ході розгляду цивільної справи №376/560/23 та викладені у рішенні Сквирського районного суду Київської області від 25.05.2023, яке не оскаржувалося та набрало законної сили.

Пунктом 2 ч. 3 ст. 22 ЦК України встановлено, що збитками є доходи, які особа могла б реально одержати за звичайних обставин, якби її право не було порушене (упущена вигода).

Відповідно до ч. 4 ст. 263 ЦПК України визначено, що при виборі і застосуванні норми права до спірних правовідносин суд враховує висновки щодо застосування відповідних норм права, викладені в постановах Верховного Суду.

Верховний Суд у постанові від 30.03.2021 у справі № 908/2261/17 зробив висновок, що при визначенні розміру упущеної вигоди мають враховуватися відомості, які безспірно підтверджують реальну можливість отримання винагороди, якби зобов`язання було виконано боржником у належний спосіб. Дохід не може бути абстрактним, адже для відшкодування упущеної вигоди повинні враховуватися заходи, вжиті потерпілою особою для його отримання. Вимагаючи відшкодування збитків у вигляді упущеної вигоди, особа повинна довести, що за звичайних обставин вона мала реальні підстави розраховувати на одержання певного доходу.

Відповідно до експертного висновку про розмір збитків, понесених бенефіціарним власником 1426 звичайних іменних бездокументарних акцій ВАТ «Красная поляна» від 29.09.2023 встановлено, що потенційний дохід від інвестування неотриманих доходів від продажу інвестиційного активу (1426 акцій ВАТ «Красная поляна») становить 1418,61 млн доларів США.

Отже, можливий дохід від інвестування неотриманих доходів від продажу інвестиційного активу, який належав ОСОБА_2 та управління яким здійснювалося ОСОБА_1 через компанію «Зіланд Девелопмент Корп.», а саме 817 акцій ВАТ «Красная поляна» (57,3 % від 1426 акцій) становить 812863530доларів США.

Аналізуючи обставини зазначені у позовній заяві та матеріали, які долучені до цивільної справи, суд доходить висновку, що позивачі за звичайних обставин мали реальну можливість отримати дохід у розмірі, зазначеному в експертному висновку про розмір збитків, понесених бенефіціарним власником 1426 звичайних іменних бездокументарних акцій ВАТ «Красная поляна».

За таких обставин суд доходить висновку, що з огляду на домовленості позивачів щодо розподілу прибутку ОСОБА_1 мав реальну можливість отримати дохід у розмірі 40643176,50 доларів США (5 %), а ОСОБА_2 у розмірі 772220353,50 доларів США (95 %).

Положенням п. 8 ч. 2 ст. 16 ЦК України визначено, що способами захисту цивільних прав та інтересів можуть бути відшкодування збитків та інші способи відшкодування майнової шкоди.

При цьому слід зауважити на тому, що нормами ч. 3 ст. 386 ЦК України визначено, що власник, права якого порушені, має право на відшкодування завданої йому майнової та моральної шкоди.

Так, правилами ч. 1, 2 ст. 22 ЦК України, особа, якій завдано збитків у результаті порушення її цивільного права, має право на їх відшкодування. Збитками є: 1) втрати, яких особа зазнала у зв`язку зі знищенням або пошкодженням речі, а також витрати, які особа зробила або мусить зробити для відновлення свого порушеного права (реальні збитки); 2) доходи, які особа могла б реально одержати за звичайних обставин, якби її право не було

порушене (упущена вигода). Збитки відшкодовуються у повному обсязі, якщо договором або законом не передбачено відшкодування у меншому або більшому розмірі.

Відшкодування збитків є однією із форм або заходів цивільно-правової відповідальності, яка вважається загальною або універсальною саме в силу правил статті 22 ЦК України, оскільки частиною першою визначено, що особа, якій завдано збитків у результаті порушення її цивільного права, має право на їх відшкодування. Тобто порушення цивільного права, яке потягнуло за собою завдання особі майнових збитків, саме по собі є основною підставою для їх відшкодування.

Враховуючи положення частини четвертої статті 22 ЦК України, стягнення збитків є формою відшкодування майнової шкоди.

Так, за певних обставин захистом статті 1 Першого протоколу до Конвенції може користуватися легітимне очікування (legitimate expectation) успішної реалізації майнових прав (право вимоги). Для того, щоб «очікування» було «легітимним», воно має бути заснованим на нормі закону або іншому правовому акті, такому як судове рішення, пов`язаному із майновим інтересом (див. mutatis mutandis рішення ЄСПЛ від 28 вересня 2004 року у справі «Копецький проти Словаччини» (Kopecky v. Slovakia), заява № 44912/98, § 49-50). Проте стаття 1 Першого протоколу до Конвенції не гарантує право на набуття майна (див. mutatis mutandis рішення ЄСПЛ у справі «Копецький проти Словаччини», § 35).

Особа, яка має майновий інтерес, може розглядатись як така, що має «легітимне очікування» успішної реалізації її права вимоги (зокрема, відшкодування державою шкоди) у сенсі статті 1 Першого протоколу до Конвенції, коли для цього інтересу є достатні підстави у національному законодавстві. Останнє повинно давати змогу чітко визначити конкретний майновий інтерес особи, який має бути передбаченим у відповідних нормативних приписах або підтвердженим в іншому правовому акті, зокрема, у судовому рішенні (див. для порівняння mutatis mutandis ухвалу ЄСПЛ щодо прийнятності від 2 липня 2002 року у справі «Гайдук та інші проти України» (Gayduk and Others v. Ukraine), заяви № 45526/99 та інші).

Право власності є непорушним. Ніхто не може бути протиправно позбавлений цього права чи обмежений у його здійсненні (частина перша статті 321 ЦК України). Кожна фізична або юридична особа має право мирно володіти своїм майном. Ніхто не може бути позбавлений своєї власності інакше як в інтересах суспільства і на умовах, передбачених законом і загальними принципами міжнародного права. (стаття 1 Першого протоколу до Конвенції про захист прав людини і основоположних свобод (далі Конвенція)).

За таких обставин неотримання відповідного доходу позивачами стало наслідком незаконного відчуження належного їм майна на користь відповідача, а тому з відповідача на користь позивачів слід стягнути завдані їм збитки у

розмірі, визначеному в експертному висновку про розмір збитків, понесених бенефіціарним власником 1426 звичайних іменних бездокументарних акцій ВАТ «Красная поляна».

Щодо валюти, у якій має відбутися стягнення завданих збитків, то суд дійшов наступних висновків.

Статтею 99 Конституції України встановлено, що грошовою одиницею України є гривня.

При цьому Основний Закон не встановлює заборони щодо можливості використання в Україні грошових одиниць іноземних держав.

Відповідно до статті 192 ЦК України іноземна валюта може використовуватися в Україні у випадках і в порядку, встановлених законом.

Тобто відповідно до чинного законодавства гривня має статус універсального платіжного засобу, який без обмежень приймається на всій території України, однак обіг іноземної валюти обумовлений вимогами спеціального законодавства України.

Такі випадки передбачені статтею 193, частиною четвертою статті 524 ЦК України, Законом України «Про зовнішньоекономічну діяльність», Законом України «Про валюту і валютні операції».

Статтею 524 ЦК України визначено, що зобов`язання має бути виражене у грошовій одиниці України гривні. Сторони можуть визначити грошовий еквівалент зобов`язання в іноземній валюті.

Статтею 533 ЦК України встановлено, що грошове зобов`язання має бути виконане у гривнях.

Якщо у зобов`язанні визначено грошовий еквівалент в іноземній валюті, сума, що підлягає сплаті у гривнях, визначається за офіційним курсом відповідної валюти на день платежу, якщо інший порядок її визначення не встановлений договором або законом чи іншим нормативно-правовим актом.

Заборони на виконання грошового зобов`язання у іноземній валюті, у якій воно зазначено у договорі, чинне законодавство не містить.

Із аналізу наведених правових норм можна зробити висновок, що гривня як національна валюта є єдиним законним платіжним засобом на території України. Сторони, якими можуть бути як резиденти, так і нерезиденти фізичні особи, які перебувають на території України, у разі укладення цивільно-правових угод, які виконуються на території України, можуть визначити в грошовому зобов`язанні грошовий еквівалент в іноземній валюті.

Однак позивачами подано даний позов у зв`язку нанесенням їм збитків у формі упущеної вигоди, яку б за звичайних обставин вони отримали в іноземній валюті (доларах США) на рахунки компанії «Зіланд Девелопмент Корп.».

Національною валютою російської федерації є рубль. Відповідно всі розрахунки на її території здійснюються в рублях та стягнення збитків з резидента російської федерації за загальним правилом було б можливе в рублях.

Однак, відповідно до принципу розумності, який насамперед пов`язаний зі справедливістю та добросовісністю, а також зважаючи на те, що після повномасштабного військового вторгнення російської федерації в Україну, Україна, резидентом якої є ОСОБА_1 , та Сполучені штати Америки, резидентом яких є ОСОБА_2 , розірвали будь-які відносини з російською федерацією, у тому числі економічні, що свідчить про недоцільність стягнення збитків у валюті агресора. Тому збитки на користь кожного з позивачів слід стягнути у тій валюті, яку б вони отримали за звичайних обставин, тобто в доларах США.

Що стосується можливості і порядку визначення в рішенні суду еквівалента суми боргу в національній валюті, то Великою Палатою Верховного Суду у постанові від 04.07.2018 у справі № 761/12665/14-ц, вказано, що зазначення судом у своєму рішенні двох грошових сум, які необхідно стягнути з боржника, внесло двозначність до розуміння суті обов`язку боржника, який може бути виконаний примусово. У разі зазначення у судовому рішенні про стягнення суми коштів в іноземній валюті з визначенням еквівалента такої суми у гривні стягувачеві має бути перерахована вказана у резолютивній частині судового рішення сума в іноземній валюті, а не її еквівалент у гривні.

Вказана позиція також узгоджується з правовим висновком Великої Палати Верховного Суду України, викладеним у постанові від 23.10.2019 у справі №723/304/16-ц.

За таких обставин суд дійшов висновку, що на користь ОСОБА_1 слід стягнути збитки у розмірі 40643176,50 доларів США та на користь ОСОБА_2 збитки у розмірі 772220353,50 доларів США, без визначення еквіваленту в національній валюті.

Суд не бере до уваги пояснення ОСОБА_2 , яке він направив до суду після відкриття провадження у справі, в частині посилань на дії посадових осіб російської федерації та інших фізичних та юридичних осіб щодо їх взаємовідносин, залякування ОСОБА_2 та його сім`ї нанесенням тілесних ушкоджень, невиконання ПАТ «Сбербанк росії» зобов`язань щодо фінансування будівництва та процесу будівництва гірсько-лижного курорту, організації зі слів позивача схем заволодіння майном і завищення вартості будівництва, оскільки вони не відносяться до предмета спору, а також не підтверджують та не спростовують обставини поданого позову.

В іншій частині пояснення є тотожними обгрунтуванням, наведеним у позовній заяві.

З огляду на те, що суд дійшов висновку про необхідність задоволення позову у повному обсязі, то відповідно до положень ст. 141 ЦПК України з відповідача на користь ОСОБА_2 слід стягнути понесені ним судові витрати у вигляді сплати судового збору за подання до суду позовної заяви майнового характеру у розмірі по 15140 гривень. Водночас, враховуючи, що позивач ОСОБА_1 звільнений від сплати судового збору, то з відповідача слід також стягнути судовий збір за подання до суду позовної заяви майнового характеру у розмірі по 15140 гривень на користь держави.

На підставі викладеного, керуючись
ст. 2, 12, 13, 81, 82, 89, 137, 141, 258, 259, 263-265, 266, 273 ЦПК України, суд

### Вирішив:

Позов ОСОБА_1 , ОСОБА_2 до Публічного акціонерного товариства «Сбербанк росії» задовольнити повністю.

Стягнути з Публічного акціонерного товариства «Сбербанк росії» на користь ОСОБА_1 збитки у розмірі 40643176 (сорок мільйонів шістсот сорок три тисячі сто сімдесят шість) доларів США 50 центів.

Стягнути з Публічного акціонерного товариства «Сбербанк росії» на користь ОСОБА_2 збитки у розмірі 772220353 (сімсот сімдесят два мільйони двісті двадцять тисяч триста п`ятдесят три) долари США 50 центів.

Стягнути з Публічного акціонерного товариства «Сбербанк росії» на користь держави судовий збір у розмірі 15140 (п`ятнадцять тисяч сто сорок) гривень.

Стягнути з Публічного акціонерного товариства «Сбербанк росії» на користь ОСОБА_2 судовий збір у розмірі 15140 (п`ятнадцять тисяч сто сорок) гривень.

З текстом рішення можливо ознайомитися за адресою: court.gov.ua.

Рішення суду набирає законної сили після закінчення строку подання апеляційної скарги всіма учасниками справи, якщо апеляційну скаргу не було подано.

У разі подання апеляційної скарги рішення, якщо його не скасовано, набирає законної сили після повернення апеляційної скарги, відмови у відкритті чи закриття апеляційного провадження або прийняття постанови суду апеляційної інстанції за наслідками апеляційного перегляду.

Рішення суду може бути оскаржене до Київського апеляційного суду через суд першої інстанції протягом 30 днів з дня його проголошення.

Якщо в судовому засіданні було оголошено лише вступну та резолютивну частини судового рішення або у разі розгляду справи (вирішення питання) без повідомлення (виклику) учасників справи, зазначений строк обчислюється з дня складення повного судового рішення.

Учасник справи, якому повне рішення або ухвала суду не були вручені у день його (її) проголошення або складення, має право на поновлення пропущеного строку на апеляційне оскарження на рішення суду якщо апеляційна скарга подана протягом тридцяти днів з дня вручення йому повного рішення суду.

Строк на апеляційне оскарження може бути поновлений у разі пропуску з інших поважних причин, крім випадків, зазначених у частині другій <u>статті 358 ЦПК України</u>.

Реквізити сторін:

Позивач-1: ОСОБА_1 , реєстраційний номер облікової картки платника податків: НОМЕР_2 , місце проживання за адресою: АДРЕСА_1 .

Позивач-2: ОСОБА_2 , місцезнаходження за адресою: АДРЕСА_2 D NEW YORK, НОМЕР_3 т.

Відповідач: Публічне акціонерне товариство «Сбербанк росії», код ОКПО: 00332537, місцезнаходження за адресою: російська федерація, м. москва, вул.Вавілова, буд. 19.

Суддя: О.М. Коваленко

Категорія Case Category No.

**376/1329/24**
**: civil cases (from 01.01.2019); cases of claim proceedings; cases on disputes arising from transactions, in particular contracts (except for categories 301000000-303000000), among them; provision of services.**
Sent for publication:**08.11.2024.**registered:**09.11.2024.**shared access granted:**11.11.2024.**
Effective date:**04.11.2024**
number of court proceedings:**2/376/730/2024**

---

Skvirsky District Court of the Kiev region

Case No. 376/1329/24

Production # 2/376/730/2024

**decision**

### IN THE NAME OF UKRAINE

"04" October 2024 Skvirsky District Court of the Kiev region consisting of:

Presiding Judge A. N. Kovalenko,

with the participation of secretary Krys L. A.,

having considered in an open court session in g .. Skvira of the Kiev region civil case on the claim of PERSON_1, PERSON_2 to the Public Joint Stock Company "Sberbank of Russia" for recovery of losses,

Installed:

The plaintiffs filed a claim with the Skvirsky District Court of the Kiev region, in which, taking into account the clarified claims, they asked to recover from Sberbank of Russia PJSC in favor of PERSON_1 losses in the amount of 40643176.50 US dollars and in favor of PERSON_2 losses in the amount of 772220353.50 US dollars.

08.05.2024 court decision opened proceedings on the case.

Sberbank of Russia is a foreign legal entity.

The court has opened proceedings in a case with a foreign element due to the following.

The provisions of para. 2 and 4 p. 2 of Part 1of Article 1 of the Law of Ukraine "on Private International Law"determines the priority of legal regulation of certain legal

25

issues precisely by the Law of Ukraine "on private international Law", and legal relations are burdened with a foreign element in particular, but not exclusively in the following cases: at least one participant in the legal relationship is a citizen of Ukraine, resident outside Ukraine, a foreigner, a stateless person or a foreign legal entity; a legal fact that creates, modifies or terminates legal relations, has occurred or is taking place on the territory of a foreign state.

One of the issues that are in the sphere of legal regulation of the Law of Ukraine "on Private International Law" is the choice of a court in private law relations with a foreign element.

The provisions of paragraphs 1, 5 of Part 1 of Article 76 of the Law of Ukraine "On Private International Law" normalize that courts consider any legal relationship with a foreign element, in particular, if the plaintiff in the case of compensation for damage is an individual who has a place of residence in Ukraine.

PERSON_1 is a citizen of Ukraine and has a place of residence on the territory of Ukraine (a. p. 4). Therefore, judicial immunity of Ukraine directly applies to disputed legal relations on the basis of Articles 4-1, 76 of the Law of Ukraine "on Private International Law", and disputed legal relations are subject to consideration within the jurisdiction of Ukraine.

Article 10 of the Civil Procedure Code of Ukraine stipulates that the court, when considering a case, is guided by the principle of the rule of law.

The Court considers cases in accordance with the Constitution of Ukraine, laws of Ukraine, international treaties, the consent to be bound by which was granted by the Verkhovna Rada of Ukraine.

The Court applies the Convention for the Protection of Human Rights and Fundamental Freedoms of 1950 and its Protocols, which were agreed to be binding by the Verkhovna Rada of Ukraine, and the practice of the European Court of Human Rights as a source of law.

It is prohibited to refuse to consider a case on the grounds of the absence, incompleteness, vagueness, inconsistency of the legislation regulating disputed relations.

Maintaining the jurisdictional immunity of the Russian Federation would deprive the plaintiff of effective access to a court to defend his rights, which is incompatible with the provisions of article 6, paragraph 1, of the Convention for the Protection of Human Rights and Fundamental Freedoms

The Supreme Court proceeds primarily from the fact that the right to appeal to the court (the right to defense in the procedural sense) is guaranteed by the Constitution of Ukraine and the laws of Ukraine.

In accordance with part one of Article 2 of the Civil Procedure Code of Ukraine, the task of civil proceedings is fair, impartial and timely consideration and resolution of civil cases in order to effectively protect the violated, unrecognized or disputed rights, freedoms or interests of individuals, the rights and interests of legal entities, and the interests of the state.

According to the first part of Article 4 of the Civil Code of Ukraine, each person has the right to apply to the court in accordance with the procedure established by this Code for the protection of their violated, unrecognized or disputed rights, freedoms or legitimate interests.

The provisions of this article are based on the norms of the Constitution of Ukraine, which establish the duty of the State to ensure the protection of human and civil rights and freedoms by the court (article 55).

У Article 129 of the Constitution of Ukraine establishes the basic principles of judicial proceedings, which are constitutional guarantees of the right to judicial protection.

In accordance with article 6, paragraph 1, of the Convention for the Protection of Human Rights and Fundamental Freedoms, everyone has the right to a fair and public hearing of his case within a reasonable time by an independent and impartial court established by law, which will decide a dispute concerning his civil rights and obligations.

According to the case-law of the European Court of Human Rights ("ECHR"), "in cases where the application of the rule of State immunity from jurisdiction restricts the exercise of the right of access to a court, the court must determine whether the circumstances of the case justify such restriction" (Sabeh El Leil V. France (application no. 34869/05), judgment of 29 June 2011 § 51; Oleynikov V. Russia (application no. 36703/04), judgment of 14 March 2013, § 59).

According to the established practice of the ECHR, the restriction of the right to a fair trial, in particular through the application of judicial immunity of the State, is consistent with article 6, paragraph 1, of the Convention for the Protection of Human Rights and Fundamental Freedoms (hereinafter referred to as the 1950 Convention) only if such a restriction: 1) has a legitimate aim, 2) is proportionate to the aim and 3) does not infringe the very essence of the right of access to a court (Ashingdane v The United Kingdom (application no. 8225/78), judgment of 28 May 1985, § 57; Oleynikov V. Russia (application No. 36703/04), judgment of 14 March 2013, § 55; Fogarty V. the United Kingdom (application no. 37112/97), judgment of 21 November 2001, § 33; Cudak V. Lithuania (application no. 15869/02), judgment of 23 March 2010, § 55).

The ECtHR has repeatedly recognized that "granting immunity to a State in civil proceedings pursues the legitimate aim of complying with international law in order to promote comity and good relations between States through respect for the sovereignty of another State" (Oleynikov V. Russia (application no. 36703/04),

judgment of 14 March 2013, § 60; Cudak V. Lithuania (application No. 15869/02), judgment of 29 June 2011, § 52; Wallishauser V. Austria, (application no. 156/04), judgment of 17 July 2012, § 60).

Thus, in the context of the ECHR's cited practice, the application of judicial immunity of the Russian Federation in a case for damages should have a legitimate purpose, in particular, to promote courtesy and good relations between States through compliance with international law. At the same time, the armed aggression against Ukraine committed by the Russian Federation in violation of the fundamental principles and norms of international law, in particular the UN Charter, and the international crimes committed by its armed forces in Ukraine exclude, at the initiative of the Russian Federation, issues of politeness and good relations between countries.

This deprives the application of the judicial immunity of the Russian Federation, which restricts the plaintiff's right to a fair trial, of a legitimate purpose.

According to the ECHR's case law, " a restriction would be incompatible with article 6 (1) of the 1950 Convention if ... there is no reasonable proportion between the means used and the goal pursued." Also, when considering access to a court in the context of the application of a State's jurisdictional immunity, "it is necessary to ensure that the restrictions applied do not limit or reduce the access remaining to a person in such a way or to such an extent that the very essence of the right of [access to a court] is violated" (Ashingdane v The United Kingdom (application no. 8225/78), judgment of 28 May 1985, § 57; Oleynikov V. Russia (application No. 36703/04), judgment of 14 March 2013, § 55). Otherwise, a complete obstruction of the case, without any fault on the part of the plaintiff, would be contrary to article 6, paragraph 1, of the 1950 Convention (McElhinney V. Ireland (application no. 31253/96), judgment of 21 November 2001, separate opinion of Judge L. Lukeidis).

It is well known (that is, such that part three of Article 82 of the Civil Procedure Code of Ukraine does not require proof) that the Russian Federation rejects the recognition of any responsibility for its illegal military activities in Ukraine, including not only full-scale armed aggression, but also any participation of its armed forces in military operations in the Donetsk and Luhansk regions since 2014. There is no reasonable basis to assume that the violated right of the plaintiff, for which he applied to the Ukrainian court for protection, could have been protected by filing a claim in a court in which the Russian Federation did not enjoy judicial immunity, that is, in a court of the Russian Federation.

Thus, the plaintiff's appeal to the Ukrainian court is the only reasonably available means of protecting a right, the deprivation of which would mean the deprivation of such a right in general, that is, it would deny the very essence of such a right.

In such circumstances, the application of judicial immunity of the Russian Federation (in particular, part one of Article 79 of the Law of Ukraine "on Private International Law") This case will not be consistent with the duty of Ukraine as a State and the court in particular to ensure the implementation of the plaintiff's right to a fair trial.

Given the absence of other effective judicial remedies for the violated right of the plaintiff, the application of judicial immunity of the Russian Federation would violate the very essence of the right to a fair trial. Also, given the military aggression of the Russian Federation, which violates the state sovereignty of Ukraine, the application of judicial immunity of the Russian Federation will be disproportionate to its purpose.

A similar legal position was expressed by the Supreme Court in its decision of 18.05.2022 in case No. 760/17232/20-с.

19.08.2024 by a court ruling, the preparatory proceedings were closed and the case was scheduled for consideration on its merits.

The plaintiffs justified their position by the fact that since 2012 it was planned to hold the Winter Olympic Games in Russia in 2014.

Pursuing an economic interest and in order to prepare for the Winter Olympic Games in Russia, on the instructions of PERSON_2, on April 17, 2009, the company " PERSON_3 "was founded and registered in the British Virgin Islands.

On the same day, PERSON_4, INFORMATION_1, a citizen of the Republic of Estonia, personal code NUMBER_1 was appointed Director of Ziland Development Corp., and PERSON_5 was the founder and beneficial owner of Ziland Development Corp.

In the period from September 2009 to March 2012, a phased issue of shares of JSC Krasnaya Polyana was carried out in the total amount of 12771066 thousand rubles. At the same time, the par value of one share is 50,000 rubles, and the placement price for one share is 6270 thousand rubles (market value as of 05.03.2012).

During the above-mentioned period, PERSON_2 acquired 817 shares of Open Joint Stock company Krasnaya Polyana with a total par value of 40,850 thousand rubles through authorized persons, namely PERSON_4 and PERSON_6, who were directors and participants of the company "Ziland Development Corp.". At the same time, the market value of the shares was 5122590 thousand rubles, which was equivalent to 175131282 US dollars, according to the official exchange rate of the US dollar to the Russian ruble set by the National Bank of Russia as of March 05, 2012. Accordingly, PERSON_2 managed these shares through the company "Ziland Development Corp." and these authorized persons.

In turn, open joint-stock company Krasnaya Polyana owned a plot of land near Sochi, where it was planned to build a mountain ski resort and a hotel and entertainment complex for its use in the 2014 Winter Olympics.

09.03.2013PERSON_2 and PERSON_7 entered into an agreement under which PERSON_7 acquired the powers of trustee of the company "Ziland Development Corp.", as well as assets owned by the company "Ziland Development Corp.".

15.03.2013on the basis of the agreement on the transfer of shares, PERSON_5 transferred the ownership of PERSON_7 to the company "PERSON_3". Being the nominee beneficial owner of the company "Ziland Development Corp.", the private interest of PERSON_7 covered receiving a part of the profit from the sale of shares, in the amount of 15% of the value of their sale. In turn, the private interest of PERSON_2 was to receive 85% of the sale price of shares in Krasnaya Polyana OJSC.

On the same day, 15.03.2013, pursuing the commercial interest of PERSON_2 and the private commercial interest of making a profit from the sale of shares of JSC Krasnaya Polyana, PERSON_7 on behalf of the company" Ziland Development Corp."prepared, signed and sent to PERSON_8 and PERSON_9 an agreement on the sale of 23.736% of shares of JSC Krasnaya Polyana in the amount of 817 units to the total amount of 200,000 thousand US dollars. In accordance with the terms of the agreement, PERSON_8 purchases these shares in the interests of the lender Sberbank of Russia PJSC (a representative of Sberbank of Russia PJSC on behalf of PERSON_9 ) in order to receive a credit line in the amount of USD 15000000 thousand from Sberbank of Russia PJSC controlled by PERSON_8 Group of Companies.

According to the content of clauses 2 and 4 of this agreement, PERSON_8 and the BIN Group of Companies controlled by it were obligated to pay the purchase amount of shares within 30 (thirty) calendar days from the date of signing the agreement, and the Lender PJSC Sberbank of Russia was obligated to open a corresponding credit line in favor of the BIN Group of Companies within 10 (ten) ten calendar days from the date of transfer of the shares acquired from Ziland Development Corp."owned by PJSC"Sberbank of Russia".

At the same time, in paragraph 5 of the above-mentioned agreement, the parties agreed that in the event of any disputes arising from the content of the agreement or related to the procedure for fulfilling obligations by the parties to the agreement, the parties who signed the agreement have the right to resolve the dispute under the legislation of the CIS countries and / or under the legislation of the state of New York within 10 days (ten) years from the date of signing the agreement.

This agreement was agreed and signed by both PERSON_9 of Sberbank of Russia and PERSON_8 .

However, after 03/15/2022, both PERSON_8 and PERSON_9 stopped communicating.

In addition, the former nominee founder of Zeeland Development Corp. PERSON_5 and nominee director Toomas Trouver also began to show ambiguous behavior and for a significant period of time refused to transfer to PERSON_7 the constituent and financial and economic documents of Zeeland Development Corp.

Not having received proper implementation of the agreement on the sale of shares, in April 2013 PERSON_2 began to demand that PERSON_7 take the necessary actions to resolve the issue of implementing the agreement dated 03/15/2013.due to the fact that the latter did not take any actions to understand the situation, PERSON_2 made a demand to transfer ownership to the person he indicated.

02.07.2013 on the basis of the agreement on the transfer of shares, PERSON_7 transferred the ownership of PERSON_1 to the company "PERSON_3".

As the nominee beneficial owner of Ziland Development Corp., the private interest of PERSON_1 covered receiving a part of the profit from the sale of shares, the value of which had significantly increased as of 2013, namely 1% of the value of their sale. In turn, the private interest of PERSON_2 was to receive 99% of the sale price of shares in Krasnaya Polyana OJSC. This agreement was recorded in the agreement dated 01.07.2013, a copy of which is attached.

Subsequently, PERSON_1 and PERSON_2 changed their arrangements regarding the distribution of future profits, so that the private interest of PERSON_1 covered receiving part of the profit from the sale of shares in the amount of 5 %, and the private interest of PERSON_2, respectively, was to receive 95% of the sale price of shares in Krasnaya Polyana OJSC.

For the purpose of obtaining personal economic interest and applying to the court regarding the receipt of funds stipulated by the agreement between PERSON_2 and PERSON_7 in the agreement dated 09.03.2013, the latter requested from PERSON_6 a package of statutory and financial and economic documents of the company "Ziland Development Corp.", from which the following circumstances were established:

- On March 11, 2013, Toomas Truuvert, Director of Ziland Development Corp. in Talin, provided a notarized power of attorney in the name of PERSON_10 (the PERSON's own brother_2) with the right of full representation of the company, actually transferred its own powers to PERSON_10 ;

- On March 11, 2013, PERSON_10 and PERSON_8 allegedly signed a Memorandum (agreement of intent) which stipulates that PERSON_10 on its own behalf undertakes to sell 41.429% of the shares of Krasnaya Polyana OJSC in the amount of 1,426 units (601 shares owned by PERSON_10, 404 shares owned by Ziland Development Corp. and 421 shares of Kambara PERSON_11") on its own behalf and acting on behalf of these companies, at a price of US $ 20 million in favor of the offshore companies Velen Finance LTD, Tovnfolk Trading Investment LTD and Hanberg Finance LTD, which represented PERSON_8 . Also, in this memorandum, paragraph 3 specifies that this preliminary transaction qualifies as a preliminary contract for the purchase and sale of the above-mentioned shares.

- On March 13, 2013, Supplement No. 1 was signed to the above Memorandum, which stipulates that in the event of a future sale of shares by the buyer at a price

higher than the purchase price, the seller will be paid the difference in their market value. The difference was approximately USD80MLN.

- On March 13, 2013, the director of "Ziland Development Corp."Toomas Truuvert and its owner PERSON_12 notarized unanimous written decisions in support of the power of attorney dated March 11, 2013 issued by PERSON_13 in the name of PERSON_10, which was apostilled on March 18, 2013 by the notary Pilia acting In the city .. Moscow.

-18 March 2013, allegedly signed by PERSON_10 on behalf of PERSON_3, a purchase and sale agreement for 404 shares of Krasnaya Polyana OJSC was signed in favor of Tovnfolk Trading Investment LTD. signed by Director Cleo Vasil'o. At the same time, the agreement refers to the preliminary agreement for the purchase and sale of shares dated March 12, 2013, which is actually dated March 11, 2013. The agreement does not contain a rate for compensation of the difference in the event of a future sale of shares by their beneficiary. The contract was not signed or visioned by PERSON_8 .

Recovery of damages requires the presence of all elements of a civil offense: illegal behavior, losses, causal relationship between illegal behavior and losses, guilt.

On 18.11.2011, PERSON_2 and PJSC Sberbank of Russia, on behalf of which PERSON_9 was acting, entered into an agreement under the terms of which PERSON_2 and PJSC Sberbank of Russia, having a common commercial interest, undertook to attract foreign capital and investors in JSC Krasnaya Polyana and on this basis assist each other in achieving these goals.

On the part of Sberbank of Russia, the agreement dated 18.11.2011 was signed by an authorized OFFICE_9 .

However, taking into account the actual circumstances described in the statement of claim, it is considered that PJSC Sberbank of Russia, on whose behalf its officials acted , in particular the Deputy Chairman of the Management Board PERSON_9, had other commercial interests that did not correspond to the essence of the obligations assumed under the agreement of 18.11.2011, which resulted in the commission of organized illegal actions aimed at the illegal and illegal withdrawal of shares of Krasnaya Polyana OJSC from PERSON_2 , which were on the balance sheet of the company Ziland Development Corp. controlled by him and were his property, in favor of Sberbank of Russia PJSC.

In particular, during the consideration of civil case No. 376/560/23, it was established that the shares of Krasnaya Polyana OJSC, including 817 units that were on the balance sheet of PERSON_3, were alienated on the basis of forged documents in favor of the companies on whose behalf and in whose interests PERSON_8 acted .

Thus, 41.429% of the shares of Krasnaya Polyana OJSC in the amount of 1,426 units (601 shares owned by PERSON_10 , 404 shares owned by Ziland Development Corp.

and 421 shares of Kambara Oversaz S. A., 413 of which were transferred from PERSON_3) were alienated in favor of offshore companies Velen Finance LTD., "Tovnfolk Trading Investment LTD" and "Hanberg Finance LTD", which were represented by PERSON_8 on the basis of a forged memorandum (agreement of intent) dated 11.03.2013, Supplement No. 1 dated 13.03.2013 to the Memorandum (Agreement of Intent) dated 11.03.2013 and the purchase and sale agreement dated 18.03.2013.

The fact of forgery of signatures on the part of sellers on the memorandum (agreement of intent) dated 11.03.2013, Supplement No. 1 dated 13.03.2013 to the Memorandum (Agreement of Intent) dated 11.03.2013 and the purchase and sale agreement dated 18.03.2013 is confirmed by expert opinion No. 62 dated 19.12.2022, provided based on the results of handwriting expertise in criminal proceedings No. 12022100030002505 dated 28.09.2022, the victim in which the PERSON_7 is recognized .

As a result, in 2013 the shares of OJSC Krasnaya Polyana in the amount of 817 units, which were on the balance sheet of Ziland Development Corp., became the property of PJSC Sberbank of Russia. This is fully confirmed by the audit report of Ernst & Young Vneshaudit CJSC dated 24.03.2014, which states that Sberbank of Russia PJSC owns 92.10% of the shares of JSC" Sberbank of Russia".Krasnaya Polyana".

In accordance with the expert opinion on the amount of losses incurred by the beneficial owner of 1,426 ordinary registered undocumented shares of Krasnaya Polyana OJSC, it is established that the potential income from investing non-received income from the sale of an investment asset (1,426 shares of Krasnaya Polyana OJSC) it amounts to 1418.61 million US dollars.

Under such circumstances, the potential income from investing the lost income from the sale of an investment asset that was owned by PERSON_2 and managed by PERSON_1 through "PERSON_3", namely 817 shares of Krasnaya Polyana OJSC (57.3% of 1426 shares) is 812,863.53 thousand US dollars.

The specified amount is a lost profit of the plaintiffs, since it is exactly the same amount that they would have been able to receive by implementing investment activities related to the ownership of shares in Krasnaya Polyana OJSC through PERSON_3.

Taking into account the agreements between PERSON_2 and PERSON_1, the essence of the violated rights of the latter is that due to the alienation of 817 shares of JSC Krasnaya Polyana, which belonged to PERSON_2 and which should be managed by PERSON_1 through "PERSON_3", on the basis of forged documents in favor of PJSC Sberbank of Russia, PERSON_1's lost income is 5% of the damage caused, which is 40643176.50 US dollars, and non-received income PERSON_2 772220353.50 US dollars.

The illegal seizure of Sberbank of Russia's shares in PERSON_2 , which belonged to it and were accounted for by the PERSON_3 company controlled by it, resulted in direct losses in the form of lost income (lost profits) of PERSON_2 and PERSON_1 .

Therefore, Sberbank of Russia is responsible for the damage, in the interests of which the illegal withdrawal of shares of Krasnaya Polyana OJSC from the ownership of Ziland Development Corp.

During the preparatory court session, plaintiff PERSON_2 sent written explanations to the court in addition to the justifications indicated in the statement of claim, in which he said that in 2006 he purchased the Mountain Carousel ski resort located in Krasnaya Polyana, Sochi region, Russia for the implementation of a business project for the construction of a new expressway ski slopes, ski lifts, and commercial properties (hotels). In 2006, since PERSON_2 held a public political position, this object was registered to his sibling PERSON_14 in the form of 84.85% of shares in Krasnaya Polyana OJSC.

In 2007, the Olympic Committee awarded the 2014 Winter Olympics to the city of Sochi. As a result, the government of the Russian Federation announced that Krasnaya Polyana OJSC will be included in the prospective Olympic projects for the construction of a springboard, the complex is designed for 15,000 seats. The project also included the Gornaya Karusel resort, where a mountain media village and 2,658-room hotels were to be built.

In 2008, at the initiative of Sberbank of Russia and in accordance with the instructions of the Government of the Russian Federation, Chairman of Sberbank of Russia Herman Gref and his Deputy Stanislav Kuznetsov, Sberbank Capital, a 100% subsidiary of Sberbank of Russia, became an investor in Krasnaya Polyana.

In accordance with the terms of this agreement, Sberbank of Russia and Sberbank Capital assumed financial responsibility for providing a credit line in the amount of RUB 40 billion for the construction of a ski jumping complex and other infrastructure facilities.

However, the commitment was never fulfilled. PJSC Sberbank of Russia provided only an interim loan of 1 billion rubles at an interest rate of 10% -15%. Sberbank revised its financial obligations by 40 billion rubles ($1.5 billion at that time) and in return offered to directly buy 25% of the company. As a result of Sberbank of Russia's refusal to finance the project, Krasnaya Polyana was forced to obtain additional high-interest loans from Vnesheconombank ("VEB") to secure its shares, which were pledged as collateral.

At the same time, PERSON_9, Deputy Chairman of the Management Board of Sberbank of Russia Herman Gref, became Chairman of the Management Board of Krasnaya Polyana, after which PERSON_15 developed a plan to gain control of the company through undue influence, fraud, and threats of bodily harm with the help of both private and state players, which include PJSC Gazprom. Sberbank of Russia,

Sberbank Capital, PERSON_16, his son PERSON_17 (as beneficiary), PERSON_9, PERSON_18, the Turkish construction company Sembol, as a company that had corrupt ties with Sberbank Capital, PERSON_16 and PERSON_9, PERSON_8, PERSON_19, PERSON_20 (son-in-law of the Governor of the Krasnodar Territory Alexander Tkachev), which deceptively The company received 41.429% of the shares of Krasnaya Polyana OJSC

18.11.2011 PERSON_21 and JSC Sberbank of Russia, an authorized official of PERSON_9, signed an agreement under the terms of which party, having a common commercial interest, undertook to attract foreign capital and investors in JSC Krasnaya Polyana and on this basis will contribute to each other's assistance in achieving these goals.

Until 2012, the construction of the facility was carried out by Transcomstroy, which was controlled by LITS_2's brother . Magomed. However, in mid-2012, under pressure from the chairman of Sberbank PERSON_22 and without any sufficient grounds, the subcontractor "Transcomstroy", which carried out the construction of the facility at a price not exceeding 1800.00 US dollars per 1 sq. m., was replaced by the Turkish construction company "Sembol "(a partner of Rixos, which at that time was building a sanatorium PERSON_23 in Crimea), which issued an invoice for the same amount of work in the amount of more than 3000 US dollars per 1 sq. m. and did not guarantee compliance with the deadlines for delivery of the object.

When PERSON_15 presented PERSON_24 as the general contractor, he insisted on investing an additional capital of US $ 50 million, which PERSON_2 did to ensure that the value of Krasnaya Polyana would exceed US $ 800 million. After that, Sberbank of Russia and PERSON_15 received a controlling stake in the company and became managing partners. The campaign cost of $ 800 million is also reflected in the annual audit conducted annually by the American audit firm Ernst & Young.

This situation led to a conflict between the brother of PERSON_2 and PERSON_25, as a result of which PERSON_15 and his accomplices were able to remove PERSON_10 from the management of Krasnaya Polyana OJSC and began threatening the plaintiff PERSON_2 and his family with bodily injuries.

Thus, since mid-2012, the project implementation and construction management carried out by Krasnaya Polyana OJSC have been under the personal control of PERSON_2, PERSON_19 (partner through Altera Capital) and his deputy Stanislav Kuznetsov.

From this point on, neither PERSON_2 nor his brother was involved in the management of the company or in making managerial decisions.

As of March 2013, PERSON_2 and his brother PERSON_26 were the actual owners of 41.429% (1,426 ordinary shares) JSC Krasnaya Polyana.

According to the financial analysis (par value, not market value) prepared by Sberbank of Russia, the total value of 41.429% of the shares or 1426 ordinary shares (shares of Krasnaya Polyana OJSC) The total amount was US $ 328 million (800 million x 41/100), which was officially distributed as follows:

- 817 shares-23.736% - Ziland Development Corp.

- 601 shares-17.461% - PERSON_10 ;

- 8 shares-0.232% - PERSON_27 .

In early March 2013, PERSON_2 was approached by PERSON_28, who, taking advantage of the current situation and long-standing friendly relations, offered to buy back 23.736% (817 shares of Krasnaya Polyana) at a price of US $ 200 million, since he needed funds from Sberbank of Russia to buy out Sberbank of Russia and Sistema (owner PERSON_29) has a 51% stake in the oil company Rusnafta for $ 1.3 billion, as well as a $ 15 billion credit line for various market acquisitions.

On the same day, pursuant to agreements with PERSON_30, PERSON_7, an agreement was prepared, signed and sent to PERSON_8 and PERSON_9 for the sale of 23.736% of the shares of OJSC Krasnaya Polyana in the amount of 817 shares for a total amount of US $ 200 million.  According to the terms of the agreement, PERSON_8 buys this block of shares in favor of its own lender Sberbank of Russia OJSC, in order to receive a credit line in the amount of $ 15 billion under the control of PERSON_8 of the BIN Group of Companies. At the same time, PERSON_8 had to make a payment for the promotion within 30 days, and receive a credit line within 10 days. This agreement was signed by PERSON_8 on behalf of the BIN Group of Companies and PERSON_9 on behalf of Sberbank of Russia.

After signing the agreement of March 15, 2013, PERSON_8 and PERSON_9 stopped communicating with PERSON_2 and PERSON_7 .

In turn, the BIN Group of Companies, on behalf of which PERSON_8 acted , in the course of implementing the agreement dated 15.03.2013 (signed by PERSON_7, PERSON_8 and PERSON_9 ) received 817 shares of JSC Krasnaya Polyana from the company as a result of forgery of documents and subsequently disposed of them at its discretion, and I gave them to PAO"Sberbank of Russia". No funds were paid by the group of companies " BIN "in favor of "PERSON_3", and were not transferred otherwise.

Thus, due to the use of forged PERSON_8 and PERSON_9 documents, Sberbank of Russia illegally obtained 817 shares of Krasnaya Polyana OJSC and 601 shares of Krasnaya Polyana OJSC owned by PERSON_10 .

The plaintiff also claims that the organizer of the above-mentioned scheme is the Chairman of the Management Board of Sberbank of Russia, PERSON_16, in order to

obtain undue benefits by increasing the cost per square meter of development in excess of $ 1,200, at the expense of credit funds allocated by Sberbank of Russia.

He carried out his actions and conducts them through his deputy PERSON_9, who is a technical deputy and does not make independent decisions.

In the end, Krasnaya Polyana was resold to the son-in-law of the governor of the Krasnodar Territory , PERSON_20, who still manages the company in favor of PERSON_31 and PERSON_19 .

As a result of this state of affairs, on the basis of the contract dated 09.03.2013, PERSON_2 required PERSON_7 to monitor the implementation of the agreement dated 15.03.2013. given that at that time PERSON_7, referring to employment in another business project, did not pay due persistence and appropriate actions, PERSON_2 raised the issue of transferring ownership of the company "PERSON_3" to another person, to which PERSON_7 agreed.

On 02.07.2013, on the basis of the share transfer agreement, PERSON_7 transferred the ownership of PERSON_1 to the company "PERSON_3". At that time, an agreement was concluded with the nominee beneficial owner of the company "Ziland Development Corp."PERSON_1, under the terms of which the share of profit received from the possible alienation of shares of JSC "Krasnaya Polyana" will be 1%. This written agreement was recorded in the agreement of 01.07.2013.

After the events of 2014, the unprovoked aggression of Russia against Ukraine, PERSON_1 repeatedly appealed to PERSON_2 with a proposal to re-register the corporate rights of the company "Ziland Development Corp."from it. In turn, PERSON_2 managed to convince PERSON_1 to comply with the terms of the agreement dated 01.07.2013, taking into account that at that time there was information about illegal alienation of shares and by agreement the commercial interest of PERSON_1 was increased to 5%.

In September 2016, PERSON_7 informed PERSON_2 that PERSON_5 sent him a package of copies of the authorized and financial and economic documents of the company "Ziland Development Corp." by mail. After studying these documents, PERSON_7 reported that the signature of PERSON_10, which was reproduced on the sheets of the share purchase agreement dated 18.03.2013 and on the Memorandum dated 11.03.2013, most of all fake and does not correspond to his / her valid signature, which, among other things, was presented on the contract dated 18.11.2011, where PERSON_10 personally issued his / her signature.

The plaintiffs and their representatives did not appear at the court session. The representative of the plaintiffs, lawyer M. V. Kucheruk, sent a statement to the court, in which he supported the claims and asked for consideration in his absence and the absence of the plaintiffs.

The defendant did not send his representative to the court session, and he was duly notified of the time and place of consideration of the case by posting an announcement on the court's website and sending a copy of the statement of claim with appendices, court decisions and summons messages to the email address of the Embassy of the Russian Federation in Moldova.

In accordance with Part 2of Article 247 of the Civil Procedure Code of Ukraine, the recording of a court session by a technical means is carried out by the secretary of the court session.  If all the participants in the case fail to appear at the court session, or if, in accordance with the provisions of thisCode, the case is considered by the court in the absence of the participants in the case, the recording of the trial by means of sound recording equipment is not carried out.

According to the requirements of Part 3of Article 211 of the Civil Procedure Code of Ukraine, a participant in a case has the right to submit a request for consideration of the case in his absence.  If such a request has been submitted by all the participants in the case, the judicial review of the case is carried out on the basis of the materials available to the court.

Based on the above, the court concluded that it is possible to make a decision on the case during the court session on the basis of the requirements of Articles211,247 of the Civil Procedure Code of Ukraine.

The court, having examined the case file, came to the following conclusions.

In accordance with Part 1 of Article4and Part 1 of Article5 of the Civil Procedure Code of Ukraine, each person has the right, in accordance with the procedure established by this Code, to apply to the court for protection of their violated, unrecognized or disputed rights, freedoms or legitimate interests.  When administering justice, the court protects the rights, freedoms and interests of individuals, the rights and interests of legal entities, State and public interests in a manner determined by law or contract.

Parts 3 and 4of Article 12 of the Civil Procedure Code of Ukraine establish that each party must prove the circumstances that are relevant to the case and to which it refers as the basis of its claims or objections, except in cases established by this Code.  Each party bears the risk of consequences associated with the commission or non-performance of its procedural actions.

According to Part 1 of Articles81,89 of the Civil Procedure Code of Ukraine, each party must prove the circumstances that it refers to as the basis of its claims or objections, except in cases established by this Code.  The Court evaluates evidence based on its internal conviction, based on a comprehensive, complete, objective and direct examination of the evidence available in the case. No evidence has any pre-established validity for the court. The court evaluates the ownership, admissibility, reliability of each piece of evidence separately, as well as the sufficiency and mutual connection of evidence in their totality.

The court found that Open Joint Stock Company Krasnaya Polyana was established on 05.09.2001 (clause 1.1. of Article 1 of the Charter as amended on 16.07.2009).

In accordance with Clause 3.1. of the Charter, it is established that the company's goal is to develop and support an investment project to create and develop a domestic ski, health and resort complex "Gornaya Karusel" that is competitive in the international market of sports and tourism services, as well as to make a profit by saturating the market with goods and services.

According to Clause 7.1. of the Charter, the company's authorized capital determines the minimum size of the company's property, which guarantees the interests of its creditors, and consists of the par value of the company's outstanding shares purchased by shareholders (placement of shares). All shares of the Company are registered. The authorized capital of the company is divided into 2007 (two thousand seven) shares.

17.04.2009 The commercial company "Zeeland Development Corp." was founded on the territory of the British Virgin Islands. PERSON_4 was appointed Director, and PERSON_5 was the founder and benificiary owner of Ziland.

On 18.11.2011, PERSON_2 and Sberbank of Russia, on whose behalf PERSON_9 was acting, entered into an agreement under which PERSON_2 and Sberbank of Russia, having a common commercial interest, undertook to attract foreign capital and investors to the Krasnaya Polyana project and on this basis assist each other in achieving these goals. The company "Ziland Development Corp." acquires ownership of 602 shares of JSC "Krasnaya Polyana".

05.03.2012 JSC Krasnaya Polyana based on the decision of the Board of Directors on the additional issue of securities No. 112 dated 17.02.2012, adopted on the basis of the decision to increase the authorized capital of the joint-stock company by placing additional shares, adopted at the Extraordinary General Meeting of Shareholders of JSC Krasnaya Polyana dated 06.02.2012, Minutes No. 53 dated 06.02.2012, an additional placement of by closed subscription in the amount of 1,435 pieces. The state registration number of the issue is 1-01-33085-E-006d.

After 05.03.2012, the authorized capital of JSC Krasnaya Polyana is divided into 3,442 (Three thousand four hundred and forty-two) shares.

Part of the shares of Krasnaya Polyana OJSC from the new issue, namely 215 shares, is acquired by Ziland Development Corp. on the basis of the securities purchase and sale agreement No. 6 dated 23.05.2012.

As can be seen from the report of the Chief Accountant of Sberbank of Russia as of 04.02.2013, Ziland Development Corp. owns 817 shares of Krasnaya Polyana OJSC, which is 23.736% of the authorized capital. In its turn, Sberbank of Russia owns 1,722 shares of Krasnaya Polyana OJSC, which is 50.029% of the authorized capital, which is also confirmed by the audit report of Ernst & Young Vneshaudit CJSC dated 18.03.2013.

09.03.2013 PERSON_2 and PERSON_7 signed an agreement on the transfer of 817 shares of JSC Krasnaya Polyana to the trust management, which are on the balance sheet of Ziland Development Corp. Under the specified agreement, PERSON_7, on the basis of the document on the transfer of shares, undertakes to take ownership of the shares of PERSON_3 from the previous trustee Dragan Perovich on the terms specified in this agreement.

15.03.2013 on the basis of the document on the transfer of shares, PERSON_5 transferred the ownership of PERSON_7 to the company " PERSON_3 ", transferring to it 1 share, which was 100% of the authorized capital. At the same time, the assets of Ziland Development Corp. also became the property of PERSON_7."in the form of 817 shares of JSC"Krasnaya Polyana".

15.03.2013 between the company "Ziland Development Corp.", on behalf of which the owner OSOBA_7 (seller), OSOBA_8 (buyer) acted and JSC "Sberbank of Russia", on behalf of which OSOBA_9 acted, on the basis of power of attorney No. 01-1/1025 dated 10.11.2010, made on behalf of JSC "Sberbank of Russia", the President, Chairman of the Management Board PERSON_32 and certified PERSON_33, acting notary of the city of Moscow Kazanova A. Yu. (Creditor), signed a contract for the purchase and sale of shares of JSC Krasnaya Polyana.

According to clause 1 of the agreement dated 15.03.2013, the seller transfers to the buyer 23.736% of the shares of JSC Krasnaya Polyana in the amount of 817 shares with an estimated value of 189800000 (One hundred and eighty-nine million eight hundred thousand US dollars) (hereinafter referred to as shares) at a price of 200000000 (two hundred million US dollars).

The buyer undertakes to pay the seller 200,000,000 (two hundred million US dollars) for the purchase of shares specified in clause 1 of this Agreement within 30 days (clause 2 of the agreement dated 15.03.2013).

In accordance with clause 3 of the agreement dated 15.03.2013, the buyer buys shares on behalf of and in the interests of the Lender (Sberbank of Russia OJSC) as part of the project of providing a credit line in favor of the buyer's enterprises of the BIN Group of Companies.

Under this agreement, after the buyer transfers the shares acquired on its behalf and in its interests to the Lender, the Lender guarantees the provision of a credit line to the BIN Group of Companies in the total amount of 15000000000 (fifteen billion US dollars) within 10 days (clause 4 of the agreement dated 15.03.2013).

Not having received proper implementation of the agreement on the sale of shares, in April 2013 PERSON_2 began to demand that PERSON_7 take the necessary actions to resolve the issue of implementing the agreement dated 03/15/2013.due to the fact that the latter did not take any actions to understand the situation, PERSON_2 made a demand to transfer ownership to the person he indicated.

01.07.2013 PERSON_2 and PERSON_1 signed an agreement on the transfer of shares of JSC Krasnaya Polyana to the trust management in the amount of 817 units, which are on the balance sheet of" Ziland Development Corp. "Under the specified agreement PERSON_1 on the basis of the document on the transfer of shares undertakes to take ownership of the shares of "PERSON_3" from the previous trustee Ismailov M. I. on the terms and conditions specified in this agreement.

In accordance with the Agreement on the transfer of shares of JSC Krasnaya Polyana to Trust Management dated 01.07.2013, the private interest of PERSON_1 covered receiving a part of the profit from the sale of shares in the amount of 1% of the sale price, and the private interest of PERSON_2 was to receive 99% of the sale price of shares of JSC Krasnaya Polyana.

Subsequently, PERSON_2 and PERSON_1 changed their agreements regarding the distribution of future profits, so that the private interest of PERSON_1 covered receiving a part of the profit from the sale of shares in the amount of 5 %, and the private interest of PERSON_2, respectively, was to receive 95% of the sale price of shares of JSC Krasnaya Polyana, about which the plaintiffs ' representative an application for clarification of the claims has been submitted.

02.07.2013 on the basis of the document on the transfer of shares, PERSON_7 transferred the ownership of PERSON_1 to the company "PERSON_3", transferring to it 1 share, which was 100% of the authorized capital. The transfer of ownership of the company "PERSON_3" is also confirmed by the register of shareholders. At the same time, according to the plaintiffs, the assets of the company " Ziland Development Corp."in the form of 817 shares of JSC"Krasnaya Polyana".

The court also found that on 11.03.2013 the director of "Ziland Development Corp."Toomas Truuvert in Talin provided a notarized power of attorney in the name of PERSON_10 (PERSON_2's own brother) with the right of full representation of the company, in fact transferred his own powers to PERSON_10 . However, the power of attorney does not contain a sample signature of the attorney.

Subsequently, the shares of JSC Krasnaya Polyana, including 817 units that were on the balance sheet of PERSON_34, were alienated on the basis of forged documents in favor of the companies on whose behalf and in whose interests PERSON_8 acted, namely 41.429% of shares of JSC Krasnaya Polyana in the amount of 1426 units (601 shares of ownership OSOBA_10, 404 shares owned by Ziland Development Corp. and 421 shares owned by Kambara Oversaz S. A., 413 of which were transferred from PERSON_3) were disposed of in favor of the offshore companies Velen Finance LTD, Tovnfolk Trading Investment LTD and Hanberg Finance LTD, which PERSON_8 represented on the basis of fake Memorandum (agreement of intent) dated 11.03.2013, Supplement No. 1 dated 13.03.2013 to the Memorandum (Agreement of Intent) dated 11.03.2013 and the purchase and sale agreement dated 18.03.2013.

The fact of forgery of signatures on the part of sellers on the memorandum (agreement of intent) dated 11.03.2013, Supplement No. 1 dated 13.03.2013 to the Memorandum (Agreement of Intent) dated 11.03.2013 and the purchase and sale agreement dated 18.03.2013 is confirmed by expert opinion No. 62 dated 19.12.2022, provided based on the results of handwriting expertise in criminal proceedings No. 12022100030002505 dated 28.09.2022, the victim in which the PERSON_7 is recognized .

As a result, in 2013 the shares of OJSC Krasnaya Polyana in the amount of 817 units that were on the balance sheet of Ziland Development Corp. became the property of PJSC Sberbank of Russia. This is fully confirmed by the audit reports of Ernst & Young Vneshaudit CJSC dated 18.03.2013 and 24.03.2014, which show that in 2012 Sberbank of Russia owned 50.029% of the shares of Krasnaya Polyana OJSC, and in 2013 Sberbank of Russia owns 92.10% of the shares of Krasnaya Polyana OJSC.".

Subsequently, after 2013, Open Joint Stock Company Sberbank of Russia was renamed Public Joint Stock Company Sberbank of Russia.

These circumstances were also investigated during the consideration of civil case No. 376/560/23 and set out in the decision of the Skvirsky District Court of the Kiev region of 25.05.2023, which was not appealed and entered into legal force.

Paragraph 2 of Part 3of Article 22 of the Civil Code of Ukraineestablishes that losses are income that a person could actually receive under normal circumstances, if his right was not violated (lost profit).

In accordance with Part 4of Article 263 of the Civil Procedure Code of Ukraine, it is determined that when choosing and applying the rule of law to disputed legal relations, the court takes into account the conclusions on the application of the relevant rules of law set out in the decisions of the Supreme Court.

The Supreme Court, in its decision of 30.03.2021 in case No. 908/2261/17, concluded that when determining the amount of lost profit, information should be taken into account that indisputably confirms the real possibility of receiving remuneration if the obligation had been properly fulfilled by the debtor. Income cannot be abstract, because in order to compensate for lost profits, the measures taken by the injured person to receive it must be taken into account. When claiming damages in the form of lost profits, a person must prove that in normal circumstances he had a real reason to expect to receive a certain income.

In accordance with the expert opinion on the amount of losses incurred by the beneficial owner of 1,426 ordinary registered undocumented shares of JSC Krasnaya Polyana dated 29.09.2023, it was established that the potential income from investing non-received income from the sale of an investment asset (1,426 shares of JSC Krasnaya Polyana) it amounts to 1418.61 million US dollars.

Therefore, it is possible to receive income from investing the lost income from the sale of an investment asset that belonged to PERSON_2 and was managed by PERSON_1 through the company "Ziland Development Corp.", namely 817 shares of JSC Krasnaya Polyana (57.3% of 1426 shares) is 812863530 US dollars.

Analyzing the circumstances indicated in the statement of claim and the materials attached to the civil case, the court concludes that the plaintiffs, under normal circumstances, had a real opportunity to receive income in the amount indicated in the expert opinion on the amount of losses incurred by the beneficial owner of 1,426 ordinary registered undocumented shares of Krasnaya Polyana OJSC.

In these circumstances, the court concludes that, given the plaintiffs ' agreements regarding profit sharing, PERSON_1 had a real opportunity to receive income in the amount of US $ 4,0643,176. 50 (5 %), and PERSON_2 in the amount of US $ 7,722,203,353.50 (95%).

The provision of clause 8 of Part 2 of Article 16 of the Civil Code of Ukraine stipulates that ways to protect civil rights and interests may include compensation for losses and other ways to compensate for property damage.

At the same time, it should be noted that the norms of Part 3 of Article 386 of the Civil Code of Ukraine determine that the owner, whose rights are violated, has the right to compensation for property and moral damage caused to him.

Thus, according to the rules of Part 1, 2 of Article 22 of the Civil Code of Ukraine, a person who has suffered damage as a result of violation of his civil law has the right to compensation for them.  Losses are: 1) losses that a person has suffered in connection with the destruction or damage of a thing, as well as expenses that a person has made or should make to restore his violated right (real losses); 2) income that a person could actually receive under normal circumstances if his right had not been violated (lost profit). Losses are compensated in full, unless the contract or law provides for compensation in a smaller or larger amount.

Compensation for losses is one of the forms or measures of civil liability that is considered general or universal precisely because of the rules of Article 22 of the Civil Code of Ukraine, since Part one defines that a person who has suffered damage as a result of a violation of his civil law has the right to compensation for them. That is, the violation of civil law, which led to the task of causing property losses to a person, is in itself the main reason for their compensation.

Taking into account the provisions of Part four of Article 22 of the Civil Code of Ukraine, recovery of losses is a form of compensation for property damage.

Thus, in certain circumstances, article 1 of the First Protocol to the Convention may be protected by a legitimate expectation of the successful realization of property rights (the right of claim). In order for an "expectation" to be "legitimate", it must be based on a rule of law or other legal act, such as a court decision related to a property

interest (see, mutatis mutandis, ECtHR judgment of 28 September 2004 in Kopecky v. Slovakia, Application No. 44912/98, § 49-50). However, article 1 of the First Protocol to the Convention does not guarantee the right to acquire property (see, mutatis mutandis, the ECtHR judgment in Kopetsky v. Slovakia, § 35).

A person with a property interest can be considered as having a "legitimate expectation" of the successful exercise of his right to claim (in particular, State compensation for damage) within the meaning of article 1 of the First Protocol to the Convention, when there are sufficient grounds for this interest in national legislation. The latter should make it possible to clearly define the specific property interest of a person, which should be provided for in the relevant regulatory prescriptions or confirmed in another legal act, in particular in a court decision (see for comparison, mutatis mutandis, the ECtHR's decision on admissibility of 2 July 2002 in the case of Gayduk and Others v. Ukraine (Gayduk and Others v. Ukraine), Applications No. 45526/99 and others).

The right of ownership is inviolable. No one can be unlawfully deprived of this right or restricted in its exercise (part one of Article 321 of the Civil Code of the Russian Federation). Every individual or legal entity has the right to peacefully own their property. No one may be deprived of his property except in the public interest and under the conditions provided for by law and the general principles of international law. (Article 1 of the First Protocol to the Convention for the Protection of Human Rights and Fundamental Freedoms (hereinafter referred to as the Convention)).

In such circumstances, the failure of the plaintiffs to receive the corresponding income was the result of illegal alienation of their property in favor of the defendant, and therefore the defendant should be recovered in favor of the plaintiffs in the amount determined in the expert opinion on the amount of losses incurred by the beneficial owner of 1,426 ordinary registered undocumented shares of JSC Krasnaya Polyana.

As for the currency in which the recovery of damages should take place, the court came to the following conclusions.

Article 99 of the Constitution of Ukraine stipulates that the currency of Ukraine is the hryvnia.

At the same time, the Basic Law does not prohibit the possibility of using foreign currency units in Ukraine.

According to Article 192 of the Civil Code of Ukraine, foreign currency may be used in Ukraine in cases and in accordance with the procedure established by law.

That is, in accordance with the current legislation, the hryvnia has the status of a universal means of payment, which is accepted without restrictions throughout Ukraine, but the turnover of foreign currency is determined by the requirements of the special legislation of Ukraine.

Such cases are provided for in Article193, Part four of Article524 of the Civil Code of Ukraine,the Law of Ukraine "On Foreign Economic Activity",the Law of Ukraine "On Currency and Currency Operations".

Article 524 of the Civil Code of Ukrainestipulates that the obligation must be expressed in the currency unit of Ukraine-the hryvnia. The Parties may determine the monetary equivalent of the liability in a foreign currency.

Article 533 of the Civil Code of Ukrainestipulates that a monetary obligation must be fulfilled in hryvnias.

If the obligation defines a monetary equivalent in a foreign currency, the amount to be paid in hryvnias is determined at the official exchange rate of the relevant currency on the day of payment, unless a different procedure for determining it is established by the contract or by law or other regulatory legal act.

The current legislation does not prohibit the fulfillment of a monetary obligation in the foreign currency in which it is specified in the contract.

From the analysis of the above legal norms, it can be concluded that the hryvnia as the national currency is the only legal tender on the territory of Ukraine. The parties, which can be both residents and non-residents of individuals located on the territory of Ukraine, in the case of concluding civil law agreements that are implemented on the territory of Ukraine, can determine the monetary obligation in a foreign currency equivalent.

However, the plaintiffs have filed this claim for damages in the form of lost profits that they would normally have received in foreign currency (US dollars) to the accounts of Zeeland Development Corp.

The national currency of the Russian Federation is the ruble. Accordingly, all settlements on its territory are made in rubles and recovery of losses from a resident of the Russian Federation would generally be possible in rubles.

However, in accordance with the principle of reasonableness, which is primarily related to fairness and good faith, and in view of the fact that after the full-scale military invasion of Ukraine by the Russian Federation, Ukraine, of which PERSON_1 is a resident, and the United States of America, of which PERSON_2 is a resident, severed any relations with the Russian Federation, including economic ones This indicates that it is inappropriate to recover losses in the aggressor's currency. Therefore, damages in favor of each of the plaintiffs should be collected in the currency that they would have received under normal circumstances, that is, in US dollars.

As for the possibility and procedure for determining the equivalent amount of debt in national currency in a court decision, the Grand Chamber of the Supreme Court, in its decision of 04.07.2018 in case No. 761/12665/14-c, stated that the court's indication

in its decision of two monetary amounts to be recovered from the debtor introduced ambiguity in understanding the essence of the debtor's be enforced. If the court decision on the recovery of funds in foreign currency is indicated, with the determination of the equivalent of such amount in UAH, the recoverer must be transferred the amount specified in the operative part of the court decision in foreign currency, and not its equivalent in UAH.

This position is also consistent with the legal opinion of the Grand Chamber of the Supreme Court of Ukraine, set out in the decision of 23.10.2019 in case No. 723/304/16-C.

In these circumstances, the court concluded that PERSON_1 should be awarded damages in the amount of US $ 4,0643,176. 50 and PERSON_2 should be awarded damages in the amount of US $ 7,722,203,353. 50, without determining the equivalent in national currency.

The Court does not take into account the explanation of PERSON_2, which it sent to the court after the opening of the proceedings on the case, regarding references to the actions of officials of the Russian Federation and other individuals and legal entities regarding their relationships, intimidation of PERSON_2 and his family by causing bodily harm, failure of Sberbank of Russia to fulfill its obligations to finance construction and the construction process according to the plaintiff, the organization of schemes for seizing property and overstating the cost of construction, since they do not relate to the subject of the dispute, and also do not confirm or refute the circumstances of the filed claim.

In the other part, the explanation is identical to the justification given in the statement of claim.

Given that the court concluded that it is necessary to satisfy the claim in full, then in accordance with the provisionsof Article 141 of the Civil Procedure Code of Ukraine, the defendant in favor of PERSON_2 should be charged the court costs incurred by him in the form of payment of a court fee for submitting a claim of a property nature to the court in the amount of 15140 hryvnias each. At the same time, given that the plaintiff PERSON_1 is exempt from paying the court fee, the defendant should also be charged a court fee for submitting a claim of a property nature to the court in the amount of 15140 hryvnias in favor of the state.

On the basis of the above, guided by art. 2,12,13,81,82,89,137,141,258,259,263-265,266,273 Civil Procedure Code of Ukraine, Court

Decided to:

To satisfy the claim of PERSON_1, PERSON_2 against Public Joint Stock Company Sberbank of Russia in full.

Recover from Public Joint Stock Company Sberbank of Russia in favor of PERSON_1 losses in the amount of 40643176 (forty million six hundred and forty-three thousand one hundred and seventy-six) US dollars 50 cents.

Recover from Public Joint Stock Company Sberbank of Russia in favor of PERSON_2 losses in the amount of 772220353 (seven hundred and seventy-two million two hundred and twenty thousand three hundred and fifty-three) US dollars 50 cents.

Collect from Public Joint Stock Company Sberbank of Russia in favor of the state a court fee in the amount of 15,140 (fifteen thousand one hundred and forty) hryvnias.

Collect from Public Joint Stock Company Sberbank of Russia in favor of PERSON_2 a court fee in the amount of 15140 (fifteen thousand one hundred and forty) hryvnias.

The text of the decision can be found at: court.gov.ua.

The court decision comes into force after the deadline for filing an appeal by all participants in the case, if the appeal was not filed.

If an appeal is filed, the decision, if it is not canceled, comes into force after the appeal is returned, the refusal to open or close the appeal proceedings, or the decision of the court of appeal instance based on the results of the appeal review.

The court's decision may be appealed to the Kyiv Court of Appeal through the court of First instance within 30 days from the date of its proclamation.

If only the introductory and operative parts of the court decision were announced at the court session, or in the case of consideration of the case (resolution of the issue) without notification (summoning) of the participants in the case, the specified period is calculated from the date of drawing up the full court decision.

A participant in a case who was not served with a full court decision or ruling on the day of its announcement or drafting has the right to renew the missed time limit for an appeal against the court decision if the appeal is filed within thirty days from the date of delivery of the full court decision.

The term of appeal may be renewed in case of omission for other valid reasons, except for the cases specified in part two of Article 358 of the Civil Procedure Code of Ukraine.

Details of the parties:

Plaintiff-1: PERSON_1, taxpayer registration card number: NUMBER_2, place of residence at: ADDRESS_1 .

Plaintiff-2: PERSON_2, location at: ADDRESS_2 D NEW YORK, NUMBER_3 t.

Respondent: Public Joint Stock Company Sberbank of Russia, OKPO code: 00332537, located at 19 Vavilova str., Moscow, Russian Federation.

Referee: A. N. Kovalenko